Nicole Owens
FEDERAL PUBLIC DEFENDER
FEDERAL DEFENDER SERVICES OF IDAHO
702 W. Idaho, Ste. 1000
Boise, Idaho 83702
Telephone:   (208) 331-5500
Facsimile:   (208) 331-5525

Attorneys for Defendant
YVONNE ST. CYR

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 1:22-cr-185-JDB |
| | ) | |
| Plaintiff, | ) | **Motion to Dismiss Counts One,** |
| | ) | **Two, Three, Four, and Six** |
| vs. | ) | |
| | ) | |
| YVONNE ST. CYR, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## Introduction

Yvonne St. Cyr files this motion to dismiss counts one, two, three, four, and six

of the Indictment, pursuant to Fed. R. Crim. P. 12(b).[1]

---

[1] Ms. St. Cyr understands that many of these issues have already been litigated at the district court level and that many district judges, including this Court, have denied similar motion to dismiss. *See, e.g.*, *United States v. Griffin*, 549 F. Supp. 3d 49 (D.D.C. 2021); *United States v. Sandlin*, 2021 WL 5865006 (D.D.C. Dec. 10, 2021); *United States v. Caldwell*, 2021 WL 6062718 (D.D.C. Dec. 20, 2021); *United States v. Mostofsky*, 2021 WL 6049891 (D.D.C. Dec. 21, 2021); *United States v. Montgomery*, 2021 WL 6134591 (D.D.C. Dec. 28, 2021); *United States v. Nordean*, 2021 WL 6134595 (D.D.C. Dec. 28, 2021); *United States v. McHugh*, 2022 WL 296304 (D.D.C. Feb. 1, 2022); *United States v. Grider*, 2022 WL 392307 (D.D.C. Feb. 9, 2022); *United States*

## Background

On May 25, 2022, Yvonne St. Cyr was indicted for charges alleging that she violated 18 U.S.C. §§ 231(a)(3), 2; 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D); and 40 U.S.C. § 5104(e)(2)(G) (*see* ECF No.37).

The government alleges Ms. St. Cyr illegally entered the Capitol grounds and Capitol building on January 6, 2021 (*see* ECF No. 1, Statement of Facts). The government further alleges that Ms. St. Cyr intentionally went inside the building for the purpose of obstructing the certification of the vote (*id.*).

## Argument

### A. Applicable legal standards

An Indictment must be a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).  It "must provide the defendant sufficient detail to allow him to prepare a defense, to defend against a subsequent prosecution for the same offense, and to ensure that he be prosecuted upon facts presented to the grand jury."  *United States v. Apodaca*, 275 F. Supp. 3d 123, 153 (D.C. Cir. 2017) (citing *Russell v. United States*, 369 U.S. 749

---

*v. Bozell*, 2022 WL 474144 (D.D.C. Feb. 16 2022); *United States v. Robertson*, 2022 WL 969546 (D.D.C. Feb. 25, 2022); *United States v. Andries*, 2022 WL 768684 (D.D.C. Mar. 14, 2022); *United States v. Puma*, 2022 WL 823079 (D.D.C. Mar. 19, 2022); *United States v. Sargent*, 2022 WL 1124817 (D.D.C. Apr. 14, 2022); *United States v. McHugh*, 2022 WL 1302880 (D.D.C. May 2, 2022); *United States v. Bingert*, 2022 WL 1659163 (D.D.C. May 25, 2022); *United States v. Fitzsimmons*, 2022 WL 1698063 (D.D.C. May 26, 2022); *United States v. Williams*, 21-cr-618 (ABJ). The arguments raised below are substantially the same as those raised in *United States v. Sheppard*, Case No. 1:21-cr-203 (JDB), *United States v. Fischer*, 21-cr-234 (CNJ), and *United States v. Nassif*, 21-cr-421 (JDB). They are set forth to preserve the record.

(1962), and *Stirone v. United States*, 361 U.S. 212 (1960)).  A criminal defendant "may raise by pretrial motion any defense, objection, or request that the Court can determine without a trial on the merits."  Fed. R. Crim. P. 12(b)(3).  Rule 12 provides that a defendant may also move to dismiss the Indictment for "failure to state an offense" and "lack of specificity."  Fed. R. Crim. P. 12(b)(3)(B)(iii),(v).

A criminal statute is unconstitutionally vague if it "fails to give ordinary people fair notice of the conduct it punishes, or is so standardless that it invites arbitrary enforcement."  *United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)).  "The touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal."  *United States v. Lanier*, 520 U.S. 259 (1997).  The "void-for-vagueness doctrine" protects against arbitrary or discriminatory law enforcement.  *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (citing *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)).

To determine the legislative intent of a law, courts "always, [ ] begin with the text of the statute."  *Am. Fed'n of Gov't Emps., AFL-CIO, Local 3669 v. Shinseki*, 709 F.3d 29, 33 (D.C. Cir. 2013). "It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain . . . the sole function of the courts is to enforce it according to its terms."  *United States v. Hite*, 769 F.3d 1154, 1160 (D.C. Cir. 2014) (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917) (internal quotes omitted)).  "The search for the meaning of the statute must also include an examination of the statute's context and

history." *Hite*, 769 F.3d at 1160 (citing *Bailey v. United States*, 516 U.S. 137, 144-45 (1995)). Importantly, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266 (1997).

Far from authorizing novel constructions that expand a criminal statute's scope, the law, through the rule of lenity, "requires that the more lenient interpretation prevail." *United States v. R.L.C.*, 503 U.S. 291, 293 (1992). The rule of lenity applies if the terms of the statute are ambiguous.  This rule is rooted in "the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should." *Id*. at 305 (quoting *United States v. Bass*, 404 U.S. 348, 336 (1971)). The Courts have "[r]eserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute." *Id*. (citing *Moskal v. United States*, 498 U.S. 103, 108 (1990)). "Whether a statutory term is unambiguous … does not turn solely on dictionary definitions of its component words. Rather, 'the plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole.  *Yates v. United States*, 574 U.S. 528, 537 (2015) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).

**B. Motions to dismiss counts one and two (civil disorder)**

Counts one and two of the indictment charge Ms. St. Cyr with violations of 18

U.S.C. §§ 231(a)(3) & (2). Count one charges:

> On or about January 6, 2021, at approximately 2:15-2:30 p.m., within
> the District of Columbia, Yvonne St Cyr, committed and attempted to
> commit an act to obstruct, impede, and interfere with a law enforcement
> officer at a barricade on the West Plaza of the United States Capitol,
> who was lawfully engaged in the lawful performance of his/her official
> duties incident to and during the commission of a civil disorder which in
> any way and degree obstructed, delayed, and adversely affected
> commerce and the movement of any article and commodity in commerce
> and the conduct and performance of any federally protected function.

(ECF No. 37 at 1-2). Count two charges this same conduct taking place at

approximately 2:56-3:19 p.m. in connection with a law enforcement officer "in the

Lower West Terrace tunnel" (*id.* at 2).

18 U.S.C. § 231(a)(3), Civil disorders, provides that:

> Whoever commits or attempts to commit *any act to obstruct, impede, or
> interfere with* any fireman or law enforcement officer lawfully engaged
> in the lawful performance of his official duties *incident to and during the
> commission of a civil disorder* which in any way or degree obstructs,
> delays, or adversely affects commerce or the movement of any article or
> commodity in commerce or the conduct or performance of any federally
> protected function shall be fined under this title or imprisoned not more
> than five years or both.

18 U.S.C. § 231(a)(3) (emphasis added).  This subsection of the civil disorder penal

statute is overbroad and unconstitutionally vague because §231(a)(3)'s imprecise and

subjective standards fail to provide fair notice and creates significant risk of arbitrary

enforcement.  Further, several of the statute's terms are so broad and indefinite as to

impose unqualified burdens on a range of protected expression.

### 1.  Section 231(a)(3) is unconstitutionally vague.

"The prohibition of vagueness in criminal statutes 'is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law,' and a statute that flouts it 'violates the first essential of due process.'" *Johnson v. United States*, 576 U.S. 591, 595 (2015) (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)).  As the Supreme Court has explained,

> [i]t is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values.  First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.  Vague laws may trap the innocent by not providing fair warning.  Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.  A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms.

*Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (internal citations and quotations omitted).  As mentioned by the Supreme Court in Grayned, vagueness concerns are most acute when the statute imposes criminal penalties and implicates the First Amendment by chilling exercise of protected expression.  See *Kolender v. Lawson*, 461 U.S. 352, 358-59 n. 8 (1983); *Village of Hoffman Estates v. Flipside*, 455 U.S. 489, 498-99 (1982); see also *Smith v. Goguen*, 415 U.S. 566, 573 (1974) (Where "a statute's literal scope [reaches] expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts.").

Section 231(a)(3) is replete with vague and imprecise terms that fail to provide a person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited.  The following examples are illustrative of §231(a)(3)'s vagueness.

### a.  "Any act to obstruct, impede, or interfere"

By penalizing "any act to obstruct, impede, or interfere," §231(a)(3) reaches the outer limits of verbal and expressive conduct without drawing any distinction that could exclude acts undertaken merely to convey a message or symbolic content.  See *Roy v. City of Monroe*, 950 F.3d 245, 252 (5th Cir. 2020) (acknowledging that "[s]tanding alone . . . a prohibition on 'any act [undertaken] in such a manner as to disturb or alarm the public' fails meaningfully to guide the police and thus poses a substantial risk of arbitrary or discriminatory enforcement.") (quoting *Louisiana v. Cox*, 379 U.S. 536, 551-52 (1965)).  The phrase "any act to obstruct, impede, or interfere" can fairly include within its plain meaning such diverse acts as pure speech, expressive conduct, minimal jostling, or even grievous, violent assaults.

### b.  "Incident to and during the commission of a civil disorder"

The phrasing "incident to and during the commission of a civil disorder" is also problematic for its vagueness.  The term "civil disorder," as defined under §232(1), is extremely far-reaching, applying to "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of . . . injury to the property."  18 U.S.C. § 232(1).  This definition of "civil disorder" offers no limitation to solve the vagueness problem because it could apply to virtually any tumultuous public gathering to which police might be called, not just large-scale protests or riots.  Further, there is no indication within the statute whether the

defendant is required to have participated in the civil disorder, or if it is sufficient that he or she be in the general vicinity of the event.

### c.  No scienter

The Supreme Court has repeatedly affirmed that "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Vill. of Hoffman Ests.* at 499.  But here, there is no such mitigation, because Section 231(a)(3) contains no scienter requirement, thus creating 'a trap for those who act in good faith.'" *Colautti v. Franklin*, 439 U.S. 379, 395 (1979) (quoting *United States v. Ragen*, 314 U.S. 513, 524 (1942)).  Because the statute omits an express mens rea requirement, it is left to police, prosecutors, and judges to decide whether the statute requires knowledge or specific intent or neither.  The absence of a scienter/mens rea element weighs in further favor of the statute's unconstitutionality.

By enacting a statute with such imprecise language, Congress created "a criminal prohibition of alarming breadth." *United States v. Stevens*, 559 U.S. 460, 474 (2010).  "Vague statutes threaten to hand responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges, eroding the people's ability to oversee the creation of the laws they are expected to abide." *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019).  Section 231(a)(3)'s scope "may entirely depend" on a law enforcement official's unbounded speculation about subjective factors, *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971), thus subjecting "individuals to the risk of arbitrary or discriminatory prosecution and conviction." *United States v. Kozminski*,

487 U.S. 931, 949-50 (1988) (holding statute unconstitutionally vague where liability "depend[ed] entirely upon the victim's state of mind").

In *Houston v. Hill*, 482 U.S. 451 (1987), the Supreme Court declared unconstitutional a municipal ordinance that made it unlawful to interrupt a police officer in the performance of his or her duties, finding that the ordinance's sweeping nature was neither "inevitable" nor "essential to maintain public order." 482 U.S. at 464. Because the ordinance was "not narrowly tailored to prohibit only disorderly conduct or fighting words," it wrongly gave police "unfettered discretion to arrest individuals for words or conduct that annoy or offend them." *Id.* at 465. Similarly, here, §231(a)(3) casts far too wide a net. By expansively encompassing "any act" that could interfere with the duties of a police officer or firefighter during a civil disorder, §231(a)(3) is not limited to "violent acts" or acts that result in bodily injury or that otherwise put persons or property in imminent danger. *C.f. United States v. Reese*, 92 U.S. (2 Otto) 214, 221 (1876) ("It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large."). Moreover, the statute does not weed out those acts with protected expressive content or those that occur in a traditional public forum. Instead, as shall be developed further, infra, §231(a)(3) reaches a substantial amount of expressive conduct, and without clear boundaries, the law chills free speech and invites discriminatory application by law enforcement and the government.

## 2. Section 231(a)(3) impermissibly criminalizes protected speech under the First Amendment.

"In the First Amendment context, . . . a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008)).  The First Amendment protects expressive conduct like cross-burning, flag-burning and assembly in inconvenient places.[2]  Conduct is considered expressive, and therefore protected, under the First Amendment when it "is intended to convey a 'particularized message' and the likelihood is great that the message would be so understood."  *Knox v. Brnovich*, 907 F.3d 1167, 1181 (9th Cir. 2018) (quoting *Nunez v. Davis*, 169 F.3d 1222, 1226 (9th Cir. 1999)).

The plain language of §231(a)(3) is at odds with the protections of the First Amendment. Indeed, the broadness of §231(a)(3)'s scope would presumably authorize a felony conviction for a bystander who yells at police to desist from an arrest, one who flips off officers to distract or encourage resistance, or one who records police activity with a cell phone.  *See Hill*, 482 U.S. at 459 ("[W]e have repeatedly invalidated laws that provide the police with unfettered discretion to arrest individuals for words or conduct that annoy or offend them."); *Glick v. Cunniffe*, 655

---

[2] *See Virginia v. Black*, 538 U.S. 343, 365-66 (2003) ("[S]ometimes the cross burning is a statement of ideology, a symbol of group solidarity"); *Texas v. Johnson*, 491 U.S. 397, 405-06 (1989) (flag burning constituted "expressive conduct" protected by the First Amendment); *Clark v. Cmty. For Creative Non-Violence*, 468 U.S. 288, 293 (1984) (assuming that "sleeping in connection with the demonstration is expressive conduct protected to some extent by the First Amendment.").

F.3d 78, 83 (1st Cir. 2011) ("[T]he First Amendment protects the filming of government officials in public places."). The First Amendment does not permit an unqualified prohibition on "interference" with police duties because "the freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Hill*, 482 U.S. at 462-462; *see also McCoy v. City of Columbia*, 929 F. Supp. 2d 541, 550 (D.S.C. 2013) (invalidating a state statute for overbreadth that made it "unlawful for any person to interfere with or molest a police officer in the lawful discharge of his duties.").

Such broad criminal statutes like §231(a)(3) "must be scrutinized with particular care." *Hill*, 482 U.S. at 459; *see also Winters v. New York*, 333 U.S. 507, 515 (1948) ("The standards of certainty in statutes punishing for offenses is higher than in those depending primarily upon civil sanction for enforcement."). Criminal laws that "make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application." Id. Section 231(a)(3) extends to a substantial amount of constitutionally protected speech and expressive conduct, well in excess of the law's legitimate sweep.

### 3. Section 231(a)(3) cannot be saved by construction without violating the constitutional separation of powers.

Judicial interpretation cannot save §231(a)(3) from its constitutional invalidity. A statute's vagueness does not permit judges to "rewrite a law to confirm it to constitutional requirements, for doing so would constitute a serious invasion of the legislative domain, and sharply diminish Congress's incentive to draft a narrowly

tailored law in the first place." *Stevens*, 559 U.S. at 481. Rather, "[w]hen Congress passes a vague law, the role of the courts under our Constitution is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite Congress to try again." *Davis*, 139 S. Ct. at 2323.

For all of the foregoing reasons, counts one and two of the Indictment must be dismissed.

## C. Motion to dismiss counts three and four (restricted building & grounds)

Count three of the Indictment charges Ms. St. Cyr with a violation of 18 U.S.C. § 1752(a)(1) as follows:

> On or about January 6, 2021, within the District of Columbia, Yvonne St Cyr, did knowingly enter and remain in a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President was and would be temporarily visiting, without lawful authority to do so.

(ECF No. 37 at 2).

Count four of the Indictment charges Ms. St. Cyr with a violation of 18 U.S.C. § 1752(a)(2) as follows:

> On or about January 6, 2021, within the District of Columbia, Yvonne St. Cyr, did knowingly, and with intent to impede and disrupt the orderly conduct of Government business and official functions, engage in disorderly and disruptive conduct in and within such proximity to, a restricted building and grounds, that is, any posted, cordoned-off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President was and would be temporarily visiting, when and so that such conduct did in fact impede and disrupt the orderly conduct of Government business and official functions.

(ECF No. 37 at 2-3).

Both of these charges concern certain conduct related to statutorily "restricted building or grounds."  18 U.S.C. § 1752(c) provides the following definition:

> (1) the term "restricted building or grounds" means any posted, cordoned off, or otherwise restricted area –
>
>> (A) of the White House or its grounds, or the Vice President's official residence or grounds;
>>
>> **(B) of a building or grounds where the President or other person protected by the Secret Service is or will temporarily be visiting;** or
>>
>> (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance.

18 U.S.C. § 1782(c)(1)(A)-(C) (emphasis added); *see* Opinion at 12, *United States v. Samira Jabr*, 18-cr-105, ECF No. 31 (May 16, 2019), *aff'd*, 4 F.4th 97 (D.C. Cir. 2021).

The United State Capitol and its grounds are not specifically included in the definition set forth above.  Rather, the government alleges that the Capitol was a "restricted building and grounds" on January 6th because it was a "building or grounds where the President or other person protected by the Secret Service is or will temporarily be visiting." 18 U.S.C. § 1752(c)(1)(B).  The "other person," as set forth in the Indictment, was then-Vice President Michael Pence. Accordingly, Ms. St. Cyr did not violate §1752 unless then-Vice President Pence was 1) "visiting" or "temporarily visiting" the specific area that Ms. St. Cyr traversed; and 2) the Secret Service designated that area as a restricted zone.  The government cannot establish either element for the reasons that follow.

## 1. Vice President Pence was not "temporarily visiting" the Capitol.

Then-Vice President Pence was not "temporarily visiting" the Capitol on January 6, 2021.  The Capitol is a federal government building in the District of

Columbia.  Vice President Pence lived and worked in D.C. at his official residence, and actually worked at the Capitol Building and grounds – it was his place of employment.  Vice President Pence had a permanent office "within the United States Capitol and its grounds," in his capacity as President of the Senate.  On January 6th, Vice President Pence was working -- he was presiding in the Senate chamber to count the electoral votes.  *See* U.S.C. § 15 ("Congress shall be in session on the sixth day of January succeeding every meeting of the electors.  The Senate and House of Representatives shall meet in the hall of the House of Representatives at the hour of 1 o'clock in the afternoon on that day, and the President of the Senate shall be their presiding officer.") (emphasis added).

Past cases support this plain, common-sense reading of the statute, as they involve conduct in or near areas where the President and Vice President were clearly "temporarily visiting."  *See United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005) (defendant entered and remained in a restricted area at an airport in South Carolina where the President was visiting for a political rally); *United State v. Junot*, 902 F.2d 1580 (9th Cir. 1990) (defendant pushed his way through a restricted area where then-Vice President George Bush was speaking at a rally at a park in Los Angeles that was secured by Secret Service agents); *Blair v. City of Evansville, Ind.*, 361 F. Supp. 2d. 846 (S.D. Ind. 2005) (defendant charged with 18 U.S.C. § 1752 at protest during then-Vice President Richard Cheney's visit to the Centre in Evansville, Indiana).  These cases all involve the President and Vice President traveling outside of the District of Columbia and "visiting" that area for a "temporary" purpose, consistent

with the plain meaning of §1752(c)(1)(B).  Vice President Pence was not traveling to a speaking event or political rally on January 6th – rather he was performing a duty of his office in a building where he had a permanent office.  Based on the plain language of 18 U.S.C. § 1752, he was not "temporarily visiting" the Capitol building and §1752 does not apply as charged.

## 2. The Secret Service did not "restrict" the Capitol or its grounds on January 6, 2021.

The legislative history of 18 U.S.C. § 1752 and the statutory authorization of 18 U.S.C. § 30569 make it clear that only the United States Secret Service ("Secret Service") can restrict areas for temporary visits by the President or Vice President. A particular place does not become restricted just because the Vice President enters it; rather, the Secret Service, the agency in charge of protecting the Vice President, must create the temporary restricted zone to facilitate its duty to protect.  Indeed, the Government has specifically argued that it is the "Secret Service" that "exercise[s] its discretion to determine the scope of the restricted area necessary to protect" a designated person.  *United States v. Jabr*, Cr. No. 18-105 (PLF), ECF No 26 at 9.

Context and legislative history confirm that only the Secret Service may restrict areas in the manner contemplated by § 1752. When this statute was enacted, it is clear that the purpose was to designate the Secret Service to restrict areas for temporary visits by the President.  *See* S. Rep. No. 91-1252 (1970).  At the time of enactment, the Secret Service was part of the Treasury.  Section 1752 grants the Treasury Secretary the authority to "designate by regulations the buildings and grounds which constitute the temporary residences of the President."  18 U.S.C.

§1752(d)(1).  It also allows the Secretary to "to prescribe regulations governing ingress or egress to such buildings and grounds to be posted, cordoned off, or otherwise restricted areas where the President may be visiting." §1752(d)(2).  There is nothing in the legislative history (or the statutory language) to suggest that anyone other than the Secret Service has the authority to so restrict the areas surrounding the Capitol building.

The Indictment charges Ms. St. Cyr with remaining or entering into a "restricted building or grounds," but it does not allege that the Secret Service designated that area as restricted. Nor could it do so now because in *United States v. Griffen*, the government conceded that it was the United States Capitol Police, not the Secret Service, that attempted to designated the area as restricted that day. 21-cr-92 (TNM), ECF No. 33. The court in *Griffen* (as well as other district courts, including this Court in *Sheppard*[3]) denied a motion to dismiss a § 1752 charge on the ground that the statute did not specifically state who must designate the "restricted areas." *Id.* at ECF No. 41. But the plain language of 18 U.S.C. §1752(c)(B), defines "restricted building or grounds" as a "building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting."  Since it is the Secret Service who protects the President or "other person," it is the Secret

_____

[3] *See United States v. Sheppard,* Case No. 21-cr-203, ECF No. 63 at 8-9.

Service who must designate the area "restricted." The legislative history bolsters this interpretation.[4]

Because the government does not allege that any of the barriers that Ms. St. Cyr allegedly crossed were specifically erected for the Vice-President's visit at the direction of the Secret Service, and because, on January 6, 2021, the restrictions placed on the Capitol were created by the Capitol Police, not the Secret Service, it follows that a necessary factual predicate to a 18 U.S.C. § 1752 offense is lacking, and counts three and four must be dismissed for failure to state a claim.

### D. Motion to dismiss count six (parading)

Count six of the Indictment charges Ms. St. Cyr with a violation of 40 U.S.C. § 5104(e)(2)(G) as follows:

> On or about January 6, 2021, within the District of Columbia, Yvonne St. Cyr willfully and knowingly paraded, demonstrated, and picketed in any United States Capitol Building.

(ECF No. 37 at 4).

Section 5104(e)(2)(G) unconstitutionally vague and overbroad; the Court should thus dismiss count six of the Indictment.

---

[4] Congress enacted 18 U.S.C. §1752 as part of the Omnibus Crime Control Act of 1970. Public Law 91-644, Title V, Sec. 18, 84 Stat. 1891-92 (Jan 2. 1971). At that time, the USSS was a part of the Treasury Department. The Senate Judiciary Committee report accompanying the current version of § 1752 noted that there was no federal statute that specifically authorized the Secret Service to restrict areas where the President maintains temporary residences and the senators explained that the key purpose of the bill was to provide that authority to the Secret Service. S. Rep. No. 91-1252 (1970).

**1. Section 5104(e)(2)(G) is unconstitutionally vague on its face.[5]**

Section 5104(e)(2)(G) does not put ordinary people on notice of the conduct that it prohibits and as such creates arbitrary and discriminatory enforcement. The vagueness doctrine "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357–58, (1983). "Where a statute's literal scope, unaided by a narrowing [ ] [ ] interpretation, is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974). Thus, in the First Amendment context, a vagueness challenge can be brought even where a defendant may have been on notice that his particular conduct fell within the bounds of the statute. *See Thornhill v. State of Alabama*, 310 U.S. 88, 97-98 (1940).

Ultimately, "any regulation that allows a police officer the unfettered discretion to restrict behavior merely because it 'conveys a message' or because it has a 'propensity to attract a crowd of onlookers' cannot survive a due process challenge." *Bynum*, 93 F. Supp. 2d at 58. Although the Bynum court placed the blame on the regulation, holding that the statute itself was constitutional, the current Capitol Police regulation is even less specific than the one in Bynum. That highlights how

---

[5] Ms. St. Cyr does not waive any as-applied challenges but recognizes they are premature right now. *See United States v. Andries*, 2022 WL 768684, at *1 (D.D.C. Mar. 14, 2022).

subjective the statutory language is. Evidently, guidance from a federal district court was not enough to narrow the ordinary meaning of the words in the eyes of those charged with enforcing them. It is easy to see why; "demonstrating" is an ambiguous word.

Merriam-Webster defines "demonstration" as, among other things, "an outward expression or display" or "a public display of group feelings toward a person or cause." Even using the narrower definition for the sake of argument, it remains unworkably vague for a criminal statute. Indeed, a child on a field trip remarking "We love our Capitol Police" while on a group tour of the building, or a staffer cheerfully singing "Battle Hymn of the Republic" in the atrium while walking to the office would both appear to be "demonstrating in the Capitol Building" under the dictionary definition.

It is unlikely that children on field trips or singing staffers will be arrested for parading, picketing, or demonstrating. However, "[t]he danger, of course, is that such a broadly-worded ban . . . would be selectively employed to silence those who expressed unpopular ideas regardless of whether the speaker created an obstruction or some other disturbance." *Lederman v. United States*, 89 F. Supp. 2d 29, 42 (D.D.C. 2000), on reconsideration in part, 131 F. Supp. 2d 46 (D.D.C. 2001).

The legislative history shows that discriminatory and arbitrary enforcement was anticipated and even intended by some lawmakers. The statutory scheme dealing with conduct in the Capitol Building was revised following a case where Howard University students sat on the floor in response to the Speaker's refusal to commit to

taking action on their petition. *Smith v. D.C.*, 387 F.2d 233, 236 (D.C. Cir. 1967). While the D.C. Circuit Court did not address the constitutionality of the federal statute (the government had not invoked it), it did advise the legislature to clarify that area of the law generally: "in view of the confusion apparent in the enforcement of these and related statutes, we commend to executive and legislative authorities a review of this entire area of the law." *Id.* at 237.

In response, Congress acknowledged the confusion-in-enforcement concern and "revise[d] the statutes relating to improper conduct in the Capitol Buildings"; House Report 90-745 noted that recent federal appeals "decisions highlight[ed] the confusion surrounding the existing laws, their implementation and their administration." 1967 U.S.C.C.A.N. 1739, 1741. Representative Jerome Waldie expressed his minority view of the law as follows:

> I suggested that the qualifying phrase used in a portion of the misdemeanor section of the act, 'with intent to disrupt the orderly conduct of official business' should have been applied to all conduct sought to be controlled. The committee did not approve of this limitation. Without such a limitation, in my view, not only does the act become of questionable constitutionality, but it becomes an instrument capable of ensnaring innocent and well-meaning visitors within its provisions.

*Id.* at 1747.

The Congressional Record provides additional insight. Representative Colmer described some additional reason for the amendment, stating that "to be perfectly frank about this bill, it is brought about because of 'the fact that there is another one of the numerous marches upon Washington anticipated here within the next few days." Congressional Record at 29388. Representative Colmer also cited the peaceful actions— sitting outside of a committee room— of the Freedom Democratic Party of

Mississippi, which he described as "an extreme leftist group." Id. He followed up that statement by contending that the bill at issue would protect the Capitol from "these misguided people who are bent on obstructing if not, in fact, destroying this, the world's most democratic form of government." Id. Representative Ryan noted that law seemed "defective on First Amendment grounds" and "vaguely drafted." Congressional Record at 29394.

Whatever the precise contours of the offense are, the plain statutory language "forbid[s] all demonstrative assemblages of any size, no matter how peaceful their purpose or orderly their conduct. A statute of that character is void on its face on both First and Fifth Amendment grounds." *Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 587 (D.D.C.), aff'd, 409 U.S. 972 (1972). Here, with no clarity or specificity as to what is meant by parading, picketing, or demonstrating, the statute fails to put ordinary people on notice of what is prohibited and encourages arbitrary and discriminatory enforcement. *Cf. Thornhill v. State of Alabama*, 310 U.S. 88, 100– 01 (1940) ("The vague contours of the term 'picket' are nowhere delineated."). Accordingly, section 5104(e)(2)(G) is unconstitutionally vague on its face.

## 2. Section 5104(e)(2)(G) is substantially overbroad.

In addition to being vague, § 5104(e)(2)(G) is also substantially overbroad. Section 5104(e)(2)(G) flatly prohibits all parading, demonstrating, and picketing in a Capitol Building. In the First Amendment context, "a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in

relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449, n. 6 (2008)). In conducting an overbreadth analysis, a court must first construe the statute. *United States v. Williams*, 553 U.S. 285, 293 (2008). The next step is to ask whether the statute, properly construed, "criminalizes a substantial amount of protected expressive activity." *Id.* at 297; *United States v. Montgomery*, No. CR 21-46 (RDM), 2021 WL 6134591, at *23 (D.D.C. Dec. 28, 2021).

The plain language itself is strikingly broad, covering enormous swaths of protected First Amendment activity. The subsection does not limit itself to disruptive speech, protests, gatherings, or even audible oral expressions of ideas. The history of the law further shows the breadth of its prohibitions and makes clear that Ms. St. Cyr's contentions are well-founded ones.

During a statutory revision in 1967, Representative O'Neal stated, "I am a little bit disturbed about the language . . . wherein the proposed legislation, if adopted, would make it a violation to parade, demonstrate, or picket within any of the Capitol buildings." Congressional Record-House (October 19, 1967) at 29389, available at https://www.govinfo.gov/content/pkg/GPO-CRECB-1967-pt22/pdf/GPO-CRECB-1967-pt22-2-1.pdf (last accessed January 8, 2023) (hereinafter "Congressional Record"). Representative Bingham expressed concerns about overbreadth:

> I am deeply concerned about the broad scope, vague language, and possible interference with first amendment rights of the bill before us today. It was so hastily conceived and reported out of committee that no official views of the Justice Department or the District government were

> available. Moreover, there seems to be no disposition on the part of the
> bill's supporters to accept clarifying amendments.

Congressional Record at 29394. He also commented on the overly broad law's

potential impact on peaceful, quiet visitors, describing the law as "a case of using a

shotgun to eliminate a gnat." Congressional Record at 29395.

The past enforcement policy likewise shows the overbreadth of the language.

*Cf. Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) ("In

evaluating respondent's facial challenge, we must consider the county's authoritative

constructions of the ordinance, including its own implementation and interpretation

of it."). One Capitol Police regulation interpreting a previous codification of the

instant statute was held unconstitutional in a case where a pastor was prohibited

from quietly praying—under imminent threat of arrest—in the Capitol building.

*Bynum v. U.S. Capitol Police Bd.*, 93 F. Supp. 2d 50, 53 (D.D.C. 2000). The Capitol

Police regulation explained that demonstration activity included:

> parading, picketing, speechmaking, holding vigils, sit-ins, or other
> expressive conduct that convey[s] a message supporting or opposing a
> point of view or has the intent, effect or propensity to attract a crowd of
> onlookers, but does not include merely wearing Tee shirts, buttons or
> other similar articles of apparel that convey a message.

*Id*. (quoting Traffic Regulations for the Capitol Grounds § 158). The pastor challenged

that regulation, arguing it was unconstitutional, and he succeeded on his motion for

summary judgment.

The Bynum court reasoned that, while the regulation was justified to an extent

to serve the statutory purpose of preventing disruptive conduct in the Capitol

Building, "it sweeps too broadly by inviting the Capitol Police to restrict behavior that

is in no way disruptive, such as 'speechmaking ... or other expressive conduct ....'"

*Bynum*, 93 F. Supp. 2d at 57 (quoting Traffic Regulations for the Capitol Grounds §

158). The court held that the regulation violated due process, stating that:

> It does not provide either permissible or sufficient guidance under the statute it purports to implement to survive a constitutional challenge. In fact, the definition of "demonstration" in the regulation— encompassing all expressive conduct, whether disruptive or not— appears to expand the restrictive powers given by statute to the Capitol Police rather than limit or guide them. This definitional "guidepost" thus has the potential to squelch nearly any type of expressive conduct, whether or not it is actually a demonstration, and may sweep within its scope expression that is protected by the First Amendment. The regulation therefore is both unconstitutionally overbroad and unconstitutionally vague.

*Bynum*, 93 F. Supp. 2d at 58. The court focused on the regulation rather than

the statute itself, operating under the premise that the statute was limited to

disruptive conduct. *Id*. at 57-58.

The premise that the statute is limited to disruptive conduct, however, was

and remains demonstrably false. The text does not include such a limitation, and the

legislative history shows that Congress did not intend to include one. At the time of

the 1967 revision, Representative Edwards expressed that he believed the "parading,

picketing, or demonstrating" language violated the First Amendment because it was

not limited to disorderly or disruptive conduct. Congressional Record at 29392.

Representative Cramer stated that to add "with intent to disrupt the orderly conduct

of official business" would "gut[ ] the section," eliminating any doubt as to whether

the failure to include limiting language was inadvertent. *Id*. at 29394.

Perhaps unsurprisingly, the statute continues to give rise to interpretations just like the regulation at issue in *Bynum*. The United States Capitol Police Guidelines now offer the following interpretation:

> Demonstration activity is defined as any protest, rally, march, vigil, gathering, assembly or similar conduct engaged in for the purpose of expressing political, social, religious or other similar ideas, views or concerns protected by the First Amendment of the United States Constitution.[6]

Ironically, the current policy is even broader than the unconstitutional regulation: the former does not contain even the meager limitations that the latter did. It reads like a too-easy bar exam essay prompt with an astonishing lack of self-awareness, directly defining demonstration to include virtually all protected First Amendment activity. In *Lederman v. United States*, a district court explained the problem with a similarly broad regulation:

> For instance, assuming that the ban was applied literally and even-handedly, a group of congressional staffers or members of the general public who stood outside the Capitol arguing about the latest campaign finance bill, health care initiative, or welfare reform would presumably be risking citation or arrest for engaging in "expressive conduct that conveys a message supporting or opposing a point of view."

89 F. Supp. 2d 29, 41 (D.D.C. 2000), on reconsideration in part, 131 F. Supp. 2d 46 (D.D.C. 2001). The same is true here. Law enforcement policy indicates that the prohibition applies to nearly all First Amendment activity, and neither the plain

---

[6] United States Capitol Police Guidelines for Conducting an Event on United States Capitol Grounds, available at https://www.uscp.gov/sites/uscapitolpolice.house.gov/files/wysiwyg_uploaded/Guidelines%20For%20Conducting%20an%20Event%20on%20United%20States%20Capitol%20Grounds_December%202019.pdf (last accessed January 8, 2023).

language nor legislative history supports a contrary interpretation. The extraordinary breadth of the language is a feature, not a bug that can be finessed away with the right policy, regulation, or court opinion. Section 5104(e)(2)(G) is unconstitutionally overbroad.

## Conclusion

For the reasons above, the Court should dismiss counts one, two, three, four, and six.

Dated: January 9, 2023                NICOLE OWENS
                                      FEDERAL PUBLIC DEFENDER
                                      By:


                                      /s/ Miles Pope
                                      Miles Pope
                                      /s/ Nicole Owens
                                      Nicole Owens
                                      Federal Defender Services of Idaho
                                      Attorneys for Defendant
                                      YVONNE ST. CYR

CERTIFICATE OF SERVICE

I CERTIFY that I am an employee of the Federal Defender Services of Idaho, and that a copy of the foregoing document was served the government via CM/ECF filing on January 9, 2023.


Dated: January 9, 2023                /s/ Joy Fish
                                      Joy Fish