```
 1                    IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA (WASHINGTON, DC)
 2


 3


 4       UNITED STATES OF AMERICA,  *
                    Plaintiff,      *   22-cr-185
 5                                  *   March 9, 2023
         vs.                        *   Washington, D.C.
 6                                  *   9:31 a.m.
         YVONNE ST. CYR,            *
 7             Defendant.           *
         ***************************

 8

 9                       TRANSCRIPT OF JURY TRIAL
                                VOLUME IV
10                  BEFORE THE HONORABLE JOHN D. BATES
                    SENIOR UNITED STATES DISTRICT JUDGE
11

12       FOR THE UNITED STATES:

13       MS. JACQUELINE N. SCHESNOL, ESQ.
         DOJ-USAO
14       United States Attorney's Office
         40 North Central Avenue, Suite 1800
15       Phoenix, AZ 85004-4449
         602-514-7689
16
         MR. ERIC BOYLAN, ESQ.
17       DOJ-USAO
         U.S. Attorney's Office, D.C.
18       601 D Street NW
         Washington, DC 20001
19       202-252-7215

20

21       FOR THE DEFENDANT:

22       MS. HEIDI JOHNSON, ESQ.
         Federal Defenders of Idaho
23       702 West Idaho Street
         Boise, ID 83702
24       208-331-5500

25
```

*CHERYL K. POWELL, CCR, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3003/cheryl_powell@alsd.uscourts.gov

1        MS. NICOLE OWENS, ESQ.
         Federal Defender Services of Idaho
2        702 West Idaho Street
         Suite 1000
3        Boise, ID 83702
         208-331-5500

4

5        COURTROOM DEPUTY: MR. TIM BRADLEY

6

7        COURT REPORTER: CHERYL K. POWELL, CCR, RPR, FCRR

     Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
8   pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies and
     Procedures Vol. VI, Chapter III, D.2.  Transcript produced by
9                    computerized stenotype.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2          **EXAMINATION**                          **PAGE**

3   **MICHAEL DOWLING**

4   DIRECT EXAMINATION (CONTINUED)                 668
    BY MS. SCHESNOL
5   CROSS-EXAMINATION BY MS. JOHNSON              675
    REDIRECT EXAMINATION BY MS. SCHESNOL         676

6   **MATTHEW GANO**

7
    DIRECT EXAMINATION BY MR. BOYLAN             676
8   CROSS-EXAMINATION BY MS. JOHNSON             746
    REDIRECT EXAMINATION BY MR. BOYLAN           771

9   **YVONNE ST. CYR**

10
    DIRECT EXAMINATION BY MS. OWENS              805
11  CROSS-EXAMINATION BY MS. SCHESNOL            860

12         **EXHIBITS RECEIVED IN EVIDENCE**         **PAGE**

13  Government's Exhibit 703                      670
    Government's Exhibit 703.10                   673
14  Government's Exhibit 905                      674
    Government's Exhibit 501                      683
15  Government's Exhibits 502-504                 683
    Government's Exhibit 908                      702
16  Government's Exhibit 701.3                    705
    Government's Exhibit 705.1                    710
17  Government's Exhibit 903.2                    714
    Government's Exhibit 907                      715
18  Government's Exhibit 906.1                    720
    Government's Exhibit 618                      735
19  Government's Exhibit 806                      740
    Government's Exhibit 807                      741
20  Government's Exhibit 808                      744
    Government's Exhibit 619                      745
21  Defendant's Exhibits 9-11                     760
    Government's Exhibit 609.2                    766
22  Defendant's Exhibit 17                        767
    Defendant's Exhibit 12                        817
23  Defendant's Exhibit 8 Excerpt                 831

24

25

**P R O C E E D I N G S**

(In open court.  Defendant present.  Jury not present.)

COURTROOM DEPUTY:  Your Honor, we have Criminal Action 22-185, United States of America versus Yvonne St. Cyr.  All counsel are present.

THE COURT:  Good morning.  Couple of things before we bring the jury in.

First, I thank the defense for the exhibit list, which is a revised exhibit list, I take it.

MS. OWENS:  Yes, Your Honor.

THE COURT:  And since defense hasn't started using exhibits, I appreciate the revised list.

Is there going to be any objection by the government to any of these exhibits that we need to discuss beforehand?

MS. SCHESNOL:  Your Honor, I don't anticipate objections based on any kind of late filing.  There might be a relevance objection.

THE COURT:  No.  No.  No late filing issues.  I understand that.  There might be a relevancy objection?

MS. SCHESNOL:  Yes.

THE COURT:  For example, to some of the first exhibits?  The Trump tweets?  What are we talking about?  Just so I'm thinking about it.

MS. SCHESNOL:  Well, Your Honor, regarding the Trump tweets and the Trump speech, it's our position that that seems

                    1    to be leaning into the public authority defense that we --

                    2          THE COURT:  I've allowed in other case,

                    3    notwithstanding my ruling on public authority defense -- same

                    4    ruling I've made here -- I've allowed clips of the Trump

09:33:09      5    speech.

                    6          MS. SCHESNOL:  Okay.  Frankly --

                    7          THE COURT:  There are some things that were said that

                    8    I feel are relevant to the case even without the public

                    9    authority defense being permitted.

09:33:21    10          MS. SCHESNOL:  Then with regard to exhibits --

                 11          THE COURT:  But I haven't dealt with Trump tweets, so

                 12    I don't know what the Trump tweets are.

                 13          MS. SCHESNOL:  Fair enough.  Fair enough.  Exhibit 9,

                 14    10, and 11, the various -- there is a register of public

09:33:38    15    authority certification and then mayor's orders from March 2020

                 16    and January 6, 2021.

                 17          Frankly, I don't understand the purpose of them.  That

                 18    doesn't mean there isn't one.  Once foundation is laid, I may

                 19    not have an objection.

09:33:53    20          THE COURT:  We will cross that bridge when we come to

                 21    it.

                 22          MS. SCHESNOL:  Number 12, the documentary for Fed Up.

                 23    That's a documentary about sugar in our food.  Again, there

                 24    might be something relevant to it.  At the moment, I can't

09:34:06    25    figure out what that might be.

```
 1              THE COURT:  We will cross that bridge when we come to

 2       it as well.

 3              MS. SCHESNOL:  And then the photos -- I mean, it's --

 4       I believe those are the defendant here in DC.  I don't

 5       anticipate an objection to those.

 6              THE COURT:  If there aren't, we don't have to go

 7       through them at length.

 8              MS. SCHESNOL:  Yes.  I don't anticipate objections to

 9       any of these but again reserve the right that I don't

10       understand yet if they're relevant.

11              THE COURT:  I'm not precluding them.  Just wanted to

12       know if there was anything that I should be thinking about in

13       advance.

14              With respect to the government's exhibit list, I

15       appreciate the fact that you've got a revised list.  It's not

16       of much use to me.  If you're not aware of it, I keep track of

17       the exhibits, and I've done that on your exhibit list.  I

18       cannot transform all those markings to this new list.  So

19       it's -- you know, you can point something out you want me to do

20       to revise the exhibit list I'm working off of.  But your new

21       exhibit list is of no utility for me.

22              MS. SCHESNOL:  So, Your Honor, it is three exhibits.

23       They are the last three in the 1,000 series.  So yes;

24       literally, the last page has the only changes.

25              THE COURT:  All right.  I appreciate that.  Then
```

1    lastly for the defense, you filed a set of jury instructions at

2    7:00 o'clock this morning, knowing that I was providing to you

3    my draft of the final jury instructions this morning.

4         MS. OWENS:  Your Honor --

09:35:34  5         THE COURT:  I have not looked at your revised jury

6    instructions.  I don't know if there are any revisions from

7    what you filed earlier.

8         MS. OWENS:  No.  We can withdraw that, Your Honor.

9    I've reviewed the Court's draft, and we're fine with --

09:35:47 10        THE COURT:  All right.  I just was going to say that I

11   can't look at it after I've filed something and, without any

12   indication of what, if any, changes there are, track those

13   changes.  That's up to you.

14        MS. OWENS:  Absolutely.  And we can talk about that at

09:36:02 15   the jury instruction conference.  But there are no substantive

16   things that need to be reviewed.  Thank you.

17        THE COURT:  Let's bring the jury in.  Let's get going.

18   And we can deal with jury instructions perhaps during a little

19   bit of the lunch break.

09:36:26 20        COURTROOM DEPUTY:  Your Honor, jury panel.

21        (Jury present.)

22        THE COURT:  Good morning, members of the jury.  I hope

23   you had a pleasant evening.  Thank you for your promptness once

24   again in being here so that we can start.

09:36:59 25        And we will bring our witness up to the witness stand.

1        Good morning, Detective Dowling.

2                THE WITNESS:  Hello.  How are you?

3                THE COURT:  I'm just fine, thank you.  And hope you

4        are as well.  I remind you you're still under oath.  And please

09:37:15  5        have a seat.

6                THE WITNESS:  All right.

7                THE COURT:  Ms. Schesnol.

8                MS. SCHESNOL:  Thank you, Your Honor.

9                   **DIRECT EXAMINATION (CONTINUED)**

09:37:18 10  **BY MS. SCHESNOL:**

11  **Q**   Good morning, Detective Dowling.

12  **A**   Hello.  How are you?

13  **Q**   Good.  Thanks.

14          I believe when we left off last night, you were in the

09:37:28 15  tunnel.

16          Do you recall your testimony up until that point?

17  **A**   Yes.

18  **Q**   Do you recall being in the tunnel area of the Capitol

19  building on January 6, 2021?

09:37:39 20  **A**   Yes.

21  **Q**   Approximately how long were you in the tunnel and that

22  immediate area?

23  **A**   About two-and-a-half to three hours.

24  **Q**   During the time --

09:37:56 25          THE COURT:  Fix the microphone.  Mr. Bradley knows how

1    to get it at the right place to get it easy for you and us.

2    Thank you.

3    **BY MS. SCHESNOL:**

4    **Q**   During the time that you were in the tunnel and its

09:38:12 5    immediate areas, can you generally describe the atmosphere?

6    **A**   It was about 30 to 40 officers trying to keep thousands of

7    protesters from trying to get in the small area we were trying

8    to defend.

9    **Q**   Why were the 30 or so officers trying to defend that area?

09:38:34 10    **A**   Because that was a key vantage point to getting in the

11    Capitol and that gains access to all the lower tunnels of the

12    building and basically give you access to anywhere in the

13    building.

14              MS SCHESNOL:  If we could please pull up Exhibit 703.

09:39:04 15    And if you will, play it without audio for the witness.

16        (Video played.)

17    **BY MS. SCHESNOL:**

18    **Q**   Detective Dowling, can you see the video playing on your

19    screen?

09:39:13 20    **A**   Yes.

21    **Q**   And are you familiar with what Exhibit 703 is?

22    **A**   Yeah.  We're smashed like sardines in the tunnel.  So a lot

23    of it you just see the other officers -- see my body-worn

24    camera pressed against their back.

09:39:28 25    **Q**   So this video is your body-worn camera; is that right?

1    **A**    Yes.

2    **Q**    And when was this clip, 703, recorded on your body-worn

3    camera?

4    **A**    3:18.

09:39:43   5    **Q**    P.m.?

6    **A**    Yes.

7    **Q**    On what date?

8    **A**    January 6th.

9    **Q**    Does it fairly and accurately represent or depict what you

09:39:55  10    were doing at that time of day on that date at the Capitol?

11    **A**    Yes.

12         MS. SCHESNOL:  Your Honor, the government moves for

13    the admission of Exhibit 703.

14         MS. JOHNSON:  No objection.

09:40:06  15         THE COURT:  Without objection, 703 is admitted and may

16    be published.

17      (Government's Exhibit 703 was admitted in evidence.)

18         MS. SCHESNOL:  And may we publish it with audio?

19         THE COURT:  Yes.

09:40:13  20         MS. SCHESNOL:  So please start from the beginning.

21      (Video played.)

22         MS. SCHESNOL:  We have paused the video at 32 seconds.

23    **BY MS. SCHESNOL:**

24    **Q**    Can you please explain what just happened and what we're

09:40:58  25    looking at in this still frame?

1    **A**   I grabbed a flagpole from the ground that had been thrown

2    at us by the protesters.

3    **Q**   Why did you grab that flagpole?

4    **A**   Because people were telling the person on the wall to get

09:41:13  5    down and she wasn't getting down.

6    **Q**   And when you say the wall, can you describe what you mean

7    by that?

8    **A**   The ledge that has, like, a small either air conditioner or

9    radiator.  I don't know what it was, but it creates a small

09:41:25  10   place to stand on the wall.  Very small.  Not even enough to

11   put two feet on.

12   **Q**   And what was -- what was your intention when you picked up

13   this flagpole?

14   **A**   Use the flagpole to get her down from the wall with the

09:41:41  15   least amount of force necessary.

16   **Q**   And why choose a flagpole over some other means?

17   **A**   Because it had a long reach.

18   **Q**   Had other means, if you know, worked up until that point to

19   get people off the ledge?

09:41:56  20   **A**   No.  At that point, they had been pepper sprayed and other

21   officers had tried to remove them from the wall, but nothing

22   had worked.

23           MS. SCHESNOL:  Please press play.

24       (Video played.)

09:42:48  25           MS. SCHESNOL:  You can pause it there.

1            We've paused the video at one minute and 13 seconds.

2    **BY MS. SCHESNOL:**

3    **Q**   Can you describe what happened, what you did between the

4    last time we paused it and now?

09:42:57 5   **A**   I used strikes to remove her from the wall, and it worked.

6            MS. SCHESNOL:  Can we please pull up exhibit -- and

7    sorry.

8    **BY MS. SCHESNOL:**

9    **Q**   What time of day is this that now this worked, getting this

09:43:16 10  person off the ledge?

11   **A**   3:19 p.m. on January 6th.

12   **Q**   Thank you.

13           MS. SCHESNOL:  Can we pull up 703.10?  It is a photo.

14           THE COURT:  So 703.10?

09:43:36 15          MS. SCHESNOL:  Correct.

16   **BY MS. SCHESNOL:**

17   **Q**   Are you familiar with 703.10?

18   **A**   Yes.

19   **Q**   What is that?

09:43:43 20  **A**   My body-worn camera when I'm standing on the ledge.

21   **Q**   Fair and accurate depiction of events of January 6?

22   **A**   Yes.

23           MS. SCHESNOL:  Your Honor, the government moves for

24   the admission of 703.10.

09:43:57 25          MS. JOHNSON:  No objection.

1          THE COURT:  Without objection, 703.10 is admitted.

2     May be published.

3          (Government's Exhibit 703.10 was admitted in evidence.)

4     **BY MS. SCHESNOL:**

09:44:09  5   **Q**   The individual that you used the flagpole on, do you know

6     who that person is?

7     **A**   No.

8     **Q**   Haven't interviewed her as part of your preparation for

9     trial?

09:44:21 10   **A**   No.

11          MS. SCHESNOL:  If we can please pull up Exhibit 905

12     without audio.  Please play that without audio for Detective

13     Dowling.

14          (Video played.)

09:45:15 15   **BY MS. SCHESNOL:**

16     **Q**   Detective Dowling, are you familiar with what Exhibit 905

17     is?

18     **A**   Looks like it's what happened right before I got up.  Yeah.

19     **Q**   Are there two images in this video?

09:45:31 20   **A**   Yes.

21     **Q**   And what does the image on the right side of the screen --

22     what is that?

23     **A**   My -- the bottom, right is my body-worn camera.

24     **Q**   And does the one on the left side of the screen appear to

09:45:46 25   be some fixed camera?

1   A    Yes.  It appears to be a fixed camera I guess from the

2   Capitol.

3              MS. SCHESNOL:  You can pause it there.

4   **BY MS. SCHESNOL:**

09:45:54  5   Q    And does Exhibit 905 with these two videos -- what time of

6   day are these side-by-side videos taken?

7   A    One is at 3:19 and the other one says it's at 3:19.

8   Q    Fairly and accurately depict the events at the Capitol on

9   January 6, 2021?

09:46:20 10   A    Yes.

11             MS. SCHESNOL:  Your Honor, the government moves to

12  admit and publish 905 with audio.

13             MS. JOHNSON:  No objection, Your Honor.

14             THE COURT:  Without objection, Exhibit 905 is

09:46:33 15  admitted.  May be published with audio.

16        (Government's Exhibit 905 was admitted in evidence.)

17        (Video played.)

18  **BY MS. SCHESNOL:**

19  Q    Detective Dowling, can you explain why it was important to

09:47:42 20  get this person off the ledge in the tunnel?

21  A    Because we were trying to maintain that opening, and we had

22  to get everyone from outside the opening so we could maintain

23  it and set up a perimeter.

24  Q    And why was that important?

09:47:58 25  A    Just because it's easier to control a smaller space than it

1    is a bigger space.

2            MS. SCHESNOL:  Thank you.  No more questions.

3            THE COURT:  Ms. Johnson.

4                    **CROSS-EXAMINATION**

09:48:18 5   **BY MS. JOHNSON:**

6    **Q**   Your testimony was that there were 30 to 40 officers in

7    that small tunnel?

8    **A**   I don't have the exact number.  It is a guess.

9    **Q**   I understand.  I didn't ask for an exact number.  I said:

09:48:37 10  Your testimony was there were 30 to 40 officers in that tunnel

11   at the time you were there?

12   **A**   Around there.

13   **Q**   And you said that you were all kind of smashed together

14   like -- your testimony was that you were all smashed together

09:49:01 15  like sardines?

16   **A**   Correct.

17   **Q**   And as you were hitting her off the ledge, she yelled that

18   she was trying?

19   **A**   Correct.

09:49:13 20  **Q**   When she did get down, as she was pushed out and hit out,

21   she had to kind of go on top of the crowd because you were all

22   pushed together so tight in that tunnel?

23   **A**   Correct.

24           MS. JOHNSON:  Okay.  Nothing further.

09:49:31 25       (Discussion off the record.)

1          THE COURT:  Redirect?

2          (Discussion off the record.)

3                    **REDIRECT EXAMINATION**

4   **BY MS. SCHESNOL:**

09:49:45   5   **Q**   Detective Dowling, when the person you used the flagpole to

6   get out of the tunnel off the ledge said, I'm trying, had you

7   seen evidence that that person was trying to leave prior to you

8   using the flagpole?

9   **A**   At that point, she was the only one remaining from the

09:50:04  10  three or four people that were on the wall.

11          MS. SCHESNOL:  No other questions.  Thank you.

12          THE COURT:  Detective Dowling, thank you very much.

13  You may step down.

14          THE WITNESS:  Thank you.

09:50:15  15          THE COURT:  We appreciate it.

16          (Witness steps down.)

17          THE COURT:  Next witness, please.

18          MR. BOYLAN:  Your Honor, the government calls FBI

19  Special Agent Matt Gano.

09:50:35  20          (Witness sworn.)

21          THE COURT:  Good morning, Agent Gano.

22          THE WITNESS:  Good morning.

23          THE COURT:  Mr. Boylan.

24                    **DIRECT EXAMINATION**

09:50:52  25  **BY MR. BOYLAN:**

1   **Q**   Agent, can you state your name for the record and spell

2   your name?

3   **A**   My name is Matthew Gano, last name, G-A-N-O.  I am a

4   special agent assigned to the Washington field office of the

09:51:02  5   FBI.

6   **Q**   You're with the Washington field office of the FBI?

7   **A**   Yes, I am.

8   **Q**   And how long have you currently been employed there?

9   **A**   I've been assigned there for approximately five years.

09:51:13  10   **Q**   Did you have experience as a government employee before

11   joining the FBI?

12   **A**   I did.

13   **Q**   And what was that?

14   **A**   Previously before joining the FBI, I was on active duty

09:51:25  15   with the U.S. Army for seven years.

16   **Q**   What was the highest rank you obtained while in the Army?

17   **A**   I left service as a captain.

18   **Q**   You said you work in the Washington field office.  Can you

19   tell us what your current position is?

09:51:40  20   **A**   I am a special agent.  I am assigned to a squad that, among

21   other things, investigates violations of civil rights laws and

22   public corruption laws.

23   **Q**   What are some of the ordinary duties of a FBI special

24   agent?

09:51:55  25   **A**   During the course of any investigation, I conduct

1   interviews, gather and review evidence, provide testimony.

2   **Q**   Do you receive training to become an FBI agent?

3   **A**   Yes, I do.

4   **Q**   Can you describe that for us?

09:52:10 5   **A**   I attended the FBI academy at Quantico, Virginia for

6   approximately six months.

7   **Q**   Just as a note, did you -- during your training, did you

8   receive training with pepper spray or OC spray?

9   **A**   Yes.  It's part of the defensive tactics training at the

09:52:29 10   academy.

11   **Q**   Were you pepper sprayed or OC sprayed?

12   **A**   I was.

13   **Q**   Can you describe what that feels like?

14   **A**   It is an unpleasant experience.  Pepper spray is unpleasant

09:52:39 15   by design.  It irritates the eyes, nose, the mouth.  Your nose

16   runs uncontrollably.  You tear.  It's hard to keep your eyes

17   open.

18   **Q**   How about CS gas or teargas?  Have you experienced that?

19   **A**   I have.

09:52:52 20   **Q**   In what context?

21   **A**   I experienced training with CS gas or teargas while I was

22   on active duty with the Army.

23   **Q**   Can you describe the effects of CS gas for us?

24   **A**   It is similar.  It irritates the eyes, mouth, nose.  It is

09:53:07 25   difficult to breathe.  Your lungs feel like they're burning.

1    **Q**   I want to focus your testimony on the events of January 6,

2    2021.

3          Aside from investigations, did you personally play a

4    role in the reaction to the events of January 6?

09:53:24  5    **A**   I responded with other agents from the Washington field

6    office to the Capitol grounds.

7    **Q**   What were you doing that day before you realized something

8    was out of the ordinary?

9    **A**   I was actually on leave that day.

09:53:37  10   **Q**   And how did you become aware that something was out of the

11   ordinary?

12   **A**   Message came out from our chain of command that there was

13   essentially an emergency and that all available agents needed

14   to report to the area of the Capitol to assist.

09:53:52  15   **Q**   And did you do that?

16   **A**   I did.

17   **Q**   And what happened when you arrived there?

18   **A**   Upon arriving around approximately 4:30, 5:00 in the

19   afternoon, we were dispatched from a staging location to assist

09:54:06  20   on the Capitol grounds.  The agents I was with followed in with

21   a group of Metropolitan Police Department officers and entered

22   the Capitol grounds through a tunnel system underneath the

23   building.

24   **Q**   What did you do inside that tunnel system?

09:54:24  25   **A**   We eventually made our way to a garage area that overlooked

```
 1    a driveway where they had pulled up some buses and were
 2    securing an exit for people from one of the office buildings.
 3  Q   Pulled security?
 4  A   Essentially, yes.
 5  Q   And how long were you there for?
 6  A   We were there for three or four hours.
 7  Q   And did you go home later that night?
 8  A   I did.
 9  Q   I want to shift and talk about the investigations of
10    January 6th suspects.
11        Is that part of your duties?
12  A   It is, yes.
13  Q   And what were you assigned to do in that aspect?
14  A   After the events of January 6th, I was assigned to
15    investigate potential violations of law that occurred there and
16    the subjects who may have violated the laws.
17  Q   How many investigations like this have you been a part of?
18  A   I was -- I've assisted with approximately five or six
19    January 6th investigations, and I've been a case agent assigned
20    to three.
21  Q   Can you tell us what a case agent is?
22  A   A case agent is a term that just describes the primary
23    investigator assigned to any investigation.
24  Q   For the three cases and for the others that you've been a
25    part of, can you tell us some of the typical things that you
```

09:54:36   5
09:54:55  10
09:55:10  15
09:55:27  20
09:55:44  25

1   will do for a case like that kind?

2   **A**   A great deal of these cases involved gathering relevant

3   video and media evidence from multiple sources whether it was

4   open source information from the internet, media, social media,

09:56:05   5   surveillance camera footage, body-worn camera footage, records

6   requests and conducted interviews.

7   **Q**   Did you watch videos?

8   **A**   I did.

9   **Q**   Did you watch a lot of videos?

09:56:19   10   **A**   Many videos, yes.

11   **Q**   As part of your investigation, did you gather records from

12   businesses related to this case?

13   **A**   Yes.

14   **Q**   Is one of those businesses Safeway?

09:56:29   15   **A**   Yes, it was.

16   **Q**   For those what may not know, what's Safeway?

17   **A**   Safeway is a grocery store chain in the area.

18   **Q**   Do you know from your investigation what Safeway's parent

19   company is?

09:56:41   20   **A**   It is a company called Albertson's.

21   **Q**   And the records that you gathered, have you reviewed those

22   in preparation for your testimony today?

23   **A**   Yes, I have.

24   **Q**   And have you become familiar with those records and the

09:56:52   25   information that they contain?

```
 1    A    I have, yes.

 2              MR. BOYLAN:  Can you pull up 501?

 3              THE COURT:  I'm sorry.  What number?

 4              MR. BOYLAN:  501.

 5    BY MR. BOYLAN:

 6    Q    Do you see 501?

 7    A    I cannot, no.

 8              MR. BOYLAN:  Thank you, Mr. Bradley.

 9    A    I see it now.

10    BY MR. BOYLAN:

11    Q    Okay.  Are you familiar with 501?

12    A    I am.

13    Q    And briefly what is it?

14    A    It is a certification of the records requested from

15    Albertson's for this investigation.

16    Q    Does it specifically reference 30 documents?

17    A    Yes, it does.

18    Q    And are you aware that those are marked 502, 503, and 504

19    for this case?

20    A    Yes, I am.

21    Q    And at the bottom there, do you see a signature?

22    A    I do.

23              MR. BOYLAN:  Your Honor, we would move for its

24    admission into evidence.

25              MS. JOHNSON:  No objection based on the certification,
```

1    Your Honor.

2              THE COURT:  No objection what?

3              MS. JOHNSON:  Based on the certification under 902.

4              THE COURT:  501 is admitted and may be published.

09:58:02 5         (Government's Exhibit 501 was admitted in evidence.)

6              MR. BOYLAN:  And, Your Honor, based on the

7    certification, we would move for the admission of 502, 503, and

8    504 as well.

9              THE COURT:  Any objection?

09:58:10 10            MS. JOHNSON:  No, Your Honor.

11             THE COURT:  All right.  502, 503, and 504 are also

12   admitted and may be published.

13        (Government's Exhibits 502-504 were admitted in evidence.)

14             MR. BOYLAN:  Can you bring up 502?

09:58:19 15   **BY MR. BOYLAN:**

16   **Q**   Do you recognize this document?

17   **A**   I do.

18   **Q**   Okay.  And can you tell us what this is?

19   **A**   This document is an email from management to various

09:58:35 20   Safeway stores in the District of Columbia dated on January 6,

21   2021.

22   **Q**   The date is January 6.  Can you tell us who it is from?

23   **A**   It is from the Albertson's management chain to various

24   store managers in the Safeways of the District of Columbia.

09:58:51 25   **Q**   Would you go ahead and read the subject line of the email

1    for us?

2    **A**    Yes.  It says, Washington, D.C. curfew tonight, 1/6/21,

3    6:00 p.m. to 6:00 a.m. Capitol locked down.

4              MR. BOYLAN:  Can you zoom in on the first paragraph?

09:59:09  5    **BY MR. BOYLAN:**

6    **Q**    Would you read that for us, Agent Gano?

7    **A**    It says, there is in place a 6:00 p.m. to 6:00 a.m.

8    citywide curfew throughout Washington, D.C. tonight, Wednesday,

9    1/6/21.  All D.C. stores will be closed at 4:00 p.m. with plans

09:59:26  10    to reopen at 6:00 a.m. to 7:00 a.m.  Night crews will not be in

11    place.

12    **Q**    In the course of your investigation, have you become aware

13    of what time Safeway stores normally close?

14    **A**    Yes.

09:59:39  15    **Q**    And what times are those?

16    **A**    There are some in the District of Columbia that are open

17    24 hours.  Others I believe close at midnight.

18    **Q**    Any of them plan to close at 4:00 p.m. on January 6?

19    **A**    No.

09:59:52  20              MR. BOYLAN:  Can you bring up 503, please?

21    **BY MR. BOYLAN:**

22    **Q**    Is this a document you're familiar with?

23    **A**    Yes, it is.

24    **Q**    And can you describe what it shows?

10:00:01  25    **A**    It's a projected sales sheet for the various Safeway stores

1     in the District of Columbia.

2              MR. BOYLAN:  Can you zoom in on the box?  Perfect.

3     **BY MR. BOYLAN:**

4     **Q**   Can you explain what's shown in the first column on the

10:00:28   5     left?

6     **A**   The first column on the left lists the various Safeway

7     stores and their store numbers.

8     **Q**   What date is this for?

9     **A**   For Tuesday, January 5th, 2021.

10:00:41  10     **Q**   And you said this reflects sales figures.

11              Can you tell us what is shown on the far, right

12     column?

13     **A**   The far, right column is a combination of the projected

14     versus actual sales figures for each store.

10:00:54  15              MS. JOHNSON:  Your Honor, I'm just going to object.

16     That's not what the document actually says.  It says ID percent

17     vs projected, and there's been no explanation as to what that

18     is.

19              I think he can read what the document said, but any

10:01:03  20     explanation as to what it means is not acceptable testimony

21     from this officer.

22              THE COURT:  You will have a chance to cross-examine

23     him with respect to the accuracy of his testimony.  So with

24     respect to the accuracy, we will let him testify and the jury

10:01:18  25     will be able to assess it.

**BY MR. BOYLAN:**

Q   I'm going to circle a phrase here.

Do you see what it says there, Agent Gano?

A   It says sales to public.

10:01:28   Q   Maybe we will take the first line as an example.

Which store is that?

A   The Store Number 1276 on Piney Branch.

Q   And reading across, what does it say the sales figures for

that store were for January 5th?

10:01:43   A   It says actual ID percentage 17.75 percent.

Q   And reading across the far, right column.

A   The far, right column says ID percentage versus projected.

Q   For Piney Branch?

A   It says 2.80 percent.

10:02:05   Q   In simple terms, what does that mean?

A   It is the difference between the actual ID percentage

column and the projected ID percentage number.

Q   So what is the difference between the black numbers and the

red numbers in the far, right column?

10:02:20   A   The black numbers project a positive sales versus the red

numbers with the negative symbol projecting a negative sale.

Q   So for January 5th, the day before January 6th, generally,

how would you characterize the sales figures for stores?

MS. JOHNSON:  Your Honor, I object to improper opinion

10:02:36   testimony.  This is expert -- we're veering very far into

1    expert opinion based on these documents.  They have been

2    certified, but he's not been listed as an expert.  And to be

3    testifying as to what they mean is absolutely improper.

4         THE COURT:  Okay.  You can stop.  I'm not going to

10:02:50  5    allow him to provide expert testimony.  He's not identified as

6    an expert.  So ask the questions and get the answers.  But if

7    he starts to give what I consider to be expert testimony, I

8    will stop the testimony.

9         MR. BOYLAN:  Well, I'll just ask it again.

10:03:10  10   **BY MR. BOYLAN:**

11   **Q**   Agent Gano, how would you characterize the figures for the

12   sales of Safeway stores on January 5th in the far, right

13   column, generally?

14   **A**   From just looking at the far, right column, it appears that

10:03:21  15   they projected mixed positive and negative numbers.

16   **Q**   Some red, some black?

17   **A**   Yes.

18   **Q**   Can we go to the next page of this exhibit, please?  Can

19   you zoom in on the box?  And what date is this for?

10:03:41  20   **A**   This is for January 6, 2021.

21   **Q**   How would you characterize the far, right column of this

22   document?

23   **A**   In the far, right column, the ID percentage versus

24   projected, all of the numbers for the Safeway stores are minus

10:03:55  25   indicated in red.

1   **Q**   Fair to say all those are in double digits?

2   **A**   Yes.

3   **Q**   Does this show a difference from the first page?

4   **A**   It shows a difference that the -- instead of mixed, the

10:04:15  5   results were all negative.

6          MR. BOYLAN:  Go to the third page.

7   **BY MR. BOYLAN:**

8   **Q**   This is the third page of the document.  What does this

9   show?

10:04:30 10   **A**   This shows the same information but for Thursday,

11   January 7th, 2021.

12   **Q**   The day after January 6th?

13   **A**   Yes.

14   **Q**   And how about the far, right column in this document?

10:04:40 15   **A**   The far, right column shows positive ID percentage versus

16   projected all in black.

17   **Q**   All in black and some single digit, some double digit; fair

18   to say?

19   **A**   Yes.

10:04:54 20   **Q**   So not as significant a gain as the loss that we saw in

21   Page 2?

22   **A**   Yes.

23          MR. BOYLAN:  Okay.  Can you bring up 504?

24   **BY MR. BOYLAN:**

10:05:14 25   **Q**   Is this a document you recognize?

1    **A**   It is.

2    **Q**   And can you tell us what it is?

3    **A**   It is a warehouse shipping manifest for a warehouse in

4    Lancaster, Pennsylvania.

10:05:28  5    **Q**   And what does it show in the first column on the left?

6    **A**   The first column on the left shows the -- a distribution

7    center letter number indicator for Pennsylvania.

8    **Q**   What is a distribution center?

9    **A**   It is essentially a warehouse.

10:05:45 10   **Q**   And how about the second column?

11   **A**   The second column lists different D.C. store numbers for

12   Safeway stores in the District of Columbia.

13   **Q**   These are the same store numbers we saw in the previous

14   document?

10:06:00 15   **A**   Yes.

16   **Q**   What is this document showing us?

17   **A**   This is a shipping manifest supplying the Safeway in the

18   District of Columbia.

19   **Q**   You see the shipments came from Pennsylvania to D.C.?

10:06:12 20   **A**   I do.

21            MR. BOYLAN:  You can take that down.  Thank you.

22   **BY MR. BOYLAN:**

23   **Q**   Let's shift off of the documents now.

24            And you told us that you investigated some individuals

10:06:21 25   related to the January 6th events?

```
 1    A    I did.

 2    Q    Was one of those individuals a woman named Yvonne St. Cyr?

 3    A    Yes.

 4    Q    Are you the case agent for that case?

10:06:34 5    A    I am.

 6    Q    You told us some of the things a case agent typically does.

 7         Can you tell us some of the things that you

 8    specifically did for that case?

 9    A    Specifically for this case, we did all of those things,

10:06:48 10   gathered video evidence, media evidence from various social

11    media outlets, online media, obtained videos from the subject's

12    mobile phone as well as other devices that were at the

13    January 6th protest, surveillance camera footage, body-worn

14    camera footage, records requests, and review of all of that.

10:07:14 15   Q    Did you participate in the arrest of the -- Ms. St. Cyr?

16    A    I did not.

17    Q    You did not.

18         During the course of the investigation, have you

19    become familiar with Ms. St. Cyr's appearance specifically?

10:07:33 20   A    Yes, I did.

21    Q    Before today, what did you do to familiarize yourself with

22    her appearance?

23    A    I reviewed many hours of video from multiple sources,

24    reviewed social media content, surveillance video footage,

10:07:49 25   videos from Ms. St. Cyr's mobile devices, things like that.
```

1    Q    Can you estimate how many hours of video you've watched

2    that portray the defendant?

3    A    Approximately 15 to 20 hours.

4    Q    You also observed Yvonne St. Cyr's appearance in court

10:08:11  5    proceedings for this proceeding?

6    A    Yes, I have.

7    Q    For the record, can you identify Yvonne St. Cyr by pointing

8    to her and telling the jury what she's wearing?

9    A    Ms. St. Cyr is sitting in the middle, wearing a purple

10:08:25 10   sweater.

11          MR. BOYLAN:  Your Honor, I would ask the record

12   reflect an in-court identification of the defendant.

13          THE COURT:  The record will so reflect.

14   **BY MR. BOYLAN:**

10:08:33 15   Q    Agent Gano, you told us you watched a lot of video.

16          Have you watched a lot of exhibits in this case that

17   have a yellow circle on them?

18   A    Yes, I have.

19   Q    For each and every one of the exhibits in this case

10:08:45 20   containing -- that have a yellow circle, is it fair to say that

21   the person inside that yellow circle is the defendant, Yvonne

22   St. Cyr?

23   A    Yes.

24   Q    Each and every one?

10:08:57 25   A    Yes.

1  **Q**   During the course of your investigation, have you become

2  familiar with the defendant's voice?

3  **A**   I did.

4  **Q**   And what have you done before today to become familiar with

10:09:11  5  the defendant's voice?

6  **A**   Again, review of many hours of social media content, videos

7  depicting the defendant at the January 6 Capitol riot, and

8  then, of course, experiencing her voice here in court

9  proceedings.

10:09:34 10  **Q**   Okay.  Do you have a high degree of certainty that you

11  would recognize the defendant's voice if you heard it?

12  **A**   Yes.

13        MR. BOYLAN:  Can you bring up 802?  This has been

14  admitted.

10:09:51 15        COURTROOM DEPUTY:  It has?

16        MR. BOYLAN:  It is.

17        THE COURT:  Yes.  802 is admitted.

18  **BY MR. BOYLAN:**

19  **Q**   Do you recognize this?

10:10:06 20  **A**   I do.

21  **Q**   Can you tell us what it is?

22  **A**   It is a video obtained from the defendant's mobile phone,

23  depicting the events of January 6th.  This is particularly

24  starting at the end of the speech at the Ellipse.

10:10:20 25  **Q**   And it is a long video, an hour and 20 minutes?

1   **A**   It is.

2   **Q**   Have you watched the whole thing?

3   **A**   Yes.

4   **Q**   Multiple times?

10:10:28  5   **A**   Yes.

6   **Q**   And you said it starts at the Ellipse.  Can you tell us

7   where it finishes?

8   **A**   It finishes on the lower west terrace of the United States

9   Capitol.

10:10:40  10          MR. BOYLAN:  Can you fast-forward to 3:25?

11   **BY MR. BOYLAN:**

12   **Q**   And before I play this, what time period, time of day does

13   it cover?

14   **A**   It begins at approximately 1:10, 1:15 in the afternoon and

10:10:57  15   ends at approximately 2:15 in the afternoon.

16          MR. BOYLAN:  Play this to 3:40 please.

17          (Video played.)

18   **BY MR. BOYLAN:**

19   **Q**   Can you tell us what's happening in this video?

10:11:28  20   **A**   The defendant is walking with the rest of the crowd away

21   from the Ellipse in the area where the speech occurred.

22   **Q**   And based on your review of the rest of this video, can you

23   tell us what route they took?

24   **A**   They walked down -- the defendant with them walks down

10:11:48  25   Constitution Avenue until the intersection with Pennsylvania

1  Avenue at which point they branch towards the United States

2  Capitol building.

3          MR. BOYLAN:  Can you fast-forward to 41:45?  Pause at

4  41:57.

10:12:10  5      (Video played.)

6          MR. BOYLAN:  Just pause it right there.

7  **BY MR BOYLAN:**

8  Q   Do you see a building on the right side of the screen?

9  A   I do.

10:12:18  10  Q   What building is that?

11  A   That is the U.S. District Courthouse for the District of

12  Columbia.

13  Q   What about in the left center?

14          THE COURT:  On the right side of the screen?

10:12:29  15  **BY MR. BOYLAN:**

16  Q   Oh.  I'm sorry.  The right side of the screen.

17  A   Is the United States Capitol building.  The edge of it.

18  Q   Thank you.  And the left side of the screen?  Can you tell

19  us --

10:12:37  20  A   That is the U.S. District Courthouse for the District of

21  Columbia.

22  Q   That is the building we're in now?

23  A   Yes.

24          MR. BOYLAN:  Can you pull up 602?

10:12:58  25          This exhibit, Your Honor, has been conditionally

1  admitted pending an identification of what time of day.

2  **BY MR. BOYLAN:**

3  **Q**   So, Agent Gano, I will ask you if you recognize this.

4  **A**   I do.

10:13:10  5       MR. BOYLAN:  And if you can play it for us.

6       (Video played.)

7       MR. BOYLAN:  Pause.

8  **BY MR. BOYLAN:**

9  **Q**   And can you tell us:  What time of day is this?

10:13:23  10  **A**   This is approximately 2:00 p.m.

11       MR. BOYLAN:  And play one more second.

12       (Video played.)

13       MR. BOYLAN:  Stop.

14  **BY MR. BOYLAN:**

10:13:34  15  **Q**   Do you recognize the individual in the yellow circle?

16  **A**   I do.

17  **Q**   And who is that?

18  **A**   The defendant, Yvonne St. Cyr.

19  **Q**   Can you tell us what she's wearing?

10:13:42  20  **A**   She's wearing a white jacket with a knit cap and carrying a

21  pink Trump flagpole.

22  **Q**   Based on your review of other videos from January 6th, is

23  that consistent with the defendant's dress throughout the day?

24  **A**   Yes, it is.

10:13:54  25  **Q**   Where is this video taken in relation to the Capitol?

1    **A**    This is the Peace Circle Monument.

2    **Q**    In relation to the Capitol, where is that?

3    **A**    It's just off Capitol grounds on the western side heading

4    off of Pennsylvania Avenue towards the Capitol building.

10:14:19   5              MR. BOYLAN:  Can you bring up 602.1?  And this is --

6              THE COURT:  Not yet in evidence.

7              MR. BOYLAN:  Not yet in evidence?

8              THE COURT:  602.1?  No.  Not yet in evidence.

9              MR. BOYLAN:  You can take that down.  You can take it

10:14:53  10   down.

11             Can you bring back 802, please, the video?  And

12   fast-forward to 52 --

13             THE COURT:  This is in evidence.

14             MR. BOYLAN:  In evidence.  52:58.

10:15:11  15   **BY MR. BOYLAN:**

16   **Q**    Do you recognize this?

17   **A**    I do.

18   **Q**    Same video we were watching earlier?

19   **A**    Yes, it is.

10:15:20  20   **Q**    Okay.

21             THE COURT:  Where are we?  50 what?

22             MR. BOYLAN:  52:58.

23             THE COURT:  52:58.

24             MR. BOYLAN:  And can you play that to 53:18?

10:15:37  25        (Video played.)

**BY MR. BOYLAN:**

Q   Do you recognize the defendant's voice in that video?

A   I do.

    MS. JOHNSON:  Your Honor, I am going to object to this opinion.  I don't believe it's proper, and it hasn't been noticed.

    THE COURT:  Overruled.

**BY MR. BOYLAN:**

Q   Can you tell us what you heard the defendant say?

A   You can overhear the defendant saying, "push it" while moving through the crowd.

Q   And where is this video taken?

A   This video is taken off of a walkway leading up towards the lower west terrace on the west side of the Capitol.

Q   Is this past Peace Circle?

A   Yes, it is.

Q   Closer to the Capitol?

A   Yes, it is.

    MR. BOYLAN:  Exhibit 204, please.  This is admitted.

    THE COURT:  204 is in evidence.

**BY MR. BOYLAN:**

Q   Can you show us where on this document or where on this image the defendant was located in that last video that we saw?

A   Along this section of the Capitol grounds, the walkway leading towards the west terrace plaza.

1          MR. BOYLAN:  Thank you.  And you can take that down.

2    And if you can bring back 802.  And fast-forward to 51:30.

3        (Video played.)

4          MR. BOYLAN:  Stop.  All right.  54:37.

10:17:47  5   **BY MR. BOYLAN:**

6    **Q**   What did you hear the defendant say there?

7    **A**   You can overhear the defendant saying, "tear it down; let's

8    go."

9          MR. BOYLAN:  I have a few more of these to do.

10:18:00 10          Can you go to 55 minutes flat, please?

11   **BY MR. BOYLAN:**

12   **Q**   This is in the same location or on that same pathway?

13   **A**   Yes.  Further up towards the Capitol building at this

14   point.

10:18:10 15   **Q**   As the defendant walks closer to the Capitol?

16   **A**   Yes.

17          MR. BOYLAN:  Can you play to 55:14?

18        (Video played.)

19   **BY MR. BOYLAN:**

10:18:28 20   **Q**   What did you hear the defendant say there?

21   **A**   You can overhear the defendant saying, "push it.  Don't be

22   scared.  Push it."

23          MR. BOYLAN:  And 55:45, please.

24        (Video played.)

10:18:41 25          MR. BOYLAN:  That's fine.  55:44.  And play to

1    56 minutes.

2        (Video played.)

3    **BY MR. BOYLAN:**

4    **Q**   How about there?

10:19:05  5    **A**   You can overhear the defendant saying, "push it.  There are

6    millions of us.  Push it.  This is our house."

7            MR. BOYLAN:  You can go to 56:54 and play to

8    57 minutes.

9        (Video played.)

10:19:21  10    **BY MR. BOYLAN:**

11    **Q**   What did you hear there?

12    **A**   "Push it.  They can't stop us all."

13            MR. BOYLAN:  And last one.  If you can go to 57:55.

14        (Video played.)

10:19:54  15            MR. BOYLAN:  You can stop there at 58 minutes.

16    **BY MR. BOYLAN:**

17    **Q**   What did you hear?

18    **A**   "This is our house.  Let's go."

19            MR. BOYLAN:  Can you bring up 402.3?

10:20:06  20    **BY MR. BOYLAN:**

21    **Q**   Do you recognize this?

22    **A**   I do.

23    **Q**   And what time does this take place?

24    **A**   This takes place approximately between 2:15 and 2:28 p.m.

10:20:46  25    the afternoon of January 6, 2021.

1   **Q**   How do you know that it takes place at that time?

2   **A**   Because this is depicting the police line in the lower west

3   terrace plaza, and I know that the defendant was present there

4   in a position at the front of the bike racks at that time.

10:21:00   5   **Q**   And you know that from watching other videos like CCTV?

6   **A**   CCTV, body-worn camera, open source videos from within the

7   crowd, and the defendant's own videos from her mobile device.

8   **Q**   Can you identify the defendant in this photo?

9   **A**   In this photo, the defendant is circled in yellow.

10:21:18   10   **Q**   This is pretty zoomed out.  How can you be sure that this

11   is the defendant?

12   **A**   Again, just from viewing this moment on the police line and

13   other moments on the police line from multiple different

14   perspectives and multiple different sources of media.

10:21:37   15   **Q**   Where in relation to other members of the crowd is the

16   defendant now?

17   **A**   The defendant is right up front by the bike racks and the

18   police officers.

19   **Q**   I would like to ask you to mark on our Exhibit 206.  Let me

10:21:53   20   bring that up.

21       (Witness steps down.)

22   **BY MR. BOYLAN**.

23   **Q**   Can you draw a red D where the defendant is depicted in

24   this video?

10:22:42   25   **A**   The defendant is depicted right around here along the

1   police line, bike racks, and police officers.

2   **Q**   And maybe put a small one next to it.

3   **A**   (Witness complies.)

4   **Q**   Thank you.  That's good.

10:23:04  5   (Witness resumes stand.)

6   MR. BOYLAN:  Can you bring back 802, please?

7   Fast-forward to 58 minutes.

8   I'm sorry.  Let's go right to 59:30.  That's great.

9   And if you can play that to one hour even.

10:23:53  10   (Video played.)

11   **BY MR. BOYLAN:**

12   **Q**   Based on this video, where has the defendant gotten herself

13   to?

14   **A**   At this point in her video, the defendant has moved up to

10:24:31  15   the police line right up along the bike racks.

16   **Q**   Directly adjacent to police officers?

17   **A**   Directly adjacent to police officers, yes.

18   MR. BOYLAN:  Can you show 908, please?

19   (Video played.)

10:24:41  20   **BY MR. BOYLAN:**

21   **Q**   Do you recognize the videos that are shown here?

22   **A**   I do.  These are three separate body-worn cameras from

23   similar time frame on the police line, January 6, 2021 at

24   approximately 2:11 p.m.  I can't see the small numbers in the

10:25:17  25   top.

1    **Q**   Based on your review of other videos in our investigations,

2    are all these an accurate and fair depiction of the west plaza

3    on January 6?

4    **A**   They are.

10:25:30  5              MR. BOYLAN:  Your Honor, we move to admit this.

6              MS. JOHNSON:  Your Honor, I believe all of these are

7    already admitted.  I guess it's for demonstrative.  I don't

8    really have an objection other than these are all already in

9    evidence.

10:25:43  10             THE COURT:  If they're already admitted, then the only

11   problem is any cumulative nature.  But given the fact that they

12   are admitted already and together on one screen for

13   demonstration purposes, I will admit 908, and it may be

14   published.

10:26:02  15        (Government's Exhibit 908 was admitted in evidence.)

16             MR. BOYLAN:  Can you play and pause at 20 seconds?

17        (Video played.)

18   **BY MR. BOYLAN:**

19   **Q**   Can you identify the video that's now shown in the top,

10:26:30  20   right corner?

21   **A**   I can.

22   **Q**   And what video is that?

23   **A**   That is the defendant's video from her mobile device.

24   **Q**   It's 802 that we've been watching?

10:26:40  25   **A**   Yes, it is.

1           MR. BOYLAN:  Can you play and pause at 25 seconds?

2      (Video played.)

**3  BY MR. BOYLAN:**

4  **Q**  Can you identify the defendant in the bottom, right video?

10:26:55  5  **A**  Yes, I can.  She's in front of the two Capitol Police

6  officers.  You can see the part of her pink backpack and her

7  white jacket.

8  **Q**  And how about the bottom, left?

9  **A**  Yes.  You can see, again, in front of those two same

10:27:12  10  Capitol Police officers from a different perspective the

11  defendant is in her white jacket which you can see.

12            MR. BOYLAN:  Can you fast-forward to 1:35?

**13  BY MR. BOYLAN:**

14  **Q**  Now, we fast-forwarded the video here.

10:27:36  15       And can you identify the defendant in the bottom,

16  right?

17  **A**  In the bottom, right, you can see the edge of the

18  defendant's white jacket but also the pink Trump flagpole to

19  which the mobile phone is affixed.

10:27:49  20  **Q**  And she's still in the same location?

21  **A**  Yes.  Right up against the bike racks across from police

22  officers.

23  **Q**  Can you describe her activity now?

24  **A**  Her back is turned towards the police line.

10:28:02  25          MR. BOYLAN:  Fast-forward to three minutes, please.

**BY MR. BOYLAN:**

**Q**   We fast-forwarded another about a minute and a half.

Can you identify the defendant now?

**A**   The defendant is again in front of the police line right up against the bike racks with her back turned, shoulders hunched. There is a riot shield now on the line right by the defendant.

MR. BOYLAN:  Let's go to nine minutes.

**BY MR. BOYLAN:**

**Q**   Can you identify the defendant here?

**A**   Yes.  Again, you can see, for instance -- in the upper, left, you can see the defendant's pink flagpole and the edge of her white jacket right on the other side of the riot shield on the police line.

**Q**   You watched this video in its entirety?

**A**   I have.

**Q**   And does the defendant ever move away from that location?

**A**   The defendant only moves from that location when the police line is breached.

**Q**   And, in total, how much time does the defendant spend at that spot?

**A**   Approximately 15 minutes.

MR. BOYLAN:  Can you pull up 604.1, please?

This has been conditionally admitted, Your Honor.

**BY MR. BOYLAN:**

**Q**   We've seen this exhibit before.

1              Do you see the defendant in this photo?

2    **A**   I do.  The defendant is circled in the yellow circle on the

3    far right side of the image.

4    **Q**   Approximately what time is this photo depicting?

10:30:00  5    **A**   This is approximately 2:20 to 2:28 on the afternoon of

6    January 6th.

7              MR. BOYLAN:  Can you pull up 701.3, please, which has

8    not been admitted?

9    **BY MR. BOYLAN:**

10:30:21  10   **Q**   Do you recognize this image?

11   **A**   I do.

12   **Q**   And can you tell us what it is?

13   **A**   This is a still-frame image from an officer's body-worn

14   camera from January 6th, 2021 at 2:14 in the afternoon.

10:30:34  15   **Q**   Fair and accurate depiction based on your review of other

16   videos?

17   **A**   Yes.

18             MR. BOYLAN:  Your Honor, we would move to admit this.

19             MS. JOHNSON:  Your Honor, it's cumulative.

10:30:46  20            THE COURT:  Overruled.  701.3 is admitted.

21        (Government's Exhibit 701.3 was admitted in evidence.)

22   **BY MR. BOYLAN:**

23   **Q**   Can you tell us what the defendant is doing here?

24   **A**   The defendant has her back turned to the police line,

10:30:56  25   pressed up against the bike racks in front of two Capitol

1   Police officers.

2   **Q**   We will do one more.

3           MR. BOYLAN:  Can you pull up 701.4, please?  We can

4   skip that one.  Can you go to 403.1, please?

10:31:22  5           THE COURT:  403.1 is in evidence.

6           MR. BOYLAN:  Can you fast-forward to 30 seconds,

7   please, and play to one minute.

8           (Video played.)

9   **BY MR. BOYLAN:**

10:32:21  10  **Q**   Can you describe for us what's happened here?

11  **A**   This is a depiction of the time of which the police line in

12  the lower west terrace is breached at about 2:28 p.m. on

13  January 6th.

14          The defendant is circled in yellow.  You can see her

10:32:34  15  at the front of the bike racks as they come apart.

16  **Q**   Is this immediately following the other videos that we've

17  seen?

18  **A**   Yes.

19          MR. BOYLAN:  And can you go ahead and play that to the

10:32:48  20  end?

21          (Video played.)

22          MR. BOYLAN:  You can pause it there.  That's fine.

23  **BY MR. BOYLAN:**

24  **Q**   Can you tell us what the defendant did, from your review of

10:33:53  25  that video, after the breach of the police line?

1   **A**   The defendant moved towards the Capitol building and the

2   inaugural stage that had been constructed on the lower west

3   terrace.

4           MR. BOYLAN:  Can you bring up 605.1?

10:34:26  5         THE COURT:  605.1 is in evidence.

6           MR. BOYLAN:  I think it's been conditionally admitted,

7   Your Honor, and we will ask the witness to identify the time.

8   **BY MR. BOYLAN:**

9   **Q**   Do you know what time this photo was taken?

10:34:44  10  **A**   This is just before 2:28 p.m. on January 6, 2021.

11  **Q**   Thank you.

12          MR. BOYLAN:  Can you go back to 802, please?  And can

13  you fast-forward that to an hour and 17 minutes?

14  **BY MR. BOYLAN:**

10:35:24  15  **Q**   And where is this video at this time?

16  **A**   At this time, the defendant's video depicts her on the bike

17  racks on the police line.

18  **Q**   Before the breach?

19  **A**   Yes.

10:35:37  20          MR. BOYLAN:  Can you play this for us to 1:18:20?

21      (Video played.)

22  **BY MR. BOYLAN:**

23  **Q**   Can you describe what we've seen?

24  **A**   Following the breach of the police line, the defendant

10:37:07  25  walks up towards the inaugural stage that had been constructed

1    on the lower west terrace.

2    **Q**   And can you tell us, based on that video, where the

3    defendant is in relation to the bike racks that she was

4    standing on?

10:37:22  5    **A**   After the bike rack line was breached, the defendant is

6    past that point.

7    **Q**   Where is she standing now in relation to police officers?

8    **A**   Behind and throughout their position.

9              MR. BOYLAN:  Can you go to 609.1, please?

10:37:42 10              THE COURT:  It is in evidence.

11              MR. BOYLAN:  Can you play that?  Yeah.

12         (Video played.)

13              MR. BOYLAN:  And pause.  We're paused at six seconds.

14    **BY MR. BOYLAN:**

10:37:57 15    **Q**   Can you tell us what time this takes place?

16    **A**   This takes place at 2:28 p.m. on the afternoon of

17    January 6th.

18              MR. BOYLAN:  Can you go to 606.1, please?  It is a

19    still.

10:38:12 20    **BY MR. BOYLAN:**

21    **Q**   Can you tell us approximately what time this takes place?

22    **A**   This takes place at approximately --

23              THE COURT:  It is in evidence.

24    **A**   -- same time.  2:28 p.m.

10:38:30 25              MR. BOYLAN:  And can you show us 606.2, please?

**BY MR. BOYLAN:**

1

**Q**   Can you tell us approximately what time this takes place?

**A**   This, again, takes place at approximately 2:28 p.m. on the afternoon of January 6th.

10:38:43    MR. BOYLAN:  Can you bring up 607.1, please?

I believe this has been admitted, Your Honor.

THE COURT:  It is admitted.

**BY MR. BOYLAN:**

**Q**   Okay.  Can you tell us what time this take place, first of

10:39:03    all?

**A**   This takes place just after 2:28 after the police line that has been breached and the crowd surges forward through the officers.

MR. BOYLAN:  Can you play that and pause at

10:39:20    31 seconds?

(Video played.)

**BY MR. BOYLAN:**

**Q**   Can you describe what the defendant's done here?

**A**   Walking through the crowd around police officers and up

10:40:00    towards the inaugural stage constructed on the west terrace plaza.

MR. BOYLAN:  Can you go to 712.1?

THE COURT:  712.1?

MR. BOYLAN:  Yes, sir.

10:40:17    THE COURT:  It is in evidence.

1            MR. BOYLAN:  Can you fast-forward to 50 seconds,

2    please?

3    **BY MR. BOYLAN:**

4    **Q**   Can you identify the defendant here?

10:40:30  5    **A**   Yes.  The defendant is circled in yellow here.

6    **Q**   And can you tell us what time of day this takes place?

7    **A**   Per the body-worn camera time stamp, it takes place at 2:28

8    p.m. and 45 seconds.

9    **Q**   Thank you.

10:40:42  10            MR. BOYLAN:  Can you bring up 705.1 please?

11            THE COURT:  This is not in evidence.

12    **BY MR. BOYLAN:**

13    **Q**   Do you recognize this image?

14    **A**   I do.

10:41:02  15    **Q**   And can you tell us what's depicted?

16    **A**   This is a still shot from the body-worn camera from the

17    west terrace plaza.

18    **Q**   Fair and accurate depiction of the events of January 6th?

19    **A**   Yes.

10:41:16  20            MR. BOYLAN:  And we move to admit this, Your Honor.

21            MS. JOHNSON:  No objection.

22            THE COURT:  Without objection, Exhibit 705.1 is

23    admitted.  May be published.

24        (Government's Exhibit 705.1 was admitted in evidence.)

10:41:26  25    **BY MR. BOYLAN:**

1    **Q**    And can you tell us what time of day this takes place?

2    **A**    Per the time stamp in the upper, right-hand corner, 2:29

3    p.m. and two seconds.

4    **Q**    Just after the breach?

10:41:36  5    **A**    Just after, yes.

6            MR. BOYLAN:  Can you show us 608.1, please?

7    **BY MR. BOYLAN:**

8    **Q**    Do you recognize this?

9    **A**    I do.

10:41:48  10    **Q**    And what is it?

11    **A**    This is a video obtained from open sources media on the

12    internet, depicting the west terrace plaza.

13            THE COURT:  It is in evidence.

14            MR. BOYLAN:  It's in evidence.  I'm sorry.

10:42:01  15    **BY MR. BOYLAN:**

16    **Q**    Can you tell us what time it takes place?

17    **A**    Just after 2:28 p.m.

18            MR. BOYLAN:  And can you play and pause at eight

19    seconds, please?

10:42:08  20        (Video played.)

21    **BY MR. BOYLAN:**

22    **Q**    Can you tell us what you can see the defendant doing here?

23    **A**    The defendant is circled in yellow, talking to another

24    rioter.

10:42:26  25    **Q**    And does the defendant appear to you to be disoriented?

```
 1    A   Not at this time, no.

 2    Q   Does the defendant appear to be suffering the effects of

 3    pepper spray as you know them?

 4    A   From what I can see, no.

 5    Q   CS gas?

 6    A   No.

 7    Q   Looking at the crowd around the defendant, is there

 8    sufficient room to move around there?

 9    A   It appears so.

10            MR. BOYLAN:  Can we go to 610.1, please?

11            THE COURT:  610.1 is in evidence.

12            MR. BOYLAN:  This is with no sound.

13            I think we have this one without audio; is that right,

14    Your Honor?

15            THE COURT:  I think this was without audio.

16            MR. BOYLAN:  Okay.  You can play no sound.

17       (Video played.)

18            MR. BOYLAN:  And pause there, please, at three

19    seconds.

20    BY MR. BOYLAN:

21    Q   And can you tell us what time of day this is?

22    A   This is approximately 2:42 p.m.

23    Q   And can you tell us what the defendant is doing?

24    A   The defendant is walking up the staircase towards the west

25    terrace door or the tunnel.
```

Timestamps in left margin:
10:42:41 (line 5)
10:43:00 (line 10)
10:43:25 (line 15)
10:43:35 (line 20)
10:43:49 (line 25)

```
 1              MR. BOYLAN:  Can you go to 903.1, please?

 2              THE COURT:  903.1 is in evidence.

 3   BY MR. BOYLAN:

 4   Q   Do you recognize these two camera angles?

 5   A   I do.

 6   Q   And what are they?

 7   A   One is body-worn camera from an officer in the tunnel and

 8   then the other is the surveillance camera from the Capitol

 9   building inside the tunnel leading up towards the west terrace

10   door.

11              MR. BOYLAN:  If you can fast-forward to 1:55 and play

12   for five seconds, please.

13       (Video played.)

14   BY MR. BOYLAN:

15   Q   And do you see the defendant pictured there?

16   A   Yes, I do.

17   Q   And can you tell us what she is doing?

18   A   She is walking up towards the staircase that we saw in the

19   other video leading in towards the west terrace door.

20              MR. BOYLAN:  And can you play that to the end, please?

21       (Video played.)

22              MR. BOYLAN:  Can you pull up 903.2, please?

23              THE COURT:  Not in evidence.

24   BY MR. BOYLAN:

25   Q   Do you recognize this image?
```

1    **A**   I do.

2    **Q**   And what is it?

3    **A**   It is a still frame from the video we just watched.

4    **Q**   And fair and accurate, from your review of other video?

10:45:58  5    **A**   Yes, it is.

6             MR. BOYLAN:  We would move to admit this, Your Honor.

7             MS. JOHNSON:  No objection.

8             THE COURT:  Without objection, 903.2 is admitted.  May

9    be published.

10:46:09  10        (Government's Exhibit 903.2 was admitted in evidence.)

11   **BY MR. BOYLAN:**

12   **Q**   Can you identify the defendant in this picture?

13   **A**   I can.  The defendant is circled in yellow.

14   **Q**   What time does this take place?

10:46:16  15   **A**   This is, again, approximately 2:42 p.m.

16             MR. BOYLAN:  Can you take that down and bring up 907,

17   please?

18             907 is not in evidence.

19   **BY MR. BOYLAN:**

10:46:32  20   **Q**   Do you recognize this?

21   **A**   I do.

22   **Q**   And what is it?

23   **A**   This is surveillance camera footage from inside the tunnel

24   leading up to the west terrace door.

10:46:42  25   **Q**   And starting at what time?

1    A    According to the time stamp, it's listed at 2:39 p.m. and

2    56 seconds.

3    Q    Fair and accurate depiction, based on your review?

4    A    Yes.

10:46:54  5         MR. BOYLAN:  We move to admit this, Your Honor.

6              MS. JOHNSON:  No objection.

7              THE COURT:  Without objection, 907 is admitted.  May

8    be published.

9         (Government's Exhibit 907 was admitted in evidence.)

10:47:04 10         MR. BOYLAN:  Fast-forward to 2:15, please, and play to

11   2:18.

12        (Video played.)

13   **BY MR. BOYLAN:**

14   Q    Do you see the defendant there?

10:47:18 15   A    I do.

16             MR. BOYLAN:  And can you play to two minutes,

17   22 seconds and pause?

18        (Video played.)

19   **BY MR. BOYLAN:**

10:47:27 20   Q    Do you recognize the new camera angle that's appeared in

21   the bottom, right corner?

22   A    I do.

23   Q    And what is that?

24   A    That's video we've seen previously taken from open sources,

10:47:40 25   depicting the defendant walking up the staircase towards the

1    tunnel.

2    **Q**    These appear to occur at the same time?

3    **A**    They do.

4            MR. BOYLAN:  And can you play that to the end, please?

10:47:49  5    (Video played.)

6    **BY MR. BOYLAN:**

7    **Q**    What's the defendant doing in those two videos?

8    **A**    Walking into the tunnel.

9            MR. BOYLAN:  Can you pull up 405, please.

10:48:25  10           I believe this is admitted.

11           THE COURT:  It is in evidence.

12   **BY MR. BOYLAN:**

13   **Q**    Do you recognize this camera angle?

14   **A**    I do.

10:48:30  15   **Q**    What is it?

16   **A**    This is, again, surveillance camera footage from inside the

17   tunnel.

18           MR. BOYLAN:  And can you fast-forward to 6:17, please?

19   **BY MR. BOYLAN:**

10:48:43  20   **Q**    And what time is this?

21   **A**    This is at 2:55 p.m. in the afternoon.

22   **Q**    It is a little later than the last video we saw?

23   **A**    Yes.

24   **Q**    About how much later?

10:48:55  25   **A**    Just about 12, 13 minutes later.

1    **Q**   Do you recognize the defendant in this picture?

2    **A**   I do.

3    **Q**   Can you circle her?

4    **A**   (Witness complies.)

10:49:05  5    **Q**   And how can you be sure that that's the defendant?

6    **A**   Because I've watched other surveillance and body-worn

7    cameras that capture this moment as the defendant exits.

8            MR. BOYLAN:   Okay.   Can you play this to 6:30 please?

9        (Video played.)

10:49:22 10   **BY MR. BOYLAN:**

11   **Q**   Can you describe what the defendant's done?

12   **A**   The defendant is walking out of the portico entrance to the

13   tunnel.

14   **Q**   Is this after her first time in the tunnel?

10:49:43 15   **A**   Yes.

16           MR. BOYLAN:   And let's play this to 7:34.

17       (Video played.)

18   **BY MR. BOYLAN:**

19   **Q**   Do you recognize the defendant in this image?

10:50:57 20   **A**   I do.

21   **Q**   Can you circle her?

22   **A**   (Witness complies.)

23   **Q**   What's the defendant doing now?

24   **A**   The defendant is coming back into the tunnel.

10:51:06 25   **Q**   After she left the first time?

1    **A**    Yes.

2    **Q**    And this is about how much later after she left the first

3    time?

4    **A**    Just over a minute.

10:51:15  5           MR. BOYLAN:  Can you play this to 8:15 and pause?

6           (Video played.)

7    **BY MR. BOYLAN:**

8    **Q**    Can you tell us what we've seen the defendant do here?

9    **A**    Defendant has come back in the tunnel and climbed up on the

10:52:14 10    ledge on the right side.

11           MR. BOYLAN:  You can take that down.  And if you could

12    bring up 405.2.

13           THE COURT:  405.2?

14           MR. BOYLAN:  405.2, yes, Your Honor.

10:52:30 15           THE COURT:  It's in evidence.

16    **BY MR. BOYLAN:**

17    **Q**    Can you identify the defendant in this photo?

18    **A**    I can.  The defendant is circled in yellow.

19    **Q**    And about what time is this taken?

10:52:41 20    **A**    This is about 2:55 p.m. as the defendant leaves the tunnel.

21    **Q**    Thank you.

22           MR. BOYLAN:  And if you could bring up 614.1.

23           THE COURT:  614.1 is in evidence.

24    **BY MR. BOYLAN:**

10:52:58 25    **Q**    And do you recognize this?

1   **A**   I do.

2   **Q**   And what time does it take place?

3   **A**   This takes place at approximately 2:55 p.m.

4          MR. BOYLAN:  Can you fast-forward to 37 seconds?

10:53:10  5   (Video played.)

6   **BY MR. BOYLAN:**

7   **Q**   Can you identify the defendant here?

8   **A**   You can see the defendant circled in yellow.

9          MR. BOYLAN:  Can you bring up 906.1, please?

10:53:34 10          THE COURT:  Not in evidence.

11   **BY MR. BOYLAN:**

12   **Q**   Do you recognize the camera angle that's shown on the

13   screen?

14   **A**   I do.

10:53:40 15   **Q**   And what is it?

16   **A**   On the upper, left-hand corner is the surveillance camera

17   from the tunnel.

18   **Q**   And what time of day?

19   **A**   2:56 p.m.

10:53:52 20   **Q**   Is this a fair and accurate depiction of the tunnel at this

21   time of day, from your review of other video?

22   **A**   Yes it is.

23          MR. BOYLAN:  We would move to admit this, Your Honor.

24          MS. JOHNSON:  No --

10:54:02 25          THE COURT:  This is 906.1?

1             MR. BOYLAN:  Yes, Your Honor.

2             THE COURT:  906.1 is indicated as being a side by

3     side.  If you're going to admit it, you have to get to the side

4     by side before we do that.

10:54:14 5             MR. BOYLAN:  Sure.  I will do so.

6             Can you fast-forward to 2:10, please?

7     **BY MR. BOYLAN:**

8     **Q**   Do you recognize the second angle that's shown here?

9     **A**   I do.  The video on the right is a video obtained from the

10:54:28 10    defendant's mobile phone.

11    **Q**   Is that a fair and accurate depiction?

12    **A**   Yes.

13            MR. BOYLAN:  Your Honor, we again move to admit.

14            MS. JOHNSON:  No objection, Your Honor.

10:54:38 15            THE COURT:  Without objection, 906.1 is admitted.  May

16    be published.

17        (Government's Exhibit 906.1 was admitted in evidence.)

18            MR. BOYLAN:  Can you go back to the beginning, please?

19    I'm sorry.  Can you fast-forward to 1:55?

10:54:46 20    **BY MR. BOYLAN:**

21    **Q**   And do you recognize the defendant in this picture?

22    **A**   I do.

23    **Q**   And can you circle her?

24    **A**   (Witness complies.)

10:55:07 25    **Q**   And what is she doing?

1    **A**   She's standing on the ledge, partially obscured by a

2    flagpole in front of her.

3        MR. BOYLAN:   Okay.   Can you play this and pause at

4    2:27, please?

10:55:24  5        (Video played.)

6    **BY MR. BOYLAN:**

7    **Q**   Did you see the individual on the right in the

8    blue-and-white-striped shirt?

9    **A**   I do.

10:56:00 10  **Q**   Can you tell us what that individual did?

11   **A**   That individual seems to have some type of baton or pole

12   and striking at police officers at the front of the line.

13   **Q**   What's the defendant's reaction?

14   **A**   She's filming on her cell phone.

10:56:14 15      MR. BOYLAN:   Can you play again and pause at 2:36?

16       (Video played.)

17   **BY MR. BOYLAN:**

18   **Q**   I circled this object here on the left side of the screen.

19       Do you recognize that?

10:56:35 20  **A**   I do.

21   **Q**   And what is it?

22   **A**   It is a police riot shield.

23   **Q**   Can you tell us what's happening with the riot shield?

24   **A**   They're moving it to the front of the line.

10:56:47 25      MR. BOYLAN:   And can you play to 3:28?

1          (Video played.)

2     **BY MR. BOYLAN:**

3     **Q**   Do you recognize the defendant's voice?

4     **A**   I do.

10:57:46 5     **Q**   Can you tell us what she said?

6     **A**   She is saying, "this is America.  Are you fucking kidding

7     me?"

8          MR. BOYLAN:  Can you play again to four minutes?

9          (Video played.)

10:57:57 10          MR. BOYLAN:  Pause it here.

11          I paused it at 3:51.

12     **BY MR. BOYLAN:**

13     **Q**   Before we go further, I want to draw your attention to the

14     center of the cell phone video.

10:58:29 15          MR. BOYLAN:  Play it to four minutes, please.

16          (Video played.)

17          MR. BOYLAN:  Play for two or three more seconds,

18     please.

19          (Video played.)

10:58:43 20          MR. BOYLAN:  And we're paused at 4:03.

21     **BY MR. BOYLAN:**

22     **Q**   Can you tell us what you saw there?

23     **A**   You can see a police officer at the front of the line,

24     striking a rioter with their riot baton.

10:58:54 25          MR. BOYLAN:  And can you play to 4:10, please?

```
 1          (Video played.)
 2              MR. BOYLAN:  Play for three more seconds, please.
 3          (Video played.)
 4     BY MR. BOYLAN:
 5     Q   What's the defendant's reactions?
 6     A   The defendant is screaming to stop, stop it.
 7              THE COURT:  I'm sorry.  Screaming what?
 8              THE WITNESS:  "Stop.  Stop it.  Knock it off," Your
 9     Honor.
10              MR. BOYLAN:  Can you play again and pause -- let's go
11     to 4:55.
12          (Video played.)
13     BY MR. BOYLAN:
14     Q   Did you notice the rioter on the right screen, the brown
15     jacket?
16     A   I did.
17     Q   What did he do there?
18     A   He threw forward some type of pole at the police line.
19              MR. BOYLAN:  Can you play again and pause at 6:24?
20          (Video played.)
21     BY MR. BOYLAN:
22     Q   Do you recognize the defendant's voice?
23     A   I do.
24     Q   And what is she saying?
25     A   She says, "here; I got a loud mouth," and leans out and
```

Timestamps (left margin):
- 10:59:14 — line 5
- 10:59:28 — line 10
- 11:00:18 — line 15
- 11:00:27 — line 20
- 11:02:03 — line 25

1    says, "we need fresh people.  We need fresh people."

2    **Q**   How can you be sure it is the defendant's voice?

3    **A**   From the many hours of video that I've reviewed.  But also

4    with the two, surveillance video and mobile phone video,

11:02:22  5    married up, you can see the defendant's motions and mannerisms

6    match her speaking.

7    **Q**   Her body language matches her voice?

8    **A**   Yes.  Her body language.

9           THE COURT:  All right.  We are going to have to take

11:02:33  10   our morning break, so we will take it now.  15 minutes.  So I

11   will see you at 11:18.

12          (Jury excused.)

13          (Witness steps down.)

14          (In open court.  Jury not present.)

11:03:19  15          THE COURT:  How much longer, Mr. Boylan?

16          MR. BOYLAN:  I'm sorry, Your Honor?

17          THE COURT:  How much longer with this witness?

18          MR. BOYLAN:  30 minutes.

19          THE COURT:  All right.  I think you're going to break

11:03:38  20   Ms. Schesnol's promise, but we will see.

21          MR. BOYLAN:  Try not to, Your Honor.

22          MS. SCHESNOL:  We have an hour and a half until the

23   lunch break.

24          THE COURT:  I'm sorry.  What?

11:03:47  25          MS. SCHESNOL:  We have an hour and a half until the

```
       1    lunch break.
       2            THE COURT:  Well, you don't after this break, you
       3    know.
       4            COURTROOM DEPUTY:  All rise.
11:03:54  5        (Short recess.)
       6        (In open court.  Jury not present.)
       7            THE COURT:  Mr. Bradley, bring the jury in.
       8            All right.  It is 11:34.  We will see how good you are
       9    in your estimate, Mr. Boylan.
11:22:04 10            MR. BOYLAN:  Race to the finish, Your Honor.
      11            COURTROOM DEPUTY:  Your Honor, jury panel.
      12        (Jury present.)
      13            THE COURT:  Welcome back, members of the jury and
      14    Special Agent Gano.  And I remind you you're still under oath.
11:22:55 15            THE WITNESS:  Yes, Your Honor.
      16            THE COURT:  Mr. Boylan.
      17            MR. BOYLAN:  Can you bring back up Exhibit 906?
      18    906.1.  And fast-forward to 627.
      19            This is where we left off.
11:23:18 20            THE COURT:  What exhibit number is this?
      21            MR. BOYLAN:  906.1, Your Honor.
      22            THE COURT:  906.1.  In evidence.
      23    **BY MR. BOYLAN:**
      24    **Q**  Agent Gano, before we go any further, could I have you come
11:23:31 25    over to Exhibit 206?
```

1            (Witness steps down.)

2     **BY MR. BOYLAN:**

3     **Q**    Could you put a second red D where the defendant is located

4     in the video we're watching now?

11:23:51   5     **A**    Yes.   The defendant is currently located inside the tunnel

6     to the west terrace doors approximately right on the other side

7     of this D marked with a two.

8            (Witness resumes stand.)

9                MR. BOYLAN:   Could you play this?

11:24:16   10    **BY MR. BOYLAN:**

11    **Q**    And I want to draw your attention to the cell phone screen.

12               MR. BOYLAN:   And play it to 6:48, please.

13           (Video played.)

14    **BY MR. BOYLAN:**

11:24:57   15    **Q**    I'm placing a circle around a rioter there.

16               And can you -- do you see that?

17    **A**    I do.

18    **Q**    And can you tell us what's he doing?

19    **A**    That appears to be a rioter spraying the police line with

11:25:08   20    what appears to be OC spray.

21               MR. BOYLAN:   Can you play again to 7:02?

22           (Video played.)

23    **BY MR. BOYLAN:**

24    **Q**    Can you describe what the crowd is doing now?

11:25:36   25    **A**    The crowd is trying to push through the police line with

1     the weight of their numbers.

2     **Q**   Is it a constant push, or how would you describe it?

3     **A**   I would say it is a rhythmic push.  They're continually

4     rocking back and forth.

11:25:50  5   **Q**   I want to draw your attention to the defendant at this

6     point.

7               MR. BOYLAN:  And if you could play to 7:16, please.

8          (Video played.)

9     **BY MR. BOYLAN:**

11:26:09  10  **Q**   Do you recognize the defendant's voice?

11    **A**   I do.

12    **Q**   And what is she saying?

13    **A**   She's saying, "push, push, push," over and over again.

14    **Q**   And how can you be sure it is the defendant's voice?

11:26:20  15  **A**   I recognize the defendant's voice from hearing it through

16    many different sources.  And then also married up with the

17    surveillance camera footage, you can see the defendant's body

18    language mirroring her words.

19              MR. BOYLAN:  Can you play this for one more minute,

11:26:37  20  please, to 8:16?

21         (Video played.)

22    **BY MR. BOYLAN:**

23    **Q**   Can you describe the defendant now?

24    **A**   The defendant is standing still up on the ledge in the

11:27:44  25  tunnel, filming the crowd.

```
 1              MR. BOYLAN:  Can you take this down and bring up 620,
 2     please, which is admitted without the audio.
 3     BY MR. BOYLAN:
 4     Q   Have you reviewed this video, Agent Gano?
 5     A   I have.
 6     Q   And do you know what it is?
 7     A   It's a video obtained from the mobile device of another
 8     rioter.
 9     Q   And have you listened to the audio of this video?
10     A   I have.
11     Q   And have you compared it to other videos taken at the same
12     time and place?
13     A   Yes.
14     Q   And is the audio from this video fair and authentic, in
15     your opinion?
16     A   Yes, it is.
17              MR. BOYLAN:  Your Honor, we move to admit this fully.
18              THE COURT:  620?
19              MR. BOYLAN:  Yes.
20              THE COURT:  It is in evidence already.  With the audio
21     now?
22              MR. BOYLAN:  With the audio.  Now we'd like to admit
23     the audio as well.
24              THE COURT:  Any objection?
25              MS. JOHNSON:  I didn't have that as being an
```

1   objection.  We've already listened to it played.

2           THE COURT:  All right.  It's in evidence, and we can

3   listen to the audio.

4           MR. BOYLAN:  Okay.

11:28:45  5   **BY MR. BOYLAN:**

6   **Q**  And where was this video taken from?

7   **A**  This video was taken immediately adjacent to the

8   defendant's position on the ledge in the west terrace tunnel.

9           MR. BOYLAN:  Can you play this and pause it at four

11:29:06 10   seconds?

11     (Video played.)

12         MR. BOYLAN:  Go forward a few more frames, if you can.

13   Keep going.  Keep going.

14     (Video played.)

11:29:15 15         MR. BOYLAN:  And you can stop there.  We're still at

16   four seconds.

17   **BY MR. BOYLAN:**

18   **Q**  Do you recognize the defendant's arm in this video?

19   **A**  I do.

11:29:21 20         MR. BOYLAN:  And can you go ahead and play the rest of

21   this video, please?

22     (Video played.)

23   **BY MR. BOYLAN:**

24   **Q**  Do you recognize the defendant's voice there?

11:29:37 25   **A**  I do.

| | | |
|--|--|--|
| | 1 | **Q**   What is she saying? |
| | 2 | **A**   This is another perspective of her shouting, "push, push, |
| | 3 | push." |
| | 4 | **Q**   At the same time as the video we saw previously? |
| 11:29:46 | 5 | **A**   Yes. |
| | 6 | **Q**   Have you watched CCTV depicting the defendant's entire time |
| | 7 | on the ledge in the tunnel? |
| | 8 | **A**   Yes, I have. |
| | 9 | **Q**   Multiple times? |
| 11:29:57 | 10 | **A**   Yes. |
| | 11 | **Q**   How long in total does the defendant spend on that ledge? |
| | 12 | **A**   Approximately 24 minutes total. |
| | 13 | MR. BOYLAN:  Can you bring up 612, please? |
| | 14 | My notes say that this is admitted but without the |
| 11:30:15 | 15 | sound. |
| | 16 | THE COURT:  Correct. |
| | 17 | **BY MR. BOYLAN:** |
| | 18 | **Q**   Okay.  Do you recognize this video? |
| | 19 | **A**   I do. |
| 11:30:22 | 20 | **Q**   And what is it? |
| | 21 | **A**   It is a 360 GoPro image taken from within the crowd. |
| | 22 | **Q**   And have you listened to the audio from this video? |
| | 23 | **A**   I have. |
| | 24 | **Q**   And have you listened to other videos taken |
| 11:30:37 | 25 | contemporaneously? |

1    **A**    Yes, I have.

2    **Q**    And is the audio from this video a fair and accurate

3    depiction of the sounds on January 6, 2021 at this time and

4    place?

11:30:46  5    **A**    Yes, it is.

6            MR. BOYLAN:  Your Honor, we would move to admit this

7    with sound.

8            MS. JOHNSON:  I'm going to object, Your Honor.

9            And could we have a bench conference?

11:30:53 10          THE COURT:  Yes.

11        (Bench discussion:)

12          THE COURT:  The objection is on what basis?

13          MS. JOHNSON:  The objection, Your Honor, is, one,

14   relevance; two, that it's cumulative; three, that there's

11:31:26 15   inadmissible hearsay; and four, the distorted image of it from

16   the GoPro camera.

17          THE COURT:  Distorted image doesn't have anything to

18   do with the audio.  It's already been admitted in terms of its

19   video.

11:31:37 20          MS. JOHNSON:  Sure.  Those continue to be my

21   objections to the audio.

22          The other part of it, Your Honor, is that I'm not even

23   sure that we've established what actual time -- there's no time

24   stamp on this video.  And as it's already been indicated, this

11:31:50 25   is happening for three-plus hours at the tunnel.  And I don't

1  believe there's any identification of her in this actual video.

2              THE COURT:  Do you understand all the objections?

3              MR. BOYLAN:  I don't know that I can remember them

4  all.

11:32:03  5              We will have the witness identify the time of the

6  video and the defendant in the video.

7              THE COURT:  All right.  The other objections.

8  Hearsay.

9              MR. BOYLAN:  Hearsay -- we're not admitting anything

11:32:16  10  spoken on this individual video for the truth of the matter

11  asserted.

12              THE COURT:  And cumulative.

13              MR. BOYLAN:  I don't think we've admitted a video yet

14  of the defendant being ejected from the tunnel.

11:32:27  15              MS. JOHNSON:  Multiple videos.

16              MS. SCHESNOL:  From this vantage point.

17              MR. BOYLAN:  From this vantage point.

18              MS. JOHNSON:  It doesn't add anything to it, Your

19  Honor.  It still makes it cumulative.  There have been at least

11:32:36  20  four to six different videos of her being taken from the

21  tunnel.

22              THE COURT:  Has he addressed each of your objections?

23              MS. JOHNSON:  Yes, Your Honor.

24              THE COURT:  All right.  I will overrule the hearsay

11:32:46  25  objection.  Cumulative, there's some validity to that point,

1    but I don't think this is going to be -- I do think it's a

2    different vantage point and isn't going to be extending the

3    trial unnecessarily or with any prejudice.  And the distortion

4    I don't think has anything to do with the audio aspect.

11:33:07  5         And for that reason, I will overrule the objection and

6    allow the audio portion to be admitted.

7         (End of bench discussion.)

8         (In open court.)

9         THE COURT:  All right.  With respect to 612, I have

11:33:28 10   overruled a series of objections and will allow the video to be

11   admitted, including the audio portion.

12         MR. BOYLAN:  Can you play -- I'm sorry.  Can you

13   fast-forward to 23 seconds, please?

14   **BY MR. BOYLAN:**

11:33:47 15   **Q**   Can you identify the defendant in this video?

16   **A**   Yes.  The defendant is circled in yellow.

17         MR. BOYLAN:  And can you play to 32 seconds, please?

18         (Video played.)

19   **BY MR. BOYLAN:**

11:34:05 20   **Q**   And what can we see -- what can we see in this video?

21   **A**   This is an outside perspective of the defendant being

22   ejected from the tunnel.

23   **Q**   What time is this video depicting?

24   **A**   Approximately 3:19 p.m.

11:34:20 25        MR. BOYLAN:  Can you pull up 613, please?

                    And I, again -- this one has been admitted but without

the sound.

                    THE COURT:  Correct.

                    MR. BOYLAN:  Can you fast-forward to ten seconds,

please?

**BY MR. BOYLAN:**

**Q**   Agent Gano, have you reviewed this video for your

testimony?

**A**   Yes, I have.

**Q**   And in comparison to other videos taken at the same time

and place, is it a fair and accurate depiction?

**A**   Yes, it is.

**Q**   And have you listened to the audio from this video?

**A**   Yes, I have.

**Q**   And it fairly and accurately depicts the sounds at this

time and place?

**A**   Yes, it does.

                    MR. BOYLAN:  Your Honor, we would move to admit this

with sound.

                    MS. JOHNSON:  No objection, Your Honor.

                    THE COURT:  Without objection, sound portion of 613

may be admitted and published to the jury.

                    MR. BOYLAN:  Can you play to 20 seconds, please?

       (Video played.)

**BY MR. BOYLAN:**

1   **Q**   Can you describe what we've seen here?

2   **A**   This is another perspective from within the crowd of the

3   defendant being ejected from the tunnel.

4           MR. BOYLAN:  Can you take this down and bring up 618,

11:35:42  5   please?

6           THE COURT:  Not yet in evidence.

7   **BY MR. BOYLAN:**

8   **Q**   Do you recognize this?

9   **A**   I do.

11:35:50  10   **Q**   And what is it?

11   **A**   This is another video obtained from within the crowd.

12   **Q**   And have you reviewed the video in preparation for your

13   testimony today?

14   **A**   I have.

11:36:00  15   **Q**   And is it a fair and accurate depiction?

16   **A**   Yes, it is.

17           MR. BOYLAN:  Your Honor, we would move to admit this.

18           MS. JOHNSON:  I'm sorry, Your Honor.  No objection.

19           THE COURT:  Thank you.  That's all right.

11:36:15  20           618 is admitted.  May be published.

21       (Government's Exhibit 618 was admitted in evidence.)

22           MR. BOYLAN:  Can you play this to 30 seconds and

23   pause, please?

24       (Video played.)

11:36:39  25           MR. BOYLAN:  I paused it at 15 seconds.

**BY MR. BOYLAN:**

Q   Can you describe the portico that's on the right side of the screen?

A   On the right side of the screen is the portico or the entrance to the lower west tunnel.

Q   The tunnel we've been describing, seeing?

A   The tunnel we've seen in multiple videos, yes.

Q   And what's on the left side of the screen?

A   On the left side of the screen is a window to an office space adjacent to the tunnel.

Q   And approximately what time of day is this?

A   This is after 3:19 p.m. when the defendant had been ejected from the tunnel.

Q   Sometime after 3:19?

A   Sometime after 3:19.

        MR. BOYLAN:   And can you play, I'm sorry, to 30 seconds this time?

    (Video played.)

        MR. BOYLAN:   Can you play another 21 seconds to 51 seconds, please?

    (Video played.)

**BY MR. BOYLAN:**

Q   Do you recognize the defendant here?

A   I do.

Q   And can you describe what we've just seen?

1    **A**    After a window was broken out of the upper portion of this

2    window, the defendant pops up, filming on her cell phone.

3    **Q**    And from your investigation, if you know, is this CCTV

4    taken from inside that room?

11:38:25   5    **A**    Not from inside the room, no.

6    **Q**    So the other sources of video you've seen for this

7    location, what were they?

8    **A**    They were obtained from the defendant's mobile device and

9    the devices of other rioters in that same room.

11:38:40  10            MR. BOYLAN:   Can you play this and pause again at

11    1:19?

12        (Video played.)

13    **BY MR. BOYLAN:**

14    **Q**    Describe the defendant again for us.

11:39:14  15    **A**    The defendant continues to stand in the window, filming the

16    crowd.

17    **Q**    Can I ask you one more time to make a mark on our 206

18    exhibit?

19    **A**    Yes.

11:39:26  20        (Witness steps down.)

21    **BY MR. BOYLAN:**

22    **Q**    This time, can I ask you to put a D3?

23    **A**    So at this time of the day and just depicted in the video,

24    we see the defendant here at this window.

11:39:54  25        (Witness resumes stand.)

                    MR. BOYLAN:  You can take this video down.

                    If you could bring up 804, please.

                    And this is admitted.

**BY MR. BOYLAN:**

11:40:23  Q   Do you recognize this video?

          A   I do.

          Q   And what is it?

          A   This is a video filmed on the defendant's mobile phone from
within the room we just saw her standing in the window of.

11:40:39      MR. BOYLAN:  Can you play this and stop it at one
minute, 30 seconds?

              (Video played.)

**BY MR. BOYLAN:**

          Q   Do you recognize the defendant's voice in that video?

11:42:12  A   I do.

          Q   And can you tell us what she said?

          A   She's talking about breaking the windows because they're
getting gassed.

                  MR. BOYLAN:  You can go ahead and play this to the
11:42:21  end.

              (Video played.)

**BY MR. BOYLAN:**

          Q   Do you recognize the defendant's voice there?

          A   I do.

11:43:19  Q   And can you tell us what she said?

1    **A**    She's talking about being gassed multiple times and how she

2    was inside, taking video that she has and it was crazy.

3              MR. BOYLAN:  Can you bring up 806, please, which is

4    not admitted?

11:44:10   5              Court's indulgence, Your Honor.

6              THE COURT:  Got to find it.  Yeah.

7         (Discussion off the record.)

8              MR. BOYLAN:  Can you help me with the Elmo?

9              MS. SCHESNOL:  We need to switch, Mr. Bradley.

11:44:50  10    Mr. Bradley?

11             COURTROOM DEPUTY:  I'm sorry.

12             MS. SCHESNOL:  Can we switch to the overhead

13    projector?

14             Is this being displayed to the jury?

11:45:17  15             COURTROOM DEPUTY:  It shouldn't be.  No.

16             MR. BOYLAN:  Okay.  Jackie, do you know how to operate

17    this?

18             MS. SCHESNOL:  It should be on.

19             MS. JOHNSON:  It's on.

11:45:37  20             MR. BOYLAN:  It's on, but I'm getting too much video.

21    Can I zoom out?  It's not showing the whole thing.

22             MS. OWENS:  I have it on my computer if you just want

23    to switch to my screen.

24             MR. BOYLAN:  I would love that.  Thank you very much.

11:46:11  25             THE COURT:  I will note that to continue the

1    confusion, in my exhibit book, 806, which is what you're trying

2    to admit now, actually is a copy of what I think is 809.

3              MR. BOYLAN:  Okay.  We will fix that, Your Honor.

4              THE COURT:  I'm more interested in your getting this

11:46:29  5   taken care of.

6              MR. BOYLAN:  Thank you.

7    **BY MR. BOYLAN:**

8    **Q**   Do you recognize what's being shown on your screen now?

9    **A**   Yes, I do.

11:46:36  10  **Q**   And can you tell us what it is?

11   **A**   It is a Facebook post made by the defendant, depicting

12   parts of the video we just saw.

13   **Q**   And are the pictures a fair and accurate representation?

14   **A**   Yes.

11:46:49  15             MR. BOYLAN:  Your Honor, we would move to admit this.

16             MS. JOHNSON:  No objection.

17             THE COURT:  Without objection, 806 is admitted.  May

18   be published.

19        (Government's Exhibit 806 was admitted in evidence.)

11:46:57  20  **BY MR. BOYLAN:**

21   **Q**   And can you read the top line?

22   **A**   The caption says, patriots are in our house.

23             MR. BOYLAN:  Would you guys do 807 for me, too?  Thank

24   you.

11:47:19  25             And this is not admitted.

1    **BY MR. BOYLAN:**

2    **Q**   Do you recognize this image?

3    **A**   I do.

4    **Q**   And what is it?

11:47:23  5    **A**   It's an image from a Facebook post of -- made by the

6    defendant.

7            MR. BOYLAN:  We would move to admit this.

8            THE COURT:  Do you want to give the date of it?

9            MR. BOYLAN:  For 806 or for this one, Your Honor?

11:47:38  10            THE COURT:  Well, for 806.  You didn't do it.

11            MR. BOYLAN:  I didn't.

12            THE COURT:  But this one has a date on it, doesn't it?

13            Any objection to the admission?

14            MS. JOHNSON:  No, Your Honor.

11:47:47  15            THE COURT:  It's admitted, but I think it would be

16    helpful if you inform the jury of the date and time.

17        (Government's Exhibit 807 was admitted in evidence.)

18    **BY MR. BOYLAN:**

19    **Q**   Agent Gano, do you see a date on this image?

11:47:55  20    **A**   I do.

21    **Q**   And what is it?

22    **A**   January 6th.

23    **Q**   Thank you.  And what is it depicting?

24    **A**   It depicts the defendant in the room that we just saw.

11:48:06  25    **Q**   Okay.

```
 1                THE COURT:  At what time?

 2                THE WITNESS:  The time says 2:40 p.m., Your Honor.

 3                MR. BOYLAN:  Thank you.  Thank you, you guys.

 4           Can you bring up 621, please?  It is a video.

 5                THE COURT:  It is in evidence.

 6                MR. BOYLAN:  621 is admitted.  Can you play this,

 7      please, and pause at ten seconds?

 8           (Video played.)

 9                THE COURT:  It's only 12 seconds long.

10                MR. BOYLAN:  Yeah.  And pause at ten seconds.

11           (Video played.)

12      BY MR. BOYLAN:

13      Q   Do you recognize the defendant in this image?

14      A   I do.

15      Q   And what's she doing?

16      A   She's standing in the window of that office space, filming

17      the crowd outside.

18                MR. BOYLAN:  Can you bring up 808, please?

19                This is not admitted.

20           (Discussion off the record.)

21      BY MR. BOYLAN:

22      Q   Do you recognize this?

23                MR. BOYLAN:  Well, can you play the first ten seconds,

24      no sound, please?

25           (Video played.)
```

1           MR. BOYLAN:  You can stop it there.

2    **A**   I do recognize this video.

3    **BY MR. BOYLAN:**

4    **Q**   And what is it?

11:49:54 5   **A**   This is another video taken by the defendant on her mobile

6    phone.

7    **Q**   And is it a fair and accurate depiction of the events of

8    January 6th at this time and place?

9    **A**   Yes, it is.

11:50:05 10          MR. BOYLAN:  Your Honor, we would move to admit this.

11          MS. JOHNSON:  Your Honor, I'd just ask if there's

12   anything further they can lay a foundation regarding the time.

13   **BY MR. BOYLAN:**

14   **Q**   Can you describe the lighting in the video?

11:50:16 15  **A**   Yes.  The lighting seems to be -- the Capitol lighting, the

16   street lamps seem to have come on.  And it seems like the sky

17   is darker, indicating it might be toward the evening.

18   **Q**   Relative to other events that we've described?

19   **A**   Yes.  It would be after 3:19 p.m. and closer towards

11:50:40 20  evening time, 5:00 p.m.

21          THE COURT:  Anything else with respect to an

22   objection?

23          MS. JOHNSON:  No objection, Your Honor.  Thank you.

24          THE COURT:  All right.  808 is admitted and may be

11:50:48 25  published.

```
 1            (Government's Exhibit 808 was admitted in evidence.)
 2                 MR. BOYLAN:  Can you rewind to the beginning and play
 3    to 15 seconds, please?
 4            (Video played.)
```
11:51:10 **BY MR. BOYLAN:**
```
 6    Q    Do you recognize the defendant's voice?
 7    A    I do.
 8    Q    And what is she saying?
 9    A    She is saying, "this is America.  I hope you guys are
```
11:51:18 10   enjoying the show."
```
11                 MR. BOYLAN:  And can you play to the end, please?
12            (Video played.)
```
13   **BY MR. BOYLAN:**
```
14    Q    Can you tell us, if you know, what the banging sounds are
```
11:51:56 15   that we heard?
```
16    A    I believe the banging sounds and the cloud is the
17    deployment of CS gas to clear the crowd on the terrace.
18                 MR. BOYLAN:  Can you bring up 619, please?
19                 This is not admitted.
```
11:52:12 20                 THE COURT:  619?
```
21                 MR. BOYLAN:  Yes.
```
22   **BY MR. BOYLAN:**
```
23    Q    Do you recognize this?
24    A    I do.
```
11:52:19 25    Q    What is it?

**A**   This is an open source video taken from someone else in the

crowd.

**Q**   Is it a fair and accurate depiction?

**A**   Yes.

11:52:24          MR. BOYLAN:  Your Honor, we would move to admit.

          MS. JOHNSON:  No objection, Your Honor, other than to

the hearsay, and we can address that later.

          THE COURT:  Hearsay objection is overruled.  It is

admitted.  May be published.

11:52:37          (Government's Exhibit 619 was admitted in evidence.)

          MR. BOYLAN:  And you can play this and pause at

22 seconds, please.

          (Video played.)

**BY MR. BOYLAN:**

11:53:05 **Q**   Can you describe the lighting conditions in this video?

**A**   Like the last video we saw, it appears to be closer to the

evening hours of January 6th.

          The Capitol's exterior lighting has come on, and the

sky is darkening.

11:53:21 **Q**   Can you describe the general conditions of the Plaza as you

see it there?

**A**   The crowd is starting to disperse.  You can see a haze in

the area.  As in the last video that we saw, there appears to

be CS gas deployed.

11:53:37          MR. BOYLAN:  And you can play this -- just play it.

1       (Video played.)

2             MR. BOYLAN:  You can pause there.

3   **BY MR. BOYLAN:**

4   **Q**   Do you recognize the defendant at 23 seconds?

11:53:43  5   **A**   I do.

6   **Q**   And can you describe what she's doing?

7   **A**   She is walking away from the Capitol through the crowd,

8   holding her cell phone in her hand.

9             MR. BOYLAN:  And play the rest, please.

11:53:56  10      (Video played.)

11      (Discussion off the record.)

12            MR. BOYLAN:  No further questions, Your Honor.

13            THE COURT:  Ms. Johnson?

14                        **CROSS-EXAMINATION**

11:54:26  15  **BY MS. JOHNSON:**

16  **Q**   Okay.  We covered a lot of ground in the last little bit.

17            Let's start:  You were assigned this case January 27th

18  of 2021?

19  **A**   I don't remember the specific date.

11:55:14  20  **Q**   So January of 2021?

21  **A**   Yes.

22  **Q**   And your investigation was related to specifically,

23  obviously, multiple individuals' conduct, but, in this case

24  specifically, Ms. St. Cyr?

11:55:29  25  **A**   In this particular case, it was Ms. St. Cyr's conduct, yes.

1    **Q**    You reviewed open source media posts?

2    **A**    Yes, ma'am.

3    **Q**    You reviewed publically accessible photos and videos?

4    **A**    Yes, ma'am.

11:55:43   5    **Q**    You also reviewed Ms. St. Cyr's Facebook, Instagram,

6    Twitter, anything that was available?

7    **A**    Yes.  Some social media.

8    **Q**    You also reviewed YouTube videos?

9    **A**    Yes, ma'am.

11:55:59   10    **Q**    And in all of this video that you observed and from your

11    own experience as you were there that day, there were

12    individuals in the crowd who were engaged in violence; is that

13    right?

14    **A**    That is correct.

11:56:15   15    **Q**    And you said you watched a lot of hours of video and,

16    specifically, 15 to 20 of Ms. St. Cyr.

17         You don't ever see her engaging in any violence?

18    **A**    Not in any violence, no, ma'am.

19    **Q**    There are individuals that are being harmed and hurt in the

11:56:35   20    crowd, both in the crowd and in law enforcement?

21    **A**    Yes.

22    **Q**    And you don't see Ms. St. Cyr involved in any of that?

23    **A**    Not that I saw, no.

24    **Q**    You were aware, as part of your investigation and your

11:56:49   25    position within the FBI, that there were groups that discussed

 1    traveling to the Capitol that day while armed and with a plan

 2    to do something, for lack of a better word, bad?

 3    **A**   Broadly speaking, yes.

 4    **Q**   And in your investigation, you were able to determine that

11:57:11  5    Ms. St. Cyr had no plan other than to travel to the Capitol

 6    with her husband, Troy?

 7    **A**   That is correct.

 8    **Q**   And that she was not a part of any larger group or

 9    organization of people going to the Capitol?

11:57:22  10   **A**   Not that we found, no.

11    **Q**   And you've done a lot of investigating in this case?

12    **A**   Yes; a fair amount.

13    **Q**   And if there was something to find, you likely would have

14    found it?

11:57:35  15   **A**   I believe so, yes.

16    **Q**   This investigation started in Ms. St. Cyr's case based on a

17    tip from someone in the public?

18    **A**   Yes.

19    **Q**   And an interview was conducted with that individual?

11:57:48  20   **A**   Yes.

21    **Q**   And that individual provided some of these social media

22    posts to get this investigation started?

23    **A**   Many tips were submitted that provided information about

24    Ms. St. Cyr, but there were some followup interviews, yes.

11:58:04  25   **Q**   And was there only the one followup actual interview

1    outside of the multiple tips?

2    **A**   I conducted one followup interview with a person who

3    submitted a tip, yes.

4    **Q**   And that was just a phone interview; is that right?

11:58:16  5    **A**   That was correct.

6    **Q**   And based on these tips and videos, Ms. St. Cyr was

7    identified pretty quickly?

8    **A**   That is correct, yes.

9    **Q**   And I believe in your reports it's within about seven days

11:58:33  10   of January 6th.

11   **A**   That sounds correct.

12   **Q**   And it seems pretty clear, based on multiple Facebook

13   posts, Instagram, Twitter, all the things you reviewed, that

14   she wasn't attempting to hide her involvement with January 6.

11:58:50  15   **A**   That is a fair characterization, yes.

16   **Q**   Besides just looking and observing all of these things, you

17   did, in fact, send record requests and preservation letters to

18   all of the large social media organizations, right?

19   **A**   We did, yes.

11:59:08  20   **Q**   And you did, in fact, get responses?

21   **A**   We did.

22   **Q**   And there was a lot of information?

23   **A**   Yes.

24   **Q**   You were able to review her entire Facebook, YouTube,

11:59:23  25   Twitter, and Instagram posts?

1    **A**   Facebook -- I reviewed her Facebook, her YouTube, and

2    portions -- yes.  Facebook and YouTube.

3    **Q**   And you didn't observe outside of January 6th Ms. St. Cyr

4    involved in any other type of posts depicting her engaging in

11:59:48  5    violence?

6    **A**   Not that I saw, no.

7    **Q**   You haven't seen any posts about her engaging in any

8    assaultive behavior against a police officer.

9    **A**   Not that I saw.

11:59:56  10   **Q**   Or encouraging violence against a police officer or others?

11   **A**   Not beyond what was on January 6th, no.

12   **Q**   You also obtained a search warrant for her phone?

13   **A**   I did not swear to that warrant but other FBI agents did.

14   **Q**   So a search warrant was obtained for her phone?

12:00:24  15   **A**   Yes, ma'am.

16   **Q**   And you were able to search her phone?

17   **A**   Yes.

18   **Q**   And there weren't any messages or emails that showed a

19   specific intent to come to the Capitol and do something

12:00:36  20   criminal?

21   **A**   No.

22   **Q**   Do you recall watching or listening to or in the time that

23   you've been a part of this investigation reviewing President

24   Trump's speech?

12:00:55  25   **A**   I have reviewed parts of it before and have a recollection

1    broadly of what it was.

2    **Q**   Okay.  I'm just going to ask you a couple of questions

3    about it.

4    **A**   Thank you.

12:01:06  5    **Q**   But he remarked in that speech that we are going to walk

6    down to the Capitol, and I'm going to be there with you; is

7    that right?

8               MR. BOYLAN:  Objection, Your Honor.  Calls for

9    hearsay.

12:01:18  10              THE COURT:  Overruled.

11    **A**   I do remember that that was part of the speech, yes.

12    **BY MS. JOHNSON:**

13    **Q**   He further stated that all Vice President Pence has to do

14    is send it back to the states and recertify?

12:01:30  15    **A**   Something like that, yes.

16    **Q**   And do you understand that the former president was

17    referring to the election results that the Congress was there

18    to certify that day?

19    **A**   I believe that was the subject.

12:01:46  20    **Q**   And the vice president could, in fact, refer the matter

21    back to the states and they could consider whatever issues had

22    been raised involving fraud and irregularities?

23    **A**   Is that a statement by the president during the speech?

24    **Q**   No.  I'm asking you whether you know that.

12:01:59  25              I apologize for the poor question.

1  **A**   No.  I do not have a solid -- I understand the general

2  process.  But as far as specifically what the different steps

3  are, I don't have that general knowledge.

4         MS. JOHNSON:  Your Honor, I would ask the Court at

12:02:15  5  this time to take judicial notice pursuant to Federal Rule of

6  Evidence 201 of Title III United States Code, Section 15, 16,

7  and 17.

8         THE COURT:  Any problem from the perspective of the

9  government?  They're wanting me to take judicial notice of

12:02:41 10  certain federal statutes.

11         MR. BOYLAN:  There's no objection.

12         THE COURT:  All right.  And you're asking me to take

13  judicial notice in order to admit them as evidence in the case?

14         MS. JOHNSON:  That's correct, Your Honor.

12:02:52 15         THE COURT:  Statutes don't have to be admitted as

16  evidence, but okay.  Go ahead.

17         MS. JOHNSON:  If I could now please publish to the

18  jury -- well, let me first --

19  **BY MS. JOHNSON:**

12:03:04 20  **Q**   Would you like a second to take a look at it?  Do you think

21  that would be helpful?

22  **A**   Yes.

23  **Q**   Just as with those Safeway documents, I'm just going to ask

24  you a couple of questions about them.

12:03:17 25  **A**   Thank you.

1           MS. JOHNSON:  Okay.  Let's start with Exhibit 16,

2      please.

3           THE COURT:  You're talking about on your exhibit list?

4           MS. JOHNSON:  Yes, Your Honor.  I'm sorry.  Defense

12:03:32    5      Exhibit Number 16.

6           THE COURT:  So you want those Title III provisions

7      labeled as Defense Exhibit 16?

8           MS. JOHNSON:  And they are labeled as such, Your

9      Honor.

12:03:43   10           THE COURT:  We would go ahead and do that.

11           MS. JOHNSON:  And if I could have just a second.

12           THE COURT:  And you've asked me to take judicial

13      notice of them.  I'll do so so that you can utilize them with

14      this witness.

12:04:17   15      (Witness reviews document.)

16      **BY MS. JOHNSON:**

17      **Q**  So if we can -- have you had a second to just kind of look

18      at this Section 15?  And I will try and point it out to you.

19      **A**  Yes, ma'am.  Briefly.

12:04:38   20      **Q**  Okay.  Would you have any reason to disagree with me if I

21      said that the members of Congress are supposed to meet at 1:00

22      p.m. in the hall of the House of Representatives?

23      **A**  I mean, if that is within this document, no; I would not

24      disagree.

12:04:52   25      **Q**  Okay.  And it would take me just a second and I could find

1    it for you.  The screen is so small, so I apologize.

2    **A**   It was just highlighted.  Thank you.

3    **Q**   Thank you.  And the president of the Senate is supposed to

4    be the presiding officer?

12:05:10  5    **A**   Yes.  I see that in here.

6    **Q**   Okay.  And that, at the time, was former Vice President

7    Mike Pence?

8    **A**   Yes.

9    **Q**   And then the next couple of sentences there essentially

12:05:23  10   talk about the process, but I'm going to make it a little

11   briefer.  But, essentially, there's two individuals appointed

12   from both the House and the Senate, and they are to certify the

13   papers that come from each state.

14        Would you agree with that statement?

12:05:40  15   **A**   Yes.  If it's contained within this description, yes.

16   **Q**   And the states open these certifications in alphabetical

17   order?

18   **A**   Yes.

19        THE COURT:  Are you just going to be asking this

12:05:55  20   witness to agree with the language of the statute?

21        MS. JOHNSON:  Yes, Your Honor.

22        THE COURT:  I don't know why you're doing that.

23        MS. JOHNSON:  Your Honor, it goes to her -- Ms. St.

24   Cyr's intent.

12:06:06  25        THE COURT:  No.  No.  No.  That's fine in terms of --

1   this witness -- all he's doing is reading the words that you

2   put in front of him as an exhibit.

3          MS. JOHNSON:  I agree, Your Honor.  It seems similar

4   to me to the Safeway documents.

12:06:20  5          THE COURT:  No.  No.  No.  He worked on those and was

6   familiar with them.

7          MS. JOHNSON:  I understand.  I'm just asking him

8   questions about the document.  And I think it's important for

9   the jury to hear.

12:06:30  10          THE COURT:  I'm going to let you do it, but I don't

11   think it is a proper method of examination.  But I will let you

12   do it so we get this done within a reasonable period of time.

13          MS. JOHNSON:  It's not very long, Your Honor.

14   **BY MS. JOHNSON:**

12:06:43  15   **Q**   And the objections are made in writing, and a person from

16   the House and the Senate both have to object in order for it to

17   be valid?

18   **A**   Yes.  If it is in here.

19   **Q**   And then when an objection is made, the House is recessed

12:06:59  20   in order to debate; is that right?

21   **A**   Yes.

22   **Q**   And then two Houses can reject the electoral certification

23   when they agree that such vote or votes have not been so

24   regularly given?

12:07:17  25   **A**   Yes.  It appears so.

                    MS. JOHNSON:  If we could go to the next page, please,

Section 17.  And I'm very close to wrapping up with this

document.

**BY MS. JOHNSON:**

12:07:29   Q   But Section 17 talks about the time limit for debate.  And

it's clear that each person in a House can talk for either five

minutes but no more than two hours?

    A   Yes.  It looks like that's written in here.

    Q   Okay.  So if you would bear with me for just a second, if

12:07:51   there's -- it seems like, if you would agree with me, there's

50 states.

    A   Yes, of course.

    Q   And we're lawyers, not mathematicians, but should be easy

enough.  50 times two, would you agree, is 100?

12:08:18   A   I would.

    Q   Okay.  And then if you divide 100 total possible hours by

24 hours in a day, that's just a little over four days?

    A   That sounds about right, yes.

    Q   And so Section 16 further provides for recesses of the

12:08:40   joint session but says that it can't take any further recesses

if the electoral count hasn't been certified by the fifth day.

           Does that look right?

    A   I see the fifth calendar day, yes.

           MS. JOHNSON:  Thank you.  We're finished with this,

12:09:03   Ms. Owens.

**BY MS. JOHNSON:**

1

2    **Q**   And the election in 2020 did end up being certified?

3    **A**   It did.

4    **Q**   And the vice president at the time and other legislators

12:09:12  5    were not deterred from completing this electoral count?

6    **A**   They reconvened to complete it, yes.

7    **Q**   And, I mean, really they had a commitment and a

8    conviction -- I'm sorry.  You wouldn't know that.  I apologize.

9    I'll withdraw that question.

12:09:29  10          But besides this protest or interruption, the senators

11    and representatives completed their job that day?

12    **A**   They did.

13          THE COURT:  That day or early the next day?

14          MS. JOHNSON:  Into the next morning.  Thank you, Your

12:09:47  15    Honor.

16    **BY MS. JOHNSON:**

17    **Q**   I would like to talk a little bit about the Safeway

18    exhibits.

19    **A**   Yes.

12:09:55  20    **Q**   And at this time, I would like to -- and this might be a

21    weird question, but, as part of being the case agent in this

22    case, have you reviewed the defense exhibits in this case?

23    **A**   Very briefly and not comprehensively.

24    **Q**   Okay.  I would just like to show you Defense Exhibit 9.

12:10:23  25    **A**   Yes.  This looks familiar.

1    **Q**   And do you understand what this is?

2    **A**   Could you scroll down, please?  I'm looking for the date on

3    the document.

4    **Q**   It does not have a date specifically on this.

12:10:48  5    **A**   Broadly I understand that it is a publication of the D.C.

6    Register, but beyond that, no.

7    **Q**   So does it purport to --

8              MS. JOHNSON:  In fact, Your Honor, could I have just a

9    moment?

12:11:05  10             THE COURT:  Certainly.

11         (Discussion off the record.)

12             MS. JOHNSON:  Your Honor, again, I would ask that the

13   Court take judicial notice of -- not of this one but of Ten,

14   Defense Exhibit 10 and Defense Exhibit 11, which are the D.C.

12:11:36  15   mayor's order from March 23rd, 2020 and January 6th, 2021,

16   which Exhibit 9 provides the publication authority for.

17             THE COURT:  All right.  So the view of the government?

18   The defense requests that I take judicial notice of two orders

19   of the D.C. mayor -- one from March of 2020, one from

12:12:05  20   January 6th, 2021 -- and of a publication authority from the

21   District of Columbia.

22             MR. BOYLAN:  Your Honor, I'm not sure what the

23   relevance of these documents is.

24             THE COURT:  If we need to discuss relevance, we will

12:12:21  25   do it in a bench conference, so come on up.

1        (Bench discussion:)

2                THE COURT:  The objection is relevance.

3                MS. JOHNSON:  I will try to be brief and succinct.

4                It appears that the government's Safeway evidence has

12:12:54  5      been admitted to show some type of effect on commerce and that

6        they're blaming the insurrection or riot for that effect on

7        commerce.  And, specifically, the D.C. mayor's order excluded

8        essential workers; that they were not subject to a curfew and

9        that they were not forced or required to close; that it was,

12:13:25 10      instead, a choice of Safeway to close.  So I think it's

11       important that that full context is applied and allowed to be

12       argued.

13                THE COURT:  That's the proffer of why she's

14       introducing this evidence.

12:13:36 15                MR. BOYLAN:  That's fine if that's the argument.  No

16       objection, Your Honor.

17                THE COURT:  Okay.

18           (End of bench discussion.)

19           (In open court.)

12:13:55 20                THE COURT:  You may proceed, Ms. Johnson.

21                And I guess the first thing, again, is you're asking

22       me to take judicial notice of three documents that are on your

23       exhibit list as Exhibits 9, 10, and 11.

24                MS. JOHNSON:  That is correct, Your Honor.

12:14:11 25                THE COURT:  You haven't shown me all those documents.

1  They haven't been provided to me heretofore, but I think I know

2  what they are.  And without objection from the government, I

3  will go ahead and have them marked as Exhibits 9, 10, and 11.

4  And they may be admitted as Exhibits 9, 10, and 11.  And you

12:14:30  5  may utilize them with this witness.  And I'm not making any

6  ruling with respect to any question you may be asking the

7  witness about the documents.

8          (Defendant's Exhibits 9-11 were admitted in evidence.)

9          MS. JOHNSON:  Sure, Your Honor.  And it's, again -- if

12:14:47  10  we could?

11          THE COURT:  Yes.  The jury can see them to the extent

12  she's using them.

13          MS. JOHNSON:  I'm sorry, Your Honor.  I didn't hear

14  that.

12:14:58  15          COURTROOM DEPUTY:  I was showing the jury.

16          MS. JOHNSON:  Oh, thank you.

17          THE COURT:  I said the jury can see them.  I've

18  admitted them.

19  **BY MS. JOHNSON:**

12:15:05  20  **Q**   So this is Defense Exhibit Number 10.

21          And do you see that this is the mayor's order from

22  March 24th of 2020?

23  **A**   I do, yes.

24  **Q**   And that -- just the title of it is that it was a closure

12:15:18  25  of nonessential businesses and prohibition on large gatherings

1       during a public health emergency?

2   **A**   Yes.

3   **Q**   And then in this order, it discusses -- it appears to be

4       the background and history of COVID-19?

12:15:35   5   **A**   Yes.  It looks like that.

6   **Q**   Other medical findings that may have been made?

7   **A**   Yes.

8   **Q**   And in Section 2, it orders the closure of nonessential

9       businesses and activities and prohibits large gatherings?

12:15:51  10   **A**   Yes.  It looks like that does say that.

11   **Q**   And then in Section 4, it defines what essential businesses

12       are?

13   **A**   Yes, it does.

14   **Q**   And it says that for the purpose of this order, food and

12:16:07  15       household products and services, including grocery stores,

16       supermarkets, and farmers markets are essential businesses and

17       are not subject to any order?

18   **A**   It looks like it says that in C, yes.

19   **Q**   I would like to now draw your attention to Exhibit

12:16:26  20       Number 10, please.

21           THE COURT:  What number was that you were just

22       examining him on?

23           MS. JOHNSON:  I'm sorry.  11.  I apologize.

24           THE COURT:  All right.

12:16:36  25           MS. JOHNSON:  Exhibit 11.

1              THE COURT:  That was Ten.

2              MS. JOHNSON:  That was Ten.

3     **BY MS. JOHNSON:**

4     **Q**   So this is, again, the mayor's declaration of a public

12:16:50  5     emergency, implementing a citywide curfew; is that correct?

6     **A**   Looks like that, yes.

7     **Q**   And this was dated January 6, 2021?

8     **A**   Yes.

9     **Q**   And throughout the order, it discusses some of the First

12:17:05  10    Amendment demonstrations that had occurred in the District that

11    day as well as the previous months?

12    **A**   Does it as you scroll down?  Yes.  I see that.  Thank you.

13    **Q**   And because the former president had continued to

14    encourage -- this is one, Number 10.  Right there.  So because

12:17:32  15    the former president continued to encourage supporters to

16    participate in demonstrations that were likely COVID-19

17    spreaders, she imposed a curfew.

18    **A**   Okay.  Yes.

19    **Q**   Is that right?

12:17:42  20    **A**   That looks like that here.

21    **Q**   And then the last part of the mayor's order excluded

22    workers performing essential duties or participating in

23    essential activities as authorized by prior mayor's orders; is

24    that correct?

12:17:56  25    **A**   Looks like it says that here, too, yes.

1           MS. JOHNSON:  Thank you, Ms. Owens.  And we're done

2       with that for now.

3           Thank you, Tim.

4       **BY MS. JOHNSON:**

12:18:10 5       Q   So I don't need to pull them back up right now, but you

6       recall admitting several exhibits from Safeway; is that right?

7       A   I do.

8       Q   And you had gathered those in the course of your

9       investigation?

12:18:24 10      A   Yes.

11      Q   And you did not prepare those documents?

12      A   I did not.

13      Q   You have not provided the basis for any of the projections

14      in those documents?

12:18:35 15      A   For the sales projections?  Just that I reviewed them, the

16      basic mathematics of projected versus the column of actual

17      sales.  That's all.

18      Q   Right.  Just the document itself, but you don't have any

19      other underlying information or information that was used to

12:18:53 20      create the projections?

21      A   That is correct, yes.

22      Q   You don't have any idea where these numbers come from other

23      than Safeway or Albertson's?

24      A   Other than the source, no.

12:19:03 25      Q   You are unaware of the nature and quality of the data that

1    was used to create those projections?

2    **A**   Yes.  That's a fair assessment.

3    **Q**   And you would agree with me that there's probably a lot of

4    different reasons why sales may go up or down?

12:19:22  5    **A**   Many, yes.

6    **Q**   You're not an expert in economics?

7    **A**   No, I'm not.

8    **Q**   You don't have any experience in preparing these types of

9    sales reports?

12:19:33  10   **A**   No, I do not.

11   **Q**   And, again, you're unaware of the methodology that was used

12   to create them?

13   **A**   That is correct.

14   **Q**   I'm going to go through with you -- and it's not going to

12:19:52  15   be as cohesive because it's just notes from your direct

16   testimony, but there was an exhibit, 907, if you recall, which

17   was the side by side where it's her video and the CCTV tunnel

18   at the same time.

19           Do you recall that?

12:20:11  20   **A**   I recall that video.

21   **Q**   And the government stopped it for you and played different

22   portions and asked you what was said by Ms. St. Cyr?

23   **A**   Yes.

24   **Q**   And, again, in that video, one of the phrases that she

12:20:30  25   yells out is "this is our house; we're just trying to get into

1   our house."  Do you recall that?

2   **A**   I do.

3   **Q**   And that she was screaming, "stop it" and "knock it off"?

4   **A**   I recall a section of the video where she was screaming,

12:20:44  5   "stop it," yes.

6   **Q**   And that this was likely in reference to the violence that

7   she was witnessing at the front of the line?

8   **A**   Maybe a particular incident of violence, yes.

9   **Q**   Would you agree that in that tunnel it was a very loud

12:21:02  10  environment and there were a lot of people there?

11  **A**   From what I've reviewed and heard, yes.

12          MS. JOHNSON:  This has not been admitted, Your Honor,

13  but I would like to pull up, please, Government Exhibit 609.2.

14          THE COURT:  609.2?

12:21:48  15  **BY MS. JOHNSON:**

16  **Q**   Can you see it?

17  **A**   I cannot.

18          THE COURT:  It hasn't been pulled up.

19          COURTROOM DEPUTY:  There you go.

12:21:54  20  **BY MS. JOHNSON:**

21  **Q**   So this is Government Exhibit 609.2.

22          Do you recognize this?

23  **A**   I do.

24  **Q**   And what is it?

12:22:01  25  **A**   It's an open source video obtained from someone in the

1    crowd of the -- appears to be the defendant up against the bike

2    racks.

3    Q   And is this a fair and accurate representation of that day?

4    A   Yes.

12:22:16 5            MS. JOHNSON:  Your Honor, move to admit and publish.

6            MR. BOYLAN:  No objection.

7            THE COURT:  Any objection?

8            MR. BOYLAN:  No objection, Your Honor.

9            THE COURT:  609.2 is admitted and may be published.

12:22:24 10       (Government's Exhibit 609.2 was admitted in evidence.)

11   **BY MS. JOHNSON:**

12   Q   You've sat throughout this trial for the last four days?

13   A   I have.

14   Q   And you've heard all of the testimony?

12:22:33 15  A   I have.

16   Q   And you've heard officers testify that there was plenty of

17   space, people could have moved around, and there was no one

18   behind her?

19   A   Yes.  At certain points.

12:22:46 20  Q   And, specifically, it appears that this is the point that

21   the perimeter is being broken through; is that correct?

22   A   Yes.  I'm familiar with this point.

23   Q   And you can see the individual in the green backpack which

24   is directly behind her; is that right?

12:23:01 25  A   Appears to be.

1    **Q**   I'd like to --

2           MS. JOHNSON:  This has not been admitted yet either,

3    Mr. Bradley.

4    **BY MS. JOHNSON:**

12:23:19 5    **Q**   I would like to show you Defense Exhibit 17.

6           Do you know what this is?

7    **A**   This is a still frame image from an officer's body-worn

8    camera.

9    **Q**   And does it identify Ms. St. Cyr?

12:23:46 10   **A**   It looks like it does, yes, circled in yellow.

11   **Q**   And is this a fair and accurate representation of the

12   circumstances and that day?

13   **A**   It looks like it, yes.

14          MS. JOHNSON:  I would move to admit and publish.

12:24:01 15         THE COURT:  Defense 17.

16          MR. BOYLAN:  There's no objection, Your Honor.

17          THE COURT:  Without objection, it is admitted.  May be

18   published.

19          (Defendant's Exhibit 17 was admitted in evidence.)

12:24:07 20   **BY MS. JOHNSON:**

21   **Q**   Do you recall in Ms. St. Cyr's video, which was I think

22   802, as she walks through the line, it kind of ended as she

23   went right to this corner.

24          Do you recall that?

12:24:23 25   **A**   I do recall that, yes.

Q    And so this is a frame of her kind of sitting down, taking

a beat; doesn't it look that way?

A    Looks like she's sitting on her heels essentially, kneeled

down.

12:24:37    Q    And you would also agree that you observed video of

Ms. St. Cyr being pepper sprayed?

A    Yes.

Q    You would also agree you never observed her use her

flagpole as a weapon?

12:24:52    A    I never saw her strike anyone with the flagpole.

Q    You would also agree that once in her -- specifically

referring to the Government's Exhibit 802, once she is

initially past that stair and walkway that we discussed, moving

up --

12:25:09    A    Yes.

Q    -- to the Capitol grounds and she's involved in some chants

or "let's push, let's go" -- for the almost 30 minutes that

she -- or 20 minutes that she's standing at the line or makes

her way to the line, you can't hear her say anything, can you?

12:25:27    A    No.  I don't recall overhearing any specific statements

from that time in the video.

Q    So when she's at the line there, she's not yelling or being

aggressive with officers?

A    Not that I could overhear.

12:25:40    Q    And she's not encouraging people to push through there?

1    A    Not at that time.

2    Q    And you would also -- I think we have established that the

3    line broke at 2:28 p.m.?

4    A    Yes.

12:26:07  5    Q    And I think Ms. St. Cyr does not go up to the upper

6    terrace, heading towards that tunnel until 2:42 p.m.?

7    A    Yes.

8    Q    And so she remains down here for 14 minutes or so?

9    A    Approximately, yes.

12:26:26  10    Q    Okay.  And where there's a video or an image of her at some

11    point chatting with someone else, she's also taking a moment in

12    the corner by herself?

13    A    Yes.  That would be during that 14-or-so-minute span.

14    Q    And it doesn't appear from the video you've reviewed that

12:26:44  15    she had some type of plan and then as soon as she ran through,

16    rushed up the stairs and rushed in.

17         Would you agree with that?

18    A    Not for at least --

19         MR. BOYLAN:  Objection.  Calls for speculation.

12:26:56  20         THE COURT:  I'll sustain it.  You will have to

21    rephrase it.

22    **BY MS. JOHNSON:**

23    Q    Does it appear from the video that she immediately rushes

24    up the stairs?

12:27:08  25    A    No.  There's approximately 14 minutes.

1  **Q**   And during that 14 minutes, besides taking a rest, she's

2  kind of just milling about?

3  **A**   Yes.

4        MS. JOHNSON:  Could I have just one moment, Your

12:27:22  5  Honor?

6        THE COURT:  Certainly.

7        MS. JOHNSON:  And I'm almost done.

8    (Discussion off the record.)

9        MS. JOHNSON:  The jury is not seeing this, right,

12:27:36  10  Mr. Bradley?

11        COURTROOM DEPUTY:  Yeah.

12        MS. JOHNSON:  I just wanted to look something up.

13        COURTROOM DEPUTY:  Oh.  Turn it off where they don't

14  see it.  Got you.

12:27:58  15    (Discussion off the record.)

16  **BY MS. JOHNSON:**

17  **Q**   And then you never actually interviewed Yvonne?

18  **A**   I did not.

19  **Q**   You never had any personal interaction with her?

12:28:28  20  **A**   I did not.

21  **Q**   You're aware that when she was taken into custody, she was

22  cooperative?

23  **A**   Yes.  From what I was told.

24  **Q**   And she voluntarily spoke with agents for more than an

12:28:41  25  hour?

1    **A**    Yes.

2    **Q**    And she answered all their questions presented to her?

3    **A**    I believe so, yes.

4              MS. JOHNSON:  Thank you.  I have nothing further.

12:28:50  5    THE COURT:  All right.  How long is the redirect?

6              MR. BOYLAN:  Five minutes, Your Honor.

7              THE COURT:  We will go ahead and do it.  Excuse me for

8    holding you for a couple of minutes, ladies and gentlemen, but

9    we will complete this witness.

12:29:02  10   MR. BOYLAN:  May be less.

11             Would you bring up 501, please?  This is admitted.

12             COURTROOM DEPUTY:  It is?

13             MR. BOYLAN:  Yes.

14                    **REDIRECT EXAMINATION**

12:29:19  15   **BY MR. BOYLAN:**

16   **Q**    Ms. Johnson asked you a few questions about the documents

17   from Safeway; is that correct?

18   **A**    That is correct.

19   **Q**    She established that you don't work at Safeway?

12:29:27  20   **A**    I do not.  Never have.

21   **Q**    Do you recognize this document that I've got on the screen

22   here?

23   **A**    I do.  This is the certification document for the records.

24   **Q**    Can you tell us what it says about the documents that were

12:29:36  25   received from Safeway?

1   **A**   They were certified and authenticated by the custodian of

2   records for Albertson's that they are authentic.

3   **Q**   The person who signed it is a person who works for Safeway?

4   **A**   Yes.

12:29:49   5   **Q**   And has knowledge of those documents?

6   **A**   Yes.

7   **Q**   Thank you.

8           MR. BOYLAN:  You can take that down.  Can you bring

9   up -- can we see 17?

12:29:55  10   **BY MR. BOYLAN:**

11   **Q**   Ms. Johnson showed you this image?

12   **A**   Yes.

13   **Q**   And we established that it's at 14:29:50, the time in the

14   upper, right corner?

12:30:26  15   **A**   Yes, that is.

16   **Q**   Just after the breach?

17   **A**   Yes.

18   **Q**   And how quickly did Ms. -- did the defendant move from this

19   position, if you know?

12:30:36  20   **A**   I know that, from this position, some 12 or so minutes

21   later, she was up on the next sides of the terrace, heading

22   towards the tunnel.

23   **Q**   Do you know from your experience with CS gas how long the

24   effects of CS gas last?

12:30:53  25   **A**   The CS in particular doesn't last very long once you are

1    outside of its immediate vicinity.

2    **Q**    Sure.   How about for pepper spray?

3    **A**    Pepper spray, depending on a couple of circumstances, you

4    can clear it from your face and eyes in ten or so minutes with

12:31:10   5    some irritation afterwards.

6    **Q**    Can it last longer?

7    **A**    Yes.

8    **Q**    Up to how long would you say?

9    **A**    45 minutes, an hour.

12:31:16   10         MR. BOYLAN:   Okay.   You can take that down.   Thank

11    you.

12    **BY MR. BOYLAN:**

13    **Q**    Ms. Johnson asked you about the defendant's commission of

14    violent acts on January 6th?

12:31:32   15    **A**    Yes.

16    **Q**    And you said that you didn't see the defendant commit any

17    violence?

18    **A**    Not herself, no, sir.

19    **Q**    Did you -- and you didn't see her -- did you recommend any

12:31:43   20    assault charges for this case?

21    **A**    No.   Not in this case.

22    **Q**    And while the defendant didn't commit any violence, she was

23    in close proximity to others who committed violence; isn't that

24    true?

12:31:55   25    **A**    That is true.

1    Q   Next to the bike racks on the west plaza?

2    A   Yes.

3    Q   Can you describe that for us?

4    A   Objects -- while on the bike racks in the west plaza, the

12:32:06  5    defendant was near many incidents of police officers being

6    struck with thrown objects, struggles over bike racks, hit with

7    poles or things from the crowd.

8    Q   And when you say close proximity, how close?

9    A   Within feet.

12:32:21 10    Q   How about in the tunnel?

11    A   The same.  To a greater degree, most likely, with many

12    objects being thrown at a police line, pepper spray being

13    sprayed at police officers within feet of her, striking with

14    poles, flagpole poles at -- pretty much anything and everything

12:32:41 15    the crowd could obtain.

16    Q   And what was the defendant's reaction to being in that

17    circumstance?

18    A   To stand on the ledge and film with her cell phone.

19    Q   And more than filming, right?

12:32:52 20    A   Yes.

21    Q   What did she say?

22    A   She essentially cheers the crowd on, asking for fresh

23    people, and then chanting to push.

24         MR. BOYLAN:  Thank you.  No further questions, Your

12:33:02 25    Honor.

1           THE COURT:  All right.  Thank you, Agent Gano.  You

2    can step down.

3        (Witness steps down.)

4           THE COURT:  Will the government be calling any further

12:33:13  5    witnesses?

6               MS. SCHESNOL:  No, Your Honor.  The government rests.

7               THE COURT:  All right.  We're going to take our lunch

8    break.  The government has completed its case.  We will have

9    more to do, but that will be after the lunch break.  So let's

12:33:26 10    go ahead and resume at quarter of 2:00.  That's one hour and

11    11 minutes from now it looks like.  So it will be 1:45.

12           Ladies and gentlemen, we're making good progress, but

13    we have more to go and more work to do.  But we will see you

14    back here at 1:45 after your lunch.

12:33:47 15        (Jury excused.)

16        (In open court.  Jury not present.)

17           THE COURT:  So we will resume at 1:45.

18           Please have a seat.  Let's see if we can figure out

19    what we need to -- we may be getting together before 1:45 --

12:34:33 20    what we're going to need to deal with.  So why don't you give

21    me a little bit of a preview in terms of what to expect from

22    the defense when we get back together.

23           MS. OWENS:  Thank you, Your Honor.

24           Your Honor, we do intend to make a motion under

12:34:48 25    criminal procedure Rule 29.  We also anticipate talking with

1   our client about her right to testify and her right to elect

2   not to testify and having a decision for Your Honor at that

3   point after the lunch hour.

4            THE COURT:  All right.

12:35:03  5            MS. OWENS:  We also have the exhibits that the

6   government disclosed this morning.  We need to review those in

7   advising our client.  And so we do --

8            THE COURT:  Those exhibits have not been utilized.

9            MS. OWENS:  They have not been utilized.  We

12:35:18  10  anticipate they would be utilized on cross-examination however.

11           THE COURT:  And with respect to the motion you're

12   going to make -- I guess it would be one motion.

13           Do you anticipate or want to be able to argue it, and,

14   if so, how long do you think it will take you to present it?

12:35:39  15           MS. OWENS:  It will be brief.

16           THE COURT:  All right.

17           We have jury instructions to go over.  And especially

18   if the defendant is not going to testify, we need to get those

19   jury instructions done.

12:35:52  20           So why don't you eat quickly and why don't we get back

21   together at 20 after 1:00 so we have 20, 25 minutes -- well, so

22   we have 15 or 20 minutes to work on jury instructions.  And

23   then we'll resume before we bring the jury in at 1:45 with the

24   motions.

12:36:21  25           MS. OWENS:  Your Honor, may I inquire of the Court its

1    schedule?  So just forecasting a little, if Ms. St. Cyr does

2    elect to testify, I would imagine that would take the bulk of

3    the afternoon.  And would the Court --

4              THE COURT:  I would anticipate that would be true.

12:36:38  5    MS. OWENS:  Would the Court then be inclined to do

6    closing summations in the morning?

7              THE COURT:  It depends what the bulk of the afternoon

8    is.  If you finish at 3:30, no; we'll do the closings.

9              MS. OWENS:  Okay.

12:36:50 10              THE COURT:  But, you know, it all depends.

11              MS. OWENS:  Okay.  Thank you, Your Honor.

12              THE COURT:  My schedule is such that I actually

13    have -- I'm supposed to be at the Supreme Court at 5:00 o'clock

14    today, but I'm not going to end this early in order to do that.

12:37:03 15    I will be late.  They will have to tolerate that.  They

16    meaning -- I don't mean all the justices, but --

17              MS. OWENS:  Wow.

18              COURTROOM DEPUTY:  Off the record.

19              THE COURT:  So my schedule is flexible, but I have

12:37:20 20    some constraints.  But we'll utilize all the time that we have

21    available to us.  Okay?

22              MS. OWENS:  Thank you, Your Honor.

23              THE COURT:  Thanks.  Okay.  See you at 20 after 1:00.

24              COURTROOM DEPUTY:  All rise.

12:37:32 25         (Luncheon recess.)

*CHERYL K. POWELL, CCR, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3003/cheryl_powell@alsd.uscourts.gov

```
 1            (In open court.  Jury not present.)

 2                 THE COURT:  I think we need to go on the record for

 3      what I'm going to say even before we start with the jury

 4      instructions.

 5                 It has come to my attention that Ms. St. Cyr has given

 6      interviews, maybe a talk show interview.  And there's no gag

 7      order in this case, so there's no prohibition on that.  And I

 8      will not hold anything that she's said or done to this point

 9      against her in any way.  But I do think it's worth my pointing

10      out that it seems that the substance of her comments include

11      not only criticisms of the Court's handling of these

12      proceedings but divulgence of attorney-client information and

13      an indication of -- this may be overstating it but attempts to

14      influence particular jurors through gestures or eye

15      communication and so forth.

16                 I would ask Ms. St. Cyr not to engage in that kind of

17      conduct and simply say for Ms. St. Cyr and her counsel that I'm

18      not sure it's a good idea to be divulging attorney-client

19      communication and doing some of the other things that are part

20      of the interview that you've given.

21                 I'm not going to do anything more about it because

22      there's nothing that I think I should do about it except to

23      caution not to engage in any attempts to influence particular

24      jurors.  The evidence and the testimony in the courtroom will

25      be what will be for the jurors to assess.  And I'll leave it at
```

1    that.

2           All right.  Let's go -- and as I said, I'm not holding

3    anything that you've done against you, Ms. St. Cyr.  I'm just

4    pointing out my assessment of the lack of wisdom in some of the

13:24:25  5    things that you've done.

6           All right.  Jury instructions.  Why don't we do this

7    so we feel like we're making progress.

8           Any comments on Pages 1 through 23?

9           MS. SCHESNOL:  Not from the government, Your Honor.

13:24:51  10           MS. OWENS:  Nor from the defense, Your Honor.

11           THE COURT:  And there will have to be a change made to

12    Page 18, is it?  18 or 19.  18.  One or the other selected.

13    And then I'll jump to the end and anything from Page 39 or

14    40 -- 40 onward to the end?

13:25:16  15           MS. SCHESNOL:  Not from the government, Your Honor.

16           MS. OWENS:  Not from the defense either.

17           THE COURT:  All right.  So we can concentrate on the

18    charged offenses that are on Page 25 through 39.

19           Page 25 is just a review of the charges.  Anything on

13:25:31  20    those?

21           MS. SCHESNOL:  No.  May I come to the -- I don't have

22    a lot of --

23           THE COURT:  I will let Ms. Owens and Ms. Johnson fight

24    you for it when they want to, but you can be there.

13:25:45  25           MS. SCHESNOL:  We're not going to have to settle this

1    with arm wrestling, are we?

2         THE COURT:  I would move Counts One and Two, civil

3    disorder counts, with the aiding and abetting and attempt

4    stretch from Pages 26 through 30.

13:26:04  5         Any comments, suggestions, et cetera?

6         MS. SCHESNOL:  Your Honor, I think the only comment

7    from the government on Page 25 --

8         THE COURT:  25.

9         MS. SCHESNOL:  I'm sorry.  Where are you?

13:26:14 10         THE COURT:  I was on Page 26.  25 is just a list of

11   the charges.  Is there something wrong in those?

12         MS. SCHESNOL:  I believe Count Four should be

13   disorderly or disruptive conduct.  In the disjunctive, not the

14   conjunctive.

13:26:29 15         THE COURT:  And is that how it is -- the ands and ors

16   have been issues in some of these cases in the way the

17   indictment reads versus the way the statute reads.  But in

18   the --

19         MS. SCHESNOL:  Right.  And my understanding --

13:26:46 20         THE COURT:  Go ahead.

21         MS. SCHESNOL:  -- is that they're charged in the

22   conjunctive, proved in the disjunctive.  And for that reason, I

23   think the "and" can be confusing in a jury instruction and

24   should read "or."

13:27:02 25         THE COURT:  Any problem with changing the "and" to

1    "or"?

2             MS. OWENS:  I would ask that we leave it as "and."

3    That is how it is charged in the indictment.  I understand the

4    government's position, and I think they're free to argue that.

13:27:20  5    This is simply a list of offenses.  We would ask it mirror

6    those in the indictment.

7             THE COURT:  All right.  What this list on Page 25 says

8    is the indictment in the case contains six counts.  What's the

9    indictment say?  "And" or "or"?

13:27:37 10             MS. SCHESNOL:  The indictment says "and."

11             THE COURT:  Then that will stay as "and."  And in the

12    first sentence on Page 32, it will also stay as "and" because

13    that's what the indictment says, and that's just a repeat of

14    what the indictment says.

13:27:53 15             We will deal with the "or" as we need to with respect

16    to the rest of the jury instructions.

17             But first, let's talk about Counts One and Two, the

18    civil disorder.  Anything on those pages, 26 through 30?

19             MS. SCHESNOL:  Your Honor, with regard to -- yes.  On

13:28:13 20    page --

21             THE COURT:  Let me ask you -- because you're leaning

22    down and talking -- are you intending to leave your mask on?

23             MS. SCHESNOL:  No, Your Honor.  I apologize.  Force of

24    habit.  And leaning down so I can read.

13:28:26 25             THE COURT:  No.  I know.

             1              MS. SCHESNOL:  Page 28.

             2              THE COURT:  Yes.

             3              MS. SCHESNOL:  In the second element of attempt, the

             4      government's proposed instruction read:  Ms. St. Cyr took a

13:28:39     5      substantial step towards committing civil disorder.  And the

             6      Court's proposed instruction says, which strongly corroborates

             7      or confirms she intended to commit that crime.  And we don't

             8      believe that's accurate and/or necessary.

             9              THE COURT:  That's been in other instructions I've

13:28:59    10      given on this, but I will note that and review whether the

            11      which clause there should be included.

            12              Any view from the defense?

            13              MS. OWENS:  Your Honor, we agree with the Court's

            14      language here.  We have an objection to the government's

13:29:22    15      position.

            16              THE COURT:  Any particular reliance or reason for that

            17      agreement?

            18              MS. OWENS:  Your Honor, I can review and provide more

            19      reliance.

13:29:29    20              THE COURT:  All right.  If you want to, do that,

            21      although we have limited time before we'll actually be giving

            22      the instructions which could be as early, unlikely, as late

            23      this afternoon but will definitely be sometime tomorrow.

            24              All right.  Anything else from the government on the

13:29:48    25      Counts One and Two instruction?

1            MS. SCHESNOL:  Yes.  Aiding and abetting.  Page 29 of

2      the Court's proposed instructions.

3            THE COURT:  Yeah.  It's really sad the way these

4      things play out is the aiding and abetting and attempt sort of

13:30:02  5      swallows the rest of the instruction.  But that's the way it is

6      with these things.

7            MS. SCHESNOL:  Well, a couple of things.

8            As the Court did with -- the attempt instruction I

9      believe directs the jury that attempt is not a separate

13:30:19 10      offense, just an alternative means by which the defendant could

11      have committed the offense.

12            So I think, number one, that would be helpful with the

13      aiding and abetting so that the jury doesn't think that they

14      have to find it all; that these are just alternative ways.

13:30:35 15            And then, more substantively, the government submitted

16      an aiding and abetting instruction relying both on Redbook as

17      well as --

18            THE COURT:  I'm sorry.  Say that sentence again.

19            MS. SCHESNOL:  The government's proposed aiding and

13:30:52 20      abetting instruction was taken out of Redbook 3.200 as well as

21      relying on the jury instructions that Chief Judge Howell gave

22      in the *Gillespie* case and the *Herrera* case.

23            THE COURT:  And, therefore, what problem do you have

24      with this version of aiding and abetting other than what you've

13:31:12 25      just talked about with adding in the separate offense concept?

1          MS. SCHESNOL:  So I think we would have to maybe go

2     line by line.

3          THE COURT:  Because it's possible that I have improved

4     on the Redbook or Judge Howell's instruction.

13:31:35 5          MS. SCHESNOL:  It is your courtroom, Judge.  You can

6     give whatever instructions you want.

7          THE COURT:  I know that, but it's also possible that

8     I've improved on them and that you would agree if you focus on

9     them.  So tell me where you think it's problematic.

13:31:43 10          MS. SCHESNOL:  Well, calling the defendant an

11     accomplice -- I think that's not necessarily accurate.  I don't

12     believe that's how --

13          THE COURT:  Where does that appear so I can find it?

14          MS. SCHESNOL:  On the fourth line down, the very last

13:31:59 15     word.

16          THE COURT:  Is often called an accomplice.

17          MS. SCHESNOL:  Right.  I don't think that's how

18     18 U.S.C. 2 reads.

19          THE COURT:  So you would remove that sentence?

13:32:08 20          MS. SCHESNOL:  Yes.

21          THE COURT:  All right.  All right.  I'll take that

22     into account.

23          MS. SCHESNOL:  Let's see.

24          THE COURT:  And then the next sentence is the person

13:32:22 25     whom the accomplice aids.

1              MS. SCHESNOL:  Right.

2              THE COURT:  How would you rephrase that?

3              MS. SCHESNOL:  So I think it is a little difficult to

4    go line by line -- I'm sorry.  I'm the one that suggested that.

13:32:36  5   I don't think that we need to start defining principal aider

6    and abetter.  Again, I don't think that that's what the aiding

7    and abetting statute --

8              THE COURT:  So you would take out the next sentence as

9    well?

13:32:52 10   MS. SCHESNOL:  I would, yes.

11             THE COURT:  The person whom the accomplice aids and

12   abets is known as the principal?

13             MS. SCHESNOL:  Right.

14             THE COURT:  All right.

13:33:06 15   MS. SCHESNOL:  Let's see.  The way the government's

16   proposed aiding and abetting instruction reads with regard to

17   what essentially would be close to the next line is:  To find

18   the defendant aided and abetting, you must find the defendant

19   knowingly associated himself or herself in this case with the

13:33:22 20   commission of a crime; that she participated in the crime, is

21   something she wished to bring about and succeed -- yes.  And

22   succeed.  Make it succeed.

23             THE COURT:  All right.  So your suggestion is that I

24   go back to the government's proposed instruction.

13:33:39 25   MS. SCHESNOL:  Yes.

1          THE COURT:  All right.

2          MS. SCHESNOL:  Well, that's why we proposed it.

3          THE COURT:  I'll look at it.  I'm not going to take

4     you through line by line.  I will look at it and see.  I did

13:33:50  5     make some -- let me just look at something.

6          MS. SCHESNOL:  And the other thing in the government's

7     proposed instruction is specifically it states the government

8     is not required to prove that anyone discussed or agreed upon a

9     specific time or method of committing the crime.

13:34:08  10          The government's not required to prove the crime was

11     committed in a particular planned, agreed-upon way.  So -- or

12     that the -- I just think -- that almost sounds more like

13     conspiracy to leave out that -- anything about explaining to

14     the jury the government need not prove that there was this

13:34:30  15     advanced planning.

16          THE COURT:  All right.  Let me review it --

17          MS. SCHESNOL:  Thank you.

18          THE COURT:  -- with your comments but also the

19     government's proposed jury instruction in mind.  But let me

13:34:40  20     first hear from the defense with respect to the aiding and

21     abetting instruction for Counts One and Two.

22          MS. OWENS:  Your Honor, we would ask that the Court

23     keep in its language in the first paragraph, the last sentence;

24     that we think that that captures --

13:34:58  25          THE COURT:  The accomplice principal language?

1            MS. OWENS:  Yes.  We think that captures the

2      relationship between the players, as you will, and we think

3      it's appropriate to give the jury that level of information.

4            We also think that it's important that the Court leave

13:35:15  5      in the burden of proof and that Ms. St. Cyr knowingly and

6      intentionally aided and abetted a person in committing that

7      crime.

8            And then I will look at the government's proposed

9      language with respect to the "it's not requisite that there be

13:35:33 10      advanced planning" and see if I have a position on that.

11            THE COURT:  All right.  We'll review that.  Let's move

12      on to Count Three and any comments on Count Three.

13            MS. SCHESNOL:  So, Your Honor, that's on Page 31.

14            THE COURT:  Correct.

13:35:48 15            MS. SCHESNOL:  And the government does not believe

16      it's necessary in the second element to go on any past

17      Ms. St. Cyr did so knowingly.  The "meaning she knew the

18      building or ground was restricted, knew she had the lack of

19      authority to remain" is not necessary.

13:36:08 20            THE COURT:  And you would take that out?

21            MS. SCHESNOL:  Yes, Your Honor.

22            THE COURT:  Just say Ms. St. Cyr did so knowingly.

23            MS. SCHESNOL:  Yes.

24            THE COURT:  And then the definition of knowingly

13:36:18 25      adopted from Counts One and Two would be that person acts

knowingly if she realizes what she is doing and is aware of the
nature of her conduct and does not act . . .

        MS. SCHESNOL:  If I understood Your Honor correctly --
I just want to make sure I don't overlook anything.

13:36:43        We're leaving the "and" in the portion "Count Three of
the indictment charges Ms. St. Cyr with entering and remaining"
because that's the way the indictment reads; is that correct?

        THE COURT:  In the heading and the first sentence,
yes.

13:37:01        MS. SCHESNOL:  Okay.

        THE COURT:  It's stating what the indictment charges.

        MS. SCHESNOL:  Yes.

        THE COURT:  And that's what the indictment charges.

        MS. SCHESNOL:  I'm tracking.

13:37:09        Then as far as the bottom of Page 31, the last
sentence, a person who enters or remains in a restricted area
with a good faith belief that she has the authority to do so is
not guilty of this offense.

        So several comments on this.

13:37:28        THE COURT:  And this comes from the defense.  It's
half of what I think the defense proposed, and it's here as a
placeholder to get a discussion going.

        MS. SCHESNOL:  Okay.  I'm ready to discuss.

        So it is my understanding, through a little bit of
13:37:42 research that other people in the office have been nice enough

1   to do, that this good faith concept comes from tax law, wire

2   fraud, and mail fraud.  So to use the expression "ignorance of

3   the law is no defense" -- in those crimes, mail fraud, wire

4   fraud, tax fraud, ignorance of the law is a defense.  But it is

13:38:08  5   limited to those types of crimes.  And those crimes require the

6   defendant knows that their conduct did, in fact -- that there

7   was a law specifically saying they couldn't do it.

8           So we don't think that is accurate.  Additionally, we

9   don't yet know if the defendant is going to testify.  If she

13:38:29  10   does not, then I think we don't even have a discussion about

11   this good faith belief because there is no evidence whatsoever

12   that the defendant could possibly have a good faith belief if

13   we don't hear her say it.

14          And I will advise Your Honor, just to the extent that

13:38:48  15   it is at all instructive or interesting to you, that in a case

16   before Judge Chutkan, the Russell Dean Alford Case, 21-cr-263,

17   there was a very similar discussion where the government talked

18   about this concept of good faith came from tax law.  And I feel

19   certain that, in that case, Judge Chutkan then either modified

13:39:19  20   or did not give the good faith instruction because there was --

21   they specifically discussed that there was no evidence that the

22   defendant in that case believed that he had any lawful

23   authority to be on restricted grounds.

24          THE COURT:  But, in any event, even if Ms. St. Cyr was

13:39:36  25   to testify, your position is this good faith instruction should

1    not be included because it is not appropriate in a case such as

2    this as opposed to the financial fraud type cases that actually

3    leave more room for good faith as a defense.

4            MS. SCHESNOL:  That is correct.  And one additional

13:40:00  5    point is that courts have said appeals -- appeals have

6    concluded that it is not error to deny a good faith defense

7    instruction where the jury is required to find proof beyond a

8    reasonable doubt -- required to -- excuse me.  Required to find

9    knowledge beyond a reasonable doubt.  So just in -- it's not in

13:40:25 10    error to not give the good faith instruction.

11            THE COURT:  When there's a knowingly aspect that the

12    jury has to find.

13            MS. SCHESNOL:  Correct.

14            THE COURT:  All right.  So on the Count Three

13:40:38 15    instruction, the two points, the second being the good faith

16    provision that the defense has suggested and the first being

17    the additional language on the second element, the knowingly

18    element, the defense position?

19            MS. SCHESNOL:  Correct.

13:40:55 20            THE COURT:  I'm asking for the defense position.

21            MS. OWENS:  Thank you, Your Honor.

22            MS. SCHESNOL:  I apologize.

23            THE COURT:  And if you think the defense position is

24    correct, then we're done.

13:41:03 25            MS. SCHESNOL:  Nope.

1          MS. OWENS:  We approve of the government's approval of

2     our position.

3          Your Honor, we do believe that because knowingly is an

4     element of the offense that a good faith instruction is

13:41:16  5     appropriate here, especially in the event that Ms. St. Cyr

6     testifies about her knowledge of the restricted grounds and of

7     the restricted perimeter.

8          Obviously, we cited to caselaw, which is *Darab v.*

9     *United States* at 623 A.2d 127.  And then we also cited to case

13:41:41 10     number, which is a January 6 case, Case Number 21-cr-204 at ECF

11     Number 215 where, when the defendant in that case testified

12     that he was permitted -- he believed he was permitted in a

13     restricted area, then a good faith instruction was appropriate

14     in that case, and it was given.

13:42:01 15          And so we believe that if the evidence supports giving

16     a good faith instruction through Ms. St. Cyr's testimony, that

17     this instruction, as the Court has proposed, would be

18     appropriate.

19          THE COURT:  All right.  I will look at it and look at

13:42:14 20     the law.  But you, of course, can narrow our focus considerably

21     by indicating in a few minutes whether Ms. St. Cyr is going to

22     testify.

23          MS. OWENS:  Correct.

24          THE COURT:  All right.  Count Four.

13:42:29 25          MS. SCHESNOL:  I'm sorry.  If I can just make one

1      other point on the good faith.

2              THE COURT:  Sure.

3              MS. SCHESNOL:  That it is also the government's

4      position that if the good faith instruction is deemed

13:42:41  5    appropriate, it would only go to the 40 U.S.C. 5104 count, not

6      the 1752 counts.

7              THE COURT:  And why is that?

8              MS. SCHESNOL:  For a very good reason that someone

9      explained to me that at the moment I can't think of.

13:43:00  10           MS. OWENS:  Your Honor, while she's looking for that,

11     if I can just address in the second element on Count Three -- I

12     understand the government would prefer that there be a period

13     where the comma is.  We would ask that the Court keep that

14     language following the comma.  And the reason is, Your Honor, I

13:43:20  15   think for the reason the Court had indicated at the beginning

16     of this, which is when you have alternate ways to commit

17     offense through aiding and abetting and then also attempt, the

18     instructions get clunky and the jury has to continue to refer

19     back.

13:43:37  20           And so this really does just mirror the knowingly

21     definition and helps them to understand that in the context of

22     this instruction here.

23             THE COURT:  That's not true for Count Three, that

24     there's attempt or aiding and abetting.  And this second

13:43:51  25   element is not referred to anywhere else.  So I don't really

1    understand your point.

2             MS. OWENS:  Well, instead of just referring back to

3    knowingly has the same definition as given previously, to leave

4    the --

13:44:05  5             THE COURT:  So in other counts, we'd refer to what?

6             MS. OWENS:  Oh, well, that's fair, Your Honor.

7    Because it's 1823 -- yeah.

8             THE COURT:  All right.  So I understand that you want

9    to keep the language in.

13:44:30 10             MS. OWENS:  Yes.

11             THE COURT:  But I don't understand the last aspect of

12    it.  You will have a moment to add to it if you want to.

13             But I will turn back to Ms. Schesnol on the 5104

14    point.

13:44:47 15             MS. SCHESNOL:  Thank you.  Yes.  So if good faith is

16    to be -- if the jury is to be instructed on good faith at all,

17    the reason it is the government's position that would only be

18    with regard to the 5104 counts is because those have a

19    willing -- sorry.  Willful.

13:45:04 20             THE COURT:  Willfully.

21             MS. SCHESNOL:  Willfully component versus the mental

22    state in the 1752 counts, which is knowingly.

23             THE COURT:  And you're representing that there is

24    appellate law that says where there is a knowingly aspect, you

13:45:23 25    shouldn't have a good faith?  Have you given me that law?

1          MS. SCHESNOL:  No.

2          THE COURT:  Are you going to give it to me?

3          MS. SCHESNOL:  I sure could.  I can give it to you

4    orally or --

13:45:34  5          THE COURT:  Orally right now because we have a means

6    of taking notes and remembering things.

7          MS. SCHESNOL:  Sure.  United States versus -- I'll

8    spell the name -- G, as in Greg, E-R-M-E-I-L.  And that's

9    Number 19-14942 and 19-14961 at 2023 Westlaw 1991723 from

13:46:11 10   February 14th of this year.  The quote is the district court

11   didn't abuse its discretion by rejecting Dr. Germeil's proposed

12   good faith instruction because it instructed that a conviction

13   required Dr. Germeil to act knowingly, and we have held

14   repeatedly that the good faith defense is substantially

13:46:33 15   included in the instruction that the criminal act must be done

16   knowingly.

17          And then the cases cited there are, *United States v.*

18   *Jordan,* 582 F.3d 1239 at 1248, Eleventh Circuit, 2009.  See

19   also *United States vs. McNair*, M-C-N-A-I-R, 605 F.3d 1152, 1201

13:47:02 20   Note 4, Eleventh Circuit, 2010, explaining that knowingly

21   finding necessarily excuses --

22          THE COURT:  I don't think you need to give me anymore.

23   You've given me the cites.  That's all I need.

24          MS. SCHESNOL:  And I have additional -- maybe for your

13:47:21 25   law clerk -- if you'd like these.  I am happy to share these.

1        THE COURT:  So, Mr. Bradley, tell the jury we're going

2   to be five minutes.  Have them ready in five minutes.

3        So let's move on to Count Four.

4        MS. SCHESNOL:  Count Four I believe we've already

13:47:53  5   discussed the "and" versus the "or."  I understand the Court's

6   ruling on that.  So nothing on Page 32 with regard to Count

7   Four or Page 33 with regard to Count Four.

8        THE COURT:  From the defense, anything on Count Four?

9        MS. OWENS:  No, Your Honor.

13:48:07  10       THE COURT:  Count Five.

11       MS. SCHESNOL:  Count Five.  The definition of

12  willfully at the bottom of Page 34, the government believes

13  it's inaccurate.  The second sentence, an act is not done

14  willfully if it is done as a result of mistake, carelessness,

13:48:29  15  lack of evil purpose, or motive or by some other innocent

16  reason -- the government does not believe that's the

17  appropriate instruction and the --

18       THE COURT:  So you would not substitute something for

19  that; you would simply delete it?

13:48:45  20       MS. SCHESNOL:  Correct.

21       THE COURT:  All right.

22       MS. SCHESNOL:  And in the government's proposed

23  exhibits that were submitted a couple of weeks ago, our

24  definition reads, which, again, was taken from about four or

13:49:05  25  five cases, I believe including *United States v. Sheppard* that

1    was before Your Honor, a person acts willfully if she acts with

2    the intent to do something that the law forbids; that is, to

3    disobey or disregard the law.

4            THE COURT:  That's the first sentence here.

13:49:23  5            MS. SCHESNOL:  Yes.  Willfully does not, however,

6    require proof that the defendant be aware of the specific law

7    or rule her conduct might be violating, which is the third

8    sentence.  So we're back to deleting the sentence.

9            THE COURT:  You would just delete the second sentence.

13:49:39  10   All right.  I understand that.  I have to look and see where I

11   got that from.

12           Did I get that from the defense?  What's the defense'

13   position?

14           MS. OWENS:  Your Honor, our position is it should

13:49:49  15   remain.  And I can double check my proposed instructions.

16           THE COURT:  I can look.

17           MS. OWENS:  And then the other language that's coming

18   to mind is the Ninth Circuit pattern instruction.  If the Court

19   does delete that, which we're obviously not asking, I do have a

13:50:05  20   suggested alternative.

21           THE COURT:  All right.

22           MS. SCHESNOL:  And we would just say that the

23   government is not in favor of giving the jury instruction

24   that's given in the Ninth Circuit.

13:50:19  25           THE COURT:  I understand that.  All right.  And

1  lastly, Count Six.

2          MS. SCHESNOL:  The only thing there is willfully

3  refers back to how it's defined in Count Five.  If we change it

4  in one, we would change it in the other.  And then -- I'm

13:50:37  5  sorry.

6          THE COURT:  Anything on Count Six from the defense?

7          MS. OWENS:  No, Your Honor.

8          THE COURT:  All right.

9          MS. SCHESNOL:  And then one last thing from the

13:50:43  10  government.  Sorry.  Lots of papers here to juggle.  If the --

11  if I could have a moment.

12      (Discussion off the record.)

13          MS. SCHESNOL:  In the event the defendant testifies,

14  the government believes a limiting instruction may be

13:51:04  15  appropriate with regard to statements of others and it might

16  even --

17          THE COURT:  That is not an instruction that's included

18  in this packet.

19          MS. SCHESNOL:  Correct.  Which is why I'm bringing it

13:51:18  20  up now.

21          Frankly, in recalling the question that was asked of

22  Agent Gano about some statements that the former president made

23  at the rally the morning of the Sixth, it might be appropriate,

24  regardless of the defendant testifying.

13:51:32  25          And the way it reads is -- and I am happy to give Your

1   Honor a copy -- you have heard evidence regarding statements by
2   former President Donald Trump on January 6, 2021.  This
3   evidence has been admitted for a limited purpose and that is
4   its potential impact on the intent required to establish the
5   defendant's guilt on the offenses she is charged with
6   committing in this case.
7           If you conclude the defendant heard those statements,
8   you are not to consider the evidence for any other purpose.
9   Neither former President Trump or others actually had the power
10  to authorize or make legal the alleged offenses charged in this
11  case.
12          THE COURT:  I believe that's close to or exactly an
13  instruction I've given in --
14          MS. SCHESNOL:  *Sheppard*.
15          THE COURT:  -- *Sheppard*.
16          MS. SCHESNOL:  I'm pretty sure we got this from the
17  *Sheppard* trial team.
18          THE COURT:  All right.  And we'll see if we need it.
19          MS. SCHESNOL:  Yes.  Nothing other than those.
20          THE COURT:  Anything further from the defense?
21          MS. OWENS:  No, Your Honor.
22          THE COURT:  All right.  Then let's bring the jury in
23  and finish with --
24          MS. SCHESNOL:  Oh.  Do you want to do the Rule 29?
25          THE COURT:  Pardon me?

1               MS. SCHESNOL:  Rule 29?

2               THE COURT:  Yes.  We got to do Rule 29 first.  I'm

3       sorry.

4               So the government has closed.  I turn to you,

13:52:47   5    Ms. Owens --

6               MS. OWENS:  Yes, Your Honor.

7               THE COURT:  -- with respect to the defense case or any

8       motion.  Won't be the case because the jury is not here.

9               MS. OWENS:  Thank you, Your Honor.

13:53:00  10          Then I will make a motion under Federal Rule of

11      Criminal Procedure 29.

12              We are asking this Court to enter a judgment of

13      acquittal.  Under that rule, as the Court is aware, this Court

14      must enter a judgment of acquittal of any offense for which

13:53:14  15    there is evidence insufficient to sustain a conviction.

16              Certainly, as the Court is also aware, you should not

17      assess witness credibility, weigh the evidence, and you should

18      view the evidence in the light most favorable to the

19      government.

13:53:29  20          We believe that if the Court does view the evidence in

21      the light most favorable to the government, a judgment of

22      acquittal is still appropriate.

23              THE COURT:  On all six counts?

24              MS. OWENS:  On all six counts, Your Honor.  And I will

13:53:43  25    start with Counts One and Two.

1          Here, the statute only criminalizes acts performed to
2      obstruct, impede, or interfere with a law enforcement officer.
3      The code, 18 United States Code 231(a)(3), requires an
4      obstructive intent.

13:54:00  5          We believe the government's evidence has failed to
6      establish that there was any obstructive intent by Ms. St. Cyr.
7      Both the Seventh and the Eighth Circuits have held that the
8      statute requires the defendant to have acted with obstructive
9      intent, and, here, there's nothing that demonstrates that
13:54:21 10    Ms. St. Cyr had such an intent.

11          We also are asking the Court to find that there's not
12     sufficient intent evidence on the attempt and aiding and
13     abetting, which require the intent to commit the crime of civil
14     disorder, which involves acts of violence and that Ms. St. Cyr
13:54:40 15    have needed to have taken a substantial step towards the civil
16     disorder.  Here, she was merely present, and mere presence is
17     not enough.

18          Again, there's no proof of her obstructive intent.  No
19     weapons, no violence, no protective gear, no screaming at the
13:54:58 20    police.  Instead, she stood and stood at the line.

21          With respect to Count Three, the government is
22     required to prove that she entered or remained in a restricted
23     building or grounds and did so knowingly; that she knew the
24     building or grounds were restricted and that she knew she
13:55:16 25    lacked lawful authority.

1    Here, we've heard evidence that, by 1:00 o'clock, the

2    signage and the fencing were down.

3    THE COURT:  Let's talk about the building rather than

4    the grounds.

13:55:26   5    MS. OWENS:  Your Honor, with respect to the building,

6    we would argue that she believed she had a right to be there

7    under her belief that it was the people's house and she was

8    able to go --

9    THE COURT:  There's no evidence of that at the moment.

13:55:41   10    MS. OWENS:  Well, there's evidence of her statements

11    in the video that this is our house.  Her video that she took

12    as she was walking up to the Capitol.

13    THE COURT:  I don't think the jury would have to

14    interpret that statement that this is our house as being a

13:55:56   15    belief that she had authority to be there.

16    MS. OWENS:  Nonetheless, we believe that the

17    government hasn't demonstrated her intent with respect to that

18    count and would ask the Court to enter a judgment of acquittal.

19    With respect to Count Four, the government has to

13:56:10   20    prove that there was disorderly and disruptive conduct in a

21    restricted building or ground and requires the intent to impede

22    or disrupt the orderly conduct of government business.

23    First, there's no evidence that her intent was to

24    impede or disrupt the orderly conduct of government business.

13:56:30   25    But, secondly, the evidence presented to this Court is that

1    Congress had adjourned by 2:15 that afternoon.

2         Ms. St. Cyr did not breach the first police barrier

3    until 2:28, minutes after Congress had already adjourned.  So

4    her intent --

13:56:47  5         THE COURT:  That sounds like a legal argument that has

6    been unsuccessful in many other cases.

7         There's been caselaw in other cases dealing with the

8    question of what if someone came after Congress adjourned, and

9    the continuing delay of the resumption of the proceedings has

13:57:09  10   been viewed as sufficient.

11        MS. OWENS:  And, I guess, there's not evidence that

12   her intent was to delay because she didn't have -- the

13   government hasn't presented any knowledge that she knew they

14   were recessed.  And so her intent was not to obstruct or delay

13:57:25  15   the orderly conduct of government business.

16        With respect to Count Five, which is disorderly

17   conduct in the Capitol building, again, it requires that same

18   intent to impede, disrupt, or disturb the orderly conduct of a

19   session of Congress.

13:57:38  20        She was not near where Congress could have been or

21   should have been operating, and there's no proof of her intent

22   to disrupt those proceedings.

23        Lastly, there's no evidence that she -- with respect

24   to Count Six that she paraded, demonstrated, or picketed at all

13:57:55  25   when she was inside the Capitol building.  We've certainly seen

```
 1    that she took a live video and then that she left that
 2    building.  Her conduct was not to parade, demonstrate, or
 3    picket.  And so we would ask the Court to enter a judgment of
 4    acquittal on that basis.
```
13:58:08
```
 5                THE COURT:  All right.  Thank you.
 6                MS. OWENS:  Thank you.
 7                THE COURT:  Unless the government is going to concede
 8    anything, my intent is to reserve a decision on the motion and
 9    proceed with the remainder of the trial.  But I will hear from
```
13:58:26
```
10    the government to the extent it wishes to focus on anything at
11    this moment.
12                MS. SCHESNOL:  We are not conceding anything and then
13    we will wait -- I have a lot to say.
14                THE COURT:  We will have to deal with this again, as
```
13:58:40
```
15    you know, under Rule 29.
16                MS. SCHESNOL:  Yes.
17                THE COURT:  But if you want to hold your fire until
18    then, I will allow you to do so.
19                MS. SCHESNOL:  I will keep my mouth shut for now.
```
13:58:47
```
20                THE COURT:  All right.  So I will reserve decision on
21    the motion.
22                We will proceed with the defense case.  And I intend
23    to submit the case to the jury and then decide the motion in
24    accordance with Rule 29.  I guess it could be resumed after the
```
13:59:04
```
25    close of all the evidence, and I might have to reserve it again
```

1          then.  But -- and allow the jury to return a verdict.

2                  Bring the jury in for now.  Oh.  No.  No.  No.

3          Mr. Bradley?

4                  COURTROOM DEPUTY:  I got it.

13:59:23  5                  THE COURT:  You can't bring them in yet because I need

6          to inquire as to whether Ms. St. Cyr will be testifying because

7          I don't want to have that inquiry be with the jury present.

8                  MS. OWENS:  Your Honor, Ms. St. Cyr will be

9          testifying.

13:59:35 10                  THE COURT:  All right.  And, Ms. St. Cyr, you've made

11         that decision to testify after listening to your counsel and

12         considering the advice that you've received from counsel; is

13         that correct?

14                  THE DEFENDANT:  Yes, Your Honor.

13:59:49 15                  THE COURT:  But it is your decision -- taking that

16         advice into account, considering everything else that you feel

17         is relevant, it's your decision that you will take the stand

18         and testify at this time?

19                  THE DEFENDANT:  Yes, Your Honor.

14:00:00 20                  THE COURT:  All right.  Let's bring in the jury.

21                  COURTROOM DEPUTY:  Your Honor, the jury panel.

22              (Jury present.)

23                  THE COURT:  Welcome back, members of the jury.

24                  I apologize for the delay, but this is the time in the

14:02:12 25         case where there are occasionally things that I need to discuss

1    and resolve with the two sides.  That sometimes means you are

2    delayed for a few minutes.  I apologize for that, but we are

3    ready to proceed again.

4            The government closed at the moment before you were

14:02:31  5    dismissed for lunch.  And we're now ready, Ms. Owens and

6    Ms. Johnson, for the defense case.

7            MS. OWENS:  Thank you, Your Honor.  The defense calls

8    Yvonne St. Cyr to the stand.

9        (Defendant sworn.)

14:03:20 10            THE COURT:  Good afternoon, Ms. St. Cyr.

11            THE DEFENDANT:  Good afternoon, Your Honor.

12            THE COURT:  Ms. Owens.

13            MS. OWENS:  Thank you, Your Honor.

14                    **DIRECT EXAMINATION**

14:03:25 15    **BY MS. OWENS:**

16    **Q**   Yvonne, how are you?

17    **A**   Nervous.

18    **Q**   Well, we'll try and make this as painless as possible.

19            Yvonne, can you tell the jury your full name?

14:03:39 20    **A**   Yvonne Elisia St. Cyr.

21    **Q**   Yvonne, where are you from?

22    **A**   Mountain Home, Idaho.

23    **Q**   Where is Mountain Home?

24    **A**   It is a small town outside of Boise, Idaho.

14:03:49 25    **Q**   About how many people are in that small town?

1    **A**    I'm not sure what the current population, but when I was

2    growing up, it was under 10,000.

3    **Q**    And did you spend your entire childhood there?

4    **A**    I was born on a base, but -- the first three years of my

14:04:02    5    life, we did move.  My dad was in the Air Force, so we went to

6    overseas and Alabama, and then we moved back to Idaho when I

7    was about three.

8            MS. OWENS:  Thank you, Mr. Bradley.

9    **BY MS. OWENS:**

14:04:12    10    **Q**    And can you tell me about your parents?

11    **A**    My mom was an emigrant from Spain and she was -- lived in

12    Spain and was uneducated.  Her parents both died when she was

13    very young in the Spanish Civil War.  And she was very poor and

14    uneducated and she had a daughter and she married my dad.

14:04:38    15            My dad was in the Air Force and came to Spain, and she

16    thought that she could give my sister a better life by coming

17    to America.  So she came to America.

18            She did not realize that she was marrying an

19    alcoholic, abusive man who adopted my sister and then

14:04:55    20    threatened my mom by saying he would keep my sister and keep

21    her if my mom tried to take her back.  So my mom stayed.  And

22    by the time I was five, they were divorced.

23    **Q**    And what --

24            THE COURT:  Excuse me.  Mr. Bradley, could you just

14:05:14    25    move her microphone?

```
 1            I don't want you to change how you're addressing the
 2      jury, but we need to move the microphone a little bit further
 3      that direction or your seat a little bit back so the microphone
 4      picks you up a little bit better.
```

14:05:29  5      **BY MS. OWENS:**

```
 6      Q    Yvonne, what happened after your parents divorced?
 7      A    Again, because my mom had no education and no family and no
 8      one here, she knew nothing.  And my sister is a little bit
 9      older than me.  About six years.  Really was the caretaker of
```
14:05:46 10      the family.  We were on welfare.  My dad was -- I loved my
```
11      father and I -- as a child, I didn't know any different to know
12      that there was anything wrong.  So I actually was kind of hard
13      on my mom.  I'm kind of stubborn.  And -- but my mom didn't
14      have any help or support.  She didn't know anyone.  And she
```
14:06:10 15      cleaned houses to make money and live off of welfare.  So that
```
16      was most of my life until she got remarried when I was in
17      fourth grade.
18      Q    So she did eventually get remarried when you were in fourth
19      grade?
```
14:06:23 20      A    Yes, she did.
```
21      Q    And what was that marriage like?
22      A    She married a pedophile who molested my little sister.  I
23      have no memory of being molested, but I don't have a lot of
24      memories of my childhood.  So I don't know if I -- I don't know
```
14:06:38 25      if that trauma is just suppressed.  I don't know, but --

1    Q    Yvonne, what happened in your childhood?  Where did you end

2    up staying?

3    A    By sixth and seventh grade, I ran away from home -- I would

4    say in seventh grade -- which really wasn't running away.  I

14:06:56  5    ran about four blocks to my dad's home.  He had a trailer -- he

6    had moved to Mountain Home by this time from Boise.  And so I

7    stayed with my dad.  And there were times when he would get

8    drunk and he would turn me over to the state.

9              So I lived in and out of foster care also.  And in

14:07:13  10   eighth grade, I went into the group home.  And then after I got

11   out of the group home, I went back to my mom's for a little bit

12   my ninth grade year.

13             And then by the time I was a sophomore, I was pretty

14   much on my own.  I stayed at my dad's when he was sober.  I

14:07:25  15   stayed at my boyfriend's house who ended up finally being my

16   husband at a later date.

17   Q    So let's talk about that.

18             When did you get married?

19   A    I got married my senior year in high school.  I got

14:07:36  20   pregnant, and I got married my senior --

21   Q    How old were you when you had your baby?

22   A    I was 18.  I graduated pregnant.  So I was 18 when I had

23   him, but I was pregnant at 17.

24   Q    And what happened after you had your baby?

14:07:50  25   A    I had no idea how to be a parent.  I had no idea what that

1    meant.  I started cosmetology school.  And from lack of having

2    a healthy foundation to base her -- I didn't do very well with

3    money.  That's never been my forte.  So I blew through my

4    student loan and I found myself at a crossroads.

14:08:18    5    Q    When you were at that crossroads, what choice did you make

6    about the direction you wanted your life to go?

7    A    I was headed down a really dark road.  I wasn't making good

8    choices.  Definitely not good choices for my son.  So I prayed,

9    and I decided to join the military.  I had looked at joining

14:08:35   10    the military in high school, but my mom thought she had cancer

11    and so I didn't.  But I decided then that I was going to join

12    the military.

13    Q    What branch of the military did you join?

14    A    Originally, it was the Army.  I didn't even -- it was in

14:08:49   15    the 80's, and I didn't know girls could join the Marine Corps

16    then.  But while I was at the Army, met -- I met the Marines,

17    and I was up for the challenge.  And everyone told me I

18    couldn't do it.  So I had to prove them all wrong.

19    Q    How do you feel about your service in the Marines?

14:09:06   20    A    The Marine Corps was -- it gave me discipline.  It gave me

21    guidance.  It gave me a family.  It gave me a brotherhood that

22    I never experienced.  It changed my life.  It changed who I

23    was.  It changed my -- where the trajectory -- it gave me

24    something that meant more than me.  I was a part of something

14:09:43   25    that was bigger than me.  And, for the first time in my life, I

1    felt like I had a purpose.

2    **Q**   Did it give you principles to live by and a core value to

3    hold on to?

4    **A**   Yes.  Part of the -- honor, courage -- God, country, Corps

14:10:00  5    is God first -- and when I first joined the Marine Corps, God

6    wasn't necessarily at the top of my list.  But God, country,

7    and Corps were definitely.  And then God came a little bit

8    later.

9    **Q**   So how long did you serve in the military?

14:10:16  10   **A**   16 years.

11   **Q**   Tell me about what kinds of things you did while you were

12   in the military.

13   **A**   I went in open contract, and I was an -- air traffic

14   controller was my first job.  And then I lat moved because of

14:10:33  15   single parent and it was a difficult job to do with a child and

16   being a young Marine and shift work.  So I lat moved into

17   administrative.

18         And I did that until 1991 when the Gulf War happened

19   and they closed my MOS and I had to lat move again.  And I lat

14:10:54  20   moved into public affairs which is basically base newspaper,

21   any media.  We deal with the media that comes to the bases.

22   Things like that.

23         And I did that until I went onto the drill field.  And

24   that was my last assignment was the drill field.

14:11:08  25   **Q**   Can you tell me a little bit about what that means to be on

1    the drill field?

2    **A**   Drill instructors are who train the recruits.  And it's

3    usually a -- most the time, it is a voluntary billet because it

4    is a very difficult job and it's very demanding.

14:11:26  5            At the time I went to the drill field, I had four

6    kids, and my youngest was only two.  I was breast feeding.  And

7    I did not want to go to the drill field.  I was in an MOS that

8    promoted fine without B-billets.

9    **Q**   You just said something.  I want to stop you there.

14:11:43  10           What is an MOS?

11   **A**   Oh.  It is our job in the Marine Corps.

12   **Q**   What does it stand for?

13   **A**   Military occupational specialty.

14   **Q**   Thank you.

14:11:51  15  **A**   So I didn't need that for promotion.  That's why most

16   people take B-billets.  But they were changing fourth battalion

17   and adding a company.  So any females that had orders in that

18   time frame were sent orders to the drill field, and that is

19   where I went.

14:12:07  20  **Q**   How many hours did you have to work on the drill field?

21   **A**   We work, the first part of training, lights to lights.  You

22   literally work -- for the females, because so many were

23   parents, they tried to keep us at 90 hours a week.  That never

24   happened.  We usually worked well over 100 to 120 hours, I

14:12:25  25  would say.  It's lights to lights especially for the beginning

1    of training.  It does ease up a little bit towards the end, but

2    it's still 100 hours a week.

3    **Q**    Okay.  Did you enjoy your service in the military?

4    **A**    I loved my service in the military.

14:12:39   5    **Q**    Why?

6    **A**    I spent my whole life alone, feeling like I was fighting

7    for myself.  Or I was a child and I didn't even understand what

8    was happening.  And in the Marine Corps, I was not alone

9    anymore.  I was surrounded -- I always wanted a brother, and I

14:13:08  10    was surrounded by brothers.  There's something -- camaraderie

11    is real.  I don't know how to explain it to civilians, but it's

12    real and it's powerful and it's life giving, life changing.

13    **Q**    I want to talk about then how that service ended.  And

14    there came a time after the birth of your fifth child where you

14:13:32  15    had to make weight.

16          Do you remember that?

17    **A**    I met my current husband on the drill field, and we decided

18    to have a child.  I had finished my time as a drill instructor,

19    so I was just waiting for him to finish his time.  And my

14:13:49  20    son -- our son turned six months.  And at six months, you have

21    to make weight, and you have to take a PFT.  Those are the

22    requirements of the Marine Corps.

23          I was 35 years old with five kids, and I had struggled

24    with my weight my entire career.  Being 35 didn't make it any

14:14:08  25    easier.  I weighed in, and I was eight pounds over.  And prior

1    to the Marine Corps, I had made some poor choices.  And as a

2    Marine, I had not made any of those choices.  But in this time

3    frame, I realized -- I knew I could drop some weight real quick

4    with cocaine.

14:14:33  5            I had a friend on base who --

6    Q    Yvonne, I am going to stop you right there.

7            So you decided to use cocaine to lose weight.

8    A    Yes.

9    Q    Were you caught for that choice?

14:14:43  10   A    Yes.

11   Q    Did you go to a court-martial?

12   A    Yes.

13   Q    And did you ultimately take responsibility for that choice?

14   A    Yes.

14:14:50  15   Q    What did you do?

16   A    I took the plea deal because I felt like I had made a

17   mistake and -- that I wanted to own.  I wanted to own what I

18   did.  I believe we learn from our mistakes, but the only way

19   you can learn from them is if you acknowledge them and own them

14:15:13  20   and change from them.  So I knew what I had done was wrong and

21   I didn't want to fight that.  So I took the plea deal and --

22   Q    Were there some significant consequences for you as a

23   result of that?

24   A    I was four years away from retirement.  So I lost my

14:15:39  25   retirement.  I spent six months in jail.  Military.  I ended up

1    getting out a little bit early on clemency.  I was away from my

2    children.  And I was ashamed of my choices.  I had to live with

3    that shame until I came to terms with that.

4    Q    Were you discharged from the military?

14:16:00  5    A    I was.  Bad conduct discharge.

6    Q    What happened once you were discharged from the military?

7    A    I told my husband, I am going back to Idaho.  You can join

8    me -- he's not from there -- or not.  And we moved back to

9    Idaho.

14:16:15  10   Q    When you came back to Idaho, how did you find a new sense

11   of community?

12   A    When we got in trouble in the Marine Corps, there was a --

13   the night -- they showed up at my house.  So the day -- can I

14   give background to this?

14:16:38  15   Q    Background to --

16   A    The story to explain.

17   Q    Just where did you find community?

18   A    God.  Church.

19   Q    Church?

14:16:45  20   A    Yes.

21   Q    You found a Christian church that you took your children

22   to?

23   A    I did.

24   Q    Had you been particularly active in a faith before then?

14:16:53  25   A    On and off.  I like to tease that I have been saved so many

1  times in my lifetime.  I was the kid that rode the buses to the

2  churches by themselves.  I was raised Catholic, and Catholic

3  religion never connected.  So I spent my whole life seeking, on

4  and off.  This last time, we were in our church until 2020.  We

14:17:15  5  were active, and we helped with teens.  We have -- I was very

6  active in my church.  It meant -- it wasn't just to put a check

7  in the box and show up on a Sunday morning.  It was who I was.

8  **Q**  You said it was who you were.

9  **A**  Correct.

14:17:29  10  **Q**  What did it mean to you?

11  **A**  I believe all of us are here for purpose.  I want to make a

12  difference.  I want to serve my community.  And, for me, church

13  was a way to serve the teens to be -- I am -- I tried to go to

14  camp whenever I could.  I would use vacation and go with the

14:17:50  15  kids to camp.  I helped with the teens.  I went to winter

16  retreat every year that they would let me.  It was my way to

17  give back to the kids that -- because I didn't have that.  I

18  didn't have that support as a child.  And I didn't have a

19  normal childhood.  So I wanted to be a difference in my

14:18:09  20  community.

21  **Q**  And did you find that difference in your -- that different

22  community, that sense of spirituality and faith, in your

23  church?

24  **A**  I did.

14:18:21  25  **Q**  Were you still struggling with your weight?

1    **A**   I actually gained a lot of weight after the Marine Corps.

2    I gained over 100 pounds and was much heavier than I was in the

3    Marine Corps, but yes; I continued to struggle with my weight.

4    **Q**   And I want to direct your attention -- I want to

14:18:41   5   fast-forward us to about 2020 just around the time COVID hits.

6         Do you have a recollection of that in your mind?

7    **A**   I do.

8    **Q**   Did you want to lose weight at that point?

9    **A**   It was actually prior to COVID.  It was in January of 2020.

14:18:54   10   I had a friend from church -- I had started to lose weight, and

11   I had lost about 80 pounds but I just couldn't get the rest

12   off.  And she had a bad health thing, so we decided to do a

13   ten-pound takedown challenge together.

14   **Q**   A ten-pound --

14:19:10   15   **A**   Takedown challenge.  And so we decided to do that together.

16   **Q**   As part of that, I understand that you were asked to watch

17   some documentaries?

18   **A**   Yes.  It included a lady that does coaching for people.

19   And part of it is she wants you to educate and learn about good

14:19:29   20   food so you can learn to change your habits so it's forever

21   instead of the yo-yos that we all play.  She required us to

22   watch three documentaries.  One was called Fed Up; one was

23   called A Simple Pill; and one was Away With Wheat.

24   **Q**   Yvonne, I'm going to pull up Defense Exhibit 12, which is a

14:19:49   25   trailer for one of those documentaries, the film, Fed Up.

1           Have you watched that trailer?

2    **A**   I have.

3    **Q**   Have you watched Defense Exhibit 12?

4    **A**   I have.

14:19:57   5    **Q**   Does it fairly and accurately reflect the substance of that

6    film?

7    **A**   Absolutely.

8    **Q**   And did that have an impact on your state of mind at that

9    time?

14:20:06   10   **A**   100 percent.

11              MS. OWENS:  Your Honor, I would move to admit Defense

12   Exhibit 12 and publish to the jury.

13              THE COURT:  View of the government?  How long is this

14   clip of a movie?

14:20:20   15             MS. OWENS:  Your Honor, it's two minutes and

16   26 seconds.

17              THE COURT:  Any view from the government?

18              MS. SCHESNOL:  No objection, Your Honor.

19              THE COURT:  All right.  We'll take two-and-a-half

14:20:28   20   minutes to watch a trailer from a movie.  It's admitted.

21        (Defendant's Exhibit 12 was admitted in evidence.)

22              MS. OWENS:  Thank you.

23        (Video played.)

24              MS. OWENS:  Your Honor, is the audio connected?

14:20:55   25             Can counsel pause?  I'm not getting the audio.

1    COURTROOM DEPUTY:  It comes from your laptop, not

2    here.

3    MS. OWENS:  Okay.

4    MS. JOHNSON:  Mr. Bradley, could I have just a second?

14:21:20  5    MS. OWENS:  Your Honor, if we could just have a moment

6    to get the audio.

7    (Discussion off the record.)

8    **BY MS. OWENS:**

9    **Q**   Can you tell me what impact those documentaries had on you?

14:23:13  10   **A**   It was very eye opening.  I didn't realize that I had

11   lacked so much information and knowledge about what we are

12   given to eat in the food and how our government and the

13   organizations that monitor food, the FDA and things -- I had no

14   idea what had been hidden from us and what had not been told.

14:23:38  15   **Q**   And why was that significant to you?

16   **A**   So the movie, Fed Up, is about sugar.  And sugar -- it has

17   the same chemical reaction that cocaine does; but yet, we put

18   sugar in babies' formula.  And we are addicted to sugar from

19   the word go.  And if you look at the nutritional value of food,

14:24:06  20   sugar is the only thing they do not have to tell you how much

21   is in the nutritional value.

22   If they're not telling the truth about sugar, then how

23   much are they hiding from us?  And that set me up to start

24   consider and think of everything to make sure that I was

14:24:23  25   responsible for what I was putting into my body, what I was

1  putting into my mind, and what my kids were consuming and what

2  was happening.

3         And it shifted the whole way I looked at life because,

4  for the longest time, I had trusted the people that I thought

14:24:37  5  were put in place to govern us and to help us, and I was

6  realizing they weren't here to help me.  I had to help myself

7  and that -- I had to help my brothers and sisters see the

8  truth.

9  **Q**  And so remind the jury what the time frame was for that

14:24:53  10  again.

11  **A**  We started the ten-pound takedown challenge in January and

12  we -- my whole family, we shifted the way we ate.  We all lost

13  weight.  My son -- it affected his medication.  He got off his

14  ADHD medicine.  It changed our life.

14:25:14  15  **Q**  And how did that change the way you viewed the world?

16  **A**  Well, it made me start to question everything and to start

17  to realize that there were things I hadn't been told and I

18  needed to start trusting myself and start researching for

19  myself and start looking at things because I wasn't given the

14:25:31  20  whole truth.

21         I feel like -- I believe we are given bits and pieces

22  of truth, but it's up to us to find the truth.

23  **Q**  Did you start questioning the church?

24  **A**  I started to question the church after COVID happened.

14:25:43  25  **Q**  Did you start questioning medical communities?

1    **A**    Absolutely.

2    **Q**    Did you start questioning the government?

3    **A**    100 percent.

4    **Q**    Corporations?

14:25:53  5    **A**    Yes.

6    **Q**    Did you start questioning all the systems of authority that

7    you had previously just accepted?

8    **A**    Yes, I did.

9    **Q**    And how did you begin to do your research into these

14:26:05  10   systems of authority and the truth?

11   **A**    Originally, it was -- when COVID happened, that really

12   shook me.  I -- God said to me, wake up, Yvonne.  This isn't

13   about a virus; this is about control.  And that kind of set the

14   stage.

14:26:23  15        I was in my chiropractor's office and there was a

16   video playing.  And I went home -- or asked them what it was,

17   and I went home and watched it.  It was called Out of the

18   Shadows.  And that started too.

19        And then I started to think about while I worked at

14:26:38  20   TruGreen in corporate America and things that had happened.  My

21   husband had worked with me and also my daughter.  And we

22   started talking about procedures and policies that were put in

23   place that had never made sense to us before, but now we were

24   all starting to question things.

14:26:53  25        So just a lot of truth started to come up.  And, for

me, it was remembering things, researching, connecting dots,
listening to -- I believe everything has a perspective.  And
you cannot listen to one side.  You have to listen to both
sides of every story and realize that there's so many different
14:27:07  perspectives to get a full picture of what is happening.

**Q**   Did you start to question politics?

**A**   Yes.  Absolutely.

**Q**   And you say absolutely.  Why is that?

**A**   I had already started to see the division.  And things were
14:27:26  already starting prior to 2020, but all the elections, all the
way people acted.  It was -- so that was there.  But 2020
definitely -- and then when COVID happened, it was -- all of a
sudden, it was like we were at war with each other.  There was
two sides.  And I didn't understand.  I could -- and instead of
14:27:49  coming up with answers, it felt like we were given more
division and more -- everything just felt nefarious and wrong.
Like, it just didn't make sense to me.  And so I researched and
researched and researched.

**Q**   Did you gain a distrust for media and news?

14:28:08  **A**   I had already distrusted the media just because when you
watch -- you watch one news channel and then you watch another
news station and they tell you two completely different
stories.  So you have to go find the truth in that.  So I
already knew the media, but definitely during 2020, I saw
14:28:26  firsthand and really realized -- and then I started doing

1    research on things that have been declassified and things in

2    our government.  So that -- I believe media's propaganda.

3    **Q**   I want to direct your attention, then, to the day we've

4    spent a lot of time talking about, which is January 6, 2021,

14:28:47  5    which is after the 2020 presidential election.  Okay?

6    **A**   (Witness nods head.)

7    **Q**   Is that okay?

8    **A**   Yes.

9    **Q**   Okay.  So had you -- did you develop feelings about the

14:29:00  10    presidential election that occurred in November of 2020?

11    **A**   Yes, I did.

12    **Q**   What were those?

13    **A**   That our election was stolen.

14    **Q**   And why did you develop that feeling?

14:29:10  15    **A**   Because 2020 was a year of research, I was following and

16    looking at everything.  And with the election coming up and the

17    way that -- like, in Idaho, we have never just got mail-in

18    ballots.  Ever.  You have to request an absentee ballot.  And

19    all of a sudden, I had, like, four ballots show up at my house.

14:29:36  20    And my husband and I are the only registered voters.

21         There were things that -- so I just started to

22    question everything, and I started to watch everything.  I

23    wanted to make sure that it made sense.  I wanted to make sure

24    that we do have free and fair elections.  I wanted to make sure

14:29:51  25    my kids and grand kids would have this same country that I had

1    at this current time or I believed I had.

2    **Q**   Did you believe that the election in November of 2020 was

3    free and fair?

4    **A**   No.  I do not.

14:30:03   5    **Q**   How did you make the decision to come to Washington, D.C.

6    from Idaho on January 6th, 2021?

7    **A**   After I watched the -- after the election happened, I did

8    more research and was looking at all the evidence and the

9    things that were coming out that the questions that people had.

14:30:24   10           And then in December, Trump said, come to D.C.  And

11   there was Stop the Steal also that was -- so I told my

12   husband -- at that moment, I knew -- I said, we're watching

13   history happen, and I want to be a part of history.  I have an

14   opportunity to go to D.C. and participate in history.  I have

14:30:50   15   never had that opportunity.  I never -- I knew, and I told my

16   husband, I said, "I'm going with or without you.  Can you take

17   the time off?  I would love to have you there."  But I knew --

18   and Trump said -- when he said, I ask you to do two things,

19   vote and come to D.C.  So I said, I'm going.

14:31:05   20   **Q**   Did that have an impact on you when former President Trump

21   said that you should vote and come to D.C.?

22   **A**   Yes.  He's our commander in chief.  And there was enough

23   questions and enough going on that our government needed to

24   follow the Constitution.  It needed to do the proper things

14:31:31   25   that we had -- we, the people, had questions, and that needed

1    to be acknowledged.  And I wanted to make sure that I was there

2    to say, we have questions.  Follow the Constitution.  Do what

3    you're supposed to do.

4    **Q**    I want to -- how did you -- how did you get to Washington,

14:31:50  5    D.C. from Idaho?

6    **A**    We drove.  We left on January 1st.

7    **Q**    And you say we.  Who is we?

8    **A**    My husband and I.

9    **Q**    Did you come with anyone else?

14:31:59  10   **A**    No.  Not physically.  We came with a lot of people

11   spiritually and emotionally and asked us to keep them updated,

12   do lives, and share our journey.

13   **Q**    Did you come as part of an organized group?

14   **A**    No.

14:32:14  15   **Q**    Did you coordinate with anyone before you came?

16   **A**    No.

17   **Q**    When you got to Washington, D.C. on January 6th, that

18   morning, what did you do?

19   **A**    We got up very early, and we wanted to get to -- we wanted

14:32:30  20   to try to get into the speech, so we got on the metro and we

21   were in D.C. probably about 5:30 or 6:00 in the morning, I

22   think, if I recall.  Between 5:00 and 7:00, just to be safe?

23   **Q**    You said the speech.

24   **A**    For President Trump's speech.

14:32:46  25   **Q**    Did you make it to President Trump's speech?

1    **A**   We did make it to the speech, but we did not make it in the

2    front.  Not anywhere near the front.

3    **Q**   Did you make it for other people's speeches?

4    **A**   I did.  I was there from the time the speeches started

14:32:58  5    until the speeches ended.

6    **Q**   And where is there?

7    **A**   We were in between the Washington Monument and the Ellipse.

8    Somewhere in that massive amount of people.

9    **Q**   You said that when you came, you were there with the sense

14:33:16 10    that you needed to film for other people so that they could

11    have that experience.

12    **A**   I believe we're here for the human experience.  I believe

13    we experience things and that's part of our journey.  And I had

14    a lot of friends that couldn't come.  Either work or whatever.

14:33:32 15    So I promised them that I would film it and share my experience

16    with them.

17    **Q**   We've seen some of those videos throughout this trial;

18    yeah?

19    **A**   Yes.

14:33:43 20    **Q**   Did you film former President Trump's speech on January 6,

21    2021?

22    **A**   Yes.  Just with video.  I was not able to go live.  We had

23    no internet service all day and all morning.

24    **Q**   So you filmed it and saved it to your phone?

14:33:59 25    **A**   Yes.

1    **Q**   And have you seen a copy of Defense Exhibit 8, which is

2    clips from that speech taken off your phone?

3    **A**   Yes.

4    **Q**   And does it fairly and accurately reflect the statements

14:34:12  5    that were made during his speech?

6    **A**   Yes.

7    **Q**   And did those statements have an impact on you that day?

8    **A**   Yes.

9           THE COURT:  Which statements?

14:34:21 10           MS. OWENS:  Former President Trump's.

11           THE COURT:  Which statements?  Just the statements on

12    the clip?

13           MS. OWENS:  Yes.

14    **A**   Yes.

14:34:29 15    **BY MS. OWENS:**

16    **Q**   And would it help the jury to understand what impact those

17    statements had on you to listen to them?

18    **A**   I believe so.

19           MS. OWENS:  Your Honor, we would move for the

14:34:39 20    admission and publication of Defense Exhibit 8.

21           THE COURT:  How long is it.

22           MS. OWENS:  Your Honor, it's about 20 minutes.

23           THE COURT:  Come up to the bench.

24       (Bench discussion:)

14:35:00 25           THE COURT:  Government's position?

1          MS. SCHESNOL:  Well, Your Honor, if they are being

2     offered for the effect on the listener, we understand they're

3     not hearsay.  But if the whole point is the effect on the

4     defendant, we are back into the public authority realm which

14:35:19   5     Your Honor ruled on.

6          So this is the exact reason why we filed briefs on

7     this in the first place is the defendant is saying what former

8     President Trump said had an effect on me and that's why I took

9     the actions I took.  That's a public authority defense.

14:35:40  10          MS. OWENS:  She's not saying that she thought he gave

11     her permission or that --

12          THE COURT:  What is she saying?  You have to make a

13     proffer or I don't know what she's saying.

14          MS. OWENS:  Okay.  Your Honor, she is going to testify

14:35:50  15     that she heard those statements; that that is why she went down

16     to the Capitol; that his statements about the election being

17     stolen served to verify her deep beliefs that the election had

18     been stolen and that the country was in deep peril and it was

19     imperative that the people go down to support the legislators

14:36:07  20     that were there to certify the electoral votes and that that's

21     why she did what she did in terms of --

22          THE COURT:  No.  No.  No.  No.  She did what she

23     did -- that's why she went into the Capitol?

24          MS. OWENS:  No.  That's why she went down to the

14:36:21  25     Capitol.

           1              THE COURT:  That's why she went to the Capitol.

           2              MS. OWENS:  That's why she went to the Capitol.  She's

           3    never going to testify that she believed President Trump gave

           4    her any sort authority or permission to go inside.  That's not

14:36:32   5    her position.  But it served to validate her deeply held

           6    beliefs.  It served to underscore her beliefs that the election

           7    had been stolen.  This wasn't some, you know, conspiracy theory

           8    she read online.  This was the president of the United States

           9    telling her there had been election fraud.

14:36:49  10              MS. SCHESNOL:  At the risk of sounding snarky, potato,

          11    potato.

          12              I mean, so she's not going to say -- she's not going

          13    to use the magic words "public authority" because Your Honor

          14    has ruled she can't, but that's exactly what we have going on

14:37:04  15    here.

          16              THE COURT:  First of all, if you do this, even though

          17    you may be contending it's not public authority and the

          18    government may be contending it is, I will probably give the

          19    instruction that I gave in the *Sheppard* case.

14:37:16  20              MS. OWENS:  And that's fine, Your Honor.

          21              THE COURT:  Secondly, I don't see why we need to play

          22    20 minutes of a clip of President Trump's speech in order for

          23    her to say that.  She can say that based on what she heard at

          24    the speech.  We do not need the jury to see a 20-minute speech

14:37:31  25    from the president.

```
 1              MS. OWENS:  Your Honor, we spent almost two days --
 2              THE COURT:  I don't care.  I'm talking about what's
 3       relevant and what's important, and a 20-minute speech is not
 4       relevant.  Her actions -- the videos of her actions are
 5       relevant.
 6              MS. OWENS:  Well, her intent and her state of mind on
 7       that day are certainly relevant.
 8              THE COURT:  She can testify.
 9              MS. OWENS:  Well, this impacts her --
10              THE COURT:  If you want to show two or three little
11       clips of things that he said that had a particular impact on
12       her, okay.  But not 20 minutes.
13              MS. OWENS:  Okay.
14              THE COURT:  I'm not going to allow 20 minutes of a
15       speech to be played during this trial.  And with respect to the
16       line drawing, if she starts saying things that I think would
17       get into public authority, I'm going to stop her in front of
18       the jury.
19              MS. OWENS:  She's really not.
20              THE COURT:  If you start arguing something along those
21       lines, I'm going to stop you in front of the jury because I
22       can't --
23              MS. OWENS:  Your Honor --
24              THE COURT:  -- take the jury out of the room every
25       time you start to do something like that, if you do.
```

Timestamps in left margin:
14:37:43 (line 5)
14:37:53 (line 10)
14:38:04 (line 15)
14:38:25 (line 20)
14:38:32 (line 25)

1      MS. OWENS:  There's genuinely no -- there's no intent
2  to do that.
3      THE COURT:  I will allow her to testify that she went
4  to the Capitol from that speech because of the impact of things
14:38:50  5  that President Trump said and that -- I'll stop there.
6      MS. OWENS:  Okay.
7      THE COURT:  And I will not let her go further than
8  that.  And we do not need a 20-minute tape -- clip of the
9  speech.  As I said, if you had edited it so you had two or
14:39:09  10  three things that you thought were particularly important to be
11  said that had an impact on her, I would allow that.
12      MS. OWENS:  The speech was an hour and 20 minutes
13  long.
14      THE COURT:  Okay.  If you want to argue with me, you
14:39:20  15  can --
16      MS. OWENS:  No.  I don't.
17      THE COURT:  -- but I am not allowing 20 minutes of the
18  speech to come in.
19      MS. OWENS:  No.  I understand.
14:39:27  20      (End of bench discussion.)
21      (In open court.)
22      THE COURT:  You may proceed.
23      MS. OWENS:  Thank you, Your Honor.  May I have just
24  one moment?
14:39:48  25      THE COURT:  Sure.

1          MS. OWENS:  Thank you.

2          (Discussion off the record.)

3      **BY MS. OWENS:**

4      **Q**   So I'm going to play you --

14:41:24   5          MS. OWENS:  So, Your Honor, we would move for the

6      admission of Defense Exhibit 8, and then we would like to

7      publish a portion of that exhibit for the jury.

8          THE COURT:  I'm admitting only a limited portion of

9      Exhibit 8.  And how long a portion are you seeking to admit and

14:41:41   10     show to the jury?

11         MS. OWENS:  Your Honor, approximately three minutes.

12         THE COURT:  I will allow that.

13         MS. OWENS:  So if we --

14         THE COURT:  Those three minutes, as you identify them,

14:41:51   15     will be admitted and may be published to the jury.

16         (Defendant's Exhibit 8 Excerpt was admitted in evidence.)

17         MS. OWENS:  So I would like to play for the jury

18     starting at 14:40.

19         (Video played.)

14:41:58   20     **BY MS. OWENS:**

21     **Q**   Yvonne, do you recognize this video?

22     **A**   Yes, I do.

23     **Q**   And what is it?

24     **A**   It is my video off my phone of President Trump's speech.

14:42:10   25     **Q**   Okay.

1          (Video played.)

2              MS. OWENS:  Thank you.

3      **BY MS. OWENS:**

4      **Q**   Yvonne, do you remember that section from President Trump's

14:43:33  5   speech?

6      **A**   I do.

7      **Q**   And what impact did that have on you after his speech?

8              Let me just rephrase that.

9              Is that why you went down to the Capitol?

14:43:47 10   **A**   Yes.

11     **Q**   Throughout the speeches that day, had there been talk of

12     the election?

13     **A**   Yes.

14     **Q**   Had President Trump talked about the election being stolen?

14:44:01 15   **A**   Yes.

16     **Q**   Had he talked about the evidence of the election being

17     stolen?

18     **A**   Yes, he did.

19     **Q**   What impact did that have on you?

14:44:08 20   **A**   It just confirmed what I had already researched and found;

21     that there were at least five states that had questions and

22     enough to -- that we needed to send it back to the states to be

23     recertified and to ensure that it was done fairly and properly

24     and that we still had free and fair elections.

14:44:30 25   **Q**   Yvonne, former President Trump says that you were going to

1   demand that Congress do the right thing.

2            Did you hear him say that?

3   A   I did.

4   Q   What did you think about that?

14:44:44  5   A   Well, as a Marine, I took an oath to support and defend the

6   Constitution against all enemies, foreign and domestic.  And if

7   our election was stolen, then that, to me, was enemies domestic

8   because freedom is who we are.  That's our right.  That's our

9   God-given right.  So it was -- it meant everything to me.  It

14:45:13  10  is an oath that I took.  It is my honor.  It's God, country,

11  Corps.  I felt like I was born for such a time as this.

12  Q   And so did you when you went to the Capitol -- what was

13  your intent?

14  A   To watch our legislative branch follow the Constitution and

14:45:34  15  to send the certification back to the states to be recertified

16  and make sure our election was done correctly.

17  Q   Yvonne, I want to talk a little bit about going into the

18  Capitol generally.

19            Had you been inside our nation's Capitol before?

14:45:53  20  A   No.  I had not.

21  Q   Had you been inside the Capitol for the State of Idaho

22  before?

23  A   I have.

24  Q   And when you go into the Capitol for the State of Idaho,

14:46:06  25  can you describe for the jury the security measures that are in

1    place for visitors?

2    **A**   There are none.  It is an open -- you walk in.  You can

3    walk in any door.  I mean, obviously, I didn't try to go

4    anywhere.  So I'm not sure you can go into open offices or

14:46:21  5    whatever, but we went to watch a legislative branch.  We walked

6    right to and went to the Rotunda.  And they had seating for us,

7    and we sat up there.  There was no -- no security, no nothing.

8    **Q**   Was there a metal detector?

9    **A**   No.

14:46:34  10   **Q**   Did anyone inspect what you brought in?

11   **A**   No.

12   **Q**   Did you have to talk to anyone?

13   **A**   No.

14   **Q**   Did you have to make an appointment?

14:46:40  15   **A**   No.

16   **Q**   When did you go to Idaho State Capitol?

17   **A**   The last time I went inside was in 2020.

18   **Q**   So when you came to the Capitol on January 6th, did you

19   understand that there was a different process for going into

14:46:59  20   the nation's Capitol?

21   **A**   No.

22   **Q**   Why not?

23   **A**   Because I didn't have that perspective.  I didn't know.  I

24   grew up in Idaho, and Idaho is what I know, and I only know

14:47:13  25   what I know.

1    **Q**   Did you believe that you could go into the Capitol

2    without --

3    **A**   Yes.  It's our house.  It's our Capitol.  They are our

4    elected officials.  They work for us.  They are in service to

14:47:28  5    we, the people.  So yes; it's our house.  Why would I not be

6    able to go into it?

7    **Q**   Did you think that anyone could keep you from going into

8    the Capitol?

9    **A**   Not constitutionally, no.  It's our house.

14:47:47  10   **Q**   You keep saying that.  What does that mean?

11   **A**   It means that this is our government.  These elected

12   officials work for us.  We elect them into office.  It is our

13   house.  It is -- it is our nation's Capitol.  It is -- it

14   wouldn't be if it wasn't for us.

14:48:02  15   **Q**   And so did that impact your thinking on January 6, 2021?

16   **A**   Yes.  We're -- we are here to hold our government

17   accountable.  We elect them.  We need to watch what they're

18   doing.  We need to ensure they're telling us about sugar,

19   following the Constitution.  That's -- part of our duty as

14:48:26  20   Americans is to make sure that they're doing the things that we

21   elected them to do.

22   **Q**   Did you feel like you had the right, as someone who elected

23   them, to go in and to oversee what they were doing, even?

24   **A**   Yes.  To ensure they followed the Constitution and they

14:48:42  25   sent it back to be recertified.

1    **Q**   Was that important to you?

2    **A**   It is everything to me.  If we lose our freedom, we lose

3    everything.

4    **Q**   Were you worried about losing your freedom on January 6,

14:48:58  5    2021?

6    **A**   I'm absolutely still worried about losing my freedom.  But

7    yes; I was absolutely worried that day.

8    **Q**   Why?

9    **A**   Because things are -- we don't know the truth.  We're given

14:49:14 10    bits and pieces, and it's hard to find the truth.  It's hard to

11    know.  I don't know where to turn to find the truth anymore.

12    I've learned to trust myself and trust my intuition.  And I

13    believe that God gives us -- I believe Spirit and God talks to

14    us.  So -- but on the outside world, I don't know who to follow

14:49:34 15    anymore or who to trust or -- I am scared.  I am scared for our

16    country.  I'm scared what's happening.

17    **Q**   I want to talk to you about some of the things we've seen

18    that happened on January 6, 2021.  And I want to start with

19    some of the video we watched of you walking up to the Capitol.

14:49:57 20         Do you remember that video?

21    **A**   I do.

22    **Q**   And you were filming that walk?

23    **A**   I was.

24    **Q**   About how long did it take you to walk from where you were

14:50:07 25    watching former President Trump's speech to the Capitol?

```
 1   A   It took about an hour and 15 minutes, I believe.

 2   Q   Was it -- can you describe for me the mood of the crowd

 3   after former President Trump spoke?

 4   A   I believe in energy, and I believe we feel energy.  And

 5   I -- it was nothing I had never experienced in my entire

 6   lifetime.  I've never been around -- I believe there were a

 7   million people, but the numbers are 100,000 -- whatever it was.

 8   It was my brothers and sisters there with me.  And it was

 9   patriotism.  I felt love.  I felt people that had the same

10   concerns that I did.  I felt like I was a part of something

11   bigger than myself.  Something was happening in our world, and

12   I got to be a part of it.

13   Q   Was that important to you to be able to experience this

14   event?

15   A   Absolutely.  I mean, we spent our life growing up and

16   reading about all these amazing people that have changed the

17   course of history by standing up and doing things, going

18   against the grain when no one else would.  They were brave

19   enough to do it, and I felt like that was my call; that there

20   was a -- not everyone was brave enough to stand up and have a

21   voice, but I was.

22   Q   When you walked up to the Capitol, we've seen video and

23   we've heard video of some of the things you said.  So I want to

24   talk about what you saw when you were walking up to the Capitol

25   in front of the Capitol next -- are you oriented with me?
```

1    **A**    Around the Peace Monument?

2    **Q**    Yes.

3    **A**    Just sea of people.  On the walk, I lost my husband.  So --

4    I was pretty excited, and so I kind of skipped and moved around

14:52:03  5    and got up.  And before I knew it, he was nowhere to be found.

6    So I wanted to go to the front.

7         I was there for the experience.  I believe we come to

8    experience life.  So I wanted to see what was happening.  I

9    wanted to talk to the police.  I wanted to feel the energy of

14:52:18  10    what everyone was experiencing and so -- but when I got there

11    in the middle, nobody was moving.  Everyone was just standing.

12    And I didn't -- so, to me, it was, like, push.  We have a right

13    to be there.  This is our house.  Push to the front.  Let's go.

14    Let's -- I wanted to see.  So that's why I was yelling, "push,

14:52:37  15    push" and trying to get to the front.

16         Trying to get to the -- so I -- I wanted to see what

17    was happening.  I wanted to experience it.  I didn't want to be

18    lost in a crowd somewhere.

19    **Q**    Did you see any signs that said you couldn't be there?

14:52:52  20    **A**    No.  I did not.

21    **Q**    Did you see any bicycle racks near the Peace Circle that

22    said you couldn't be there?

23    **A**    No.  Not that I recall.

24    **Q**    Snow fencing?

14:53:02  25    **A**    No.

1    **Q**    What were you focused on?

2    **A**    People and the energy and the experience.

3    **Q**    So we did -- we heard you say, "push."

4          Can you tell us about that?  What were you thinking?

14:53:15  5    **A**    I was thinking, why did I drive all the way to D.C. to just

6    stand here.  I want to experience.  I want to see what's

7    happening.  I want to know what's going on with our elected

8    officials.  So I didn't quite understand why we weren't moving.

9    I didn't know.  I was -- I had my very limited perspective at

14:53:35  10   that moment.  So all I knew -- what was happening for me in

11   that moment.  And it was, like, we have a right to be here.

12   This is our house.  Why are we not moving.  Why are we not

13   going.

14   **Q**    So what did you do then?

14:53:47  15   **A**    I walked to the front.  I pushed my way through.  No one

16   else was going to push.  I was going to go up to the front and

17   figure out what was going on.

18   **Q**    And we've seen some time-lapse video of CCTV where you walk

19   up through that crowd.

14:54:07  20         Do you remember that video?

21   **A**    I do.

22         MS. OWENS:  And that is Exhibit 402.3.  And if we

23   could pull that up, please, Ms. Johnson.

24         And, Your Honor, that has been admitted.

14:54:20  25         Thank you.

**BY MS. OWENS:**

**Q**   You are circled there.  Do you see that?

**A**   I do.

**Q**   Is that where you first arrived at the front of the line?

14:54:28   **A**   It was.

**Q**   Is that where you ended up staying?

**A**   No, it was not.

**Q**   What happened?

**A**   If you can watch, I somehow -- at that point, I was the 14:54:35 smallest I had ever been in my life.  So I was literally caught in a crowd and just kind of shoved and moved over to where I ended up being for the majority of it.

**Q**   And if we watch this, do you see that?

(Video played.)

14:54:50   **A**   You can kind of just see my flagpole just kind of move with the whole --

**BY MS. OWENS:**

**Q**   And if you watch over here, do you see -- I've circled --

**A**   There's fighting going on.  And at that point, I'm kind of 14:55:05 caught up in the fighting, and they take me with them.

(Video played.)

**BY MS. OWENS:**

**Q**   And so now we see that you're in the middle of the video.

    Do you see that?

14:55:20   **A**   Yes, ma'am.

1    **Q**   And is that where you stayed for the remainder of your

2    time?

3    **A**   Yes.

4    **Q**   Thank you.

14:55:31  5           There's been testimony about what happened at that

6    point as you stood in front of police.

7           Do you remember that testimony?

8    **A**   Yes.

9    **Q**   Can you tell the jury what you were thinking as you got up

14:55:45  10   to the front of that line?

11   **A**   I wanted to understand what was happening and I -- as law

12   enforcement, they take the same oath I took -- take.  So I was

13   confused as to why they were stopping us from seeing our

14   government.  And that's the traitor thing where it felt like we

14:56:15  15   have a right to be here; this is our house; and you are

16   preventing us from being here.

17          So I wanted -- and I actually talked to the police --

18   it wasn't caught on video -- and wanted to understand them.

19   They're not my enemy, but I wanted to know.  I wanted to

14:56:28  20   understand what was happening.

21   **Q**   Did you -- Yvonne, did you have any intent to disobey them

22   when you walked up there?

23   **A**   Absolutely not.  I wasn't there to fight with the police.

24   I just was there to see our government do what it was supposed

14:56:43  25   to do by the Constitution.

1    Q    But you saw that around you -- I mean, this was not

2    peaceful?

3    A    No.  It wasn't.  But it also wasn't not peaceful in the

4    beginning.  It became -- there were parts of it that were very

14:56:56    5    peaceful.  It felt very -- you -- it felt very chaotic and

6    confusing like -- like people got caught in a moment and

7    didn't -- I just feel like no one was thinking clear and it

8    wasn't -- they weren't fighting.  It was like we would stand

9    there and then, all of a sudden, flash bangs.

14:57:39    10           Like, I was just standing there.  I got pepper sprayed

11    right in the eye.  I wasn't doing anything.  I was just talking

12    to the police.  And that was the point that I turned my back

13    because there were people trying to help me get the -- flush my

14    eyes with water and everything.

14:57:54    15           So there was just so much chaos.  And I didn't

16    understand.  Why was I getting pepper sprayed.  I was just

17    standing there.  And I told the police, I am not going to push

18    against you, but I have a right to be here, and I am not going

19    to move from this place.

14:58:04    20    Q    And is that a belief that you held, that you had a right to

21    be there?

22    A    Yes.  I had a right to be there for that experience.  I had

23    a right to see what was happening.  I had a right to see what

24    was going on at our Capitol.

14:58:15    25    Q    And so you said that you were going to stand there but that

1  you weren't going to get aggressive with the police; is that

2  fair?

3  **A**  That is fair.  And I did not.

4  **Q**  You testified just a moment ago that you did get pepper

14:58:29  5  sprayed.  And is that why you turned your back then to the

6  police?

7  **A**  Yes.  And that was why I was crouched down because they

8  were trying to flush my eyes with water and help me.  And

9  saline.

14:58:41  10  **Q**  Who is they?

11  **A**  I have no idea who they were.  Just some guys who were

12  there.  There was -- one guy I think was a medic because he had

13  saline, but I have no idea who they were.  I've never met them.

14  Never talked to them after.

14:58:53  15  **Q**  Was it your intent to try to push through that barrier

16  against law enforcement's orders?

17  **A**  No, it wasn't.  I don't think -- I don't believe I did

18  push.  I believe I was being pushed and trying to stop it, but

19  I -- I know I -- I know my frame of mind was not to push, so

14:59:09  20  that is the only thing I know for certain; that I did not have

21  any intention of pushing.  As how the photos or whatever -- I

22  can only speak to my intention, and I never pushed.  I know

23  that.

24  **Q**  But we did see that that barrier was broken.

14:59:23  25  **A**  Yes, it was.

1    **Q**   And that was not something that the police opened up and

2    let you through?

3    **A**   No.  It was not.

4    **Q**   Why didn't you just turn around and leave at that point,

14:59:34   5    Yvonne?

6    **A**   Because I still didn't have any resolve to what was

7    happening.  I still didn't understand what was going on.  I

8    still didn't -- I didn't come all the way to D.C. to go home

9    and think, I have no idea what just happened.  I still wanted

14:59:53   10   to know what was going to come of the day and what was going to

11   proceed.

12          So I still was there to document it and to share my

13   story to see.  I didn't have a story at that point.  I didn't

14   understand what was happening.  So I wasn't thinking of

15:00:06   15   anything else.

16   **Q**   When you went to the Capitol, was your intention to stop

17   the certification of the election?

18   **A**   No.  My intention was for them to follow the Constitution

19   and to send it back to the states to be recertified, not to

15:00:23   20   disrupt or to stop them from doing their job.  My reason was

21   there to ensure that they did it correctly.

22   **Q**   So we saw that after you broke through that police line --

23   after it was broken and you went through, what did you do?

24   **A**   I went over to the corner, and I took my phone off.  And I

15:00:47   25   tried to figure out what I was going to do or gather my

1    thoughts.  And I sat there for a little bit.  And then -- then

2    I saw people moving and I --

3    **Q**   Let me stop you right there.

4         You said you took your phone off.  What do you mean?

15:01:03  5  **A**   It was on my flagpole.  So at that point, I took it off the

6    flagpole.  I don't remember at that point if I had tried to

7    call my husband.  I cannot say for certain.  But I took it off

8    and just tried to gather my thoughts and collect my breath.

9    And I didn't have a plan, so I didn't know what I was doing.

15:01:26 10       There was no -- and I can't go back to that moment to

11   say exactly what I was thinking because I don't know.  I can't

12   honestly know what I was thinking at that moment.

13   **Q**   I want to talk to you just for a minute about the flagpole

14   we've seen you were carrying.

15:01:40 15       Where did you get that?

16   **A**   I bought that at a vendor's spot along -- they had tons of

17   Trump flags and all sort of gear along the way.

18   **Q**   Can you describe what the flagpole was like?

19   **A**   It was a plastic, lightweight flagpole.

15:01:56 20  **Q**   Did you buy that as a weapon?

21   **A**   Heck, no.

22   **Q**   Did you use that as a weapon?

23   **A**   Never.

24   **Q**   Why not?

15:02:04 25  **A**   I don't believe we're here to hurt other human beings.  I

1    believe we're here to love other human beings.

2    **Q**   Did you come with any sort of bricks or sticks or steel

3    pipes?

4    **A**   No.  I did not.

15:02:14  5    **Q**   Did you throw anything at police?

6    **A**   No.  I did not.

7    **Q**   Did you scream obscenities at the police?

8    **A**   No.  I did not.

9    **Q**   Threaten them?

15:02:22  10   **A**   No.  I did not.

11   **Q**   Why not?

12   **A**   Because that's not who I am.  I don't believe in violence.

13   I believe in love.

14   **Q**   I want to talk to you -- we've seen that, after ten or so

15:02:34  15   minutes, you go up to the second tier of the Capitol.

16            Do you remember that?

17   **A**   I do.

18   **Q**   Tell me when you got upstairs what you were thinking.

19   **A**   I have no idea.  I just followed the crowd.  And when I got

15:02:47  20   in there, I ended up on the other side of the glass panes with

21   the police.  And that was the first time that I was, like --

22   the voice inside my head said, Yvonne, you need to get out of

23   here.  You are little, and you are going to get crushed and

24   this is dangerous and you are not accomplishing anything at

15:03:06  25   this point.  You are not, so --

1    Q    So I want to stop you there, and I want to walk you back

2    and unpack that a little bit.  Okay?

3    A    Okay.

4    Q    So you walk up to the second tier --

15:03:16  5    A    I just walked in.

6    Q    Into where?

7    A    The tunnel.

8    Q    The tunnel that we've heard about?

9    A    Right.

15:03:21 10    Q    Why did you do that?

11    A    I didn't know where the tunnel led.  I didn't know where

12    they were going.  So I went in there to see.  And when I got to

13    the police, I realized we weren't going anywhere and that that

14    wasn't leading anywhere.  So --

15:03:33 15    Q    Why did you realize that wasn't leading anywhere?

16    A    Because I ended up with the police and then -- it was crazy

17    in there.

18    Q    You ended up with the police.  We've seen that there were

19    two sets of glass doors?

15:03:46 20    A    I was on -- so the doors that open and then they had panes

21    against them.  I had somehow come in, and I got against the

22    pane because I was getting squished.  And I had my water bottle

23    in my backpack.  And I knew it was steel.  And I knew I would

24    at least be protected if I had my water bottle between me and

15:04:06 25    the crowd as they were -- we were in there.  So I waited until

1    I could get out.  And then when they put me out, I went out.

2    **Q**   And so you spent about 12 minutes being pushed against that

3    door?

4    **A**   I believe so.  For me, it was just -- I just stood there

15:04:22  5    and prayed.

6           THE COURT:  Let's make sure that the witness is

7    testifying, not you.

8           MS. OWENS:  Okay.  Sorry.  I'm just trying to follow

9    up and orient, Your Honor.

15:04:31 10    **A**   Yes.  I believe that was how long.  I don't remember the

11    testimony, but I was there for a bit because I was praying.

12    **BY MS. OWENS:**

13    **Q**   When you got out of the tunnel, what did you do next?

14    **A**   Well, then I got out, and I decided that I was going to

15:04:46 15    take pictures and video it just to have it to share with people

16    that I had told I would share the story.

17           So I had noticed the ledge when I got out, so I

18    crawled back up and crawled up on the ledge and started

19    videotaping everything.

15:05:04 20    **Q**   Why would you go back in there if it was so dangerous?

21    **A**   Again, because I came to D.C. to watch what was going to

22    happen and to see.  And I wanted to watch -- I wanted to be

23    there for the experience.  I wasn't thinking about anything

24    other than that moment and why I had came.

15:05:22 25    **Q**   We've seen the video.

1        Can you tell us what you were thinking as you stood up

2    on that ledge?

3    **A**   I felt like we had lost our country.  I thought it was

4    over.

15:05:46  5    **Q**   Why did you feel that way?

6    **A**   Because I believe when -- in the beginning of 2020 when

7    stuff started to come out, I believed that we had already

8    been -- I believe we're at war.  Military programming -- call

9    it what you want, but I believe we're at war.

15:06:00  10        And that was the first moment that I thought for a

11    minute that maybe the good guys hadn't won and that maybe

12    things I had hoped that I was going to see -- that we were

13    going to do this the right way that maybe they weren't in

14    charge and that we were about to lose our country for good.

15:06:25  15    **Q**   There's a moment when you can see that a person in the

16    tunnel picks up a pipe and hits a police officer.

17        Do you remember that?

18    **A**   I do.

19    **Q**   Tell me what was going through your mind at that point.

15:06:42  20    **A**   I was watching violence like I had never experienced, and I

21    just -- at some point, I just -- it was too much.  And that was

22    when I screamed, "stop it; stop it."  I couldn't -- here were

23    people that love each other fighting each other, and it made no

24    sense to me.  It made no sense that we were fighting.  I didn't

15:07:03  25    understand what was happening, why we were not talking, why we

1    were not doing the things that we needed to do to unite this

2    country, why we were fighting instead.

3    **Q**   And so I want to try and make sense of that with your

4    statements when you said for people to push and that you said

15:07:21   5    we need fresh bodies.

6          Can you explain to me what you were thinking when you

7    made those statements?

8    **A**   At that point, I was angry because we had a right to be

9    there and we were not being allowed.  We were being beaten to

15:07:42   10   try to -- and it -- if we would have just been allowed in, I

11   don't feel like any of that would have happened.  I feel like

12   the fighting was created when we just wanted to watch -- we

13   watch -- I watched on TV the Kavanaugh proceedings.  I watched

14   it happen.  There were people in there.  They were sitting.

15:08:00   15   They stood in front of -- why did I not have the same rights

16   that they had at that moment?  I didn't understand that.

17   **Q**   You seen that at some point you get told to get off the

18   ledge.

19          Do you remember that?

15:08:13   20   **A**   Yes.

21   **Q**   Why didn't you jump down immediately?

22   **A**   Because I would have had to step on the police officers,

23   and I didn't want to hurt them and I didn't want to step on

24   them.

15:08:21   25   **Q**   What happened after you got down?

1    **A**   Well, when they threw me out, I lost my phone and I

2    couldn't find it.  So I stood outside for quite a while.  And

3    at that point, it just -- I tried to call my husband -- I

4    borrowed a phone -- and he couldn't hear me.

15:08:42   5    **Q**   Why couldn't he hear me?

6    **A**   It was so loud.  So loud.  We couldn't -- you couldn't even

7    hear yourself think.  You couldn't -- so I just watched it

8    unfold and tried to figure out what to do.  I didn't know what

9    to do because I have never metro'd.  And I had metro'd that

15:08:59   10    morning, but I had my phone to metro.  I didn't know how -- I

11    just stood there and didn't know what to do.

12    **Q**   Eventually -- and we've seen that you get inside the

13    Capitol.

14            Can you tell us about that?

15:09:12   15    **A**   Well, when they started to break the windows, I watched

16    that all unfold.  And, again, there were people screaming at

17    them to not break the windows.  We don't break windows.  We

18    don't do that.  And then there were people breaking the

19    windows.  It didn't make sense.  I didn't understand.

15:09:27   20            But after the window got broken, I stood there for a

21    little bit.  I was, like, well, I can crawl in the window,

22    borrow a phone, and call my husband and get out of there.  I

23    was ready to go at that point.  So I crawled through the

24    window, and I asked to borrow a phone.

15:09:40   25    **Q**   Yvonne, did you think it was okay to crawl through the

1    window at the Capitol that had been broken?

2    **A**    I did.

3    **Q**    Why?

4    **A**    Because it's our house.  I had a right to be there.  And I

15:09:53  5    wasn't breaking the windows.  I had no intention of going in

6    there and doing any harm to any person or any property.  I was

7    just going in there to use the phone and get out and go home.

8    **Q**    What happened when you got inside?

9    **A**    I asked anyone if they had a phone.  And, literally, the

15:10:10 10    guy standing next to me pulls my phone out of his pocket and

11    says, is this your phone, and it was.  And to me, that was a

12    God moment.

13          So I didn't think about -- I had no idea what everyone

14    else was watching or seeing.  And I called my husband.  And I

15:10:28 15    noticed that my phone was dying, so I plugged it in.  And while

16    I was sitting in the corner of that video where they were

17    watching, videotaping it, I realized -- or maybe before that

18    because I don't know if that was a live.  I realized, oh my

19    God.  I have service.  I didn't have service all day long.  I

15:10:46 20    don't have to video for my friends; I can actually go live and

21    show my friends what is going on.  And that is when I went

22    live.

23    **Q**    And is that when we see you out the window?

24    **A**    Window.

15:10:56 25    **Q**    What were you thinking at that point?

**A**   I got caught up in the moment that we were in our house and that I was a part of history in the making.  And so I just got caught up in the moment.

**Q**   Are you proud that people broke the windows at the Capitol?

**A**   Absolutely not.

**Q**   Are you proud of the damage that occurred?

**A**   No.  Our Capitol is sacred ground.  It is our house.  It is our freedom.  It's where government started.  It is why we've been free for all this time.  I don't want anyone to destroy anything.

**Q**   We've seen the end of the live video you took.

Can you tell me what you were thinking as you signed off on that live video?

**A**   I believed we were at war.  I believed it was over.  I thought -- I thought that was it.

**Q**   How were you feeling?

**A**   Broken, sad, destroyed.

**Q**   When you went inside the Capitol, was your intent to delay or destroy or obstruct anything?

**A**   Never.

**Q**   Tell me about your decision and when you left the Capitol.

**A**   Troy and I had decided to meet at the Reflection Pond.  So I got out.  And I just kind of watched it unfold.  And that was where all the canisters of teargas and everything were thrown. And it struck me -- in that moment, it struck me.  And I have

1    said that.  It made no sense to me.  Why did they not throw

2    that teargas when we were standing with the barriers.  I have

3    been gassed.  I have been through the gas chamber.  People

4    don't like it, and they leave.  And it made no sense to me.

15:12:51  5    And at that point, I just was done.  I wanted to go home.  I

6    was ready to drive back to Idaho.  And I thought we were done.

7    Q    Yvonne, why did you go to the Capitol on January 6th?

8    A    For freedom.  To make sure that we continue to be free and

9    fair America; that we have -- I want my grand kids to have a

15:13:20  10    country to raise their grand kids in.  I want freedom.  We were

11    given that right by God.  I don't want man to take it away from

12    me.

13              MS. OWENS:  Thank you, Yvonne.

14              I don't have any further questions for you.

15:13:32  15              THE COURT:  All right.  We will take our afternoon

16    break and come back for cross-examination.  So let's be ready a

17    minute or two before 3:30.  Thank you.

18         (Jury excused.)

19         (In open court.  Jury not present.)

15:14:29  20              THE COURT:  All right.  Time estimate, Ms. Schesnol?

21              MS. SCHESNOL:  I'm sorry, Your Honor?

22              THE COURT:  A time estimate for cross-examination?

23              MS. SCHESNOL:  I mean, there's a --

24              THE COURT:  Just give me a number.

15:14:42  25              MS. SCHESNOL:  I will do my best to finish by 5:00.

1              THE COURT:  Okay.

2              MS. SCHESNOL:  Your Honor, may I bring up an issue?

3         So the government had filed a 404(b) motion that was

4    denied.

15:14:55  5              THE COURT:  Correct.

6              MS. SCHESNOL:  And the government did not use

7    defendant's prior conviction or prior arrest in its case in

8    chief.  However, it is the government's position that the

9    defendant has opened the door to that.

15:15:08  10             THE COURT:  How so?

11             MS. SCHESNOL:  Because defendant's whole testimony was

12   she thought she had the right to be at a government building

13   when she knew, from less than a month before, that government

14   buildings, in fact, do have restrictions and do have protocols

15:15:23  15  and, as a result of her not following those restrictions and

16   protocols at a department of health office in Idaho in

17   December, 2020, less than a month before January 6 when she

18   refused to follow orders of the police there to either follow

19   the protocols of that building, the protocols and rules

15:15:43  20  restrictions --

21             THE COURT:  To wear a mask.

22             MS. SCHESNOL:  And we don't even have to go into what

23   the detail was.  There was a protocol or restriction and she

24   was told you either follow it or leave voluntarily or be

15:15:56  25  arrested.

1          THE COURT:  All right.

2          MS. SCHESNOL:  And she was arrested.  So to say she

3     didn't know that -- she didn't know --

4          THE COURT:  Stop.

15:16:02  5          MS. SCHESNOL:  Okay.

6          THE COURT:  404(b) deals with an arrest or conviction.

7          It sounds to me like you're asking, I take it, not for

8     me to reconsider my decision on that because I'm not going to

9     reconsider it; I think it was the correct decision, but you're

15:16:21  10     asking perhaps whether you can ask about that circumstance and

11     about whether she was told at some earlier time that she -- I

12     mean, you'll have to ask it factually accurately.  And I

13     suppose as long as you don't get into the fact of a criminal

14     arrest -- and there isn't a conviction, so it's not a

15:16:50  15     conviction; it's just an arrest.

16          MS. SCHESNOL:  Well, to be accurate, Your Honor, after

17     January 6th, there was, in fact, a conviction.  The defendant

18     went to a jury trial and was convicted.  And I believe that's

19     currently on appeal because that's after January 6th.

15:17:05  20          THE COURT:  It's on appeal.  You're right.

21          MS. SCHESNOL:  Because that's after January 6th, I

22     don't think that portion is relevant.  But I do think that the

23     arrest is relevant because defendant's whole testimony was I

24     thought I could go there; I thought I could be there.  The fact

15:17:21  25     she was previously arrested for failing to follow restrictions,

1   protocols, and orders of police at a government building in

2   Idaho shows the lack of a mistake at the Capitol, United States

3   Capitol, on January 6th, 2021.

4           MS. OWENS:  Your Honor, may I respond?

15:17:37  5           That was not an order of the police.  That was a

6   public meeting of central district health, and the central

7   district health commissioner told her she had to wear a mask.

8   And she didn't, so she was arrested for trespassing.

9           The police -- it wasn't about police.  It wasn't about

15:17:52  10  government building.  It was about COVID masking protocol.  I

11  think it really takes us far afield of the issues here.

12          MS. SCHESNOL:  Your Honor, it was a government

13  building when she wouldn't put a mask on -- and I really don't

14  care about the mask or no mask -- and she refused to follow --

15:18:10  15  the police were called, and the police said to her, wear a

16  mask, leave voluntarly, or you will be arrested.  And she

17  stood her ground and was arrested, which sounds very similar to

18  what we have going on right here.

19          So there's a -- it goes to her -- a lack of mistake, a

15:18:31  20  modus operandi.  And the government believes it should be able

21  to cross-examine the defendant about that.  Three weeks prior,

22  she was arrested because she wouldn't follow orders from the

23  police about a government building and its restrictions.  It's

24  right on point.

15:18:45  25          THE COURT:  Ms. Owens?

1          MS. OWENS:  Your Honor, I mean, I think we've

2     addressed that issue in our briefing.  Again, it wasn't an

3     order of the police.  It was a central district health

4     commissioner who said that these are the requirements to enter

15:18:57  5     the building.  She went in with a mask.  It was a meeting that

6     was open to the public.  It was a public hearing.  And when she

7     wouldn't wear the mask properly, then she was trespassed from

8     the building by the central district health commissioner.

9          So I think this is clearly propensity.  This is

15:19:13  10     exactly what we argued and briefed before, and we didn't open

11     the door to this.  It's clearly not something that shows a

12     motive or a motive to disobey police orders.

13          THE COURT:  All right.  I will give you a final

14     decision 45 seconds before we bring the jury in.

15:19:31  15          COURTROOM DEPUTY:  All rise.

16     (Short recess.)

17     (In open court.  Jury not present.)

18          THE COURT:  Oh.  Mr. Bradley, I have to say something

19     first.

15:35:41  20          All right.  On the 404(b) issue, two parts to it.  One

21     is relevance; one is prejudice for 403.  On considering it

22     furthering -- is there something you want to say, Ms. Owens?

23          MS. OWENS:  No.  Do you want Ms. St. Cyr to take the

24     stand?

15:36:07  25          THE COURT:  No.  Wait until I finish this.

1          I am now convinced that there is marginal relevance.

2     I don't think there's very high relevance.  You know, a

3     different charge here it might be more relevant to.  But it

4     seems to me that the masking issue there doesn't wind up with a

15:36:29  5     great deal of relevance here.  It's very marginal relevance.

6          On the other hand, the prejudice that I was concerned

7     with was not just because of a criminal offense but also just

8     throwing this masking issue into things.  I'm not as concerned

9     with the masking issue anymore, given Ms. St. Cyr's testimony

15:36:54  10    and how she has presented herself to the jury.  But I'm still

11    concerned with the criminal offense aspect of it.

12         And I think that the prejudice does, in the words of

13    403 -- because the relevance is so limited does substantially

14    outweigh the relevance.  On the other hand, if -- and that's

15:37:19  15    because of the criminal nature.  Not because of the masking

16    issue, which I was concerned about as well as the criminal

17    nature of it.

18         It's possible that a question or two could be asked of

19    Ms. St. Cyr that would not get into this specific event and,

15:37:42  20    therefore, would not raise a 404(b) issue, per se.  And I won't

21    rule sitting here with respect to any such question.  But with

22    respect to the 404(b) issue, I am going to continue to deny the

23    government's request to use that.  All right?

24         Let's bring the jury in.

15:38:04  25    COURTROOM DEPUTY:  Your Honor, the jury panel.

1          (Jury present.)

2                  THE COURT:  Tim, can we have more water for the

3     witness?

4                  Welcome back, members of the jury.  We are ready to

15:39:02  5     proceed again.

6                  Ms. St. Cyr, I remind you you're still under oath.

7                  THE DEFENDANT:  Yes, sir.

8                  THE COURT:  And, Ms. Schesnol, it will be your

9     examination when we get the water to Ms. St. Cyr.

15:39:11 10                MS. SCHESNOL:  Thank you, Your Honor.

11                 THE COURT:  All right.  Please.

12                            **CROSS-EXAMINATION**

13    **BY MS. SCHESNOL:**

14    **Q**   Who are we at war with?  Who are you at war with?  You said

15:39:17 15   we are at war.  Who are we at war with?

16    **A**   I believe we're at war with foreign entities.

17    **Q**   Were there foreign entities at the United States Capitol

18    building on January 6, 2021?

19    **A**   Not that I'm aware.  I don't know.  How would I know that?

15:39:36 20   **Q**   Well, you said multiple times during your direct

21    examination that you believe we're at war, and I want to know

22    who you think we're at war with.

23    **A**   Well, I believe we're possibly at war with China.

24    **Q**   Was the Chinese government at the United States Capitol on

15:39:53 25   January 6, 2021?

1     A    There were Chinese-Americans there.

2     Q    Are we at war with Chinese-Americans?

3     A    No.

4     Q    So who were we at war with at the United States Capitol on

15:40:07  5   January --

6              MS. OWENS:  Your Honor, objection.  Asked and

7     answered.

8              THE COURT:  I'm sorry.  Ms. Owens?

9              MS. OWENS:  Your Honor, asked and answered and

15:40:11  10  argumentative.

11             THE COURT:  Overruled.  You may answer the question.

12             If you need it repeated, she can repeat it.

13    **BY MS. SCHESNOL:**

14    Q    At the United States Capitol, a few blocks from where we

15:40:21  15  sit today, January 6, 2021, who were you at war with?

16    A    Who is our country at war with?

17    Q    Well, you kept saying we're at war.

18    A    The foreign entities that interfered with our election that

19    Director Ratcliff even showed that there was foreign

15:40:38  20  interference with our election.  So pull the report, and you

21    will find out who we are at war with.

22    Q    Can you tell me where in the Constitution it gives members

23    of Congress authority to send votes back to the states?

24    A    Not off the top of my head, but I know it's in there.  If

15:40:56  25  the -- if there are questions and the election has any, they

1   can send it back to be recertified to the states.  That's in

2   our Constitution.

3   **Q**  Well, you've sat through this entire trial, right?

4   **A**  I have.

15:41:10  5   **Q**  And your very capable defense attorneys introduced

6   exhibits.

7        Do you recall that?

8   **A**  I do.  But not the numbers off the top of my head.

9   **Q**  And part of the exhibits that were introduced this morning

15:41:20  10  with Agent Gano were portions of the Constitution.

11        You were here for that, correct?

12   **A**  I was.

13   **Q**  And what portion of the Constitution said that members of

14   Congress could send electoral votes back to the states?

15:41:37  15       THE COURT:  You can answer that question, but I'm not

16   sure there's an exhibit that is --

17        MS. SCHESNOL:  Exactly, Your Honor.  That's the point.

18        THE COURT:  You said it was introduced as an exhibit.

19        I'm not sure any portion of the Constitution was

15:41:44  20  introduced as an exhibit if that's what you meant.  But you can

21   answer the question.

22   **A**  I don't know the portion off the top of my head.

23   **BY MS. SCHESNOL:**

24   **Q**  But you were willing --

15:41:53  25   **A**  I can grab the Constitution out of my purse, but I don't

1   have it off the top of my head.

2   Q   But you were willing to get into the United States Capitol

3   building through police and teargas for the votes to be sent

4   back to the states, but you don't even know where it says that

15:42:14  5   in the Constitution?

6   A   No, I don't.

7   Q   You said on direct that you're stubborn?

8   A   Yes.  I have stubborn energy sometimes.

9   Q   And that you like to prove people wrong?

15:42:30  10   A   If I said that, I don't recall.

11   Q   I believe you said that you were going to join the Army

12   because you didn't think that Marines allowed females in.  And

13   a bunch of people said you couldn't do it, and you wanted to

14   prove them all wrong.

15:42:46  15   A   That I couldn't be a Marine, yes.  I wanted to prove them

16   wrong there.  That doesn't mean I want to prove people wrong

17   all the time.

18   Q   But at least sometimes, you want to prove people wrong?

19   A   In that instance, that I could become a Marine, that I had

15:42:58  20   the ability to become a Marine, that I could do whatever I put

21   my mind to, yes.

22   Q   And you like the idea of being part of something bigger

23   than yourself; is that right?

24   A   Yes, ma'am.

15:43:06  25   Q   You also talked about being dishonorably discharged from

1  the military for using cocaine to lose some baby weight,

2  correct?

3  **A**   Yes.

4  **Q**   In fact, you were court-martialed for wrongful use of a

15:43:37  5  controlled substance, correct?

6  **A**   Yes.

7  **Q**   And failure to obey a lawful order; isn't that correct?

8  **A**   It was in 2003.  I don't remember the exact charges.  I'm

9  sorry.

15:43:47 10  **Q**   So you're not disagreeing that one of the counts of your

11  court-martial was failure --

12         MS. OWENS:   Your Honor, objection.  She indicated she

13  doesn't know.  Asked and answered.

14         THE COURT:   Overruled.  You can ask the question.

15:44:03 15  **BY MS. SCHESNOL:**

16  **Q**   So you don't disagree that one of the charges of your

17  court-martial was failure to obey a lawful order?

18  **A**   I don't disagree.  I don't remember the exact charges.

19  **Q**   You talked about in 2020 beginning to question everything.

15:44:23 20         Do you recall that testimony?

21  **A**   Yes, ma'am.

22  **Q**   You questioned the media?

23  **A**   Yes, ma'am.

24  **Q**   You questioned medical authorities?

15:44:33 25  **A**   Yes, ma'am.

|  |  |  |
|---|---|---|
| 1 | Q | Questioned corporations? |
| 2 | A | Yes, ma'am. |
| 3 | Q | Questioned the church? |
| 4 | A | Yes, ma'am. |
| 15:44:39 5 | Q | Questioned the government? |
| 6 | A | Yes, ma'am. |
| 7 | Q | In 2020? |
| 8 | A | Yes, ma'am. |
| 9 | Q | Who was the president in 2020? |
| 15:44:45 10 | A | President Trump. |

11 Q And you were questioning the government under President
12 Trump?

13 A President Trump is not the entire government.  President
14 Trump is one branch of the government.

15:44:59 15 Q And you believe President Trump and not other parts of the
16 government; is that right?

17 A I overall didn't trust the government.

18 Q You testified on direct that you came to D.C. with your
19 husband for the Stop the Steal Rally, correct?

15:45:26 20 A Yes, ma'am.

21 Q And that you did not come with an organized group?

22 A Correct.

23 Q Or coordinate with anyone in advance?

24 A Correct.

15:45:34 25 Q You haven't been charged with conspiracy, have you?

1   A   No, I have not.

2   Q   In the portion of former President Trump's speech that was

3   played here, Trump encouraged people to peacefully and

4   patriotically make your voices heard.

15:45:57  5           Do you recall that?

6   A   I do.

7   Q   You also testified, though, that events that you saw at the

8   Capitol on January 6, 2021, were not peaceful; they were

9   violent, correct?

15:46:14  10  A   That is correct.

11  Q   You testified that you thought you had a right to go into

12  the United States Capitol building because at the Idaho State

13  Capitol building, there's no security.

14          Do you recall that?

15:46:34  15  A   That is not why I thought I had the right to go into the

16  Capitol, but there is no security at the Idaho state building,

17  correct.

18  Q   Have you ever gone to the Idaho State Capitol where there

19  is a line of police standing behind bike racks, telling people

15:46:50  20  they can't come any further in?  Has that ever happened at the

21  Idaho State Capitol when you've been there?

22  A   Not with bike racks.  I have been there when there was a

23  line of police, yes.

24  Q   And did you go through the line of police to get into the

15:47:02  25  Idaho State Capitol?

**A**   They weren't stopping us from going into our Capitol, but they were police there.

**Q**   So there were police there, but there was not a line of police, telling people they couldn't go in, correct?

15:47:11   **A**   There was not a line of police, blocking people, yes.

**Q**   And when you went into the Idaho State Capitol, you didn't crawl through a broken window, did you?

**A**   That is correct.

**Q**   And when you were at the United States Capitol January 6, 2021, the police were outnumbered 500 to one, correct?

**A**   I don't know the exact number.  I said that that is what I thought it was more like.  But I don't know the exact number.

**Q**   But in your estimation, it was 500 to one, correct?

**A**   Well, again, I don't have any idea the total.  I said it was more like 500 to one.

**Q**   So, in your mind, it was more like 500 to one that the police were outnumbered?

**A**   Yes.

MS. SCHESNOL:  Can we please pull up Exhibit 802?  And before we start playing it, I have a few questions.

**BY MS. SCHESNOL:**

**Q**   You testified on direct that, going to the Capitol, you felt like you were part of something bigger than yourself and you wanted to be a part of it; is that correct?

15:48:25   **A**   That is correct.

1   **Q**   So you wanted to act with other people on January 6, 2021,

2   correct?

3   **A**   No.  I was not talking about other people.  When I talk

4   about bigger than myself, I'm talk about spirit and energy.

15:48:39  5   I'm not talking about people or humans.  Sorry.

6   **Q**   You said -- you testified about going against the grain,

7   correct?

8   **A**   Correct.

9   **Q**   And going against the grain includes the authority of the

15:48:54  10   police, correct?

11   **A**   No.  That's not what I meant by going against the grain.

12   **Q**   But did you go against the authority of the police on

13   January 6, 2021?

14   **A**   That's not what I meant by going against the grain.

15:49:09  15   **Q**   You testified you wanted to go to the front of the line so

16   that you could be part of the energy.

17        Do you recall that?

18   **A**   Yes.

19   **Q**   And the energy was violent, wasn't it?

15:49:20  20   **A**   Yes.

21   **Q**   You said you didn't understand why you weren't being

22   allowed to go forward once you were walking on the path towards

23   the Capitol building.

24        Do you recall that?  And you wanted to push to get to

15:49:38  25   the front?

1    **A**   I do.

2    **Q**   Did it occur to you that people weren't moving forward

3    because people were not allowed to be there?

4    **A**   I couldn't see -- I'm short, so nothing occurred to me.  I

15:49:52  5    didn't make any presumptions.

6         MS. SCHESNOL:  If we could pull up exhibit -- I see

7    you have 802 ready to go.  And if we could go to 45 minutes and

8    30 seconds, please.  And if you can just get the freeze frame

9    there.

15:50:13  10   **BY MS. SCHESNOL:**

11   **Q**   Do you see bike racks in that picture?

12   **A**   I do.

13   **Q**   This is film from your camera, correct?  Is that a yes?

14   **A**   Yes.

15:50:26  15        MS. SCHESNOL:  If we can go to 46 minutes and nine

16   seconds.  This is film -- 802.

17   **BY MS. SCHESNOL:**

18   **Q**   Film from your camera, correct?

19   **A**   Yes.

15:50:42  20   **Q**   Do you see bike racks in the red circle?

21   **A**   Yes.

22        MS. SCHESNOL:  If we can go to 50 minutes and

23   11 seconds.  Maybe one more second.

24        THE COURT:  Just play it from 50:10.

15:51:23  25        MS. SCHESNOL:  It's 50:11.

```
 1            Well, some of these things are very fleeting, Your
 2      Honor.  That's why we had our precise times.  But you can play
 3      it from here.
 4          (Video played.)
```

15:51:38  5      **BY MS. SCHESNOL:**

```
 6      Q    Do you see bike rack there?
 7      A    I do.
 8      Q    51 minutes and 24 seconds.
 9            Do you see bike racks and snow fencing here?
```

15:51:58 10      A    I see bike racks.  I don't see snow fencing.

```
11      Q    Green mesh right there.
12      A    I can't tell what that is.
13            MS. SCHESNOL:  If we can go to 52 minutes and
14      27 seconds.
```

15:52:17 15      **BY MS. SCHESNOL:**

```
16      Q    Do you see bike racks here?
17      A    I do.
18            MS. SCHESNOL:  Can we please play the video from
19      52 minutes and 58 seconds?  That's fine right there.  With
```

15:52:59 20      audio, please.

```
21          (Video played.)
22            MS. SCHESNOL:  Can you pause it there?
23      BY MS. SCHESNOL:
24      Q    "Push it.  This is our house.  Let's go.  There are
```

15:54:09 25      millions of us.  What is wrong with America?"

1            You said those words, correct?

2   **A**   Yes.

3   **Q**   And you were already on Capitol grounds at that point,

4   correct?

15:54:18  5   **A**   Yes, ma'am.

6   **Q**   You testified on direct that you're all about love?

7   **A**   I am.

8   **Q**   Are you saying you were acting in a loving way in what we

9   just heard on this video?

15:54:31  10   **A**   I love freedom, and I will stand for freedom.

11   **Q**   And you were acting in a loving way in what we just heard?

12   **A**   Did I see anything unloving?

13   **Q**   Well, people were yelling about being pissed, and you were

14   yelling to push it to get into our house and there's millions

15:54:49  15   of us.

16            Is that how you define loving?

17   **A**   I define loving as standing for truth.

18            MS. SCHESNOL:  Let's go to 54 minutes and 25 seconds

19   and press play.

15:55:17  20       (Video played.)

21   **BY MS. SCHESNOL:**

22   **Q**   That was you saying, "tear it down," correct?

23   **A**   Yes it was.

24   **Q**   Does that sound -- is that how you define loving and

15:55:40  25   peaceful?  Tear it down?

1    **A**    Loving is loving.  I don't -- what do you want me to say?

2            I stand for truth, and that is part of my love for my

3    family and my friends is to stand for truth.

4    **Q**    And tear it down is your truth on January 6th at the

15:56:05  5    Capitol?

6    **A**    No.  I wanted to go into our house.  We have a right to be

7    in our house.

8    **Q**    You said, "tear it down."

9    **A**    Yes.

15:56:17  10           MS. SCHESNOL:  Let's go to 54 minutes and 40 seconds.

11   Press play, please.  I'm sorry.  59 minutes.  59 minutes,

12   40 seconds.  Thank you.  That's fine.  At 59:37.  Or that's

13   fine right there.

14       (Video played.)

15:57:06  15   **BY MS. SCHESNOL:**

16   **Q**    Do you hear people yelling, "fucking traitors"?

17   **A**    I do.

18   **Q**    Do you see debris here on the west plaza, poles, fire

19   extinguishers, all sorts of debris?  Do you see that?

15:57:29  20   **A**    Yes.

21   **Q**    Is that peaceful and loving?

22   **A**    Truth.

23   **Q**    Do you think that you --

24   **A**    I didn't throw those sticks up there.

15:57:38  25   **Q**    I didn't ask you if you did.

|   |   |   |
|---|---|---|
| | 1 | **A**   I can't speak for anyone else. |
| | 2 | **Q**   I'm asking if you saw those things on January 6, 2021. |
| | 3 | **A**   Yes. |
| | 4 | **Q**   And you saw a line of police, correct? |
| 15:57:47 | 5 | **A**   Yes. |
| | 6 | **Q**   And you wanted to be at the front of the line of the |
| | 7 | police, didn't you? |
| | 8 | **A**   Yes, I did. |
| | 9 | **Q**   So you worked your way right up to the front? |
| 15:57:55 | 10 | **A**   I did. |
| | 11 | **Q**   That couldn't have been easy. |
| | 12 | **A**   No, ma'am, it wasn't. |
| | 13 | **Q**   There were tens of thousands of people at the Capitol? |
| | 14 | **A**   Hundreds of thousands, yes. |
| 15:58:04 | 15 | **Q**   Sounds like you can get what you want usually. |
| | 16 | **A**   I believe when there's a will, there's a way; yes. |
| | 17 |        MS. SCHESNOL:  Can we go to 101, please?  101.  That's |
| | 18 | fine.  And press play. |
| | 19 |    (Video played.) |
| 15:59:05 | 20 |        MS. SCHESNOL:  You can pause there. |
| | 21 | **BY MS. SCHESNOL:** |
| | 22 | **Q**   It was pure chaos on the west plaza of the Capitol, wasn't |
| | 23 | it? |
| | 24 | **A**   Yes. |
| 16:00:29 | 25 | **Q**   And you were right at the front of it, weren't you? |

1    A    Yes.

2    Q    It didn't turn you off that there was some kind of chemical

3    spray, did it?

4    A    It didn't turn me on.

16:00:41    5    Q    You didn't leave.

6    A    (No response.)

7    Q    Correct; you didn't leave?

8    A    No.  I didn't leave.

9    Q    And yelling, screaming, chaos.  You could have left, but

16:00:56   10    you didn't, correct?

11    A    Correct.

12    Q    You talked about that there was some kind of skirmish and,

13    because of it, there was fighting and then you got kind of

14    shoved over, correct?

16:01:14   15    A    Yes.

16    Q    And -- but you never left the very front of the police

17    line, did you?

18    A    No.

19    Q    And the fighting that was going on didn't deter you, did

16:01:25   20    it?

21    A    No.

22    Q    Because you wanted to be part of the energy that day,

23    correct?

24    A    I wanted to be there for the experience.

16:01:36   25    Q    And you wanted to be there for the energy.  You said you

1      wanted to feel the energy.

2      **A**   I wanted to be there for the experience.

3      **Q**   And the experience was chaos and violence, wasn't it?

4      **A**   It was.  But there was also patriotism and love for

16:01:53  5      country.

6      **Q**   Expressed by breaking through police barriers?

7      **A**   No.  Expressed by showing up to be a voice at our Capitol.

8      **Q**   On restricted grounds when you weren't allowed to be there.

9      **A**   We didn't know -- I didn't know the Capitol was restricted.

16:02:09  10     **Q**   There was a line of bike racks and a line of police.  Isn't

11     that a restriction?

12     **A**   I have a Constitution that gives me the right to be at my

13     government.  Just because -- no.

14     **Q**   No.  Go ahead.  Keep going.

16:02:27  15     **A**   It's okay.

16     **Q**   Could you march into the Whitehouse if you wanted to?

17     **A**   No.

18     **Q**   Taxpayer dollars pay for the Whitehouse.

19     **A**   It's not our house; it is the president's house.

16:02:38  20     **Q**   Taxpayer dollars pay for it.

21     **A**   It's still not our house.  It is the president's house.

22     **Q**   How is that different than the Capitol?  They're both paid

23     for with our taxpayer dollars.

24     **A**   It's our elected officials, the Congress where they do

16:02:57  25     government.  The Whitehouse is where the president works and

1    does government.

2    **Q**    So you were very concerned about the election being stolen,

3    and you wanted to be at the Capitol because that's where

4    Congress meets, correct?

16:03:07  5    **A**    Correct.

6    **Q**    What day was the election in 2020?

7    **A**    November 3rd.

8    **Q**    And what day was Joe Biden declared the winner?

9    **A**    November -- I don't remember if it was on the Fourth or --

16:03:22  10    I don't remember the exact date.

11    **Q**    A few days after the election day?

12    **A**    I believe so.

13    **Q**    And what date did the electoral college vote?

14    **A**    December, I believe.  I don't know the exact date.

16:03:41  15    **Q**    Sometime in December, 2020?

16    **A**    I believe, yes.  It's been a few years.

17    **Q**    So between the day that Joe Biden was declared the

18    president and the date in December of 2020 that the electoral

19    college met to vote, what did you do about the election fraud?

16:04:04  20    **A**    Researched.

21    **Q**    Did you call any state representatives?

22    **A**    No.

23    **Q**    Did you write letters to any state representatives in any

24    state?

16:04:15  25    **A**    No.

1    **Q**    Did you go to any representatives' offices?

2    **A**    No.  I live in Idaho.

3    **Q**    And?

4    **A**    It's in D.C.  It's hard to go -- it's not an easy drive to

16:04:33   5    go to their offices.

6    **Q**    But you managed to come to D.C. January 6th all the way

7    from Idaho.

8    **A**    I did.

9    **Q**    And between the date the electoral college met to vote and

16:04:44   10   January 6th, did you make any calls to representatives?

11   **A**    No.

12   **Q**    Did you write letters?

13   **A**    No.

14   **Q**    Did you visit their offices?

16:04:57   15   **A**    No.

16   **Q**    So the only time that you took action about the 2020

17   election was on January 6th at the United States Capitol,

18   correct?

19   **A**    It was.

16:05:33   20         MS. SCHESNOL:  If we could please play Exhibit 708.5.

21       (Video played.)

22         MS. SCHESNOL:  Can you press pause?  Can you can go

23   forward a couple of screens?

24         A JUROR:  We aren't seeing it.

16:06:07   25         MS. SCHESNOL:  Oh.  You're not seeing it?  Can we make

```
 1    sure it's published?

 2            THE COURT:  This is 708, right?

 3            MS. SCHESNOL:  708.5.

 4            THE COURT:  708.5 is not in evidence.

 5            MS. SCHESNOL:  708, then.  I apologize.

 6            If I can have a moment, Your Honor.

 7        (Discussion off the record.)

 8            MS. SCHESNOL:  Can we go to the 11 minute, 20 second

 9    mark, please?  And press play.

10        (Video played.)

11            MS. SCHESNOL:  Can you pause?

12    BY MS. SCHESNOL:

13    Q   We've paused at 11 minutes and 27 seconds into Exhibit 708.

14            That's you, right, circled in red?

15    A   Yes, ma'am.

16    Q   With your back leaning on the bike rack fence, correct?

17    A   With my back to the fence, yes.

18    Q   Touching the fence?

19    A   Yes.

20    Q   And you just saw the skirmish that preceded it with police,

21    correct?

22    A   Correct.

23    Q   That didn't -- you didn't want to leave after that?

24    A   No, ma'am.

25    Q   You thought you had a right to be there?
```

16:06:18 (line 5)
16:07:26 (line 10)
16:07:44 (line 15)
16:07:52 (line 20)
16:08:02 (line 25)

1    **A**   Yes.

2                 MS. SCHESNOL:   Please press play.

3          (Video played.)

4                 MS. SCHESNOL:   Can you pause it?

16:08:16  5    **BY MS. SCHESNOL:**

6    **Q**   We've paused at 11 minutes and 35 seconds.

7                 Circled in red.   This is you, correct?

8    **A**   Right.

9    **Q**   Your legs are bent, and you are leaning your side up

16:08:33 10   against the fence, correct?

11   **A**   Yes.

12   **Q**   Using your body weight to push on the fence?

13   **A**   No.   I was leaning against it to push -- stop them from

14   pushing me back but not trying to push against them.

16:08:47 15   **Q**   Let's make sure the pronouns, thems, we're all talking

16   about the same people.

17                 You were leaning on the fence, correct?

18   **A**   Correct.

19   **Q**   And you were doing it so the police couldn't push it

16:09:03 20   against you.

21   **A**   Correct.   To move the line farther back.

22   **Q**   So you knew the police wanted to move the line farther

23   back.

24   **A**   Yes.

16:09:13 25   **Q**   And you were leaning against the fence so that the police

1   could not do that, correct?

2   **A**   Yes.

3   **Q**   So you're disobeying the police.  They're trying to move

4   the line, and you're trying to stop them.

16:09:33   5   **A**   They were trying to push the line against me, and I was

6   stopping them because I felt like I had a right to be there and

7   we didn't have to be pushed back any farther.  I told them I

8   would not push against them, but I wasn't going to move; I had

9   a right to be there to watch what was happening.

16:09:48   10   **Q**   You were in the Marines, right?

11   **A**   I was.

12   **Q**   Don't you follow orders that are given in the Marines?

13   **A**   Not if they go against my Constitution.

14   **Q**   And you think the police setting up a line goes against the

16:10:05   15   Constitution?

16   **A**   No.  That's not what I said.

17   **Q**   You didn't think the police had a right to set up a barrier

18   where they thought they should set it up; you thought you

19   should dictate where the line was set up?

16:10:21   20   **A**   No.

21   **Q**   Well, you were trying to stop them from moving the line.

22   Isn't that your testimony?

23   **A**   Yes.

24   **Q**   So you thought you should dictate where the police line --

16:10:28   25   **A**   No.

1    Q    Well, explain it to me.  Because if it wasn't the police

2    and it wasn't you --

3    A    I had a right to be there, and I wasn't going to move.

4    That's all.  There was no thought process of anything else

16:10:38  5    other than I had a right to be there, and I wasn't going to

6    move.

7    Q    So you wouldn't follow what the police were trying to do,

8    correct?

9    A    I said I wasn't going to move.

16:10:52  10    Q    So you interfered with the police trying to move the line,

11    the bike rack line?

12    A    That wasn't my intention.

13    Q    I didn't ask you that.

14         You interfered with the police, didn't you?

16:11:07  15    A    Yes.

16         MS. SCHESNOL:  Please press play.

17    (Video played.)

18         MS. SCHESNOL:  Please pause.  Can we go back a frame?

19    (Video played.)

16:11:28  20    **BY MS. SCHESNOL:**

21    Q    And what we've just seen here in the last few seconds --

22         MS. SCHESNOL:  You can pause it there.

23    **BY MS. SCHESNOL:**

24    Q    The police are trying to move the bike rack line further

16:11:38  25    back, correct?

1      A    I assume so.

2      Q    And you were continuing to try to stop them from doing

3      that?

4      A    I was trying to stand where I was standing.  I wasn't

16:11:49  5   trying to be moved.

6      Q    So you were interfering with the police setting up their

7      police line, correct?

8      A    I was trying to stay where I was standing.

9      Q    And you thought you had a right to dictate where the police

16:12:01  10  line was, not the police?

11     A    I did not say that.

12     Q    You don't think the police had a right to set up the line

13     where they thought they should, correct?

14     A    I didn't say that either.  I just said I was standing where

16:12:18  15  I was.  I thought I had a right to be there, so I stood there.

16     Q    And you thought you had a right to be there even when the

17     police --

18     A    There was no thought process of that.  I was just in that

19     moment right then, and I thought I had a right to be there, so

16:12:34  20  I didn't move.

21     Q    And you stood there, not moving purposefully, right?  That

22     was your choice, correct?

23     A    Correct.

24     Q    Okay.  No one had a gun to your head?

16:12:43  25  A    Correct.

1 **Q** No one put cement at your feet so you couldn't move?

2 **A** Yes.

3 **Q** That was your purpose and intent, to stay right where you

4 were and not move, correct?

16:12:53 5 **A** Correct.

6 **Q** Despite what the police told you, correct?

7 **A** Yes.

8   MS. SCHESNOL:  Please press play.

9  (Video played.)

16:13:04 10   MS. SCHESNOL:  Pause.

11 **BY MS. SCHESNOL:**

12 **Q** The last few seconds, you're continuing to use your body

13 weight to stop the police from moving their police line,

14 correct?

16:13:17 15 **A** Yes.

16   MS. SCHESNOL:  Please press play.

17  (Video played.)

18 **BY MS. SCHESNOL:**

19 **Q** We've paused it at 12 minutes and 18 seconds.

16:14:04 20   You're still using your body weight to keep the police

21 from moving the bike rack line back, correct?

22 **A** I'm using my body weight to maintain my position, yes.

23 **Q** And keep the police from moving the line.

24 **A** Again, my intention was to keep my position.  That is --

16:14:18 25 **Q** Even if that meant stopping the police from moving the

1    police line of bike racks, correct?

2    **A**   Yes.

3          MS. SCHESNOL:  Please press play.

4          (Video played.)

16:14:30  5          MS. SCHESNOL:  Please pause.

6    **BY MS. SCHESNOL:**

7    **Q**   We've paused at 13 minutes and ten seconds.

8          This is your pink flagpole, correct?

9    **A**   I believe so.

16:15:25  10   **Q**   So if there were police officers in the line of vision

11   between what we're looking at and you, you would be behind

12   them, approximately here, correct?

13   **A**   I believe so.

14   **Q**   And during the last 40 seconds or so that we've been

16:15:38  15   playing this, you heard the police yelled for the crowd of

16   people to back up at least three times, correct?

17   **A**   I was watching.  I actually wasn't listening, so I don't

18   know for sure.  I just watched.

19         MS. SCHESNOL:  Okay.  Let's go back about 40 seconds,

16:15:54  20   then.

21   **BY MS. SCHESNOL:**

22   **Q**   And please listen for the police saying, "back up."

23   **A**   I don't know that I would have heard them there anyways,

24   even if they did.

16:16:05  25         (Video played.)

1          MS. SCHESNOL:  Pause.  Can you go back a second or so?
2    It's very hard to get the precise point in time.
3          Nope.  Go back.  Okay.  Pause it right there.  You're
4    doing a great job.  I know this is tough.

16:16:38  5    **BY MS. SCHESNOL:**

6    **Q**   This is you, correct?

7    **A**   Yes.

8    **Q**   Pushing on the line?

9    **A**   Yes.

16:16:43 10          MS. SCHESNOL:  Okay.  Now, let's play.

11   **BY MS. SCHESNOL:**

12   **Q**   And listen for the police yelling, "back up."

13        (Video played.)

14   **BY MS. SCHESNOL:**

16:17:53 15   **Q**   Did you hear police yelling to back up?

16   **A**   I did there.  I don't know that I did that day.

17   **Q**   You didn't back up that day.

18   **A**   I don't know that I even heard it that day.

19   **Q**   If you had heard that, you wouldn't have backed up, would

16:18:05 20   you, right?  Because you were going to stand your ground.

21   **A**   I was.

22   **Q**   And you were going to keep the police from moving that

23   police line, correct?

24   **A**   Yes.  Well, I was going to try.

16:18:13 25   **Q**   And you did try, didn't you?

|       |   |                                                           |
|-------|---|-----------------------------------------------------------|
| 1     | A | I did.                                                    |
| 2     | Q | And for about 15 minutes, you were pretty successful,     |
| 3     |   | weren't you, because the line didn't breach until 2:28.   |
| 4     | A | I didn't breach the line.                                 |

16:18:28  5   Q   I didn't ask you that.

6           The line was breached at 2:28?

7   A   Right.

8   Q   So you were successful --

9   A   I wasn't successful at anything.  I didn't breach the line.

16:18:37 10   Q   You were successful on --

11   A   Standing where I was, yes.

12   Q   For 15 minutes?

13   A   Yes.

14   Q   Despite the police telling you to move.

16:18:46 15   A   I don't know if I heard them telling me to move then.

16   Q   But you wouldn't have moved even if you had heard them?

17   A   Correct.

18           MS. SCHESNOL:  Please press play.

19       (Video played.)

16:19:02 20   **BY MS. SCHESNOL:**

21   Q   "We're not trying to hurt you.  Back up please."  But you

22       wouldn't back up, would you?

23   A   No.

24   Q   You were going to stand your ground?

16:19:35 25   A   I was.

1    Q    You were going to keep the police from moving that police

2    line?

3    A    Yes.

4              MS. SCHESNOL:  Please press play.

16:19:44  5    (Video played.)

6    **BY MS. SCHESNOL:**

7    Q    "Grab her and pull her away."

8              The police are asking other rioters to pull you off

9    the line because you would not follow their commands; isn't

16:20:29 10    that true?

11    A    Yes.

12              MS. SCHESNOL:  Please press play.

13    (Video played.)

14    **BY MS. SCHESNOL:**

16:20:42 15    Q    "She's pushing on the line."

16              That was you, right?

17    A    Yes.

18    Q    "She's pushing on the fence.  She's pushing on the line."

19              They're talking about you, right?

16:20:51 20    A    Correct.

21    Q    You were standing your ground?

22    A    I was.

23    Q    You were -- didn't matter if the police wanted to move the

24    police line; you were going to stay still?

16:20:59 25    A    I was.

1    **Q**   You were going to interfere with them moving that line,

2    weren't you?

3    **A**   I wasn't trying to interfere with them moving the line.  I

4    was just standing my ground.  I had a right to be there and I

16:21:09  5    wanted to be there.

6    **Q**   But, again, you were --

7              MS. OWENS:  Objection.  As Ms. Schesnol just noted,

8    this has been asked and answered.

9              THE COURT:  I do think we can move along and not stay

16:21:21  10   on the same thing.

11             MS. SCHESNOL:  Well, we are at different points in

12   time.

13             THE COURT:  I understand that, but you're asking the

14   same question repeatedly.  Let's just move along a little bit.

16:21:31  15   **BY MS. SCHESNOL:**

16   **Q**   So through the 15 minutes that your back was to the police

17   line that you wouldn't let them move it, that was your purpose,

18   to stay there and not let them move the line, correct?

19   **A**   No.  That was not my purpose.

16:21:43  20   **Q**   Your purpose was to stay right where you were, correct?

21   **A**   My purpose was to stand for freedom and come to D.C.  For

22   that 15 minutes, I was just there for that moment, standing my

23   ground, but that wasn't my purpose.

24   **Q**   Your purpose was to stand your ground, correct?

16:22:02  25   **A**   No.  My purpose is to bring consciousness and truth to this

1    planet.  At that moment, I was just standing my ground.

2    **Q**   But you were standing there out of your own free will,

3    correct?

4    **A**   Yes.

16:22:15  5   **Q**   Again, no one cemented your feet to the ground, correct?

6    **A**   Correct.

7    **Q**   So, again, your intention was to stay put, correct?

8    **A**   Yes.

9    **Q**   For 15 minutes, correct?

16:22:25  10   **A**   For as long as it took.

11            MS. SCHESNOL:  Please press play.

12        (Video played.)

13   **BY MS. SCHESNOL:**

14   **Q**   So we've paused at 15 minutes and 18 seconds.

16:23:22  15            Another member of the crowd tries to talk to you,

16   correct?

17            THE COURT:  Oral answer, please.

18   **A**   Yes.

19            THE COURT:  Thank you.

16:23:31  20   **BY MS. SCHESNOL:**

21   **Q**   Tries to convince you to move?

22   **A**   Yes.

23   **Q**   Couldn't convince you?

24   **A**   No, they could not.

16:23:36  25   **Q**   Because you're stubborn?

|  | | |
|---|---|---|
| 1 | **A** | No.  Because I have a purpose. |
| 2 | **Q** | And whatever it takes to meet that purpose, you're going to |
| 3 | | do it? |
| 4 | **A** | Truth and consciousness, yes, I am. |
| 16:23:46  5 | **Q** | Despite the police? |
| 6 | **A** | I am going to honor my sole purpose and why I'm here on |
| 7 | | this earth. |
| 8 | **Q** | Despite the police? |
| 9 | **A** | Yes.  At that moment. |
| 16:23:56  10 | **Q** | Despite the police giving you commands? |
| 11 | **A** | Yes. |
| 12 | **Q** | Despite another member of the crowd trying to talk to you |
| 13 | | to get you to move? |
| 14 | **A** | Yes. |
| 16:24:06  15 | **Q** | Despite teargas? |
| 16 | **A** | Yes. |
| 17 | **Q** | Despite violence around? |
| 18 | **A** | I would die for freedom, so yes.  I would die for freedom. |
| 19 | **Q** | And then the police line breaks at 2:28, correct? |
| 16:24:32  20 | **A** | I believe so. |
| 21 | | (Discussion off the record.) |
| 22 | | MS. SCHESNOL:  Please play 609.1. |
| 23 | | THE COURT:  609.1? |
| 24 | | (Video played.) |
| 16:25:28  25 | | **BY MS. SCHESNOL:** |

1    Q    You saw yourself going through the police barricades,

2    correct?

3    A    Yes.

4    Q    You didn't have permission to do that, did you?

16:25:44  5    A    No.  I was pushed.

6    Q    But you kept going forward, didn't you?

7    A    Yes.  But I was still pushed.

8    Q    You didn't retreat thereafter, did you?

9    A    No.  I did not.

16:25:54  10    Q    You testified you spent about ten minutes on the Plaza,

11    correct?

12    A    I did, yes.

13         MS. SCHESNOL:  Can you please play --

14    **BY MS. SCHESNOL:**

16:26:24  15    Q    And you're saying you were pushed, but you were the first

16    person right at those gates, correct?

17    A    Because I was the first person at the line.

18    Q    And you wanted to go into the Capitol, correct?

19    A    At that point?  I don't remember.  At that point, I just

16:26:39  20    wanted to be there at the front.  I wasn't sure -- I didn't

21    have a thought.  I mean, originally, I wanted to go into the

22    Capitol, but to watch the certification.  But at that point, I

23    don't know what I was thinking.

24    Q    So let's nail this down.

16:26:52  25         At 2:28 p.m. on January 6, 2021, that's when you no

1   longer wanted to go inside the Capitol, correct?

2   **A**   No.  I didn't say that.  I said I don't know what I was

3   thinking at that point.  I don't know where I was at that

4   moment, if I still wanted to go into the Capitol or -- I don't

16:27:07  5   know what I was thinking.  I can't -- that was two years ago.

6   I don't remember.  So I don't know what I was thinking at that

7   moment.

8   **Q**   Okay.  That's fair.  It's been a long time.

9           I'm lucky if I can remember what I had for breakfast,

16:27:21  10   so I will give you that.

11   **A**   I know where I was, but I don't know what I was thinking.

12           There is a difference between knowing what you're

13   doing and remembering what you're thinking.

14   **Q**   So we can look to the videos that we have with us to see

16:27:33  15   what your conduct was.  I understand we don't know what was in

16   your head -- but to see your conduct, correct?

17   **A**   Correct.

18   **Q**   So you don't know what you were thinking at that point?

19   **A**   Correct.

16:27:44  20   **Q**   So you don't know if you wanted to move forward or not?

21   **A**   I don't remember what I was -- I don't -- I had no plan.

22   There was never a plan.

23   **Q**   I thought the plan was to get inside to see the counting of

24   the electoral votes.

16:27:58  25   **A**   Well, I thought that that was what was going to happen.

1    That was the original plan, but, obviously, that wasn't the

2    plan that happened.

3           So I had no plan -- once I got to the Capitol and

4    realized, I had no plan at that point.  It was not a thinking

16:28:10  5    or a plan of anything.

6    **Q**   But you kept moving forward every chance you got on

7    January 6th.

8    **A**   I follow my heart, and I felt like that was what I was

9    supposed to do.  So I did it.

16:28:23  10   **Q**   Voluntarily?

11   **A**   Yes.

12   **Q**   So you were at the front of the line at 2:28 when the

13   barricades come open, correct?

14   **A**   Yes.

16:28:32  15   **Q**   And you are one of the first people through at that

16   particular breach point, correct?

17   **A**   Yes.

18           MS. SCHESNOL:  Can we please play 705.1 with sound?

19   705.1?

16:28:56  20           THE COURT:  I think 705.1 is actually a still.

21           MS. SCHESNOL:  Oh.  A still.  Can we pull that up?

22       (Discussion off the record.)

23   **BY MS. SCHESNOL:**

24   **Q**   So we can tell from the time on the body-worn camera that

16:29:16  25   it's 2:29, correct?

1    **A**    Yes.

2    **Q**    And the police line has been breached?

3    **A**    Yes.

4    **Q**    And you are walking freely on this west lower terrace plaza

16:29:33  5    area, correct?

6    **A**    Yes.

7    **Q**    No one is pushing you now, are they?

8    **A**    No.

9    **Q**    You could have turned and left, correct?

16:29:39 10    **A**    Yes.

11    **Q**    You could have thought to yourself, holy moly; I didn't

12    mean to get through these barricades.  I just wanted to stand

13    on one side with the police on the other.  I got pushed from

14    behind; this is a bridge too far; I'm turning back.

16:29:56 15           You could have thought that, right?

16    **A**    I could have.

17    **Q**    But you didn't, right?

18    **A**    No, I did not.

19    **Q**    You kept moving forward, correct?

16:30:04 20    **A**    I did.

21    **Q**    Voluntarily?

22    **A**    I did.

23           MS. SCHESNOL:  If we can pull up 608.1, please.  And

24    you can press play with sound.

16:30:19 25           (Video played.)

1              MS. SCHESNOL:  There may or may not be sound.

2    **BY MS. SCHESNOL:**

3    **Q**   You saw yourself in that exhibit, correct?

4    **A**   I did.

16:30:31  5    **Q**   Standing around, chitchatting with someone?

6    **A**   I did.

7    **Q**   Voluntarily, correct?

8    **A**   Yes.

9    **Q**   You could have left, right?

16:30:38  10   **A**   Yes.

11   **Q**   But you didn't.

12   **A**   Correct.

13   **Q**   And a few minutes later, I believe your testimony was you

14   spent about ten minutes in that area, gathering your thoughts,

16:30:52  15   collecting yourself; is that correct?

16   **A**   Yes.

17   **Q**   You took your phone off your flagpole, correct?

18   **A**   Yes.

19   **Q**   You spent ten minutes catching your breath, figuring out

16:31:11  20   what you wanted to do next, right?

21   **A**   Yes.

22   **Q**   And after having that ten minutes to think about what to do

23   next, your next steps were to go up a flight of stairs up onto

24   the inaugural stage, correct?

16:31:26  25   **A**   With all the crowd, yes.

1   **Q**   Did you think you had a right to be on the inaugural stage?

2   **A**   Yes.  I wouldn't have been there if I didn't think I had a

3   right.

4   **Q**   Despite the police and breaking through barricades?

16:31:43  5   **A**   Yes.  It's our house.  I wasn't harming anyone, and I

6   wasn't breaking anything.

7   **Q**   You haven't been charged with harming anyone, have you?

8   **A**   Right.  So I didn't realize -- I had no thought that I

9   couldn't be there.  I knew as long as I didn't do -- break the

16:31:54 10   law, then I would be okay.  That's what I believed.

11   **Q**   You didn't think you were breaking the law by breaking

12   through police barricades?

13   **A**   No.

14   **Q**   At 2:42 and some odd seconds, you went into the lower west

16:32:22 15   terrace tunnel, correct?

16   **A**   I did.

17   **Q**   And you defined it as -- on direct as it was crazy in

18   there, correct?

19   **A**   Absolutely.

16:32:29 20   **Q**   And you went right into it, right?

21   **A**   I did.

22   **Q**   Despite it being crazy?

23   **A**   I did.

24   **Q**   And there were two sets of double doors, correct?

16:32:40 25   **A**   There were.

|   | | |
|---|---|---|
| 1 | **Q** | And you went in between that set of double doors, correct? |
| 2 | **A** | I did. |
| 3 | **Q** | And you stayed there for about 12, 13, 14 minutes, right? |
| 4 | **A** | Right. |

16:32:50  5   **Q**   And you thought you had a right to be there?

6   **A**   Yes.

7   **Q**   Despite the police, you thought you had a right to be

8   there?

9   **A**   Yes.

16:32:59 10   **Q**   Despite the fighting?

11   **A**   Yes.

12   **Q**   And you only left when the police physically removed you,

13   correct?

14   **A**   No.  I was planning on leaving.  I was waiting until I

16:33:13 15   could get out of that spot, and I was going to go out the door.

16            I already knew that I was going to get out of there

17   because --

18            MS. SCHESNOL:  Can we please pull up 707.1?

19   **A**   But I had to wait for them to be -- because I was being

16:33:26 20   shoved, I had to wait until I could get out.

21   **BY MS. SCHESNOL:**

22   **Q**   Well, wait a minute.

23            You managed to work your way through 10,000 people on

24   the west front to get to the very front of the police

16:33:39 25   barricades.  But in this instance, you really wanted to get out

1    and just couldn't; is that your testimony?

2    **A**    It was -- I was -- where we were -- and I was pinned up.

3    It was dangerous.  I knew at that point that if I didn't have

4    my water bottle, I could have gotten squished.  So, at that

16:33:59  5    point, I knew that I was in danger, physical danger, so I was

6    trying to get out of there.  But I had to wait until they

7    pulled me out of that place because there were too many people

8    pushing me against the door.

9    **Q**    But you weren't worried about being squished when you

16:34:14  10    worked your way through 10,000 people to get to the front of

11    the police line?

12    **A**    It wasn't the same scenario.

13    **Q**    So you were trying to get out from between the glass doors

14    inside the Capitol building, but you just couldn't; is that

16:34:29  15    your testimony?

16    **A**    No.  They got me out.  But I couldn't -- when I got in

17    there and realized -- I stood -- that's why I stood there for

18    ten minutes, waiting.  Because I couldn't get out.

19    **Q**    Were you trying to get out?

16:34:42  20    **A**    I was.  I was being squished.  There were people pushing

21    against me.  I couldn't move.

22    **Q**    But I'm so confused.

23         Now you're saying you were trying to get out?  I

24    thought you wanted to get into the Capitol.  Hasn't that been

16:34:56  25    your testimony all along?

**A**   Yes.

**Q**   So did you want to get in or did you want to get out?

**A**   When I got in there, I realized that wasn't going into the Capitol where we were going to see the legislation.  I realized that I didn't -- we weren't going anywhere.  At that point, it was just getting dangerous.  So I realized we weren't going anywhere; I wasn't going to go watch the election take place.  So I was trying to get out of that building.

**Q**   So you know by 2:55 you weren't going to watch the legislation taking place?

**A**   Yes.

         MS. SCHESNOL:  Okay.  Can we please play 707.1?  With audio, please.  Thank you.

      (Video played.)

         MS. SCHESNOL:  Pause there.

**BY MS. SCHESNOL:**

**Q**   We just watched a few seconds of video.

         It didn't look like you were trying to leave.  You're facing a corner.

**A**   That's a video.  I was there.  All I can tell you is that I was being pushed, and there were people pushing against me.  That's why I faced the window and just stood there so I could make sure that I didn't get pushed in and not able to breathe and trampled.  That is why I just stood that way until I could get a break to get out of there.

1    **Q**   And it took 13 minutes for that break?

2    **A**   I guess.  It must have because that was my intention.  At

3    that point, I wanted to get out of there.

4           MS. SCHESNOL:  Can we go back to the beginning of

16:36:24 5    that?

6    **BY MS. SCHESNOL:**

7    **Q**   And tell us where you were trying to -- it was your

8    intention; you were trying to get out.

9        (Video played.)

16:36:30 10   **A**   If you look, there were people squishing against me.  You

11   can't see them.  You're not going to get it from the video.  I

12   don't -- I'm just telling you what happened.

13          JUROR:  We can't see it.

14          COURTROOM DEPUTY:  You need to play it again.  I'm

16:36:45 15   sorry.

16          MS. SCHESNOL:  Okay.  Play it again, Sam.

17       (Video played.)

18   **A**   And then once they moved them, I could get out, and that

19   was when I got out.  But they were all blocking me up until

16:37:06 20   that point.

21          MS. SCHESNOL:  Let's keep playing.

22       (Video played.)

23   **BY MS. SCHESNOL:**

24   **Q**   The police had to push you out, correct?

16:37:15 25   **A**   Yes.  They helped me get out.  But I was waiting to get

1      out.

2   **Q**   And that was 2:55, correct?

3   **A**   Yes.

4   **Q**   And it was already dangerous, correct?

16:37:25  5   **A**   That was the first time when I got -- God said, Yvonne get

6      out of the here.

7   **Q**   But at 2:56, you went right back in, didn't you?

8   **A**   I went up on the ledge to take pictures and document it.

9   **Q**   Into the dangerous tunnel, correct?

16:37:40  10   **A**   Right.  But not in the danger.  Just to experience it and

11     to document it and film it.  I knew I would be safe on that

12     ledge.

13   **Q**   After the police threw you out of the Capitol building, you

14     still think you had a right to be there and climb up on the

16:37:54  15     ledge?

16   **A**   Yes.

17   **Q**   Where you stayed for 24 minutes?

18   **A**   Was I what?

19   **Q**   Where you stayed for 24 minutes.

16:38:04  20   **A**   Was I saved?

21          THE COURT:  Stayed.

22   **BY MS. SCHESNOL:**

23   **Q**   Stayed.

24   **A**   Yes.  I was filming it, yes.

16:38:10  25   **Q**   You didn't want to leave?

1   **A**   I wanted to film it.

2   **Q**   So you wanted to stay?

3   **A**   Yes.

4   **Q**   And, in fact, you did stay until the police forced you out

16:38:20  5   again, correct?

6   **A**   Yes.

7          MS. SCHESNOL:  Can we go to 906.1, please?  You can

8   play.

9          COURTROOM DEPUTY:  Has it been admitted?

16:38:38 10          MS. SCHESNOL:  Pardon?

11          COURTROOM DEPUTY:  Admitted?

12          MS. SCHESNOL:  Yes.

13          THE COURT:  906.1 is in.

14      (Video played.)

16:38:47 15          MS. SCHESNOL:  Pause, please.

16   **BY MS. SCHESNOL:**

17   **Q**   This is you on the ledge, correct?

18   **A**   Yes.

19   **Q**   It's now 2:57 exactly, correct?

16:38:52 20   **A**   Yes.

21   **Q**   You thought you had a right to be there after being kicked

22   out less than two minutes earlier; is that your testimony?

23   **A**   Yes.

24          MS. SCHESNOL:  Please press play.

16:39:01 25      (Video played.)

**BY MS. SCHESNOL:**

**Q**   And you are witnessing people pushing against the police, correct?

**A**   Yes.

16:39:09   **Q**   And you are witnessing flagpoles in this area, correct?

**A**   Yes.

**Q**   And it's a tight area, right?

**A**   Yes.

**Q**   And even though we don't have audio just yet, it was loud

16:39:22   in there, wasn't it?

**A**   Yes, it was.

**Q**   Did you see someone flashing some kind of strobe light?

**A**   I don't know if I remember it that day.  I see it today.

But I sure don't remember it from then.

16:39:38   (Video played.)

**BY MS. SCHESNOL:**

**Q**   And you can see in this video some people are leaving,

right?

**A**   Yes.

16:39:46   **Q**   But you did not leave, correct?

**A**   Correct.

**Q**   And the police are just out of view of this camera angle,

correct?

**A**   Yes.

16:40:08   **Q**   And you know that because the police had just thrown you

1    out of there a few minutes earlier, correct?

2    **A**   Well, I know it because I was watching them.

3    **Q**   And you see this speaker box moving in?

4    **A**   No.

16:40:24   5   **Q**   Right here?

6    **A**   No.  I do now.

7    **Q**   You saw the people were fighting the police, correct?

8    **A**   Yes.

9         (Video played.)

16:41:12  10   **BY MS. SCHESNOL:**

11   **Q**   You see a police shield being passed around?

12   **A**   I do.

13   **Q**   That didn't make you want to leave?

14   **A**   No.

16:41:52  15        MS. SCHESNOL:  Please press play.

16        (Video played.)

17        MS. SCHESNOL:  Can you pause it here?

18   **BY MS. SCHESNOL:**

19   **Q**   When you had gone down to the Idaho state legislature to

16:42:25  20   watch it in action, were there people pushing against police

21   the way they are here on the Video 906.1?

22   **A**   No.

23   **Q**   People using weapons against the police?

24   **A**   No.

16:42:38  25   **Q**   And despite seeing all this and already being thrown out of

1    the Capitol once, you thought you had a right to be there?

2    **A**    Yes.

3            MS. SCHESNOL:   Please press play.

4    (Video played.)

16:43:11  5    **BY MS. SCHESNOL:**

6    **Q**    "This is America.  Are you fucking kidding me?"

7            You said that, right?

8    **A**    I did.

9    **Q**    Because you couldn't believe that the police were keeping

16:43:20  10   you and the others out of your house?

11   **A**    I couldn't believe what I was watching.

12   **Q**    Didn't turn you off.

13   **A**    How do you know?

14   **Q**    You didn't leave.

16:43:31  15   **A**    You don't have to be turned on to stay.

16   **Q**    Well, it wasn't so offensive that you decided to leave.

17   **A**    Like I said, I am here for truth and consciousness, and I

18   wanted to know the truth of what was happening in our

19   government.

16:43:43  20   **Q**    And so you were still trying to get in so you could see the

21   truth?

22   **A**    I don't know what I was trying to do at that point other

23   than just film.  I don't remember exactly.  I was filming at

24   that point.  But I was there for truth, and I wanted to know

16:43:58  25   what the truth was.

1          MS. SCHESNOL:  Please press play.

2      (Video played.)

3   **BY MS. SCHESNOL:**

4   **Q**   The rioters are using a police shield to stop the police

16:44:36   5   from shutting those doors.  Isn't that what's happening here?

6   **A**   It looks like it.

7   **Q**   And so the truth is that a violent mob was trying to get

8   into the United States Capitol building?

9   **A**   That might be your truth.  That wasn't my truth.

16:44:56   10   **Q**   Well, what -- how -- do you not see a violent mob on this

11   video?

12   **A**   Yes.

13   **Q**   So the truth is a violent mob was trying to get into the

14   Capitol.

16:45:07   15   **A**   Not everybody was violent.  Not everybody was a mob.  Some

16   people were there for truth, and I was one of them.

17   **Q**   I don't know what you mean by that.  You are filming people

18   fighting the police.  That's the truth, right?

19   **A**   Yes.

16:45:21   20   **Q**   And you thought that it was okay.

21   **A**   To be violent, no.

22   **Q**   No.  To -- that other people were being violent.

23   **A**   I didn't say that was okay.

24   **Q**   Well, you end up encouraging them, don't you?

16:45:38   25   **A**   Pushing and more bodies is not encouraging violence.

1    **Q**   The very people you are encouraging are fighting the

2    police.

3              How is that not violent?

4    **A**   When they were fighting, I also said "stop" when they were

16:45:52  5    beating on them.

6    **Q**   You were yelling, "stop" when the police were hitting the

7    rioters.

8    **A**   It was both hitting both I said "stop."

9              MS. SCHESNOL:  Let's play a little more.

16:46:05  10    (Video played.)

11   **BY MS. SCHESNOL:**

12   **Q**   That was in direct reaction to the police hitting a rioter,

13   correct?

14   **A**   How do you know?

16:46:29  15   **Q**   I'm asking you.

16   **A**   No.  It was the violence on both sides.  He was hitting the

17   police also.

18   **Q**   Isn't it true that you said, when asked, Americans are

19   being -- that you said, "Americans are being beaten for wanting

16:47:01  20   to save their country," correct?

21   **A**   Yes.

22   **Q**   You said it on this video, correct?

23   **A**   Yes.

24   **Q**   And then when you were asked what were you talking about

16:47:09  25   when you were saying, "Americans are being beaten" -- you

1   weren't talking about the police; you were talking about the

2   people trying to get in, correct?

3   **A**   Yes.

4   **Q**   And then your explanation for that was there's a video of

16:47:23  5   me screaming, "stop it, stop it," correct?

6   **A**   Yes.

7   **Q**   And that was in direct reaction to people being beaten for

8   trying to save their country, correct?

9   **A**   And the police being beaten in that instance, yes.  It was

16:47:37  10  for both.  The police are not my enemy.  They're my brothers

11  and sisters.

12  **Q**   Well, you testified about trying to interfere with your

13  brothers and sisters out on the west plaza.

14  **A**   No.  My brothers and sisters were trying to interfere from

16:47:54  15  us -- from being able to go in and watch the constitutional

16  process take place.

17  **Q**   So that day, it was you against the police because they

18  were trying to stop you.

19  **A**   No.  It wasn't me against anyone.  I was there for the

16:48:07  20  experience.

21  **Q**   You know, you keep saying that.  But you were -- you were

22  obstructing the police when they tried to move the police line.

23  You were calling --

24          MS. OWENS:  Your Honor, objection to the

16:48:22  25  characterization of the question.  That calls for a legal

1  conclusion.  It is also argumentative.

2       THE COURT:  It is a little argumentative, but I will

3  allow you to go ahead -- the argumentative part is sustained.

4  Tone it down a little.

16:48:38  5       MS. SCHESNOL:  Let's keep playing.

6       (Video played.)

7  **BY MS. SCHESNOL:**

8  **Q**  Just to clarify, when you said on this video, "Americans

9  are being beaten for wanting to save their country," you were

16:49:08  10 talking about the police beating the people trying to get in,

11 correct?

12 **A**  Yes.

13      MS. SCHESNOL:  Please press play.

14      (Video played.)

16:49:41  15 **BY MS. SCHESNOL:**

16 **Q**  You didn't yell at members of the crowd to stop it when

17 they use a flagpole to try to bash that door or window, do you?

18 **A**  No.

19      MS. SCHESNOL:  Please press play.

16:50:29  20      (Video played.)

21 **BY MS. SCHESNOL:**

22 **Q**  Someone is using a flagpole and, at least three times,

23 tries to hit that doorway into the Capitol.

24      You don't yell at that person to stop it, do you?

16:51:09  25 **A**  Nope.

1          MS. SCHESNOL:  Please press play.

2      (Video played.)

3   **BY MS. SCHESNOL:**

4   Q   The woman standing on the ledge next to you is calling for

16:51:40   5   fresh people and saying, "guys, come on," correct?

6   A   Yes.

7   Q   And she is a little hoarse, isn't she?

8   A   Yes.

9   Q   So you say, "here.  I got a loud mouth," right?

16:51:51  10   A   Yes.

11   Q   You were a drill sergeant.

12   A   Drill instructor.

13   Q   Drill instructor.

14          And then you lean out of the tunnel to the thousands

16:51:59  15   of people and twice scream, "we need fresh people; we need

16   fresh people," correct?

17   A   Yes.

18   Q   And that was for fresh people to come and fight the police,

19   correct?

16:52:14  20   A   Come into the tunnel.  I didn't want them to fight the

21   police but to come into the tunnel.

22   Q   But that's what the people in the tunnel were doing was

23   fighting the police, weren't they?

24   A   Not all of them.  I wasn't.

16:52:28  25   Q   Well, what fresh people were needed if not fresh people to

1  fight the police?

2  **A**   Bodies to stand the ground.

3  **Q**   But you needed fresh people because the people who had been

4  fighting the police were tired and weary and been hit and

16:52:45  5  pepper sprayed, so you needed fresh people to fight the police,

6  correct?

7  **A**   No.  Fresh people to stand in there.  That was all I was

8  calling for.

9  **Q**   Fresh people to just stand there?

16:52:59 10  **A**   Yes.

11  **Q**   That's your testimony?

12  **A**   Yes.

13         MS. SCHESNOL:  Please press play.

14      (Video played.)

16:53:09 15  **BY MS. SCHESNOL:**

16  **Q**   You didn't yell at protesters to stop using chemical spray

17  on the police, did you?

18  **A**   Nope.

19         MS. SCHESNOL:  Please press play.

16:53:44 20      (Video played.)

21  **BY MS. SCHESNOL:**

22  **Q**   You see the group of people rhythmically rocking and

23  pushing?

24  **A**   Yes.

16:53:56 25         MS. SCHESNOL:  Please press play.

1          (Video played.)

2     **BY MS. SCHESNOL:**

3     **Q**   You yelled, "push" 15 times, correct?

4     **A**   Yes.

16:54:23  5   **Q**   Pushing is not standing ones ground, is it?

6     **A**   No.

7     **Q**   Pushing is pushing against the police to get into the

8     Capitol, isn't it?

9     **A**   Yes.

16:54:36  10  **Q**   And you testified on direct that you were angry because you

11    thought that you had a right to be there, correct?

12    **A**   Yes.

13         MS. SCHESNOL:  Your Honor, would you like me to keep

14    going?

16:54:58  15        THE COURT:  You got five minutes.

16         MS. SCHESNOL:  Okay.  Can we please pull up exhibit --

17         THE COURT:  You notice I avoided answering the

18    question would you like me to keep going.

19         MS. SCHESNOL:  Well, fair point, Your Honor.  Fair

16:55:15  20  point.

21         Would you like me to go until 5:00 o'clock?

22         THE COURT:  Yes, ma'am.

23         MS. SCHESNOL:  Okay.  Please pull up Exhibit 905.  You

24    can play it, please.

16:55:30  25       (Video played.)

1    **BY MS. SCHESNOL:**

2    **Q**   Did you just hear a police officer say, "get them off the

3    wall"?

4    **A**   I heard it on here.

16:56:01  5    **Q**   You heard it on here?

6    **A**   Yes.

7    **Q**   And the time of day is 3:19, correct?

8    **A**   Yes.

9    **Q**   You didn't get off the wall, did you?

16:56:08  10   **A**   I don't know that I heard it there.  I heard it here.

11            MS. SCHESNOL:  Please press play.

12       (Video played.)

13   **BY MS. SCHESNOL:**

14   **Q**   "Get them off the wall.  Get them off the well.  Get them

16:56:27  15   down."

16   **A**   I was trying to get off the wall at that point.

17   **Q**   You were?

18   **A**   Yes.

19   **Q**   Really.

16:56:32  20   **A**   I didn't want to step on anyone.

21   **Q**   Well, there were about four people on that ledge on that

22   wall.  You haven't gotten off the wall yet, have you, in this

23   video where we've paused it at 33 seconds?

24   **A**   No.  I was crack -- if you saw -- if she rewound it, you

16:56:53  25   saw me bend down.  I was trying to get off.  I didn't want to

1    step on anyone and hurt them.

2    **Q**   I believe on direct you said you didn't want to step on any

3    police officers.

4    **A**   Well, by the time he hit me with the baton -- and I didn't

16:57:06  5    even remember him hitting me with the baton -- the police were

6    there.  At that point, I was trying to get down, but I didn't

7    want to step on anyone.

8    **Q**   Well, I'm talking about right now.

9    **A**   Right.

16:57:13  10   **Q**   Right now, the police are not as far out as you are,

11   correct?

12   **A**   Correct.

13   **Q**   And other people on that ledge got down, didn't they?

14   **A**   Yes.

16:57:24  15          MS. SCHESNOL:  Please press play.

16          (Video played.)

17   **BY MS. SCHESNOL:**

18   **Q**   You just saw someone get off the wall, correct?

19   **A**   Yes.

16:57:34  20   **Q**   But not you, right?

21   **A**   Correct.

22          MS. SCHESNOL:  Please press play.

23          (Video played.)

24   **BY MS. SCHESNOL:**

16:57:42  25   **Q**   Another person just got off the wall, right?

1    **A**    Correct.

2    **Q**    But not you?

3    **A**    Correct.

4    **Q**    Because you just didn't want to hurt anyone, right?

16:57:50  5    **A**    Correct.

6    **Q**    There's no police as far out as you are, right?

7    **A**    There are people there, though.

8    **Q**    But you testified on direct you didn't want to step on the

9    police.

16:58:00  10    **A**    I didn't want to step on anyone at any point, but when the

11    police got to where I was and they were trying to get me off, I

12    didn't want to step on them.  And I was trying to get off of

13    them [sic].  And that's why I said, "I'm trying."  But I didn't

14    want to step on them.

16:58:14  15    **Q**    You only said, "I'm trying" after a police officer used a

16    flagpole to get you down.

17    **A**    Correct.

18              MS. SCHESNOL:  Let's play.

19         (Video played.)

16:58:25  20              MS. SCHESNOL:  Can you actually go back a few seconds?

21         (Video played.)

22              MS. SCHESNOL:  Let's see what that looks like.

23    **BY MS. SCHESNOL:**

24    **Q**    How are you trying to get off the wall here?

16:58:43  25    **A**    That's why I put my phone in my pocket.  And I was looking,

trying to figure out where to go and how to get down.

        MS. SCHESNOL:  Can you just go frame by frame?

    (Video played.)

**BY MS. SCHESNOL:**

16:58:54   Q   You're not trying to get down, are you?

A   I'm looking and trying to get down.  I promise you I was trying to get off that wall.  I was not wanting to step on anyone.

Q   We're literally watching the video.  You are not making any

16:59:05   movement forward.

        MS. OWENS:  Your Honor, I'm going to object.  This is very argumentative at this point, and we've gone over this.

        THE COURT:  I am going to allow this questioning to continue.  Try to keep it less than argumentative.

16:59:17   **BY MS. SCHESNOL:**

Q   It does not appear that you are trying to make any movement to get down off the wall.

A   I understand that.  But I remember that moment exactly, and I know that -- at that point, I do remember what I was

16:59:29   thinking, and I was looking down, trying to figure out how to get off.  I know it doesn't look like I was, but I'm telling you I was trying to get off.

Q   So at this exact moment of the day two years ago, you remember exactly what you were thinking, but you don't remember

16:59:44   what you were thinking --

1    A    Yes.  Because I remember looking down and saying, I don't

2    know where to go.  I didn't know how to get off there.  I

3    remember that because it was a -- it was -- I didn't know how

4    to get down from there.  So I remember that moment, yes.

16:59:56  5    Q    That just seems convenient that this you remember exactly

6    but --

7                MS. OWENS:  Your Honor.

8                THE COURT:  I will strike that question.

9                You can start off with a new question.

17:00:07  10                MS. SCHESNOL:  Please press play.

11        (Video played.)

12    **BY MS. SCHESNOL:**

13    Q    You only actually get out when the police use the flagpole

14    to get you out, correct?

17:00:22  15    A    Yes.

16    Q    And you were angry that they made you leave because you

17    thought you had a right to be there, correct?

18    A    I don't think I was angry at that point.  I think I was

19    more sad than anything.

17:00:41  20    Q    Oh.  I thought your testimony on direct was "I was angry

21    because we had a right to be there.  I didn't understand."

22    A    In the beginning, I was angry.  But at that moment, I think

23    I was just sad.

24    Q    On direct -- and then you literally said right after that,

17:00:55  25    "I didn't want to step on the police" right when you were

1    describing this time period on direct.

2    **A**   Okay.  If that's what I said.

3    **Q**   So this is now the second time you've been kicked out of

4    the Capitol building on January 6, 2021, correct?

17:01:12  5    **A**   Yes.

6            THE COURT:  All right.  We're going leave it there.

7            MS. SCHESNOL:  Thank you, Your Honor.

8            THE COURT:  And we will resume at 9:30 tomorrow

9    morning.

17:01:20  10            Ladies and gentlemen, I am pretty confident we are

11    going to finish up the evidence in this case tomorrow morning,

12    and I'm pretty confident that you're going to be deliberating

13    tomorrow.  I can't guarantee exactly what time.  All right?

14            Have a pleasant evening.  Please don't discuss the

17:01:38  15    case among yourselves or with anyone else, and we will see you

16    ready to go at 9:30.  Thank you.

17        (Jury excused.)

18        (In open court.  Jury not present.)

19            THE COURT:  You can step down.

17:02:20  20        (Defendant steps down.)

21            THE COURT:  All right.  How much longer on the

22    cross-examination?

23            MS. SCHESNOL:  No more than an hour.  Hopefully much

24    less.

17:02:34  25            THE COURT:  No more than an hour.  Hopefully much

1    less.

2              MS. SCHESNOL:  Hopefully much less.  We are getting

3    near the end of the conduct on January 6th.

4              THE COURT:  Yes, we are.  That's why I'm expecting

17:02:48  5    that it shouldn't be an hour.

6              MS. SCHESNOL:  I do not believe it will be, but I

7    don't want to make a promise I can't keep.  But I think much

8    less than an hour.

9              THE COURT:  All right.  Much less than an hour.

17:02:59  10             Redirect, how long?  Estimate?

11             MS. OWENS:  I mean, I think it depends on how long the

12    government --

13             THE COURT:  I know it does.  Give me your best --

14    based on what you've heard so far, redirect how long?

17:03:07  15             MS. OWENS:  30, 40 minutes, Your Honor.  I don't know.

16             THE COURT:  30, 40 minutes of redirect?

17             MS. OWENS:  I don't know.

18             THE COURT:  Which means an hour of redirect?  You're

19    going to have to cut your redirect shorter than an hour.  I'm

17:03:23  20    not saying to cut it to five minutes, but an hour seems like a

21    lot for redirect.  And we won't even get the case to the jury

22    tomorrow that way.

23             MS. OWENS:  Well, she's exceeded my direct exam time.

24    So I don't --

17:03:35  25             THE COURT:  I understand that.  And that's why an hour

1    of redirect -- but redirect is not supposed to be as long as

2    direct or cross; it's supposed to be shorter.  Try to make it

3    shorter.

4              We need to have a final jury conference.  We will do

17:03:49  5    that -- I don't want to burden you too much, but let's take a

6    half an hour before we start tomorrow.  So let's get together

7    at 9:00 o'clock and try to make some headway.  Maybe we will

8    get through it all since there are only a couple of pages --

9    and I've got the work to do to get me where I am -- and then we

17:04:12 10    will proceed from there.

11              Should I expect that there's no additional defense

12    case beyond Ms. St. Cyr's testimony?

13              MS. OWENS:  Yes, Your Honor.

14              THE COURT:  All right.  Should I expect that there is

17:04:26 15    or is not a rebuttal government case?

16              MS. SCHESNOL:  I would say at this point in time

17    there's not a rebuttal.

18              THE COURT:  I'm not going to hold you to it.  I

19    understand.  I'm not holding anybody to firm estimates.

17:04:38 20              MS. SCHESNOL:  And we appreciate that.  But where we

21    are now, we don't intend on putting on any rebuttal witness.

22              THE COURT:  I'm just trying to get us to where I need

23    to get us because I'm worried about the jury.  But I'm also

24    worried about myself since I have obligations on Monday and

17:04:53 25    Tuesday that will make it a little difficult.  But it seems to

1   me that it's likely that we're going to be in business still on

2   Monday.  Maybe not, but I think it's likely.

3           MS. SCHESNOL:  Let's hope not.

4           THE COURT:  I don't mean that we're still presenting

17:05:08  5   evidence, but in business means the jury is still deliberating.

6           MS. SCHESNOL:  That is true.  I've had juries come

7   back in 19 minutes; I've had juries come back in two days.

8           THE COURT:  But we've got to get it to the jury.

9           MS. SCHESNOL:  Yes, indeed.

17:05:23  10           THE COURT:  Listening to you all and giving reasonable

11   assessments to it, it sounds to me like we'll barely get the

12   testimony finished tomorrow morning.  And --

13           MS. SCHESNOL:  Oh, I think we will, Your Honor.

14           THE COURT:  Yeah.  But we'll barely get it done.  And

17:05:38  15   then we have closings and then we have instructions.  And

16   that's going to put it pretty close to the end of the day, I'm

17   afraid.  But we will do our best.  I appreciate that from

18   everyone.

19           And we will see you at 9:00 o'clock to assess the jury

17:05:55  20   instructions further and then begin the testimony again at

21   9:30.

22           MS. SCHESNOL:  Thank you.

23           THE COURT:  Thank you.

24           COURTROOM DEPUTY:  All rise.

17:06:05  25       (The Proceedings were recessed at approximately 5:06 p.m.

*CHERYL K. POWELL, CCR, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3003/cheryl_powell@alsd.uscourts.gov

1    on March 9, 2023.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*CHERYL K. POWELL, CCR, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3003/cheryl_powell@alsd.uscourts.gov

C E R T I F I C A T E

     I, the undersigned, hereby certify that the foregoing pages contain a true and correct transcript of the aforementioned proceedings as is hereinabove set out, as the same was taken down by me in stenotype and later transcribed utilizing computer-aided transcription.

     This is the 9th day of May of 2023.

*Cheryl K Powell*

_____

Cheryl K. Powell, CCR, RPR, FCRR

Federal Certified Realtime Reporter