1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLUMBIA (WASHINGTON, DC)

2

3

4    UNITED STATES OF AMERICA,  *
              Plaintiff,        *   22-cr-185
5                               *   March 10, 2023
     vs.                        *   Washington, D.C.
6                               *   9:02 a.m.
     YVONNE ST. CYR,            *
7             Defendant.        *
     ****************************

8

9               TRANSCRIPT OF JURY TRIAL
                      **VOLUME V**
10          BEFORE THE HONORABLE JOHN D. BATES
             SENIOR UNITED STATES DISTRICT JUDGE

11

12   FOR THE UNITED STATES:

13   MS. JACQUELINE N. SCHESNOL, ESQ.
     DOJ-USAO
14   United States Attorney's Office
     40 North Central Avenue, Suite 1800
15   Phoenix, AZ 85004-4449
     602-514-7689

16
     MR. ERIC BOYLAN, ESQ.
17   DOJ-USAO
     U.S. Attorney's Office, D.C.
18   601 D Street NW
     Washington, DC 20001
19   202-252-7215

20
     FOR THE DEFENDANT:
21
     MS. HEIDI JOHNSON, ESQ.
22   Federal Defenders of Idaho
     702 West Idaho Street
23   Boise, ID 83702
     208-331-5500

24

25

*CHERYL K. POWELL, CCR, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3003/cheryl_powell@alsd.uscourts.gov

1      MS. NICOLE OWENS, ESQ.
       Federal Defender Services of Idaho
2      702 West Idaho Street
       Suite 1000
3      Boise, ID 83702
       208-331-5500

4

5      <u>COURTROOM DEPUTY</u>: MR. TIM BRADLEY

6

7      <u>COURT REPORTER</u>: CHERYL K. POWELL, CCR, RPR, FCRR

       Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
8  pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies and
  Procedures Vol. VI, Chapter III, D.2.  Transcript produced by
9             computerized stenotype.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           **I N D E X**

2        **EXAMINATION**                              **PAGE**

3    **YVONNE ST. CYR**

4    CROSS-EXAMINATION (CONTINUED)              946
     BY MS. SCHESNOL
5    REDIRECT EXAMINATION BY MS. OWENS          959

6         **EXHIBITS RECEIVED IN EVIDENCE**           **PAGE**

7    Defendant's Exhibit 15                     961

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*CHERYL K. POWELL, CCR, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3003/cheryl_powell@alsd.uscourts.gov

**P R O C E E D I N G S**

1

2              (In open court.  Defendant present.  Jury not present.)

3                   THE COURT:  Good morning to everyone --

4                   COURTROOM DEPUTY:  Good morning, Judge.

09:02:41  5                   THE COURT:  -- including the frantic law clerks.

6                   COURTROOM DEPUTY:  I don't think they heard you,

7        Judge, but anyway --

8                   THE COURT:  They didn't hear me.  They're too frantic

9        to hear.

09:02:51  10                   COURTROOM DEPUTY:  Your Honor, we have Criminal Action

11       22-185, United States vs. Yvonne St. Cyr who is not present.

12                   THE COURT:  The defendant is not here, but we can

13       proceed without her?

14                   MS. OWENS:  Yes, Your Honor.  We're comfortable

09:03:09  15       talking about the jury instructions without her.

16                   THE COURT:  All right.  First question.

17                   Well, we've made the choice to delete the right of the

18       defendant not to testify and to include the defendant as a

19       witness.  That's not a big issue.

09:03:25  20                   Then there are two instructions that appear on the old

21       version on Pages 21 and 22.  And I just need to question mainly

22       the government.  One is the false or inconsistent statement by

23       defendant, indicating that we have heard evidence that

24       Ms. St. Cyr made statements in explanation of her actions, et

09:03:49  25       cetera.  And the second is statements by the defendant as

1    substantive evidence because they are statements to the police.

2             Are either of those instructions relevant?

3             MS. SCHESNOL:  Good morning, Your Honor.

4             THE COURT:  Good morning.

09:04:07  5             MS. SCHESNOL:  Definitely the statement of the

6    defendant/substantive evidence is not because we haven't

7    introduced any of those.

8             THE COURT:  Is the first one really relevant?  Have

9    there been statements -- I think you -- in one

09:04:24 10    cross-examination question, you referred to something.  I don't

11    even know where it came from.

12             MS. SCHESNOL:  I do, but --

13             THE COURT:  You and Ms. St. Cyr may know, but I don't

14    know where it came from.  But was it a statement in explanation

09:04:38 15    of her actions?  I don't really think -- it didn't really sound

16    like it was.

17             MS. SCHESNOL:  Right.  Right.

18             May I have a moment, Your Honor?

19             THE COURT:  You may.

09:04:51 20     (Discussion off the record.)

21             MS. SCHESNOL:  Your Honor, I think unless something

22    else comes out through the remainder of Ms. St. Cyr's

23    testimony, I don't think that -- this is kind of on the line,

24    so I don't think it's necessary to leave it in.

09:05:17 25             THE COURT:  I don't think it's necessary, and I think

1    that to the extent we can reduce the 50-something pages of

2    instructions, it's all for the better.  So we will take it out

3    for the movement.

4              MS. SCHESNOL:  On the topic of reducing things, just

09:05:32  5    for scheduling purposes, once I was able to get back to my

6    office last night and look through all my notes, I realized I

7    had gotten much farther along in cross than I realized.  So the

8    remainder should be closer to ten minutes than an hour.  I just

9    didn't realize how far I had gotten.

09:05:50 10              THE COURT:  That is ultimately up to you and, for the

11    redirect, up to Ms. Owens.  All I can do is put a little

12    friendly pressure on you to keep it focused and efficient.

13              All right.  Moving on to Counts One and Two.  There

14    were a number of issues.  The first was that the government

09:06:11 15    wanted to delete or omit the portion of the instruction on

16    second element; second, Ms. St. Cyr took a substantial step

17    toward committing civil disorder; and then delete that which

18    strongly corroborates or confirms that she intended to commit

19    that crime.

09:06:38 20              There is caselaw supporting that.  The D.C. Circuit

21    has explained in the *United States vs. Hite*, H-I-T-E, case, 769

22    F.3d 1154, quoting Fifth Circuit decision.  And Judge Friedman

23    and Judge Boasberg have opinions that would support it.  But

24    that -- in *Hite*, that circuit explained that for an action to

09:07:08 25    constitute a substantial step, it must strongly corroborate the

1    firmness of defendant's criminal intent.  And this language,

2    "which strongly corroborates or confirms that she intended to

3    commit that crime," is built on that caselaw.  And I have

4    decided to leave the instruction as written.

09:07:27  5          Then moving to aiding and abetting, there were a

6    number of things.  First, the government requested to add the

7    separate offense sentence that is in the attempt portion of the

8    instruction as well.  And I will add that.  There's no reason

9    not to have it paralleling the other instruction.

09:07:50  10         The government then would like to cut two sentences,

11   the accomplices and principals sentences.  As I look at that, I

12   don't think they add anything in this context.  I don't think

13   there's anything substantive with respect to them or really

14   explanatory to help the jury.  So I am inclined to cut those.

09:08:17  15         But if the defense wants to say something on that

16   before I make that decision, I will certainly listen to you,

17   Ms. Owens.

18         MS. OWENS:  Your Honor, we have no objection to

19   cutting those two sentences.

09:08:26  20         THE COURT:  All right.

21         Then, more broadly, the government is asking that I

22   revert to the government's suggestion in terms of the framework

23   of the aiding and abetting instruction which is built on the

24   Redbook instruction.  And I think there's nothing wrong with

09:08:51  25   the framework.  The question is is there anything wrong with

1    the framework I've used which is consistent with the framework

2    for the offenses both in Counts One and Two and thereafter

3    listing elements, a one-two-three-type approach.

4         And I think I would like to keep it in that framework.

09:09:07  5    So I'm inclined to retain that framework and not revert to the

6    Redbook framework.  There are one or two things, however, that

7    I think need to and can be done here.  And, especially, I am

8    inclined to include the language in the government's suggested

9    instruction that -- it appears at the end of your suggestion, I

09:09:41  10    believe; and that is, the language:  The government is not

11    required to prove that anyone discussed or agreed upon a

12    specific time or method of committing the crime, et cetera.

13         What I would like you to do is read -- each of you

14    have a chance to read over this -- the aiding and abetting

09:10:00  15    instruction, as I retained the structure but made a couple of

16    changes based on -- mainly based on suggestions that the

17    government has made.  And I don't think there's any strong

18    caselaw direction in terms of one versus the other on the

19    Redbook government-proposed instruction versus the structure

09:10:27  20    that I have adopted.  But I want you to look it over.  Now, the

21    other -- have a chance to look it over.

22         The other aspect of this is, of course, the good faith

23    aspect.  The government made a good argument, although I'm not

24    sure that it ultimately was all that strong an argument as it

09:10:53  25    got modified along the way in terms of the -- you know, why the

1    good faith defense should or should not be in there.  But in

2    any event, based in part on the testimony that has been

3    received from Ms. St. Cyr to date and on caselaw and the

4    existence of the knowingly aspect of the instruction, I think I

09:11:27    5    can go either way.  I don't think -- and I think the caselaw

6    says that.  And I think the government pointed that out; that

7    there's no real error in omitting the instruction.

8            So I don't think it's an improper instruction.  I do,

9    however, think that, in this context, it may be a little, oh,

09:11:57    10    confusing for the jury.  And my inclination, therefore, is to

11    omit the good faith instruction on the basis, in part, that it

12    is somewhat superfluous because of the knowingly instruction,

13    as the caselaw from other circuits, not from this circuit, has

14    already, in several instances, acknowledged.

09:12:22    15            Ms. Owens.

16            MS. OWENS:  Can I approach?

17            Your Honor, we would object to the Court not including

18    a good faith instruction.

19            As the Court has noted and as argued by the

09:12:37    20    government -- well, let me go through it.  First, the cases

21    cited by the government and as argued by the government -- that

22    Court was applying an abusive discretion standard.  And, as

23    this Court knows, that's not the standard that you are to

24    consider when making a determination.  Obviously, you need to

09:13:00    25    consider what the right decision is, and I believe that that

1    decision is often to give the good faith instruction.

2         The Third Circuit explained in *United States vs. Gross*

3    at 961 F.2d 1097 that even when it is not reversible error for

4    the district court to refuse to give the good faith instruction

09:13:22  5    in a case, we commend to the district court the exercise of

6    their discretion and use -- use it as a supplement to the

7    knowing and willful charge in future cases.  And so --

8         THE COURT:  What kind of case was that?

9         MS. OWENS:  Your Honor, I'm not sure of the specific

09:13:38 10    facts of that case, but I understand the government --

11         THE COURT:  The government has made an argument, have

12    they not, that that -- that it's generally given in the context

13    of some financial fraud?

14         MS. OWENS:  Sure.  And the government's argument that

09:13:51 15    it's given generally in financial fraud is understood because

16    of *Cheek vs. United States* where the Supreme Court held that a

17    defendant could not be convicted if the jury found he honestly

18    believed that the tax laws did not make his conduct criminal.

19    However, it's not so limited.

09:14:16 20         And if you look at *United States vs. Wexler* at 522

21    F.3d 194, which is out of the Second Circuit, it was given in

22    the context of a physician who was prescribing medication.  And

23    the Court there said a physician may raise a good faith defense

24    to be disproved by the government beyond a reasonable doubt.

09:14:34 25    And that was not a bank fraud case.  So it's --

```
 1              THE COURT:  What kind of case was it?

 2              MS. OWENS:  That was a prescription case.  That was a

 3         case where a physician was charged with distributing

 4         prescriptions inappropriately.  And so it's not --

 5              THE COURT:  There is other Second Circuit law that

 6         falls into the category of it's not error to choose to omit the

 7         instruction.

 8              MS. OWENS:  Certainly it's not error to choose to omit

 9         it, but it is also not error to include it.  And --

10              THE COURT:  Agree.  Agree.  And you're asking me to

11         exercise my discretion to include it.

12              MS. OWENS:  Yes.

13              THE COURT:  Why so here?

14              MS. OWENS:  Your Honor, because under these facts, I

15         would be concerned that it would fall -- that the jury would

16         want Ms. St. Cyr to prove something.  And so good faith, I

17         think, clarifies that.  It makes it clear that the burden is on

18         the government to prove that she acted with bad intent, that

19         she acted knowingly.  And it clarifies what that is in

20         relationship to.

21              I apologize.

22              And good faith is a defense to any crime for which the

23         defendant genuinely lacks an awareness or their

24         misunderstanding negates the mental state requirement.  And so

25         we're asking the Court to instruct the jury as such; that she
```

1  didn't have the mental state necessary and that the government

2  can't prove that.

3          This is specifically the issue that has been discussed

4  in this trial.  And so to not instruct the jury on good faith I

09:16:21 5  think leaves some ambiguity that could be clarified by this

6  instruction.

7          THE COURT:  All right.  Let me hear from the

8  government briefly.

9          MS. SCHESNOL:  Your Honor, the jury is already getting

09:16:32 10  an intent instruction with regards to Counts Three and Four.

11          THE COURT:  You called my instruction intense?  It's

12  getting what?

13          MS. SCHESNOL:  Intent instruction.

14          THE COURT:  Intent.  I'm sorry.

09:16:44 15          MS. SCHESNOL:  Instruction on intent in Counts Three

16  and Four.  So adding that the government has to prove the

17  defendant didn't act in bad faith is adding an element to the

18  crime that simply does not exist.

19          Additionally, I see that Your Honor did include the

09:16:59 20  good faith instruction in the 5104 counts, which is where the

21  government thinks it is rightfully placed.

22          THE COURT:  All right.  I think I'm going to exercise

23  my discretion as indicated.  It's a fairly close question.  But

24  it is -- that's what discretionary questions often are for the

09:17:22 25  Court.  I think there's some risk of some juror confusion, and

1    I think it is an issue that is taken care of by the knowingly

2    aspect of the instructions.  So I'm going to omit the good

3    faith instruction that was raised yesterday or the day before.

4    I can't remember when it was first raised.

09:17:55  5           All right.  We then have something in Count Five.  The

6    government wants to cut the phrase -- this is in the willfully

7    definition.  Cut the phrase, "an act is not done willfully if

8    it is done as a result of a mistake, carelessness, lack of an

9    evil purpose or motive or some other innocent reason."

09:18:16 10           This, too, is fairly close question, but I've included

11   that in my prior instructions in another case, in *Sheppard.*

12   And I think that it is supported by caselaw to describe willful

13   in a mens rea context, and I am going to leave that language

14   in.

09:18:41 15           We then have an issue about -- given the testimony and

16   evidence about the instruction that I gave in a prior case

17   relating to the statements of President Trump, that sort of

18   public authority type instruction.  I've included that in here.

19           But I haven't heard fully from either side on it based

09:19:11 20   on, particularly, the direct examination of Ms. St. Cyr and the

21   exhibits that the defense has introduced.  So I'll hear from

22   both sides on that now if you wish to say something.

23           What page is it on, Mr. -- I can't remember what page

24   it appears on.

09:19:34 25           MS. OWENS:  Your Honor, it's on 36.

1          THE COURT:  36.  Okay.  So if there's anything that

2     either side wants to say about including or not including or

3     changing the language of that instruction, please offer it at

4     this time.

09:19:51  5          MS. SCHESNOL:  Your Honor, there were very -- I think

6     there was very limited testimony about that.  And for that

7     reason, I don't really think that it's necessary.  I am

8     familiar that you gave it in the *Sheppard* case.

9          THE COURT:  It was a different situation in *Sheppard*.

09:20:09  10          MS. SCHESNOL:  Right.  And we talked to the trial team

11     about that.  So just because it was so limited in the form of

12     testimony here --

13          THE COURT:  So the government is not asking for it?

14          MS. SCHESNOL:  We are not asking for it.

09:20:24  15          THE COURT:  I assume the defense is comfortable with

16     the government's request not to have it.

17          MS. OWENS:  Correct.

18          THE COURT:  All right.  We will delete it.  Then I

19     think maybe the last thing would be what the government --

09:20:37  20          MS. SCHESNOL:  I'm sorry, Your Honor.  I'm sorry.

21          THE COURT:  Have I omitted something?

22          MS. SCHESNOL:  Can I give a -- because the defendant

23     isn't through testifying yet --

24          THE COURT:  No.  No.  Things could change.  I

09:20:47  25     understand we still have some testimony to complete.  And if

1    things do change, I will hear further from you.

2         The last thing is only on the intent instruction.  And

3    the government, I think, made two suggestions in what it filed

4    either last night or early this morning.  One was to add a

09:21:07  5    sentence in the second paragraph.  And the other was to add a

6    third paragraph.

7         And what I've concluded, based on my preliminary

8    assessment of this, is that the additional sentence in the

9    second paragraph is one that I am familiar with and comfortable

09:21:31  10    with.  So I have no problems with it.  I haven't heard from the

11    defense yet.

12         And with respect to the third paragraph, which is more

13    specifically suggested because of the testimony of

14    Ms. St. Cyr -- testimony to date of Ms. St. Cyr, other than

09:21:50  15    changing that to neutralize the references to Ms. St. Cyr a

16    little bit -- and I would change another reference at the end

17    of the second paragraph to a defendant or the defendant.  You

18    should consider all the circumstances . . .

19         That can be Ms. St. Cyr because it is specifically

09:22:16  20    referring to her.  But the third paragraph I've changed to just

21    refer to a defendant rather than specifically Ms. St. Cyr,

22    which is how I prefer that instructions be if we can have them

23    that way.

24         So I need to hear -- since it's basically saying yes

09:22:32  25    to the government, I need to hear from the defense.

1          MS. OWENS:  Your Honor, we object to including this

2     language.

3          Again, we believe that this improperly shifts the

4     burden, and it creates somewhat of a balancing question for the

09:22:54  5     jury regarding the dual nature of the intent.  And so we're

6     asking --

7          THE COURT:  And you're speaking specifically of the

8     last paragraph, not the additional sentence in the second

9     paragraph.

09:23:05  10          MS. OWENS:  The last paragraph.  Frankly, I think the

11     additional sentence in the second paragraph covers what needs

12     to be covered in terms of having dual purpose intent.  And so

13     my concern is -- from what I can tell, this is taken from the

14     Ninth Circuit in *U.S. vs. Smith*.  And so I'm concerned that it

09:23:26  15     just confuses the issue.

16          THE COURT:  You think that's ironic --

17          MS. OWENS:  I do.

18          THE COURT:  -- because the government the other day

19     said they would never agree to a Ninth Circuit instruction.

09:23:35  20          MS. OWENS:  I do.  I do want to make a record that

21     that is ironic.

22          MS. SCHESNOL:  I did not get this from the Ninth

23     Circuit.  Let me make a record of that.  Sorry.

24          MS. OWENS:  Nonetheless, Your Honor, I think that,

09:23:48  25     again, the intent is clarified within the elements that the

1    judge has -- that you have instructed on; that this similar --

2    I guess I will dovetail on to the good faith confusion.

3              I think that this can confuse the jury and make it so

4    that they have to weigh and see which intent was stronger, and

09:24:07  5    there's then going to be a clash.

6              THE COURT:  Do you think that this language is,

7    therefore, inaccurate?  Do you think it's wrong that it need

8    not be the defendant's sole purpose?

9              MS. OWENS:  No, Your Honor, I think -- I think my

09:24:26 10   biggest issue would be within the last -- the last sentence,

11   that somehow that lawful intent needs to be negated by another

12   purpose.  And therein I think is the real issue.  I don't

13   believe that the first sentence is necessary.  I don't

14   necessarily believe that that is an inaccurate statement of the

09:24:47 15   law.

16             I do think that it doesn't have to be someone's sole

17   purpose, and that's clear from the caselaw.  But I do think

18   that once we start getting into the fact that her unlawful

19   intent is not negated by this simultaneous presence of another

09:25:02 20   purpose, then we're not giving the jury direction as to how to

21   consider those simultaneous purposes.  And I think that that is

22   problematic.

23             THE COURT:  All right.  Let me hear from the

24   government.  Maybe the government is going to agree that the

09:25:21 25   first sentence is enough.

1      MS. SCHESNOL:  So, first of all, just to be clear, I

2  did not get this from the Ninth Circuit.

3      THE COURT:  Sounds a little bit defensive on that.

4      MS. SCHESNOL:  Well, I won't say anything more on the

09:25:34  5  record about the Ninth Circuit.

6      THE COURT:  Please.

7      MS. SCHESNOL:  Where I got this from were the many

8  cases in this very courthouse that have given either identical

9  or very, very similar instruction.

09:25:48  10     I'm not sure if she was the first to give it, but if

11  she wasn't the first, she was one of the first.  Chief Judge

12  Howell gave a very similar instruction in the *Herrera* case,

13  which I cited as a footnote as the basis for this.  I did not

14  cite anything from the Ninth Circuit.

09:26:04  15     In the *Herrera* case, it was specific to the 1512

16  charge, the obstruction of an official proceeding.  After Chief

17  Judge Howell gave it in the *Herrera* case, many other judges

18  gave the exact same instruction in other 1512 cases, including

19  the *Strand* case, which I also cited.

09:26:24  20     And then Judge Mehta has given this instruction, which

21  is more neutral, going to the various counts in both what we're

22  calling Oath Keepers 1 or Oath Keepers 2 or *Rhodes* 1 and *Rhodes*

23  2.  And I have it on good authority that I believe they are

24  finishing their closing today in Oath Keepers 3 and have

09:26:47  25  proposed this instruction and expect it to be given.  Again,

1   based on the fact it was given two previous times.  So that is

2   my source, the judges in this very courthouse giving this

3   instruction.

4           And one more thing.  The reason the government didn't

09:27:00  5   initially propose this is because, of course, we didn't know

6   for sure the defendant would take the stand.  We didn't know

7   what she was going to say.  Based on her testimony yesterday,

8   talking about other reasons for being at the Capitol such as

9   filming the events for people to watch on her Facebook live

09:27:20  10   stream -- this seems driven by the testimony.

11          And it was only then that the government thought, hmm.

12   Maybe we need -- maybe we need to address it lest the jury be

13   confused and think, well, if she had this other reason to be

14   there, then, you know -- then I guess we have to find her not

09:27:41  15   guilty when, as Your Honor pointed out, someone can have mixed

16   or dual intent.

17          THE COURT:  All right.  So the last word I'll give to

18   Ms. Owens particularly to respond to the point that, by and

19   large, the judges in this courthouse, not in the Ninth Circuit,

09:28:01  20   are giving this instruction, particularly where there's any

21   question about the possibility of a dual purpose.

22          MS. OWENS:  Sure.  And those, as I understand it, are

23   obstruction cases.  So Ms. St. Cyr has not been charged with

24   that.

09:28:17  25          THE COURT:  Why does that matter?  Why is it -- why is

1    the concept unique to obstruction cases?

2           MS. OWENS:  I don't know that it's unique, but I think

3    that's important to note.

4           Your Honor, again, I think then we're going to have

09:28:30  5    the jury questioning how they weigh those dual purposes.  I

6    think the first sentence is sufficient to cover the law and to

7    explain that somebody can have, you know, multiple purposes.

8    But when we start talking about one intent not negating the

9    other, I believe that that treads into territory where there's

09:28:52 10    a balancing that has to occur.  There is a shifting of burden

11    somehow, and I worry that it muddies the instruction that would

12    be clear without that sentence.

13           THE COURT:  All right.  I'm going to include at least

14    the first sentence.  I'm talking this through.  I wonder

09:29:10 15    whether the word "this" is the right word.  While a defendant

16    must act with the requisite intent for each charged crime, this

17    need not be the defendant's sole purpose.  Is that clear

18    enough?

19           MS. SCHESNOL:  The government thinks so.

09:29:31 20           And, again, just pulling it from other instructions

21    that have been given in other cases that were not solely

22    obstruction cases.

23           THE COURT:  All right.  And then the second sentence,

24    a defendant's unlawful intent is not negated . . . I don't

09:29:50 25    think this is going to add confusion.  I don't think this is

1   going to pull the jury into some morass of having to weigh

2   purposes any more than they would already potentially be drawn

3   into, having heard testimony about some other purpose and

4   having to sort that out.

09:30:16  5          It seems to me that this is assisting the jury in

6   attempting to sort out whether there can be dual purposes and

7   what that means for their decision.  And I don't think that

8   this unnecessarily draws the jury into some difficult situation

9   of balancing between two purposes anymore than they would be

09:30:42 10  drawn into, even without this instruction.  So I am going to go

11  ahead and include this language.

12          And I think that covers everything that we were going

13  to discuss.

14          MS. SCHESNOL:  I think so, too, with regard to jury

09:30:56 15  instructions.

16          Logistical questions, Your Honor:  During the brief

17  remainder of Ms. St. Cyr's cross-examination, I would like to

18  use our large poster exhibit.  And I just want to make sure

19  it's okay with the Court, as we've done with other witnesses.

09:31:14 20  I'm not going to ask her to step down.

21          THE COURT:  The large poster exhibit?  What do you

22  mean?  The one showing the Capitol from the west side?

23          MS. SCHESNOL:  This one.

24          THE COURT:  Yes.

09:31:26 25          MS. SCHESNOL:  I wasn't going to ask Ms. St. Cyr to

1    step down from the stand.  Just I wanted to make sure that it

2    was okay that I move to that exhibit and point to it as --

3              THE COURT:  That will be fine.  Just indicate when you

4    are going to do so.

09:31:40  5              MS. SCHESNOL:  Is that also permissible -- I don't

6    want to speak for my co-counsel.  I am doing the rebuttal

7    close.  I'm using that, as well.  I don't want to violate Your

8    Honor's order about not going into the well.  I do want to

9    point out things on the poster.

09:31:57 10              THE COURT:  We can do that.

11              MS. SCHESNOL:  Thank you, Your Honor.

12              THE COURT:  Anything else that needs to be raised?

13              MS. OWENS:  No, Your Honor.

14              THE COURT:  Let's take a five-minute break just so

09:32:06 15    everyone can stretch or if they need to run down the hall, and

16    then we'll bring the jury.

17              COURTROOM DEPUTY:  All rise.

18         (Short recess.)

19         (In open court.  Jury not present.)

09:42:11 20              THE COURT:  All right.  We ready for the jury?

21              MS. OWENS:  Yes, Your Honor.

22              THE COURT:  All right.  Bring them, Mr. Bradley.

23              And, Ms. St. Cyr, you may resume the stand.

24              COURTROOM DEPUTY:  Your Honor, the jury panel.

09:42:37 25         (Jury present.)

1          THE COURT:  Good morning, members of the jury.

2     Welcome back.  I hope you had a pleasant evening.

3          And we're ready to resume with the examination of Ms.

4     St. Cyr.

09:43:10   5          Ms. St. Cyr, I remind you you're still under oath.

6          Good morning to you.

7          THE DEFENDANT:  Good morning, Your Honor.

8          THE COURT:  And Ms. Schesnol.

9          MS. SCHESNOL:  Thank you, Your Honor.

09:43:24  10              **CROSS-EXAMINATION (CONTINUED)**

11     **BY MS. SCHESNOL:**

12     **Q**   Good morning, Ms. St. Cyr.

13     **A**   Good morning.

14     **Q**   Okay.  Let's pick up where we left off last night.

09:43:37  15          Where we left off last night, you had just been

16     removed from the Capitol building at the tunnel at 3:19 p.m. on

17     January 6th.

18          Do you recall that?

19     **A**   Yes.

09:43:50  20     **Q**   Can you just make sure --

21     **A**   Yes.

22     **Q**   Just so the jury can hear you.

23          Now, I understand you've never visited the United

24     States Capitol building before.

09:44:04  25          Even as a first-time visitor, did you believe entering

1    the building through a broken window was an acceptable way to

2    access the United States Capitol?

3    **A**    Yes.   I believe and I know I am a divine sovereign being.

4    God has told me that my right was given to me by the Creator of

09:44:35 5    this universe.   It is the right to life, liberty, and the

6    pursuit of happiness.   That is my birthright.   And if any law

7    or anything stands in the way, I will stand up for liberty, for

8    truth and freedom.   That is my sole purpose.   That is why I'm

9    here.   And I have every right to stand up for truth and

09:44:52 10    liberty, and that is why I was there.

11          That will be the same question [sic] no matter where

12    you ask where I was.   I stand for my birthright of life,

13    liberty, and the pursuit of happiness.   And no law from any man

14    or any Court can take that birthright away.   So I will go where

09:45:10 15    God leads me, and I will stand for truth and freedom any time

16    for my -- until my very last breath.

17    **Q**    So that's a yes; you believe crawling through a broken

18    window is an acceptable way to access the Capitol building?

19    **A**    Yes.

09:45:35 20    **Q**    And, in fact, you did access the Capitol building through a

21    broken window, correct?

22    **A**    Yes.

23    **Q**    You low crawled into a senator's office; is that correct?

24    **A**    No.   It was just an office.   It was not a senator's office.

09:45:53 25    But I did crawl through a window into an office.   It was not a

1    senator's office.

2    **Q**   You've been here all through trial, correct?

3    **A**   Yes.

4    **Q**   Heard the testimony of every witness?

09:46:05  5    **A**   Yes.

6    **Q**   You've never been to the United States Capitol building

7    prior to January 6, 2021, correct?

8    **A**   Yes.

9    **Q**   And have you become an expert in the layout or floor plan

09:46:21  10    of the Capitol since January 6, 2021?

11    **A**   No.  But I know what an office looks like.  And there was a

12    long -- it was more like a conference room or there was a long

13    conference table.  I've been in -- I know what an office -- it

14    was not somebody's office.  It may have been several people's

09:46:35  15    office that they use, but it was not an individual's office.

16    It was a conference area space.  Or that is what I believed it

17    to be.  Nothing in it looked like a senator's.  And if you can

18    prove that, then please do.  But I do not believe that it was a

19    senator's office.

09:46:47  20    **Q**   Were you present for the testimony of Captain Tia Summers

21    who has worked at the United States Capitol for 23 years?

22    **A**   Yes.  And she said it was an area that they use to stand

23    off or that they went to, but it wasn't somebody's individual

24    office.  She said it was a gathering place for senators or

09:47:03  25    something like that.

1   **Q**   Well, we can leave it to the jurors' recollection.

2   **A**   Yes, ma'am.

3   **Q**   But I believe the testimony she gave was it was a senator's

4   hideaway office.

09:47:13  5         MS. OWENS:  Your Honor, objection.

6         THE COURT:  Let's leave it to the jury's recollection.

7   **A**   Yes, ma'am.

8   **BY MS. SCHESNOL:**

9   **Q**   So you did not hear Captain Summers say it was a senator's

10   hideaway office?

11         MS. OWENS:  Your Honor.

12         THE COURT:  Wait a minute.

13         MS. OWENS:  Your Honor, objection.  This has been

14   asked and answered now.

09:47:27  15         MS. SCHESNOL:  Not in that way.

16         THE COURT:  You may ask that question in that form.

17   **BY MS. SCHESNOL:**

18   **Q**   Did you hear Captain Tia Summers testify that that was a

19   senator's hideaway office?

09:47:35  20   **A**   Yes, I did.

21   **Q**   And you're disputing the accuracy of Captain Summers?

22   **A**   I do not believe that it was a -- one individual senator's

23   hideaway office.  Again, that's just my belief.

24   **Q**   Could -- and your belief is based on what the office looked

09:47:57  25   like when you got into it; do I have that right?

1   **A**   It's my belief.

2   **Q**   Based on what you saw when you got in there?

3   **A**   It's my belief.  I don't know where I -- it's my belief.  I

4   don't know where it comes from, but it is my belief.

09:48:14   5   **Q**   And it's still your belief after hearing the testimony of

6   Captain Summers?

7   **A**   It's absolutely my belief still.

8           MS. OWENS:  Objection, Your Honor.  This has been

9   asked and answered.

09:48:26   10          THE COURT:  It has been asked and answered.  We've

11   asked it again, and the witness has answered it.  We'll leave

12   it at that.

13          MS. SCHESNOL:  May we please turn to Exhibit 618,

14   which we've confirmed is admitted.

09:48:39   15          THE COURT:  618 is admitted.

16          MS. SCHESNOL:  And if we can please play the beginning

17   portion of it.  And I will let you know when to pause it.  With

18   sound.

19          (Video played.)

09:49:02   20   **BY MS. SCHESNOL:**

21   **Q**   So we've paused this at 14 seconds.

22          You see the individual in this video using some kind

23   of pole or bat to bash in the window in this video?

24   **A**   Yes.

09:49:27   25   **Q**   And that's the room that you were in that we've just been

1   talking about, correct?

2   **A**   Yes.

3   **Q**   And because that window was not yet broken, you actually

4   crawled through the opening just below that kind of rectangle

09:49:43 5   area right here?

6   **A**   That window, yes.  I crawled through that window.

7   **Q**   And the reason --

8           MS. SCHESNOL:  Well, if I may go to the poster, Your

9   Honor.

09:50:03 10          THE COURT:  You may.

11   **BY MS. SCHESNOL:**

12   **Q**   Ms. St. Cyr, I know it's sort of a long distance.

13           Can you see where Agent Gano made some markings on the

14   poster yesterday?

09:50:33 15   **A**   I cannot see the markings, but I can see the window area

16   you're trying to refer to.

17   **Q**   So where I'm pointing now, there's actually a red letter,

18   D, as in dog, and the number, Three; is that accurate, the

19   window to the office we're talking about?

09:50:49 20   **A**   Where your finger is -- I cannot see anything other than

21   that is accurate where the window is, yes.

22   **Q**   I don't want you to guess.

23           THE COURT:  She can't seeing the markings is all.

24   You're asking her about the markings.  I can't see them, and

09:51:02 25   she can't see them from here.

1    **A**    So yes.  That is the window.

2    **BY MS. SCHESNOL:**

3    **Q**    And that is just adjacent to the tunnel area that I'm now

4    pointing to.

09:51:10  5    **A**    Tunnel, yes.

6    **Q**    And I believe your testimony yesterday was the reason you

7    went into that room was to borrow a phone so you could try to

8    call your husband; is that correct?

9    **A**    Yes.

09:51:32  10   **Q**    There were thousands of people outside.

11   **A**    I tried to call my husband from outside.  He could not hear

12   me.  It was way too loud.  I tried.  I borrowed a phone while I

13   stood out there.  And I tried to call him, and we couldn't hear

14   each other.

09:51:49  15   **Q**    Where were you standing when you tried to call him and he

16   couldn't hear you?

17   **A**    If you look at the guy with the red hat, I was down there

18   in that area somewhere.

19   **Q**    Few red hats.  I don't want to get the wrong one.

09:52:01  20   **A**    No.  To the right.  I was down further, but I was --

21   **Q**    This guy?

22   **A**    Yes.  But down further, standing in there.

23   **Q**    Got it.

24   **A**    And I stood there for quite a while before I called.

09:52:14  25   **Q**    Why didn't you go further away from the Capitol building

1   over to the lawn area or the Peace Circle that you had passed

2   on your way --

3   **A**   Because I was still trying to find my phone.  I didn't know

4   where my phone was, and I didn't want to leave until I found my

09:52:29  5   phone.

6   **Q**   So you low crawl into this office, correct?

7   **A**   Yes.

8   **Q**   No one dragged you, kicking and screaming; you entered

9   voluntarily, correct?

09:52:44  10  **A**   Yes.

11  **Q**   And once you were in that room, no one blocked your exit;

12  you didn't try to leave and someone stopped you; that didn't

13  happen, correct?

14  **A**   Yes.

09:52:55  15  **Q**   And I believe you testified that, by a wonderful miracle or

16  coincidence, it turned out someone in that room actually had

17  your phone; is that right?

18  **A**   Yes.

19  **Q**   And so you got your phone back, right?

09:53:17  20  **A**   Yes.

21  **Q**   But you stayed in that room much longer than the time it

22  would take to just call your husband and make an arrangement to

23  meet him, didn't you?

24  **A**   Yes.

09:53:33  25  **Q**   In fact, you hung out the window of this office, once this

1    person was successful in breaking out the window, to video what

2    was going on on this lower west terrace plaza and beyond,

3    correct?

4    **A**   Yes.

09:53:59   5          MS. SCHESNOL:   Can we start Exhibit 618 at 37 seconds,

6    please?

7          (Video played.)

8    **BY MS. SCHESNOL:**

9    **Q**   Just to be clear, we've stopped at 52 seconds, circled you

09:54:29  10    in red.

11          That's you, correct?

12    **A**   Yes.

13    **Q**   Hanging out the window, filming what's the chaos that is in

14    front of you, correct?

09:54:41  15    **A**   Yes.

16    **Q**   And you describe the events as both crazy and nuts,

17    correct?

18    **A**   Yes.

19    **Q**   But you didn't leave, right?

09:54:49  20    **A**   Yes.  That is correct.

21    **Q**   And we also see in this video more people climb into that

22    office, correct?

23    **A**   I believe so, yes.

24          MS. SCHESNOL:   Can we please go to Exhibit 6 -- I'm

09:55:19  25    sorry -- 804, which I believe has been admitted, and start

1    it --

2            THE COURT:  It is.

3            MS. SCHESNOL:  Thank you.  And start it at one minute

4    and 24 seconds.

09:55:32  5       (Video played.)

6    **BY MS. SCHESNOL:**

7    **Q**   You didn't leave after that, did you?

8    **A**   No, ma'am.

9    **Q**   In fact, you stayed and continued to live stream, correct?

09:56:54 10  **A**   I did.

11   **Q**   Even helped someone else get up into that room, right?

12   **A**   Yes.

13           MS. SCHESNOL:  Can we play Exhibit 617, please, which

14   I believe is in evidence?

09:57:06 15          THE COURT:  617 is in evidence.

16           MS. SCHESNOL:  Starting -- thank you, Your Honor.

17           Starting at 50 seconds.

18       (Video played.)

19   **BY MS. SCHESNOL:**

09:57:22 20  **Q**   Here, you are helping another person up into that office,

21   correct?

22   **A**   Yes.

23   **Q**   As a matter of fact, you only left the Capitol grounds once

24   so much teargas was deployed that you were pretty much forced

09:57:45 25  to leave, right?

```
 1   A    No.  That was not why I left, but -- it happened at the
 2   same time, but that was not why I left.
 3        MS. SCHESNOL:  You can take that down.
 4   BY MS. SCHESNOL:
 5   Q    You're aware that various places have security measures,
 6   correct?
 7   A    Yes.
 8   Q    For example, a Marine base.  There are security measures at
 9   a Marine base, right?
10   A    Yes, there are.
11   Q    Marine base has a secure perimeter around it?
12   A    Yes.
13   Q    Everyone goes through a checkpoint or an access control
14   point, right?
15   A    Yes.
16   Q    And even if you work on the base, you have to show an ID to
17   get on base, correct?
18   A    Yes.
19   Q    And if you don't work on base, you have to get a visitor's
20   badge to enter, correct?
21   A    Yes.
22   Q    And there's armed security at every checkpoint on a Marine
23   base, right?
24   A    Yes.
25   Q    This courthouse has security, doesn't it?
```

```
 1    A    Yes, it does.

 2    Q    And every morning this week, you stood in line at security

 3    to get into the courthouse, correct?

 4    A    Yes, I did.

 5    Q    You went through a magnetometer?

 6    A    Yes, I did.

 7    Q    Put your items through an X-ray machine?

 8    A    Yes, I did.

 9    Q    Abided by the directives of the court security folks who

10    wear blue jackets?

11    A    Yes, I did.

12    Q    You never entered this courthouse through a broken window,

13    did you?

14    A    No, I did not.

15    Q    You believe you have the right to be inside the Capitol

16    building because it's our house or the people's house, correct?

17    A    I believe I have a right to be inside the Capitol building

18    at that time because our liberty is at risk, and I stand for

19    truth and freedom and liberty.  And I will do it until my last

20    dying breath.

21    Q    So my question is:  You believe that you should have access

22    to the Capitol building, correct?

23    A    If I need to go to the Capitol, stand for liberty, then

24    yes; I will go.  Those rights are given to me by God.

25    Q    So you would agree there's even limitations --
```

**A**   There are no limitations to the rights given to me by God,
life, liberty, and pursuit of happiness.

**Q**   Wasn't my question.

There are limitations to the entry into the United
States Capitol building, correct?

**A**   I know that now.

**Q**   Do you believe -- did you believe prior to January 6, 2021,
you could go into the United States Capitol building at 2:00 in
the morning?

**A**   I hadn't thought about it.

**Q**   Do you think you could go into the United States Capitol
building at 2:00 in the morning?

**A**   At this moment?

**Q**   Yep.

**A**   Well, no.  Now I know because I've been through that.  But
at that moment, I hadn't thought about it.

**Q**   And on January 6, 2021, despite the police line, you
thought that you should have access to the Capitol building?

**A**   Again, my rights are given to me by God.  It is my sole
purpose to stand for liberty.  Our liberty is at risk.  We are
at war, and I will stand for truth and freedom.

**Q**   My question is:  Despite the police line on the west
front --

**A**   I answered your question.  Yes; that is why.

MS. SCHESNOL:  May I have a moment, Your Honor?

1          THE COURT:  You may.

2       (Discussion off the record.)

3          MS. SCHESNOL:  No further questions, Your Honor.

4          THE COURT:  Redirect.

10:01:45   5                    **REDIRECT EXAMINATION**

6    **BY MS. OWENS:**

7    **Q**   Good morning, Yvonne.

8    **A**   Good morning.

9    **Q**   Yesterday you were asked about what part in the

10:02:12  10   Constitution provides for the certification of the electoral

11   college.

12          Do you remember that line of questioning?

13   **A**   Yes, I do.

14   **Q**   And would looking at the specific amendment to the United

10:02:24  15   States Constitution refresh your recollection?

16   **A**   It would, I'm sure.

17   **Q**   If I can --

18          MS. SCHESNOL:  Your Honor, that is a

19   mischaracterization of my line of questioning yesterday.

10:02:34  20          THE COURT:  And therefore --

21          MS. SCHESNOL:  And I think that it's an improper

22   characterization of the questions that were asked.

23          THE COURT:  All right.  I could try to resolve the

24   mischaracterization or I can just allow you, Ms. Owens, to go

10:02:55  25   ahead with the questions that you are going to ask rather than

1    characterizing prior testimony.

2            So just go ahead with the questions you were going to

3    ask.

4    **BY MS. OWENS:**

10:03:07 5   **Q**   Would looking at the specific amendment to the United

6    States Constitution refresh your recollection as to whether

7    that provision is contained in the Constitution?

8    **A**   Yes.

9    **Q**   If I can show you what has been previously marked but not

10:03:20 10   admitted as Defense Exhibit 15.

11           MS. OWENS:  And, Your Honor, I believe Ms. Johnson

12   asked the Court to take judicial notice of this amendment.  I

13   would move now for its admission as well.

14           THE COURT:  I'm not sure that anyone asked me to take

10:03:36 15   judicial notice of it.

16           MS. OWENS:  I would ask the Court, then, if it has not

17   been -- I would ask the Court to take judicial notice of

18   Amendment 12 to the United States Constitution.

19           THE COURT:  You want it marked as -- and admitted as

10:03:51 20   exhibit --

21           MS. OWENS:  Defense Exhibit 15.

22           THE COURT:  We can do that.  You don't need to do

23   that.  You can examine someone on a provision of the

24   Constitution and hand it to them without having it marked as an

10:04:02 25   exhibit.  We will allow you to mark it as an exhibit.  That

1    will be Defense Exhibit 15?

2              MS. OWENS:  Yes, Your Honor.

3              THE COURT:  And it is the entirety of the Twelfth

4    Amendment to the United States Constitution?

10:04:13  5              MS. OWENS:  Yes, Your Honor.

6              THE COURT:  Any objection to admitting it as an

7    exhibit?

8              MS. SCHESNOL:  No, Your Honor.

9              THE COURT:  All right.  Defense 15 is admitted.  May

10:04:21 10   be published to the jury and used with the witness.

11         (Defendant's Exhibit 15 was admitted in evidence.)

12              MS. OWENS:  Thank you.

13   **BY MS. OWENS:**

14   **Q**   Yvonne, did this amendment to the Constitution form any

10:04:31 15   intent or belief about the election for you?

16   **A**   Absolutely.

17   **Q**   What?

18   **A**   Again, I am here to stand for liberty.  And if we don't

19   have free and fair elections, then we no longer have a free

10:04:46 20   country.  And all -- if there was evidence -- and there was

21   more than enough evidence -- there were states that stood up

22   that day that all they had to do was send it back to the states

23   to be certified, follow our Constitution, give us our liberty

24   and our rights.  That was all I wanted.  I just want freedom

10:05:02 25   for all of my brothers and sisters.

1    **Q**   Were there other people who were in positions of power that

2    talked about the certification of the electoral college?

3    **A**   Yes.

4    **Q**   What impact did that have on your belief about the

10:05:18  5    certification of the electoral college?

6    **A**   It confirmed what the Spirit was showing me.

7    **Q**   What impact did that have on your belief about the validity

8    of the 2020 presidential election?

9    **A**   It already confirmed what I already knew and what the

10:05:33  10   Spirit was showing me.

11   **Q**   When you came to the Capitol on January 6th, you heard

12   former President Trump speaking about the election.

13           What impact did his statements have on your belief

14   about the validity of the election?

10:05:49  15   **A**   It was the president, the commander in chief.  He was my

16   president, and he confirmed what I already knew, what the

17   Spirit had already shown me.  It was just more confirmation

18   that I was here to stand for liberty and freedom and truth.

19   **Q**   And did that --

10:06:03  20           THE COURT:  Wait a minute.  That you were here.  What

21   do you mean by you were here?

22           THE WITNESS:  January -- on January 6th in D.C.

23           THE COURT:  In D.C.

24           THE WITNESS:  Yes, sir.  Not here at the courthouse

10:06:21  25   but here --

1          THE COURT:  Not here at the Capitol.

2          THE WITNESS:  Just here in D.C., the general -- that

3    was why I made the trip, sir.  That just confirmed it.

4          THE COURT:  Go ahead.

10:06:28  5    **BY MS. OWENS:**

6    **Q**   Did former President Trump talk about evidence that the

7    election had been fraudulent?

8    **A**   Yes, he did.

9    **Q**   What impact did that have on you?

10:06:39 10   **A**   It was more confirmation.

11   **Q**   Confirmation of what?

12   **A**   What I already believed and held true and dear.  This

13   election had been stolen.  This one and many others before it.

14   **Q**   How did you feel about the fact that the election, in your

10:06:52 15   opinion, had been fraudulent?

16   **A**   Again, I have 11 grand kids.  I want to ensure that freedom

17   remains for our country.  I took an oath to support and defend

18   our Constitution.  That meant something to me.  I will stand

19   for truth and freedom for my brothers and sisters.

10:07:11 20        I believe with all my being and all my soul that we

21   are in a spiritual war between good and evil right now, and I

22   stand with the light.

23   **Q**   Yesterday you were asked about what actions you took

24   between the 2020 election in November and January 6 about your

10:07:26 25   belief that the election was stolen.

1          Do you remember that line of questioning?

2     **A**   Could you repeat it?  Sorry.  I was distracted for a

3     moment.

4     **Q**   Yesterday you were asked about what actions you took

10:07:37  5   between the November 2020 election and January 6th --

6     **A**   Yes.

7     **Q**   -- due to your belief that the election had been

8     fraudulent.

9          Do you remember that line of questioning?

10:07:47 10   **A**   Yes, I do.

11    **Q**   Specifically, you were asked why you didn't go to your

12    representatives' offices.

13         Why didn't you?

14    **A**   Because, at this point, I don't know what man I can trust.

10:07:59 15   I don't know who is good or who is -- I don't know what is

16    happening and I -- so, for me, it was to turn in and it was to

17    trust my intuition and where God was leading me.  And that was

18    the directive that I was following was from my inner knowing,

19    not from anything outside of me.

10:08:17 20   **Q**   Did you know about lawsuits that had been filed in

21    relationship to the fraudulence of the election?

22    **A**   Yes, I did.

23    **Q**   What impact did that have on you?

24    **A**   Again, it was just more confirmation what I was being shown

10:08:29 25   by God and my journey.

1    Q   I want to direct your attention to Exhibit 802, which has

2    already been admitted.

3            That is the video that you took of your walk at the

4    end of President Trump's speech down to the Capitol.

10:08:47    5            Do you remember that exhibit?

6    A   I do.

7            MS. OWENS:  And if we can go specifically to 45:30 on

8    that exhibit.

9    **BY MS. OWENS:**

10:09:09   10    Q   Yvonne, there was some questioning about bike racks that

11    were shown in this video.

12            Do you remember those questions?

13    A   Yes.

14    Q   The government stopped your video at 45 minutes and

10:09:23   15    30 seconds.  If we can -- do you see those bike racks?

16    A   I do from the video.  But I do want to clarify that my

17    camera was way up on a flagpole, and I am short.  I do not

18    remember seeing those bike racks that day.

19            MS. OWENS:  If we can pull up Government's

10:09:47   20    Exhibit 204, please.  This has already been admitted.

21            THE COURT:  It is in evidence.

22    **BY MS. OWENS:**

23    Q   Do you remember this exhibit?

24    A   I do.

10:09:57   25    Q   You see in your video that there are cars in front of the

1   bike racks?

2              THE COURT:  Excuse me?

3              MS. OWENS:  If we can switch back to Exhibit 802.

4              THE COURT:  Okay.

10:10:10  5   **BY MS. OWENS:**

6   **Q**   Do you see in your exhibit that there are cars in front of

7   those bike racks?

8   **A**   Yes, I do.

9              MS. OWENS:  If we can switch back to Government's

10:10:18 10   Exhibit 204.

11   **BY MS. OWENS:**

12   **Q**   Can you see a parking lot within the red perimeter outlined

13   on this exhibit?

14   **A**   Yes, I do.

10:10:27 15   **Q**   Where is that parking lot?

16   **A**   Within or without?

17   **Q**   Well, within.

18   **A**   No, I do not.

19   **Q**   Can you see one outside of the red perimeter?

10:10:35 20   **A**   Yes, can.

21   **Q**   Where?

22   **A**   They're over here on the left.

23   **Q**   And -- right here?

24   **A**   Yes.  And then I believe this one is also one down below

10:10:46 25   it.

*CHERYL K. POWELL, CCR, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3003/cheryl_powell@alsd.uscourts.gov

1    **Q**   Okay.  You came in through this way, though, right?

2    **A**   Yes, I did.

3          MS. OWENS:  If we can switch back to Exhibit 802,

4    please.  And if we can jump to 46 minutes and nine seconds.

10:10:53  5    **BY MS. OWENS:**

6    **Q**   Do you see the bike racks that were pointed out to you

7    yesterday in your cross-examination?

8    **A**   Yes, I do.

9          MS. OWENS:  If we can go back to Exhibit 204, please.

10:11:17  10   **BY MS. OWENS:**

11   **Q**   Are there still cars in front of those bike racks?

12   **A**   Yes, there were.

13   **Q**   And, again, is there a parking lot within the red

14   perimeter?

10:11:31  15   **A**   No, there's not.

16          MS. OWENS:  If we can then go back to Exhibit 802, the

17   government showed you Minute 50:11.

18   **BY MS. OWENS:**

19   **Q**   Are you still in the parking lot at this time, Yvonne?

10:11:56  20   **A**   I believe so.

21   **Q**   Are there signs on those bike racks that say do not enter?

22   **A**   No, there are not.

23   **Q**   Are there people on both sides of those bike racks?

24   **A**   Yes, there are.

10:12:09  25   **Q**   Did you see those bike racks?

1   A   I don't believe I did.  Again, I'm short and I wasn't -- I

2   wasn't paying attention to bike racks.

3        MS. OWENS:  We can take that down now.

4   **BY MS. OWENS:**

10:12:24  5   Q   There was a line of questioning yesterday about the crowd

6   at the front of the line and the fighting that was taking

7   place.

8        Yvonne, why didn't you leave when all that chaos and

9   fighting was happening around you?

10:12:42  10   A   Because I believe that our liberty is at risk, and I went

11   to stand for truth and freedom.  And I was there to stand for

12   that, to bring consciousness to this planet to help my brothers

13   and sisters see that we -- our liberties are being taken away

14   from us.

10:13:00  15   Q   Was your intent in any way to participate in the violence

16   that was occurring around you?

17   A   Absolutely not.  I took an oath to no violence.

18   Q   Was your intent to in any way interfere or disrupt law

19   enforcement's purpose that day?

10:13:17  20   A   No.  It was not.

21   Q   What was your intent?

22   A   To stand for truth and freedom and make sure that our

23   liberties remain intact that were given to us by God and not by

24   man.

10:13:28  25   Q   Yesterday you were asked about when you initially went into

the tunnel and why you didn't leave for that series of ten

minutes the first time that you were in the tunnel at the

front.

    Do you remember that questioning?

**A**  I do.

**Q**  Can you tell the jury what was happening during that time

frame?

**A**  In the tunnel?

**Q**  Yeah.

**A**  I was watching my two worlds collide, and it was complete

chaos.

**Q**  Were you free to move?

**A**  While I was -- oh.  In the -- on the doors.  I'm sorry.

No, I was not.  I was -- I -- I didn't feel like I -- I didn't

feel that I could move at that time.  It felt like I was

trapped and I needed to stay there and wait until it came open

and then I could get out and get out of that dangerous area.

**Q**  Were you behind the glass door?

**A**  Yes, I was.

**Q**  Were there people in front of you?

**A**  On the other side of the glass?  Yes, there were.

**Q**  Was there fighting?

**A**  Yes, there was.

**Q**  When that stopped and there was space, what did you do?

**A**  I got out.

1    Q    I want to show you Exhibit 906.1.

2         This is a video of the second time that you went in

3    the tunnel and you were on the ledge, just to orient you to the

4    questioning.

10:15:04    5         There was a series of questions about your comments or

6    your screaming.  And this is at four minutes and 11 seconds.

7              COURTROOM DEPUTY:  Are you showing this exhibit?

8              MS. OWENS:  This is Exhibit 906.1, and it has been

9    admitted.

10:15:19   10              THE COURT:  It's in evidence.

11         (Video played.)

12    **BY MS. OWENS:**

13    Q    In this video, you start screaming, "stop it, stop it."

14         Do you remember that?

10:15:27   15    A    I do.

16    Q    And do you remember the government pausing the video and

17    asking you questions about why you were screaming, "stop it,

18    stop it"?

19    A    Yes.

10:15:39   20    Q    And if we can just play that for you, and then I will ask

21    you some questions.

22         (Video played.)

23              MS. OWENS:  We can start at four minutes and five

24    seconds.

10:16:09   25              MS. JOHNSON:  Oh.  Five seconds?

1           MS. OWENS:  Approximately.

2       (Video played.)

3           THE COURT:  What are we waiting for?

4           MS. JOHNSON:  Your Honor, we just don't have a

10:16:35  5   speaker, so we're using two things simultaneously, trying to

6   help that.  It will just take one second.  It's okay.  It

7   should just be a second.

8       (Discussion off the record.)

9       (Video played.)

10:17:49 10          MS. OWENS:  If we can pause.

11  **BY MS. OWENS:**

12  **Q**   Who was hitting during the time that you were saying, "stop

13  it"?

14  **A**   Everybody.  Everyone in the front.  Both the police and the

10:18:04 15  patriots.

16  **Q**   Who were you trying to stop?

17  **A**   Anyone that was engaging in violence at that moment.

18  **Q**   Were you only asking the police to stop hitting the people?

19  **A**   No.  I just wanted it all to stop.  It just -- at that

10:18:17 20  moment, that was -- it just came out.  I couldn't take it

21  anymore.

22  **Q**   Why couldn't you take it anymore?

23  **A**   Because I believe that the division has been created by man

24  to make us think we're separate.  Those are my brothers and

10:18:31 25  sisters.  I don't want to fight my brothers and sisters.  I

1   just want truth and freedom.  And at that moment, I didn't know

2   what to do other than to say stop it.

3          The division is a lie.  We are not separate.  We are

4   together and joined.  And humans need to quit thinking that

10:18:47  5   we're separate and quit buying into hate.

6   **Q**   Were you trying to encourage violence of any kind?

7   **A**   Never.

8   **Q**   In Exhibit 905, which has been admitted, this is video of

9   you up on the ledge when officers come in to get you off.

10:19:11  10         And you were asked a series of questions about why you

11   didn't get off when you were told by police to get off.

12          Do you remember that?

13   **A**   Yes.

14   **Q**   Did you hear police order you to get off the ledge?

10:19:22  15   **A**   At the moment I heard them, I was trying.  I was trying.  I

16   was trying to get off the ledge.  I know that doesn't make any

17   sense when you watch the video, but, for me, I was looking down

18   at people.  And my only option was to step on another human

19   being, and I didn't want to hurt anyone.

10:19:40  20   **Q**   So when did you first hear that?

21   **A**   When I said, "I'm trying."

22   **Q**   So before that, had you heard the police ask you to get off

23   the ledge?

24   **A**   I don't recall because I was trying -- maybe I did because

10:19:53  25   I was trying to get off the ledge.  So I may have heard it.  I

1   don't remember exactly.  But I was trying to get off the ledge.

2          MS. OWENS:  Let's play Exhibit 905.  Start from the

3   beginning.

4       (Video played.)

10:20:35  5          MS. OWENS:  Can you pause there?

6   **BY MS. OWENS:**

7   **Q**   Could you hear the police saying, "get them off the wall.

8   Pull them down"?

9   **A**   Yes.  I believe so.  I heard them "get them off."  I didn't

10:20:44 10  know that they said "off the wall," but yes; I heard that part.

11  **Q**   Did you hear that on January 6th?

12  **A**   It was two years ago, so I cannot promise that I did, but I

13  believe I did because it looks like I was at that point trying

14  to find a way to get down because I kind of crouched down and

10:20:59 15  was trying -- what I believe -- I'm not 100 percent certain at

16  that moment that I had heard.

17          MS. OWENS:  Okay.  Can we keep playing, please?

18      (Video played.)

19          MS. OWENS:  Can we pause?

10:21:08 20  **BY MS. OWENS:**

21  **Q**   What were you thinking at that moment?

22  **A**   I wanted to get off the wall.  I didn't even remember until

23  I saw the video that I had been hit.  I was just trying to get

24  out of there.

10:21:44 25  **Q**   Were you trying to in any way disregard the instructions by

1    the police?

2    **A**    No.   I didn't want to step on anyone.

3             MS. OWENS:  And let's continue playing.

4         (Video played.)

10:21:58  5             MS. OWENS:  Let's pause.

6    **BY MS. OWENS:**

7    **Q**    Why aren't you touching the ground at that point?

8    **A**    Because I can't get to the ground.   There's people

9    underneath me.

10:22:17  10            MS. OWENS:  Can we play, please?

11        (Video played.)

12            MS. OWENS:  And stop it at 1:12.

13   **BY MS. OWENS:**

14   **Q**    Yvonne, do you see how you're reaching down in this frame?

10:22:32  15   **A**    Yes.

16            MS. OWENS:  Can we go to the next frame, please?

17   **BY MS. OWENS:**

18   **Q**    At 1:12, do you know what you are reaching down for?

19   **A**    I think to get down, but I'm not positive.

10:23:00  20            MS. OWENS:  Just a little bit ahead.   Stop.

21   **BY MS. OWENS:**

22   **Q**    Can you see what's in your hand?

23   **A**    My phone.

24            MS. OWENS:  Can we go back?

10:23:09  25   **A**    It is when I dropped it.

                    MS. OWENS:  Can we go back just a little bit?  Go back
a little bit, please.  And then go forward.  Just slightly
more.  Thank you.

**BY MS. OWENS:**

10:23:42   Q   Is that a shoe in your hand, Yvonne?

           A   No.  It's my phone.

           Q   Are you sure?

           A   No, I'm not sure, but I didn't -- I wouldn't have had a
shoe there.  I don't know why it would have been a shoe.  I'm
10:23:55   pretty sure it was my phone.

           Q   Did your shoe fall off while you were trying to get off the
ledge?

           A   Oh, it did actually.  Yes.  Now I remember.

           Q   So was it chaotic as you were trying to get off the ledge?

10:24:06   A   Yes, it was.

           Q   Were you trying to in any way stop police from carrying out
their lawful duty at that point?

           A   No.  I was not.

           Q   Yvonne, what was your purpose in entering the Capitol
10:24:22   through a broken window?

           A   To call my husband -- to borrow a phone and call my
husband.

           Q   Was your intent in any way to obstruct or delay or impede
official business that was happening in that building?

10:24:38   A   No, it was not.

1    **Q**   Why not?

2    **A**   Because I wanted official business to happen in that

3    building.  I wanted them to follow the Constitution.  I wanted

4    them to send it back.

10:24:46  5    **Q**   Throughout the videos, there's chaos.

6         Why didn't you just leave the Capitol that day?

7    **A**  I drove to stand for liberty, and that was where I believe

8    I was supposed to be.  That was the very beginning of my

9    spiritual journey.  So I was so new in my journey with Spirit

10:25:10  10    and God, and there were a lot of things I didn't understand

11    then that I do now.  But I follow my heart, and my heart had me

12    there.  And that's where I stayed.

13         MS. OWENS:  Nothing further, Your Honor.

14         THE COURT:  All right.  You may step down,

10:25:27  15    Ms. St. Cyr.

16    (Defendant steps down.)

17         THE COURT:  Anything further from the defense?

18         MS. OWENS:  No, Your Honor.  The defense rests.

19         THE COURT:  All right.  Is there any rebuttal case

10:25:47  20    from the government?

21         MS. SCHESNOL:  No, Your Honor.  The government also

22    rests.

23         THE COURT:  All right.  So the case is submitted.  I

24    think that it will therefore make sense for us to take a brief

10:26:01  25    break so we can just get everything lined up.

```
 1              And, ladies and gentlemen, you will come back in a

 2     couple of minutes and hear the closing arguments from each side

 3     in the case and then I will instruct you on the law and you

 4     will retire to deliberate.  I think we'll get that done this

 5     morning, but it may stretch it to just after lunch before you

 6     retire to deliberate.  But, please, let's take a ten-minute

 7     break now.

 8              Again, don't start talking about the case among

 9     yourselves, please.

10          (Jury excused.)

11          (In open court.  Jury not present.)

12              THE COURT:  Everybody can have a seat.

13              Let's just review once again best estimates now in

14     terms of time.  I think it's going to be you, Mr. Boylan, for

15     the initial closing?

16              MR. BOYLAN:  That's right, Your Honor.  I guess

17     30 minutes.

18              THE COURT:  And then the defense closing?

19              MS. JOHNSON:  I would say about the same, Your Honor.

20              THE COURT:  And then a brief rebuttal?

21              MS. SCHESNOL:  Yes, Your Honor.

22              THE COURT:  Depending upon what is said in the defense

23     closing.

24              MS. SCHESNOL:  Yes.

25              THE COURT:  Okay.  At some point, you're going to just
```

Timestamps in left margin:
10:26:19 (line 5)
10:26:39 (line 10)
10:27:20 (line 15)
10:27:30 (line 20)
10:27:39 (line 25)

```
         1   need to look over the exhibit list and make sure everything is
         2   in order to give back to the jury in the jury room and access
         3   the videos included.  And we will look over the instructions
         4   one more time.  And, certainly, if anybody sees anything that
10:27:59 5   needs to be brought to my attention, please do so.
         6         But let's take a brief break now so that you can come
         7   back ready to go.  Thank you.
         8         COURTROOM DEPUTY:  All rise.
         9     (Short recess.)
10:46:31 10    (In open court.  Jury not present.)
        11         THE COURT:  All right.  The jury is lined up in the
        12   hall, ready to go.
        13         Let me ask one question before we begin.  I think
        14   we're going to pull pretty close to 12:00 o'clock.  Maybe even
10:46:47 15  a touch after, depending upon your time estimates and how
        16   they're realized.  The question would be whether I should
        17   instruct or have them go to lunch.  I'm inclined to give them
        18   the choice.  But I'll listen to any druthers that you all have.
        19         MR. BOYLAN:  Just to be clear, Your Honor, you intend
10:47:06 20  to have closing statements first and then give the full
        21   instructions?
        22         THE COURT:  Yes.  You're going to close, and then I'll
        23   instruct.
        24         MR. BOYLAN:  Understood.  Do you want instructions
10:47:19 25  first, lunch first?
```

1           THE COURT:  Any preference?

2           MS. SCHESNOL:  No preference from the government, Your

3     Honor.

4           MS. OWENS:  Your Honor, we have no preference either.

10:47:26  5     THE COURT:  We will see what time it is when you

6     finish.  And if it's 12:00 o'clock or less, then I'm going to

7     go ahead and instruct.  But if it's much after 12:00, then I

8     may give them the choice.

9           MS. SCHESNOL:  Just to be clear, do you think we're

10:47:42 10    also going to get through rebuttal by 12:00?

11          THE COURT:  We never know.  No; that's why I'm saying

12    that it's likely to be after 12:00.

13          MS. SCHESNOL:  Okay.

14          COURTROOM DEPUTY:  Your Honor, the jury panel.

10:48:10 15   (Jury present.)

16          THE COURT:  Welcome back, members of the jury.  We're

17    now ready for closing arguments.

18          Mr. Bradley, will we using a lapel mic?

19          COURTROOM DEPUTY:  Yes.

10:48:53 20     THE COURT:  The closing argument, the first will be

21    given by Mr. Boylan.

22          MR. BOYLAN:  Thank you, Your Honor.  You can hear me?

23          Ladies and gentlemen, the defendant, Yvonne St. Cyr,

24    came to the Capitol building on January 6, 2021 to push.  As

10:49:20 25   she walked to the Capitol, she shouted multiple times, "push

1    it, push it."  She pushed her way all the way to the front of

2    the crowd at the bike racks.  She pushed through the bike racks

3    into the Capitol building.  And once she was in the tunnel, she

4    shouted 15 times, "push, push, push, push."

10:49:54 5         Ladies and gentlemen, those aren't the words and the

6    actions of a woman who just wanted to visit the Capitol.  They

7    are the words and actions of a woman who joined in a violent

8    riot.

9         Now, you've heard all the evidence.  I'm going to

10:50:13 10   spend a few minutes now walking through it with you.  I will

11   talk about some of the most important parts and then we will

12   cover the crimes that she's charged with.

13        Only Judge Bates can instruct you on what the law is.

14   I won't try to do that.  But what I will do is, in walking

10:50:29 15  through the elements of the crimes, I will tell you what the

16   government has to prove.  I'll show you the evidence that

17   applies to each element, and I will prove to you -- I will show

18   you why the government has proven each element and each crime

19   beyond a reasonable doubt.

10:50:50 20       First, as you know, Yvonne St. Cyr arrived at the

21   Capitol.  She walked from Donald Trump's rally at the Ellipse

22   to the Capitol building.  On her way, she passed the restricted

23   perimeter that Captain Tia Summers told you about.  It was

24   established for the certification of the election.  It was

10:51:11 25  established, in part, because Vice President Mike Pence was

1    visiting.  It was a restricted perimeter, and the defendant was

2    not allowed to be there.

3         On her way, she passed bike racks, snow fencing, area

4    closed signs, and other fencing.  On her way, she shouted

10:51:43  5    multiple things:  "Push it" over and over; "there are millions

6    of us;" "they can't stop us now;" and "tear it down."

7         (Video played.)

8         MR. BOYLAN:  Tear it down, ladies and gentlemen.

9         When she arrived at the Capitol building on the west

10:52:11  10    plaza, she made her way all the way to the front of the crowd.

11    It couldn't have been easy to do.  In fact, I think she

12    testified that it wasn't easy.

13         She made her way all the way to the front up against

14    the bike racks, against the police line.  There she stood for

10:52:30  15    15 minutes.  Not just stood, leaned, pushed, pushed against

16    those bike racks, pushed against those officers.  You can see

17    her legs squatting down, pushing, using her body weight against

18    those police officers.

19         When police officers pushed her, yelled at her, "back

10:52:50  20    up, get off the line," she disobeyed them time and time again.

21         (Video played.)

22         MR. BOYLAN:  You can hear the repeated commands over

23    and over.  They're even polite to her.  She defies them at

24    every turn.  Eventually, ultimately, they can't stop her and

10:53:42  25    they can't stop the rest of the crowd who breach that police

1    line.  And one of the first people through is the defendant.

2         (Video played.)

3         MR. BOYLAN:  Watch again from a different angle.

4         (Video played.)

10:54:07  5    MR. BOYLAN:  It was certainly crowded there, ladies

6    and gentlemen, but she spent the last 15 minutes, pushing with

7    her body weight against those bike racks.  And when they broke,

8    where did she go?  She made a beeline directly to the Capitol

9    building.

10:54:48  10   She could have left at any point.  You saw this

11   exhibit.  Look at the room around her.  Plenty of room to leave

12   and go away from the Capitol building.  Is she disoriented,

13   feeling the effects of pepper spray, OC spray, something else?

14   No.  Talking genially with another rioter.

10:55:13  15   Where does she go next?  Into the tunnel, the site of

16   some of the most violent, heinous acts that happened

17   January 6th against police officers.  2:42, she approaches the

18   tunnel, goes inside.  Spends about 12 minutes inside until

19   she's forcibly removed by police officers.

10:55:42  20   Look at the hand in the top, left corner.  That is the

21   yellow arm of a police officer, grabbing her, pulling her out.

22   She wouldn't be moved until they pulled her out.  Where does

23   she go?  Right back in.  She gets kicked out of the tunnel the

24   first time.  Spends about two minutes outside.  Comes right

10:56:03  25   back in.  And where does she go?

```
 1              (Video played.)
 2              MR. BOYLAN:  Up on the ledge.  For 24 minutes, ladies
 3      and gentlemen, the defendant stood on that ledge.  She watched
 4      other protesters, rioters, members of this violent mob strike
10:56:28 5      police officers with batons.  She watched them hurl objects
 6      like javelins.  She watched them shower police officers with
 7      pepper spray.  What was her reaction?
 8              (Video played.)
 9              MR. BOYLAN:  She called for fresh people to enter that
10:57:08 10     tunnel.  Fresh people to strike police officers, to hurl
11     objects, to use more pepper spray.  Was that enough?  No.  As
12     the protesters in this tunnel began heave-ho'ing, pushing
13     against those police officers, what did she shout?
14              (Video played.)
10:57:30 15     MR. BOYLAN:  15 times, "push, push, push," over and
16     over again.  It wasn't until Detective Dowling, who you heard
17     from, climbed up on that ledge with a flagpole that he had
18     commandeered and pushed her out of the tunnel did she finally
19     leave.
10:58:16 20              Watch the video in the top, left corner.  You can see
21     the other protesters on the ledge with her.  She's the last one
22     there.  They got off; she didn't.
23              (Video played.)
24              MR. BOYLAN:  Was that enough?  No.  She still didn't
10:59:13 25     leave.  Instead, she went into the Senate hideaway office
```

1    that's next to the tunnel called ST2M.  You heard Tia Summers

2    describe this room.  And what did she do?  She crawled through

3    a broken window to get inside.

4        (Video played.)

10:59:41  5        MR. BOYLAN:  Through a broken window, ladies and

6    gentlemen.  Once inside, what did she do?  Helped other rioters

7    get inside like this person.  What else did she do?  She went

8    live.  She filmed herself, broadcast it to the world, made

9    posts on Facebook, said, "patriots are in our house."

11:00:09  10        It wasn't until hours after she had arrived that she

11   finally left.  And only then, once officers were able to deploy

12   CS gas, teargas, and finally drive her and the rest of the mob

13   off of Capitol grounds.

14        Now, I would like to take some time to talk with you

11:00:31  15   about the crimes that have been charged in this case.  There

16   are six of them.  Ms. Schesnol showed you this same slide in

17   her opening.  And Judge Bates will instruct you on the law as

18   to each one of these crimes.

19        As I said, I can't tell you what the law is; only the

11:00:55  20   Court can do that.  But I am going to walk through each of

21   these, show you the elements, and show you how the evidence

22   proves each of those elements has been met beyond a reasonable

23   doubt.

24        The elements of the crimes are like a checklist.  If

11:01:11  25   the government carries its burden to prove each element beyond

1  a reasonable doubt, that crime has been proven and you must

2  find the defendant guilty.

3       We talk about Counts One and Two.  These are the same

4  crime charged for two different periods of time.  Count One is

11:01:31  5  for the defendant's actions on the west plaza from 2:15 to 2:30

6  when she's up against the bike racks, disobeying the police

7  officers, pushing against the line, and then ultimately

8  breaking through that line.

9       Count Two is for the 24 minutes that she spent on that

11:01:49 10  ledge in the tunnel, refusing to leave, shouting for fresh

11  people, and shouting, "push, push, push."

12       Let me first walk you through the elements for Count

13  One.  This is for the west plaza, those 15 minutes when she was

14  against the bike racks and then breaching the bike racks.

11:02:11 15       The government must prove that she knowingly committed

16  an act with the intended purpose of obstructing, impeding, or

17  interfering with law enforcement officers.  That's element one

18  of Count One.

19       An act.  One act is what the government has to prove,

11:02:27 20  and you have a lot to choose from.  The most obvious is her

21  breach of the police line.  She went through it.  But there are

22  plenty of others.  For 15 minutes, she committed multiple acts

23  over and over and over, disobedience, pushing on the police

24  line, refusing to leave, pushing with her legs and her body

11:02:56 25  weight.  But if you don't believe me, believe the defendant.

1    She said with her own words, "I wasn't going to move."

2            When Ms. Schesnol asked her on cross directly, "you

3    interfered with the police, didn't you," she said, "yes."

4    Count One, element one, proven beyond a reasonable doubt.

11:03:30  5            Elements two and three are a little more technical.

6    The second one is that officers engaged in official duties

7    incident to and during a civil disorder.  This one is pretty

8    easy.  U.S. Capitol Police and MPD responded to the riot.  They

9    were engaging in their duties.  There was a riot.  That element

11:03:53  10   has been met.

11            Element three, this is a jurisdictional element.  The

12   civil disorder obstructed, delayed, or adversely affected

13   either -- and the government has two ways to prove this, and

14   I'll walk through both of those ways now.

11:04:10  15           First, that it affected commerce or movement of any

16   article or commodity in commerce.  This is the Safeway

17   documents.  The riot January 6th affected commerce.

18            You heard from Agent Gano who told you that Safeway's

19   sales struggled on January 6th.  They were affected because of

11:04:31  20   the curfew that Mayor Bowser put in place directly because of

21   January 6th.  Was commerce affected by the riot?

22   Unequivocally.

23            MS. JOHNSON:  Your Honor, I am going to object that

24   that's a mischaracterization of the evidence because the curfew

11:04:46  25   was not put into effect based on the riots; it was due to the

1    COVID-19 precaution.  And that's in evidence.

2           THE COURT:  You will have a chance to argue in a

3    moment.  I'll overrule the objection.  You can continue.

4           MR. BOYLAN:  If you don't like the Safeway evidence,

11:05:04  5    the civil disorder also adversely affected a federally

6    protected function.  This is the other way the government has

7    to prove this same element.  We've got two of those.  The first

8    federally protected function is the Secret Service's protection

9    of Vice President Mike Pence.

11:05:23  10           You heard from Inspector Lanelle Hawa, the Secret

11    Service agent, who told you all about how Mike Pence had to

12    evacuate the Capitol.  He was taken to a secure location.  All

13    of these things -- his vehicles were removed off of the east

14    side.  All of these things took place directly because of the

11:05:45  15    riot on January 6th.  And, certainly, the riot affected the

16    Metropolitan Police Department and U.S. Capitol Police's duty

17    in protecting the Capitol building.  Element three has been met

18    beyond a reasonable doubt.

19           Brings us to the end of Count One, elements one, two,

11:06:10  20    and three have been met beyond a reasonable doubt.  Beyond a

21    reasonable doubt the defendant is guilty of this crime.

22           Let 's move on to Count Two.  This is the same crime,

23    civil disorder for the 24 minutes that she spent in the tunnel.

24    Now, I'll preview for you that elements two and three are the

11:06:36  25    same for the -- for Counts One and Two.  But let's talk about

element one first.  This is an act that the defendant engaged
in during those 24 minutes that obstructed, impeded, or
interfered with law enforcement officers.

What was her act?  24 minutes of standing on a ledge
during a riot is an act.  The entire 24 minutes, ladies and
gentlemen of the jury.  But if you want something more
specific, shout for fresh people.  There's 15 acts.  "Push,
push, push, push, push."  Beyond a reasonable doubt, ladies and
gentlemen, Count Two has been met.

You will also receive some instructions on attempt and
aiding and abetting.  These are alternative ways you can find
the defendant guilty of those two crimes, Count One and Count
Two.

Ladies and gentlemen, you don't need to even think
about these if you don't want to.  If you believe that the
defendant committed her own acts as a principal, she did it,
herself as we just talked about, leave these by the wayside.

But if you would like to consider attempt, or,
particularly, aiding and abetting, other individuals committed
those same acts.  Who?  On the west plaza for Count One,
hundreds of people committed civil disorder, and the defendant
aided and abetted those individuals.  In the tunnel, this
individual committed civil disorder.  This individual and this
individual.  And the defendant aided and abetted each and every
one of those.

*CHERYL K. POWELL, CCR, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3003/cheryl_powell@alsd.uscourts.gov

1          Ladies and gentlemen, for Counts One and Two, the

2     defendant -- excuse me.  The government has met each element

3     beyond a reasonable doubt, and the defendant is guilty.

4          Let's move on to Count Three.  This is called entering

11:08:58  5     or remaining in a restricted building or grounds.  At its

6     heart, ladies and gentlemen, this is about trespassing.  So the

7     first element is that the defendant entered or remained in a

8     restricted building or grounds without lawful authority to do

9     so.

11:09:12 10          On January 6th, the restricted perimeter was in place.

11     She was not allowed to go there.  And did she do that

12     knowingly?  Did she know that she wasn't allowed to go there?

13     There were bike racks all along her walk there.  But there

14     weren't just bike racks.  There was the police line on the west

11:09:39 15     plaza.  There were police inside the tunnel who dragged her out

16     of it.  There was a police line inside the west tunnel --

17     inside the tunnel on the west plaza, keeping people out of the

18     Capitol building.

19          Ladies and gentlemen, there was a broken window that

11:10:00 20     she crawled through.  I would submit to you that there is no

21     credible argument that she didn't know that she couldn't be

22     there.

23          For Count Three, elements one and two have been met,

24     and the defendant is guilty.

11:10:17 25          For Count Four -- you may have heard of disorderly

1   conduct.  Count Four is disorderly conduct in a restricted

2   building or grounds.  The first element that the defendant

3   engaged in disorderly or disruptive conduct in any restricted

4   building or grounds -- all of her conduct that day was

11:10:36  5   disorderly.  All of it was disruptive.

6        Did she do so knowingly with the intent to impede or

7   disrupt the orderly conduct of government business or official

8   functions?  Ladies and gentlemen, did the defendant intend to

9   disrupt government functions?  Unequivocally, yes.  That's what

11:11:06  10   happens when you invade the Capitol building.  You disrupt the

11   government.

12        Now, she might have also been there to film.  She

13   might have also been there for a litany of other reasons,

14   whatever those may be.  But she told you why she was there.

11:11:26  15   Listen again.

16        (Video played.)

17        MR. BOYLAN:  Tear it down.  Element three, the

18   government must prove that she impeded or disrupted the orderly

19   conduct of government business or official functions.  Just

11:11:53  20   that her presence did, in fact, impede government business.

21   You heard from Inspector Lanelle Hawa the certification of the

22   vote couldn't continue as long as those rioters were there.  As

23   long as she was in that building, as long as all the other

24   rioters were in that building, government function couldn't

11:12:11  25   occur.  Element three for Count Four, along with one and two,

1    has been met beyond a reasonable doubt.

2        Count Five, again, this is a similar disorderly

3    conduct charge.  This is for disorderly conduct in the Capitol

4    building.  Again, I would submit to you that all of her conduct

11:12:36    5    was disorderly or disruptive and, certainly, she was inside the

6    Capitol building at multiple times.

7        She had the intent to disturb the orderly conduct of a

8    session of Congress or the Senate.  As we've discussed, that's

9    what happens when you break into the Capitol building.  And did

11:12:52   10    she do so willfully and knowingly?  Unequivocally, yes.

11        Count Six is called parading, demonstrating, or

12    picketing in a Capitol building.  Again, all of the defendant's

13    conduct on January 6th was demonstrating.  She was

14    demonstrating.  And she did so in a Capitol building at

11:13:14   15    multiple points.  She did so willfully.  She did so knowingly.

16        Each element of each of the six crimes that the

17    government must prove has been met, there can be no question,

18    beyond a reasonable doubt.

19        Now, when you retire to deliberate, you will have all

11:13:44   20    of the exhibits that have been submitted from both sides.  And

21    I would encourage you to take your time, look through them,

22    watch the videos, look at the stills.

23        I'll draw your attention to the -- for the

24    government's exhibits, the -- probably the most probative and

11:14:00   25    relevant would be in the 600, 700, 800, and also in the 400

1    series.

2              So these would be, for the 400, the CCTV, the closed

3    circuit cameras.  For the 600, open source videos.  These are

4    videos that other rioters took.  For 700 would be the body-worn

11:14:21  5    camera from police officers that you saw.  And the 800 series

6    are the defendant's own images, videos that were taken from her

7    cell phone and posts and things like that.  I would encourage

8    you take your time, look through those as much as you would

9    like to.

11:14:44  10              Let me take a moment to talk about reasonable doubt.

11    I'm sure all of you have heard of reasonable doubt and have

12    some idea of what it is.  Let me tell you what it's not.  It's

13    not an absolute certainty.  It is not a scientific certainty.

14    It's not a belief beyond every possible doubt that could ever

11:15:05  15    exist.  It is a firm conviction.

16              If you're firmly convinced of a fact, if you're firmly

17    convinced that the government has carried its burden beyond a

18    reasonable doubt, then you must find the defendant guilty.

19              Finally, I would be remiss if I didn't talk about the

11:15:30  20    defendant's testimony and, also, two things:  First of all, the

21    instructions that you will receive will tell you that you can

22    consider the fact that she has an interest in the outcome of

23    the trial.  And you and you alone as jurors are to consider the

24    credibility of her testimony.  That's for you to decide.

11:15:56  25              I will say this, too:  You might find the defendant

1    unorthodox.  But when you strip away the religion, the truth

2    and other things, the defendant felt entitled to break the law.

3    Whatever you believe about her life history, the things that

4    led her to January 6th, this case isn't about her character.

11:16:29  5    It isn't about the things that brought her here.  It is about

6    her conduct on that day.  It's about breaching the police line.

7    It's about going into the tunnel and watching people beat

8    police officers and shower them in pepper spray.  It's about

9    pushing and pushing and pushing.

11:16:54  10          Ladies and gentlemen, the defendant pushed and pushed

11    and pushed.  She joined a riot.  We would ask you to find the

12    defendant guilty on all counts.

13          Thank you.

14          THE COURT:  Ms. Johnson.

11:17:12  15          MS. JOHNSON:  As I have been preparing this case and

16    thinking about it over the last several months and how you, a

17    D.C. jury, would hear it and consider it and what you would

18    think about it, I was concerned.

19          And we talked in voir dire to all of you.  And many of

11:18:04  20    you expressed deeply held feelings about the events on

21    January 6 of 2021.  And every single one of you promised the

22    Court and promised Yvonne that you would be able to put those

23    deeply held feelings and beliefs aside and judge this case on

24    the evidence that's been presented to you in this trial and,

11:18:29  25    more importantly, the law and the instructions that the judge

1      is going to give you.

2              After hearing the government's close and seeing all

3      the evidence, you may be sitting here, thinking, "why are we

4      here?  The government said she pushed; the government said she

11:18:48  5    was there for this intent; the government said all of these

6      things.  Of course, she's guilty.  Why are we wasting

7      taxpayer's money, your time, the judge's time, everyone's time

8      to go through this carnival of a circus when it's just plain

9      and obvious and clear that she violated the law and she's

11:19:08 10    guilty?"

11             But I'm going to tell you why.  Because for hundreds

12     of years before the founding of our country, our forefathers

13     had suffered abuses from the kings, cronies who were judges in

14     Great Britain; that when they came here and they founded this

11:19:30 15    country and they founded the principles of our Constitution and

16     our democracy, they demanded that process be given.  Not only

17     to the trial itself but to her presumption of innocence and for

18     the government's burden.

19             And it's a burden for a reason.  It is a heavy burden

11:19:53 20    to prove any case beyond a reasonable doubt, especially when

21     you're considering taking someone's liberties.  The reason we

22     bother to go through a trial and the reason we do this is

23     because it's not black and white.  And sometimes things aren't

24     always as they seem.

11:20:16 25             And you've heard Yvonne testify that she went to

1    Washington, D.C. because her president asked her to; because

2    she had a deeply held belief that the 2020 election was stolen;

3    that there were widespread claims of fraud in multiple states;

4    that lawsuits had been filed.  And she had an understanding of

11:20:41  5    the Constitution; that the electoral college process could, in

6    fact, send the certification back to the states for those

7    claims to be investigated.

8         Yvonne lacked the criminal intent necessary to commit

9    these allegations.  And, even in the government's closing, they

11:21:03 10    glossed over all of the mental intent and the mental state

11    necessary to prove her guilty of actually committing these

12    crimes.

13         The government doesn't want to believe any of what

14    Yvonne testified to or the statements.  And you may have had an

11:21:23 15    initial knee-jerk reaction to be concerned about it as well.

16    But you have to ask yourself if you are sure beyond a

17    reasonable doubt.

18         I want to talk to you about just a couple of things,

19    and the first is this timeline I'm going to put up for you just

11:21:53 20    very briefly.

21         Can you all see it?  Okay.

22         There's essentially, we've determined, 14 kind of

23    events and time frames throughout the day.  And the first is

24    the perimeter breach that happens on the west plaza, west

11:22:09 25    terrace side, at 12:55; that the west plaza was filled by 1:11

1    p.m.; that between 1:11 and 2:30, police continually push

2    against the crowd in order to try and reestablish this line.

3         Individuals have moved from the lower west plaza up

4    those stairs on the left side there behind that stadium podium

11:22:36  5    and had already made it upstairs and were going in the building

6    by 2:09.  They actually made entry into the building by 2:13,

7    and Yvonne arrived at 2:13 or 2:15 in the afternoon.

8         All of those things that happened before she got there

9    are not things that are on trial.  They're not really things

11:22:55  10   that you have to consider because she had no knowledge of any

11   of those things.

12        So let's talk about Count One and Count Two and the

13   civil disorder.  The government must prove her mental state

14   with respect to two things.  Two specific things:  One, that

11:23:15  15   she acted knowingly and, two, she acted with an intended

16   purpose.

17        Knowingly, you'll be told, means that she can't be

18   acting through ignorance, mistake, or accident.  Yvonne, on the

19   west plaza terrace, believed she had a right to stand there.

11:23:48  20   She believed, in fact, she had a right to go into the house, to

21   go into the people's house.  Let's -- we're going to keep

22   talking.  Here's the west plaza.  I'm not going to play any

23   videos for you.  I'm just going to direct your attention to a

24   couple of things.

11:24:05  25        So what I would like you to think about is:  By 1:11

p.m., if you will recall, the testimony was that that entire
plaza was filled with people.  People who had not attempted to
go up the stairs or enter the building.  And then the police
began pushing on those people.

11:24:23          And in that time-lapse video, you can kind of see this
side over here kind of gets pushed out first and then it gets
pushed out and then back.  And then they say by around a
specific time, it's kind of an established line.

          We know that they never tried to reestablish any other
11:24:40 line at the outer perimeter.  We know that officers used force
to push the line back, including teargas, batons, and
physically picking up bike racks and pushing them against the
crowd.  But Officer Riley did testify that the -- they had been
successful in reestablishing a line, and he even drew that line
11:25:05 for you on Government's Exhibit 207.

          So while Yvonne was intending to stand on the line,
others in the crowd and officers were pushing against the line
to continue and try to move it backward.

          So in Exhibit 706, that's the video that you could
11:25:22 watch where you see the officers pick up the bike rack and push
it against the people who were standing there.  People with
their hands up who are saying, don't fight us, officers, don't
fight us.  Who were standing there.  They get teargassed, and
they're physically pushing.  And that's when Yvonne says, I'm
11:25:40 standing fast.  I'm standing here.  She hadn't done anything

1  wrong.  She was standing there.  So as bike racks are getting

2  pushed into her, she is standing steadfast.

3       I understand that it may -- let's just do a quick on

4  perception.  I think it's difficult to tell what anyone ever is

11:26:02  5  doing in a video, in a photo.  I will not disagree with the

6  fact that Yvonne stood there, and Yvonne stood there with her

7  back to officers.  And at one point, she may have leaned over

8  or her side was this way or that way.  You need to look at it

9  in the entire context and not one still frame that the

11:26:23  10  government gives you, trying to prove or establish that this

11  specific thing happened.

12       The government also showed you these exhibits, which

13  are 609.2 and 602.2.  And this is the one with the yellow

14  circle that they wanted to show you to identify that, yeah; it

11:26:51  15  was her; she pushed through that line.  But when we add in

16  other exhibits and other things, you can see this gentleman

17  right there who is literally right behind her.  And in the

18  video they just showed in direct, too, if you watch again, you

19  can see another individual's hand pushing on her back.

11:27:08  20       So while Yvonne was standing there and had every

21  intent to stand there -- and even though she had an intent to

22  want to go into the building to watch the electoral process

23  unfold, she was not solely responsible.  And she was not

24  responsible for this, in fact.  And even if she was, she didn't

11:27:27  25  have the requisite knowing element to that.

1          Yvonne believed that she could enter the Capitol, as

2    we've kind of discussed, to observe the congressional

3    proceeding and watch history.

4          She talked about the prior confirmation hearings of

11:27:47  5    Supreme Court Justice Brett Kavanaugh and how, during those,

6    she saw protests of people on the Capitol stairs, all over the

7    Capitol grounds, and, in fact, people inside the Capitol

8    building.

9          She didn't understand why she was being singled out

11:28:01 10    and why she wasn't allowed to be in the building where other

11    people for other purposes were, when they seem to be very

12    similar, just maybe not the same political stance.

13          Yvonne hadn't been to D.C. in years.  She had never

14    been to the United States Capitol.  Her base of knowledge is

11:28:21 15    her hometown.  And in Idaho, as she testified, our Capitol

16    doesn't have the security.  Our Capitol doesn't have metal

17    detectors.  We don't have people standing at the door letting

18    you in or not.  It's simply an open building.

19          And one of the things I've realized as I've been back

11:28:38 20    in D.C., although I grew up here, is the amount of somewhat

21    desensitization to the amount of security that people in this

22    city become accustomed to.  You just know every time you walk

23    into a building there's going to be some type of security

24    measure.  Or in the 7/11 gas station, there's -- or convenience

11:29:00 25    store, there is a security officer.  Or the CVS.  There are

these things that are just not the same in Yvonne's hometown.
And that's the perspective that you have to come from, not your
own and not what you would know to be true but what Yvonne
knows to be true.

11:29:18          The evidence in this video, if you actually watch it,
shows -- and you see it right now.  She is pinned behind that
door.  She is pinned behind that door, and she is standing like
this.  And as you watch the video and you see multiple people,
having just completed fighting with officers, are being pushed
11:29:39  and thrown out of the building, as soon as space opens up, she
does a little move and tries to get out of there.  She doesn't
want to be there with the violence, with the nastiness that's
going on.  She wants to observe the electoral process.

          Let's talk about the tunnel.  Yvonne does come back to
11:30:02  the tunnel.  And she's filming.  She's documenting it.  She's
recording it.  She believes that it's important.  And the
government wants you to believe that Yvonne ignored some lawful
command to get off the ledge; that in this crowded tunnel,
somewhere between what the officer testified the other day was
11:30:22  four to six feet deep full of 30 to 40 officers packed in there
like sardines, that Yvonne should simply be able to just jump
right down and be on her merry way.  And you can clearly see
that that is not possible.

          And right as the video starts and they start yelling
11:30:42  at them to get off the ledge, you see Yvonne stand here and

1    look out and put stuff away and try to figure out how can I get

2    out of here.  And you see this wall of people.  You also saw

3    today:  She lost her shoe in trying to get out of the tunnel.

4    She lost her shoe, and she lost her phone because she was

11:31:03 5    trying.  And then, as you watch, she ends up getting carried

6    away.  She doesn't even make it to the ground because she can't

7    because there's so many people there.

8         The government wants you to believe that she made some

9    kind of choice; yet, there was no time for choice.  This

11:31:22 10   environment, as we've heard over and over again, was very loud,

11   very chaotic, violent.  Multiple things going on.  The fact --

12   it's not as simple as the government wants you to believe.

13   It's not as black and white.

14        Let's talk about intent.  You can determine intent

11:31:59 15   based on Yvonne's testimony, based on statements made at the

16   time, based on the surrounding circumstances, and any other

17   omitted acts.

18        And we told you at the beginning of this trial that

19   this was really going to be the only question that you were

11:32:14 20   going to have to ask yourself:  Did Yvonne have the specific

21   intent -- what other people referred to as mens rea -- to

22   commit these crimes.

23        The officers -- let's look at some of the things that

24   she didn't do.  The officers testified that Yvonne didn't steal

11:32:32 25   bike racks or attempt to use them as weapons.  She didn't

strike officers.  She didn't throw things at officers.  She didn't try to take their OC spray and use it against them.  She didn't have pipe-rocks, was not loud or angry, wasn't swearing or screaming.

11:32:50    And, in fact, that's the most -- a little bit bizarre thing to me throughout the video is that on her way up there, she's excited; she's pumped.  She goes down Constitution Avenue.  She's skipping; she's yelling things; she's chanting.

But when she's actually there -- besides that time in
11:33:08  the tunnel, when she's actually there, the entire time, she's standing at the line with her flagpole.  You don't hear a word.  Because what she told them is I'm just going to stand here.  And that's what she did.

After countless hours of investigation and review of
11:33:29  social media, emails, phone calls, everything that Agent Gano stood on the stand and told you, you didn't hear that she had planned any type of criminal intent; that she hadn't sent Facebook messages or posted on Facebook, on social media about her intent to go to the Capitol and disrupt the orderly conduct
11:33:53  of business.  None of that existed.  And he told you, if it was there, we would have found it.  You better believe if it was there and he found it, the government would have shown it to you.

She's not a part of some organization.  She's not a
11:34:08  part of some conspiracy to do any bad acts that Agent Gano

1    talked about.  She simply came with her husband.

2            Let's talk for just a minute about Safeway.  The

3    government introduced several documents from Safeway in an

4    attempt to somehow prove that this specific civil disorder had

11:34:29  5    some type of effect on interstate commerce, which is simply not

6    true.

7            What we do know and what's been put into evidence is

8    Exhibit 11.  And that's the Defense Exhibit 11.  It

9    specifically states that the order was based on COVID-19

11:34:47  10   pandemic and because of the large crowd, not a riot or civil

11   disorder or an insurrection.  Simply because of the size of the

12   crowd, they were going to institute a curfew for the District

13   because they were worried about the spread of the Corona-19

14   virus.  In that document, it also specifically tells you that

11:35:13  15   essential workers are precluded from that order.  So essential

16   workers can still work.

17           The other document that we introduced is -- and I

18   can't remember now -- Exhibit -- probably Ten.  And that is the

19   order specifically that establishes what an essential worker

11:35:38  20   is.  And it tells you in that order that essential workers are

21   grocery stores.

22           So the decision Safeway made to close was its own

23   decision.  It was not required by the mayor's order and simply

24   had nothing to do with the civil disorder.

11:35:57  25           You were also provided some information from Safeway

that purported to show some type of loss to Safeway; yet, all
we had is an agent who read numbers to you off of a line and
wants you to buy into somehow that this means something to you;
yet, there's been no testimony to understand the numbers or
what you're looking at, what the basis for that information
was, where the information came from other than it came from
Safeway.

       You simply have no information that proves beyond a
reasonable doubt that the civil disorder interfered with
interstate commerce.  And if the government wanted to prove it
to you, they sure could have put someone on the stand from
Safeway or some type of expert to explain that information and
those financial numbers to you.  Because we also know there's
multiple different reasons why sales might go down for a
specific day and time.

       Here's the remaining time that Yvonne is at the
Capitol.  At 2:29, Yvonne is through the west plaza.  By
sitting -- she's sitting in a corner at 2:29.  At the same
minute she walks through, she's in that corner.  She walks up
toward the west tunnel at 2:42.  She's through those double
doors by 2:23, leaves the double doors behind at 2:55, climbs
up on the ledge at 2:57, and is off the ledge by 3:19.  And
sometime after that is in the window.

       Before I move on to Count Three, I want to point out
two things:  The only two instances that matter with respect to

the civil disorder is the west plaza and the west tunnel.  Not
anything to do with Yvonne at the window.  Further, not
anything to do with when she allegedly or it looks like she's
helping someone or holds someone's hand while they walk up.
That is not an aiding and abetting with respect to Count One or
Count Two.  It simply -- it doesn't apply.  It's only to the
west plaza and the west tunnel.

On top of that, I'm not going to go into much -- you
will have all the instructions, and you can read and determine
for yourself, but our argument and Ms. Yvonne's sincere belief
was she didn't have the intent to commit the crime itself.  So
if she doesn't have the intent to commit the civil disorder,
she doesn't have the intent to commit the attempt.

Let's talk about Count Three, entering and remaining
in a restricted area.

Yvonne had to knowingly remain in a restricted
building or ground.  And knowing means that she lacked the
lawful authority to enter or remain there or, in other words,
that she wasn't acting through ignorance, mistake, or accident.

Let's look at the -- Exhibit 212 is what the
government provided you to show you that, clearly, these signs
are marked and Yvonne walked right past the Peace Circle and
would have seen this fence and this sign.  By the time Yvonne
walks past it, it's clear that fence is covered and you cannot
see a sign.

1                The government also showed you Exhibit 401.  And it

2       shows, oh, there's all these fields and here's all this snow

3       fencing and all of these perimeters and signs that we put up to

4       keep people out.  But we know that by 2:14 and even before

11:39:45  5     then -- I think it was 1:40 or something -- Tia Summers agreed

6       that that entire area was completely covered with people; that

7       you couldn't see signs; you couldn't see fence posts -- or

8       excuse me.  Bike racks or snow fencing.  It simply wasn't

9       visible.

11:40:16 10              The other thing I draw your attention back to is, as

11      Ms. Owens questioned Yvonne just briefly again this morning,

12      many things that the government went through yesterday -- did

13      you see the bike rack here; did you see the bike rack here and

14      here -- those weren't even inside the perimeter, and there also

11:40:35 15     weren't signs.  So none of that even mattered to anything.

16      Yvonne has to be on notice of this restricted area, and she

17      simply wasn't.  There was nothing there to provide her notice.

18              We also heard Officer Summers talk about the sworn

19      duty of the Capitol Police and it's their sworn duty to ensure

11:40:58 20     and facilitate First Amendment activity on Capitol grounds.

21              Capitol grounds, as we've discussed, are no stranger

22      to demonstrations.  And Yvonne believed that she had the right

23      and the ability to go into that building because it's our

24      house.  The senators, the Congress people, they work for us.

11:41:20 25     And we should be able to observe them in their lawful duty,

1    serving the people and ensuring that justice is happening and

2    the political process is being followed.

3         Let's talk about Count Four and Five.  These are

4    disorderly and disruptive conduct.  The government, again, has

11:41:40  5    to prove to you beyond a reasonable doubt her mental state with

6    respect to two things:  Her specific intent; that she acted

7    knowingly and with an intended purpose -- we've already

8    discussed that knowingly means she can't be acting through

9    ignorance, mistake, or accident -- and her conduct -- this is

11:41:59 10    solely her conduct, not the conduct of a civil disorder.  Her

11    conduct.  Her conduct disrupted the orderly conduct of

12    government business or official functions.

13         With respect to Count Five, this little blue dot,

14    there is an additional component that she had to have acted

11:42:23 15    willfully.  And that is to do something the law forbids.  And

16    it's not willful if it's done as a result of a mistake or

17    carelessness.

18         Yvonne -- first of all, Yvonne would argue that by the

19    time she entered or that she had done anything, all of this was

11:42:43 20    already happening.  All of this was already going on.  And all

21    of this, as we know, did have some type of effect on the

22    electoral college; that it was delayed for a period of time.

23         That was not Yvonne's actions, and this is specific to

24    Yvonne and what she did.  And we know that the electoral

11:43:03 25    process had already been paused when Vice President Mike Pence

was taken from the Senate chambers at 1:15 in the afternoon.

Yvonne did her research, and she knew that that electoral certification was not just some mere formality.  It was a real process and a real possibility.  And, although, while she was on the stand, she couldn't initially remember where it was in the Constitution, we've also provided both of those documents to you.

Exhibit 15 is the Twelfth Amendment to the United States Constitution, which talks about the electoral college process and the certification of votes and that if they don't agree, then it can't be certified.

We also provided to you Title III of United States Code, which is Defense Exhibit 16, which spells out the entire process of the electoral college, how long they have to do it such as the two hours of debate, how they specifically have to do it.  And it's a real process; it's not a formality.  And people and senators and Congress people from each district can object and can debate and they can refuse to certify that specific state's electoral slate.

And I apologize.  I misstated.  The vice president was not removed at 1:15.  It was at 2:12 p.m.  And the Senate was declared in recess at 2:13 p.m., the same time Yvonne arrived.

Even if her intent had been to impede or disrupt, again, the process had already been paused and the vice president was already moved to what they first called his suite

1    of offices.  And then it wasn't until 2:28 that he left his

2    suite of offices and was taken to another secure location.

3        We do know that Arizona and Pennsylvania are the two

4    states that objected to the electoral process; that they

11:45:31  5    believed that their certification -- that's not in evidence.

6    That they objected to the electoral certification.  And we also

7    know, based on those two exhibits, that they have up to five

8    days to complete the electoral process certification.

9        And we know that the senators, although maybe briefly

11:45:52  10    delayed or delayed a period of time, they were not deterred.

11    They were not going to let this cause any disruption to the

12    orderly conduct of business.  And they did come back and they

13    did finish and provide the certification by 3:00 a.m. in the

14    morning.

11:46:11  15        Let's talk about Count Six, the parading,

16    demonstrating, or picketing.  The government has to prove to

17    you that Yvonne knowingly and willfully paraded, picketed, or

18    demonstrated.  And this one is specifically in a Capitol

19    building.  This isn't out on the grounds.  This isn't in the

11:46:30  20    tunnel.  This is inside the Capitol building.

21        And the evidence that we have is that she went in

22    there to make a phone call; she charged her phone; and she went

23    live on Facebook, none of which is sufficient to find her

24    guilty beyond a reasonable doubt of parading, demonstrating, or

11:46:49  25    picketing.  Being on your cell phone, recording a video, or

charging it is not demonstrating, is not picketing, and it's
not parading.

We can all disagree.  That's part of being in society,
right?  We don't have to think the same.  We don't all have to
agree all the time.  It's human nature.  But the beauty of our
Constitution and the thing that sets us apart is that our
systems allow for deep disagreement.

And, in fact, if we ignore the law and we don't follow
the process because maybe we have different personal,
political, moral, or philosophical or religious views, then our
system really does fail.  Our system really would then be
broken.

When I graduated from law school, my dad gave me this
little silver pendant.  And it was just a little disc.  And on
it, it said, never give in.  Never, never, never.  And at the
time, I didn't really understand its significance.  And my dad
said, well, this just reminds me of you.

And so -- and he told me then the story about Winston
Churchill in 1941.  And in 1941, Britain was in the midst of
war with Germany.  And in the previous ten, 11 months is when
the United States finally decided they would help send aid.
And so Winston Churchill went to a boys school, an all-boys
prep school.  And he gave this speech to the children.  And he
told them -- he said -- he described:  Where we've been, it's
really hard; it's been very difficult; and things have been

1    really bad, but now we've gotten help and now we're going to

2    persevere and now all these things are going to happen.  So my

3    lesson to you is to never give in.  Never give in.  Never,

4    never, never.  In nothing great or small, large or petty, never

11:49:01  5    give in to convictions of honor and good sense.

6           And that's what Yvonne did.  She never gave in.

7    Although the government wants you to believe that she should

8    have just left and this didn't deter her, she didn't give in

9    because she believed she had a right to be there.

11:49:23  10           And we can have -- we can discuss words and whether

11    she's entitled or whatever it is you want to describe her, but

12    it's her beliefs that matter.  And she believes that she could

13    go into the Capitol building to observe this.  And her deeply

14    held belief was that there was fraud and that there -- she

11:49:43  15    didn't trust the government.  She wanted to see it for herself.

16           It's very important to Yvonne and our system of

17    justice that you understand the level of proof that the

18    government needs.  And you heard a little bit about that, this

19    idea of reasonable doubt.  And it's not a mere imaginary -- it

11:50:19  20    has to be a real -- so if I came in here and part of Yvonne's

21    defense was, well, she's not guilty because an alien came and

22    overtook her body and so she wasn't the person who was doing

23    it; it was an alien -- well, that's not reasonable and that

24    doesn't make any sense.

11:50:40  25           But if you believe that Yvonne's mistaken or ignorant

1    or accidental beliefs are reasonable -- it might not be

2    reasonable to you, but you have to take it from Yvonne's

3    perspective; her knowledge; what she knows; where she's from;

4    and all the facts and circumstances surrounding her.

11:51:04  5         If it's a reasonable belief of hers and you find that

6    that's reasonable, then Yvonne is not guilty.  And if any of

7    these are your thought process:  "I'm not really sure, but it

8    looks bad;" "could be guilty;" "she's probably guilty;" "may be

9    more likely than not that she's guilty;" "highly probable that

11:51:32 10   it's guilty;" "I don't really know for sure, but I don't really

11   like her;" or "I think she's guilty, but they didn't prove it,"

12   if any of those along this continuum are your thought process,

13   then your verdict must be not guilty.

14         And we would ask at this time when you go back to

11:51:52 15   deliberate that you come back with a verdict of not guilty.

16   And part of the instruction that you're going to be given is

17   that your verdict has to be your own.  Carefully discuss,

18   debate, talk about all the evidence, all of your opinions.  You

19   don't have to leave your common sense at the door.  You get to

11:52:14 20   talk about it, but the decision has to be your own.  You don't

21   have to agree just to agree to be able to go home.  You don't

22   have to do one thing or the other.  It is your decision and

23   your decision alone to make after discussing and conversing

24   with the entire panel.

11:52:31 25         And at this time, we would ask that you find Yvonne

1    St. Cyr not guilty on all six counts.

2              THE COURT:  Ms. Schesnol for rebuttal.

3              MS. SCHESNOL:  And, Your Honor, I will be able to --

4    "we are not losing the United States Capitol today.  Do you

11:53:16  5    hear me?  We are not losing the Capitol" were the words of the

6    commander in the tunnel on January 6, 2021.  Still gives me

7    chills to hear it.

8              How did police officers fight for hours and hours on

9    end to defend our Capitol building, the people inside, and our

11:53:44  10   democracy?  Sergeant Riley told you from the witness stand:

11   Because losing is not an option.  That is honor.  That is

12   patriotism, and that is love of country.

13             But on January 6th, and even to this day, Yvonne

14   St. Cyr has a different idea about her love of country.  She

11:54:13  15   doesn't get a monopoly on patriotism.  And as said, ideas might

16   be a little unorthodox.  And you're not here to judge her

17   character or her life history.  You are here to judge her

18   conduct, and her conduct on January 6, 2021 was criminal.

19             It's obvious she believes the 2020 election is stolen.

11:54:47  20   That is clear.  And she's allowed to have that belief.  She's

21   not being singled out, as was suggested.  This is not about

22   politics, as was suggested.  Because millions of people think

23   the 2020 election was stolen.  And they didn't all go to the

24   United States Capitol.  She is entitled to her belief that the

11:55:13  25   election is stolen, and she can write letters and she can

1   engage in lawful First Amendment protests and make phone calls

2   and encourage more people to vote the next time around.  But

3   she doesn't get to storm the Capitol.

4        It was brought up process.  There's a process.  We

11:55:37 5   want you to follow the process.  The government wants you to

6   follow the process, too.  The only person who's not following

7   the process here is the defendant, Yvonne St. Cyr.  And the

8   fact that she didn't know she couldn't go into the Capitol

9   building because, in Idaho, they don't have security is beyond

11:55:58 10   absurd.  She has never entered the Idaho Capitol through a

11   broken window or up against a police line.  We talked about

12   that.

13        About the Capitol, with permission, I'm going to

14   approach my diagram.

11:56:15 15        THE COURT:  You may.

16        MS. SCHESNOL:  The tunnel that we've heard a lot

17   about, Captain Summers, who has worked at the Capitol for

18   23 years, told you the tunnel is part of the building.  It's

19   not just about when the defendant went in through the window.

11:56:29 20   The tunnel is part of the building.

21        A lot about bike racks.  The government showed you

22   images of bike racks both outside the perimeter leading up to

23   the perimeter as well as within the perimeter itself.

24        And let's say we want to give the defendant the

11:56:51 25   benefit of the doubt.  She didn't see the bike racks; they were

1  already gone, despite Captain Summers saying they are still

2  strewn about all over the lawn.  Maybe the defendant was too

3  pumped up because she wanted to push and she wanted to tear it

4  down so she wasn't paying attention to bike racks.  But when

11:57:08  5  she got to this police line of bike racks, it's clear that she

6  was restricted from going anymore -- anymore forward.

7          Even if you want to give her the benefit of the doubt

8  about the red outline, she knew then -- she had to know then.

9  And she ultimately even admitted then that the police were

11:57:33  10  trying to reestablish the police line further from the

11  building.  And she admitted she interfered with them moving the

12  bike rack police line.  She admitted that on cross-examination.

13          She said -- she didn't just stand there.  She leaned

14  against the bike rack so the police couldn't move them and

11:57:53  15  establish a line further from the building.  And when I asked

16  her "so you interfered," she had to agree she did.  That is

17  Count One.

18          Maybe she didn't do it alone.  But just like there's

19  not a rainstorm by one individual drop; it is collective, the

11:58:14  20  mob was the weapon.  And she was part of it.  And to say that

21  Mike Pence was already removed by 2:13 -- yeah; the defendant

22  was already out on the west plaza by 2:13.  And you know what?

23  Even if she didn't show up until 4:13, it wouldn't matter.  The

24  election was delayed and they could not finish until 3:00 in

11:58:42  25  the morning.  She was a part of that delay.

1    A lot of talk about the Constitution.  You have the

2    documents.  Yeah; it talks about debating objections.  And it

3    does talk about that the certification must take place at 1:00

4    p.m. on January 6th in the House chamber.  There is nothing in

11:59:02  5    there that says the electoral votes, once certified, which they

6    were in December -- the defendant even knew that -- that they

7    could go back to the states.  That is not the law.

8    I won't dwell on Safeway too much.  But, really, I

9    just have to say that it's pretty disingenuous to say that we

11:59:29  10    should have called, you know, a business expert.  You can read

11    the documents.  And you have a certification from their

12    custodian of records to show that these are actual Safeway

13    documents.  And Safeway made the choice to close, and it

14    affected commerce.  Whether it had anything to do with the

11:59:47  15    mayor's order or not, they chose to close their stores.

16    A lot has been made about the defendant didn't know

17    that she could be at the Capitol and she thought she had a

18    right to be there.  We already discussed that only gets her up

19    to the police line.  And to say she was pushed through; it

12:00:13  20    wasn't her intent to go through, that might be a little easier

21    to believe if she then didn't go from this point to this point,

22    up the stairs, into the tunnel, get kicked out, go back in, get

23    kicked out, go back through the window -- then it might be a

24    little easier to believe that she didn't intend to go through

12:00:35  25    those bike racks.

1    The defendant acted voluntarily at all times.  Her

2  body wasn't invaded by an alien.  No one cemented her feet to

3  the ground.  Her acts were her own choice and voluntary.

4    There was a comment in closing about, oh, things were

12:00:57  5  too hectic and too chaotic to make a choice.  You know, she

6  couldn't get off the ledge and, you know, just everything was

7  too chaotic to make a choice.

8    Well, the defendant chose to go there in the first

9  place to place herself in that situation.  And when else did

12:01:17  10  she have plenty of time for choice?  And the situation was

11  chaotic, but plenty of time for choice.  15 minutes on the

12  police line on the west plaza, ten minutes once the police line

13  was breached.

14    She testified she hung out for ten minutes to collect

12:01:34  15  herself, figure out what am I going to do next.  Oh, well, what

16  she did next was go further to go to the inaugural stage and

17  then make a beeline for the tunnel at the exact moment that

18  Sergeant Riley was forming the line and sees the window of --

19  the glass within the door being broken out.

12:01:52  20    And then she goes even deeper to get herself right

21  between the double doors.  Now, she would like you to believe

22  that she desperately wanted to get out for that whole

23  12 minutes and she just couldn't.  Bologna.  She made her way

24  through thousands of people to get to the front of the police

12:02:11  25  line.  If she wanted to get out of there, she could have gotten

out of there.  Do you know when she got out of there?  When the
police got her out of there.  And she was in there for at least
12 minutes.

And, again, might be easier to believe if she didn't
go right back in in less than two minutes and pop herself up on
the ledge where she had 24 minutes to make choices.

And when else did she have plenty of time for choice?
When she went into ST2M, the senator's office, even though she
doesn't want to believe it is a senator's office.  Whosever
office it is, it ain't hers, and she has no right to be in
there.  She was in there for well over an hour.

All of this was knowing.  No one forced her into any
of these places.  People had to force her out of these places.
And then she voluntarily and with choice and with intent
decided to go right back in each and every time.

There was talk in closing about, well, Yvonne didn't
do -- and throughout testimony Yvonne didn't do this, didn't do
that.  Didn't assault police officers, didn't throw anything at
them, didn't scream at them.  We agree.  That's why in the six
counts that you have to deliberate on, none of them are for
assault.  You don't have to scream "traitor" at the police to
be guilty.  You don't have to wear face paint and horns to be
guilty.  The defendant is guilty for her own conduct, what she
did on January 6th.

She told you where there's a will, there's a way.  And

1    she kept moving forward throughout hours that afternoon.  Not

2    acting with good faith.

3         When she -- let's talk about the defendant's

4    credibility.  And you will get an instruction, as Mr. Boylan

12:04:34  5    told you, that you can consider the credibility of every

6    witness who testified from this witness stand, and that

7    includes the defendant.  And you can consider that the

8    defendant has an interest in the outcome of this trial.  I will

9    submit to you she is the only one who has an interest in the

12:04:51  10   outcome of the trial.

11        So let's talk about her credibility and why you should

12   not believe her.  On one hand, she says, I'm all about love but

13   then also says, we're at war.  She says, I was there for the

14   energy and experience.  Well, the energy and experience was

12:05:09  15   dangerous, chaotic, and crazy.  So she was there for the chaos.

16        She said she thought she had a right to stand at the

17   police line and interfere with the police repositioning the

18   line on the west front.  This is not credible.  No one would

19   think that they can stand against a police line.  Stand maybe.

12:05:35  20   Push against it, interfere with them moving it?  No.

21        Oh, but First Amendment rights are allowed on Capitol

22   grounds.  With restrictions, Captain Summers told you.  Not

23   pushing against a police line when they're saying, "get her off

24   the fence, pull her off the line.  We're not trying to hurt

12:05:55  25   her."  Even asked a fellow rioter to come.  "Will you talk to

1    her?"  Fellow rioter, he tries.  He can't do anything.  That is

2    all intentional, voluntary conduct.

3         Again, we already talked about you can -- it's

4    ridiculous to believe that she wanted to get out from between

12:06:14   5    the double doors and just couldn't.  She wants you to believe

6    that she realized -- she realized the tunnel was dangerous

7    after the people kicked her out at 2:55 from between the double

8    doors.  But she went right back in.

9         She wants you to believe that she doesn't like

12:06:36  10    violence; that she was calling for everyone to stop hitting

11    each other.  The video shows otherwise.  On cross-examination,

12    it was brought out she had made a statement in the past that

13    says otherwise.  And the fact that after she yelled "stop it"

14    to everyone, then she yelled, "we need fresh people.  We need

12:07:02  15    fresh people" -- that is not someone what wants the violence to

16    end.

17         As the mob is rocking rhythmically back and forth,

18    using their collective body weight to push against the police,

19    the defendant, who claims she doesn't like violence, calls,

12:07:21  20    "push, push, push," 15 times.

21         She claims she didn't hear the police telling her to

22    get off the wall or that she was trying; she just couldn't and

23    she didn't want to step on anyone.  Again, I say bologna

24    because you saw there were multiple other people on the wall

12:07:44  25    who one by one got down.  They either heard orders, were

1    deterred by the chemical spray, or got down.  She was the one

2    that Detective Dowling needed to use a flagpole to get her out

3    of there.

4          Then another reason something not to believe, "it's

12:08:06  5    dangerous; it's chaotic.  Oh.  I know what I'll do.  I will

6    belly crawl through a broken window to get into an office

7    within the Capitol building.  I only went in there to call my

8    husband."

9          Well, when she got her phone and called her husband,

12:08:23  10    she hung out live streaming for Facebook for hours.  She only

11    left when there was so much teargas that she couldn't stand it

12    anymore.

13          Where there's a will, there's a way.  And she pushed

14    and pushed.

12:08:47  15          The defendant's claim that she thought she had a

16    legitimate right to be there -- besides being absurd, it kind

17    of reminds me if you've ever shown up at a restaurant or a

18    museum and you didn't check the website in advance and it turns

19    out they're closed and then you're bummed and you're annoyed

12:09:10  20    because you made the trip down there and you're frustrated that

21    you can't get in.

22          That's what happened to Yvonne -- the defendant,

23    Yvonne St. Cyr, on January 6, 2021.  She wanted to go in the

24    Capitol and she was bummed and annoyed when she couldn't get

12:09:29  25    in.  But instead of turning and leaving the way a reasonable

person would do when you get to a museum and find out you can't
go in; they're closed on Mondays, you don't then engage in
civil disorder to go through and past and against the guard at
the museum door or climb through a broken window at the museum
to see your favorite exhibit.  You turn and leave.  But the
defendant didn't do that.  She pushed.

        In closing, there were some eloquent quotes from
Winston Churchill.  I am not that highbrow.  I will quote Steve
Martin instead.  Many years ago, back in his old SNL days where
he would wear the arrow on his head, he had a comedy routine in
one of his albums where he said, "very powerful words are 'I
forgot.'"  If you just say "I forgot" to anything, you can get
out of trouble.  And the exact comedy routine went:  "If you
are on trial for robbing a bank, simply say, 'I forgot armed
robbery was illegal.'"  And you know why that was on a comedy
album?  Because it's funny.  It's so ridiculous it makes it
funny.

        That is akin to what the defendant is saying.  She's
not saying, "I forgot.  I didn't know.  I didn't realize I
couldn't go in.  I didn't realize I couldn't bust past a police
line, get kicked in and out of the Capitol three times."  It's
that absurd.

        You will also have an instruction that people can act
with more than one purpose.  And in your everyday life, you
know you can act with more than one purpose.

1          I go to National Stadium with more than one purpose.

2     I like baseball; I like to chat with my friends in the nice

3     weather; if I do get some cracker jacks, that's not so bad

4     either.

12:11:40  5          The defendant might say, I was there for some innocent

6     intent.  I wanted to Facebook live and show everyone what was

7     going on.  But she also had a criminal intent, and the

8     government has proven that beyond a reasonable doubt.

9          There was talk in defense close about reasonable

12:12:00 10     doubt.  It's the highest burden in our legal system.

11     Absolutely.  But not in our lives.  We might make life

12     decisions where we want to be more than firmly convinced.

13     Maybe before we decide to get married or to buy a house or

14     something like that.  But the legal standard, as you will be

12:12:22 15     instructed, is proof that leaves you firmly convinced.  If you

16     are firmly convinced the defendant is guilty, you must find her

17     guilty.

18          There was also talk in defense close about she didn't

19     plan in advance; she didn't coordinate with other people.  We

12:12:47 20     agree.  That's why in the six counts we're asking you to

21     consider, none of them are conspiracy.  Because intent can be

22     formed at any time.  Intent didn't have to be formed before the

23     defendant left Idaho.  Didn't even have to be formed when she

24     left the rally on the Ellipse.  When was it -- when was her

12:13:11 25     intent formed?  When she saw it was possible.  That's when her

1    intent was formed.

2         Go back to my baseball analogy.  I like going to Nat

3    Stadium.  They had a blood drive there one time.  I thought, "I

4    have good veins; not squeamish; I will go donate blood."  And I

12:13:37  5    do.  And then it turned out, as a thank you for all the people

6    donating blood, they were offering tours of Nat Stadium.

7         Well, that's pretty cool.  I got to go in the press

8    box.  I got to see the locker room.  And I got to go onto the

9    field.  Onto a major league baseball field.

12:13:57  10    Well, when I went down to Nat Stadium that morning, I

11    had no intention of going on the field because I didn't know it

12    was possible.  I formed that intent once I saw it was possible.

13         Just to be clear, in that case, I was invited to be on

14    the field.  I was allowed to be on the field, which is very

12:14:13  15    different than the defendant in this case.  But the idea is a

16    person can form the intent at any time.

17         She didn't have to have the intent days, weeks, hours

18    before she actually went there.  Where there's a will, there's

19    a way.  On January 6, 2021, the defendant pushed, pushed,

12:14:38  20    pushed, pushed past the police line, into the tunnel, back into

21    the tunnel a second time, into the office.

22         And she's pushing something from that witness stand.

23    She's pushing a lot of bologna.  And we are -- she says she's

24    all about truth.

12:15:00  25    We are asking you to come to the only -- the truth,

1    the just, the right verdict, which is supported by all the

2    evidence in this case, and that is none other than a verdict of

3    guilty on all counts.

4              Thank you.

12:15:20   5              THE COURT:  All right, ladies and gentlemen.  The next

6    task is mine, which is to give you instructions.  This will

7    take about a half an hour for me to read through them.  I want

8    to make sure everybody is comfortable and doesn't need a break.

9              You need a break.  So we'll take a -- well, you're

12:15:42  10    going to also get lunch.  I could break for lunch and we could

11    come back in 45 minutes, but you wouldn't be able to deliberate

12    while you're having lunch.  You would have to refrain from that

13    until you come back and receive the instructions.

14              So the two choices are take a five-minute break, come

12:16:03  15    back for half an hour of instructions, and then retire to both

16    have lunch and deliberate or take a 45-minute break now during

17    which you can enjoy your lunch and then come back to get the

18    instructions and retire to deliberate.

19              I think I would prefer to take a brief break and then

12:16:22  20    give you the instructions.  Anybody -- any strong feeling

21    otherwise?

22              Okay.  The one feeling I saw was a thumbs up, which I

23    think is an agreement with me.  So why don't we take a

24    five-minute break so anyone who needs to use the facilities

12:16:43  25    can.  We'll come back --

1            A JUROR:  Is our lunch in private, the 45-minutes --

2     or is it free to go if we take a short break now?

3            THE COURT:  The lunch should be for you in the jury

4     room.

12:17:00  5            A JUROR:  Okay.

6            THE COURT:  But you can't deliberate while you're

7     there, eating lunch.  You're not restrained.  You can leave the

8     jury room.  You're not restrained yet because I haven't had you

9     retire to deliberate yet.  But lunch is provided for you in the

12:17:12 10   jury room.  It should be there by now or will be there in a few

11    minutes.

12           A JUROR:  So we will not have any free time beyond

13    this five minutes is what you're saying?  This break?

14           THE COURT:  Yes.  I think I received this agreement to

12:17:25 15   have a five-minute break, come back and receive the

16    instructions, and then you will retire and you will have your

17    lunch and deliberate.

18           All right?  Okay.  Five-minute break.

19        (Short recess.)

12:17:41 20       (Jury excused.)

21        (In open court.  Jury not present.)

22           THE COURT:  All right.  See you in a couple of

23    minutes.

24        (Short recess.)

12:24:59 25       (In open court.  Jury not present.)

```
 1              COURTROOM DEPUTY:  Please be seated and come to order.
 2    Well, you might have to stand back up again.
 3         (Discussion off the record.)
 4              COURTROOM DEPUTY:  Your Honor, the jury panel.
 5         (Jury present.)
 6              THE COURT:  Welcome back, ladies and gentlemen.
 7              The time has now come when all the evidence is in and
 8    you have heard the closing arguments of the lawyers.  And it's
 9    now up to me to instruct you on the law that will control your
10    deliberations in this case.
11              My instructions will be roughly divided into four
12    parts.  First, I will talk with you about some general
13    principles of the law; second, I will instruct you on
14    evaluating the evidence; third, I'll discuss with you
15    instructions that apply to the elements of the particular
16    offenses charged in this case; and finally, I will have some
17    closing remarks about your deliberations.
18              For those of you taking notes, I want to let you know
19    that a written copy of these instructions will be available for
20    you.  You can take it into the jury room as you start your
21    deliberations.
22              Let me begin with some general principles.  First, I'm
23    sure you understand by now that the jury and the Court, you and
24    I, have quite different responsibilities in a trial.  My
25    function is to conduct this trial in an orderly, fair, and
```

Timestamps: 12:25:57 (line 5), 12:26:08 (line 10), 12:26:23 (line 15), 12:26:38 (line 20), 12:26:53 (line 25)

efficient manner; to rule on questions of law; and to instruct

you on the law which applies in this case.  It is your duty to

accept the law as I state it to you.

You should consider all of the instructions as a

whole.  You may not ignore or refuse to follow any of them.

Your function, as the jury, is to determine what the facts are

in this case.  You are the sole judges of the facts.  While it

is my responsibility to decide what is admitted as evidence

during the trial, you alone decide what weight, if any, to give

to that evidence.

You alone decide the credibility or believability of

the witnesses.  You should determine the facts without

prejudice, fear, sympathy, or favoritism.  You should not be

improperly influenced by anyone's race, ethnic origin, or

gender.  Decide the case solely from a fair consideration of

the evidence.

You may not take anything I may have said or done as

indicating how I think you should decide this case.  If you

believe that I have expressed or indicated any such opinion,

you should ignore it.

The verdict in this case is your sole and exclusive

responsibility.  If any reference by me or the attorneys to

evidence is different from your own memory of the evidence, it

is your recollection that should control during your

deliberations.

*CHERYL K. POWELL, CCR, RPR, FCRR*
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3003/cheryl_powell@alsd.uscourts.gov

1       During those deliberations, you may consider only the

2  evidence properly admitted in this trial.  The evidence in this

3  case was the sworn testimony of the witnesses; the exhibits

4  which were admitted into evidence; and any facts and testimony

12:28:38  5  stipulated to by the parties.

6       During the trial, you were told that the parties had

7  stipulated; that is, agreed, to certain facts.  Any stipulation

8  of fact is undisputed evidence, and you should consider it to

9  be undisputed evidence.

12:28:53 10       When you consider the evidence, you are permitted to

11  draw from the facts which you find have been proven such

12  reasonable inferences as you feel are justified in the light of

13  your experience.

14       The statements and arguments of the lawyers are not

12:29:09 15  evidence.  They are only intended to assist you in

16  understanding the evidence.  Similarly, the questions of the

17  lawyers are not evidence.

18       The indictment is merely the formal way of accusing a

19  person of a crime.  You must not consider the indictment as

12:29:27 20  evidence of any kind.  You may not consider it as any evidence

21  of Ms. St. Cyr's guilt or draw any inference of guilt from it.

22       The lawyers in this case sometimes objected when the

23  other side asked a question, made an argument, or offered

24  evidence that the objecting lawyer believed was not proper.

12:29:49 25  You must not hold such objections against the lawyer who made

them or the party he or she represents.  It is the lawyer's
responsibility to object to evidence that they believe is not
admissible.

If, during the course of the trial, I sustained an
objection to a lawyer's question, you should ignore the
question, and you must not speculate as to what the answer
would have been.

If, after a witness answered a question, I ruled that
the answer should be stricken, you should ignore both the
question and the answer, and they should play no part in your
deliberations.

Likewise, exhibits as to which I have sustained an
objection or that I ordered stricken are not evidence, and you
must not consider them in your deliberations.

Every defendant in a criminal case is presumed to be
innocent.  This presumption of innocence remains with
Ms. St. Cyr throughout the trial unless and until the
government has proven she is guilty beyond a reasonable doubt.
This burden never shifts throughout the trial.

The law does not require Ms. St. Cyr to prove her
innocence or to produce any evidence at all.  If you find that
the government has proven beyond a reasonable doubt every
element of a particular offense with which Ms. St. Cyr is
charged, it is your duty to find her guilty of that offense.
On the other hand, if you find the government has failed to

1   prove any element of a particular offense beyond a reasonable

2   doubt, it is your duty to find Ms. St. Cyr not guilty of that

3   offense.

4        The government has the burden of proving the defendant

12:31:25   5   guilty beyond a reasonable doubt as to each count or charge

6   against her.

7        Some of you may have served as jurors in civil cases

8   where you were told that it is only necessary to prove that a

9   fact is more likely true than not true, which we call the

12:31:40   10   preponderance of evidence.  In criminal cases, the government's

11   proof must be more powerful than that.  It must be beyond a

12   reasonable doubt.

13        Reasonable doubt is the kind of doubt that would cause

14   a reasonable person, after thoughtful and careful reflection,

12:31:56   15   to hesitate to act in the graver or more important matters in

16   life.  However, it is not an imaginary doubt nor a doubt based

17   on speculation or guesswork; it is a doubt based on reason.

18        The government is not required to prove guilt beyond

19   all doubt or to a mathematical or scientific certainty.  Its

12:32:17   20   burden is to prove guilt beyond a reasonable doubt.  Proof

21   beyond a reasonable doubt is proof that leaves you firmly

22   convinced of Ms. St. Cyr's guilt.

23        There are very few things in this world that we know

24   with absolute certainty, and, in criminal cases, the law does

12:32:34   25   not require proof that overcomes every possible doubt.  If,

based on your consideration of the evidence, you are firmly
convinced that Ms. St. Cyr is guilty of the crime charged, you
must find her guilty.  If, on the other hand, you think there
is a real possibility that a defendant is not guilty, you must
give her the benefit of the doubt and find her not guilty.

There are two kinds of evidence from which you may
determine what the facts are in this case, direct evidence and
circumstantial evidence.  When a witness, such as an
eyewitness, asserts actual knowledge of a fact, that witness'
testimony is direct evidence.  On the other hand, evidence of
facts and circumstances from which reasonable inferences may be
drawn is circumstantial evidence.

I'll give you an example.  If a person looked out a
window and saw that snow was falling, he would be an eyewitness
to the fact that snow was falling.  If he later testified in
court that he had seen snow falling, his testimony would be
direct evidence of the fact that snow was falling at the time
he saw it happen.

However, if he looked out a window and saw no snow on
the ground and then went to sleep and saw snow on the ground
after he woke up, it would be a reasonable inference that it
had snowed while he was asleep.  His testimony about those
observations would be circumstantial evidence that it had
snowed.

The law says both direct and circumstantial evidence

are acceptable as a means of proving a fact.  The law does not

favor one form of evidence over another.  It is for you to

decide how much weight to give to any particular evidence,

whether it be direct or circumstantial.  You are permitted to

give equal weight to both.  Circumstantial evidence does not

require a greater degree of certainty than direct evidence.  In

reaching a verdict in this case, you should consider all the

evidence presented, both direct and circumstantial.

In determining whether the government has established

the charges against Ms. St. Cyr beyond a reasonable doubt, you

must consider and weigh the testimony of all the witnesses who

have appeared before you.  You are the sole judges of the

credibility of the witnesses.  In other words, you alone are to

determine whether to believe any witness and the extent to

which any witness should be believed.

In reaching a conclusion as to the credibility of any

witness, you may consider any matter that may have a bearing on

that subject.  You may consider the demeanor and behavior of

the witness while on the witness stand, the witness' manner

testifying, whether the witness impresses you as a truthful

person, whether the witness impresses you as having an accurate

memory and recollection, whether the witness has any motive for

not telling the truth, whether the witness had a full

opportunity to observe the matters about which he or she has

testified, and whether the witness has any interest in the

1 outcome of this case or friendship or hostility toward other

2 people concerned with the case.

3   Inconsistencies or discrepancies in the testimony of a

4 witness or between the testimony of different witnesses may or

12:35:55  5 may not cause you to discredit such testimony.

6   Two or more persons witnessing an incident or

7 transaction may see or hear it differently.  An innocent

8 misrecollection, like a failure of recollection, is not an

9 uncommon experience.  In weighing the effect of the

12:36:14 10 inconsistency or discrepancy, always consider whether it

11 pertains to a matter of important or unimportant detail and

12 whether the inconsistency or discrepancy results from innocent

13 error or intentional falsehood.

14   You may consider the reasonableness or

12:36:32 15 unreasonableness, the probability or improbability of the

16 testimony of a witness in determining whether to accept it as

17 true and accurate.  You may consider whether the witness has

18 been contradicted or supported by other credible evidence.  If

19 you believe that any witness has shown him or herself to be

12:36:50 20 biased or prejudiced for or against either side in this trial,

21 you may consider and determine whether such bias or prejudice

22 has colored the testimony of the witness so as to effect the

23 desire and capability of that witness to tell the truth.

24   You should give the testimony of each witness such

12:37:09 25 weight as, in your judgment, it is fairly entitled to receive.

1    A law enforcement officer's testimony should be evaluated by

2    you just as any other evidence in the case.  In evaluating the

3    officer's credibility, you should use the same guidelines that

4    you apply to the testimony of any witness.  In no event should

12:37:30   5    you give either greater or lesser weight to the testimony of

6    any witness merely because he or she is a law enforcement

7    officer.

8         A defendant has a right to become a witness in her own

9    behalf.  Her testimony should not be disbelieved merely because

12:37:47   10   she is a defendant.  In evaluating her testimony, however, you

11   may consider the fact that Ms. St. Cyr has an interest in the

12   outcome of this trial.  As with the testimony of any other

13   witness, you should give Ms. St. Cyr's testimony such weight

14   as, in your judgment, it deserves.

12:38:06   15        The weight of the evidence is not necessarily

16   determined by the number of witnesses testifying for each side.

17   Rather, you should consider all the facts and circumstances in

18   evidence to determine which of the witnesses you believe.  You

19   may find that the testimony of a smaller number of witnesses on

12:38:24   20   one side is more believable than the testimony of a greater

21   number of witnesses on the other side, or you may find the

22   opposite.

23        One of the questions you were asked when we were

24   selecting the jury is whether the nature of the charges would

12:38:38   25   affect your able to reach a fair and impartial verdict.  We

1 asked you that question because you must not allow the nature

2 of a charge to affect your verdict.  You must consider only the

3 evidence that has been presented in this case in reaching a

4 fair and impartial verdict.

12:38:57 5      You may have heard testimony about witnesses meeting

6 with attorneys or investigators before they testified.  You are

7 instructed that it is perfectly proper for a lawyer or

8 investigator to interview a witness in preparation for trial.

9      Now let me talk to you about the specific charged

12:39:16 10 offenses.  I will instruct you on those offenses that are

11 charged in the indictment, which in this case contains six

12 counts.

13      Count One:  Civil disorder, attempted civil disorder,

14 and aiding and abetting on the west plaza of the United States

12:39:34 15 Capitol.  Count Two:  Civil disorder, attempted civil disorder,

16 and aiding and abetting in the lower west terrace tunnel.

17 Count Three:  Entering and remaining in a restricted building

18 or grounds.  Count Four:  Disorderly and disruptive conduct in

19 a restricted building or grounds.  Count Five:  Disorderly

12:39:53 20 conduct in a Capitol building.  And Count Six:  Parading,

21 demonstrating, or picketing in a Capitol building.

22      First, with respect to Counts One and Two, civil

23 disorder.  Count One of the indictment charges Ms. St. Cyr with

24 civil disorder on the west plaza of the United States Capitol

12:40:10 25 and also charges her with attempting to commit the offense of

1    civil disorder and aiding and abetting others to commit that

2    offense.

3            Count two of the indictment charges Ms. St. Cyr with

4    civil disorder in the lower west terrace tunnel and also

12:40:24  5    charges her with attempting to commit the offense of civil

6    disorder and aiding and abetting others to commit that offense.

7            The Court will first explain the elements of the

8    substantive offenses along with associated definitions.  And

9    then I will explain how to determine whether Ms. St. Cyr

12:40:40 10    attempted the offense and whether she aided and abetted the

11    offense.

12            In order to find Ms. St. Cyr guilty of civil disorder,

13    you must find that the government proved each of the following

14    three elements beyond a reasonable doubt:  First, Ms. St. Cyr

12:40:59 15    knowingly committed an act with the intended purpose of

16    obstructing, impeding, or interfering with law enforcement

17    officers; second, at the time of Ms. St. Cyr's actual act, law

18    enforcement officers were engaged in the lawful performance of

19    their official duties incident to and during a civil disorder;

12:41:17 20    and, third, the civil disorder in any way or degree obstructed,

21    delayed, or adversely affected either commerce or the movement

22    of any article or commodity in commerce or the conduct or

23    performance of any federally protected function.

24            A few definitions.  A person acts knowingly if she

12:41:38 25    realizes what she is doing and is aware of the nature of her

conduct and does not act through ignorance, mistake or accident.

In deciding whether Ms. St. Cyr acted knowingly, you may consider all of the evidence, including what Ms. St. Cyr did or said.

The term "civil disorder" means any public disturbance involving acts of violence by groups of three or more persons which, A, causes an immediate danger of injury to another individual; B, causes an immediate danger of damage to another individual's property; C, results in injury to another individual; or D, results in damage to another individual's property.

The term "commerce" -- the term "commerce" means commerce or travel between one state, including the District of Columbia, and any other state, including the District of Columbia.  It also means commerce wholly within the District of Columbia.

The term "federally protected function" means any function, operation, or action carried out under the laws of the United States by any department, agency, or instrumentality of the United States or by an officer or employee thereof.

The term "department" includes executive departments. The Department of Homeland Security, which includes the United States Secret Service, is an executive department.

The term "agency" includes any department, independent

1    establishment, commission, administration, authority, board, or

2    bureau of the United States.

3         And the term "law enforcement officer" means any

4    officer or employee of the United States or the District of

12:43:27  5    Columbia while engaged in the enforcement or prosecution of any

6    criminal laws of the United States or the District of Columbia.

7         For the United States Capitol Police and metropolitan

8    police department on January 6, 2021, the term "official

9    duties" includes policing the U.S. Capitol building and grounds

12:43:47 10    and enforcing federal law and D.C. law in those areas.

11         In Counts One and Two, Ms. St. Cyr is alternatively

12    charged with attempt to commit the crime of civil disorder.

13    Attempting to commit this offense is not a separate offense but

14    an alternative way in which the government alleges that

12:44:15 15    Ms. St. Cyr committed the same offense in Counts One and Two.

16         In order to find Ms. St. Cyr guilty of attempt to

17    commit civil disorder, you must find that the government proved

18    beyond a reasonable doubt each of the following two elements:

19    First, Ms. St. Cyr intended to commit the crime of civil

12:44:36 20    disorder, as I have defined that offense earlier; second,

21    Ms. St. Cyr took a substantial step toward committing civil

22    disorder which strongly corroborates or confirms that she

23    intended to commit that crime.

24         With respect to the first element of attempt, you may

12:44:54 25    not find Ms. St. Cyr guilty of attempt to commit civil disorder

merely because she thought about it.  You must find that the
evidence proved beyond a reasonable doubt that Ms. St. Cyr's
mental state passed beyond the stage of thinking about the
crime to actually intending to commit it.

With respect to the substantial step element, you may
not find Ms. St. Cyr guilty of attempt to commit civil disorder
merely because she made some plans to or some preparation for
committing that crime.

Instead, you must find that Ms. St. Cyr took some
firm, clear, undeniable action to accomplish her intent to
commit civil disorder.  However, the substantial step element
does not require the government to prove that Ms. St. Cyr did
everything except the last act necessary to complete the crime.

In this case, the government further alleges that
Ms. St. Cyr aided and abetted others in committing civil
disorder, as charged in Counts One and Two.  Aiding and
abetting others in committing this offense is not a separate
offense but an alternative way in which the government alleges
that Ms. St. Cyr committed this same offense in Counts One and
Two.

A person may be guilty of an offense if she aided and
abetted another person in committing the offense.  It is not
necessary that all the people who committed the crime be caught
or identified.  It is sufficient if you find beyond a
reasonable doubt that the crime was committed by someone and

1    that Ms. St. Cyr knowingly and intentionally aided and abetted

2    that person in committing the crime.

3         In order to find Ms. St. Cyr guilty of civil disorder

4    because she aided and abetted others in committing this

5    offense, you must find that the government proved beyond a

6    reasonable doubt the following five requirements:  First,

7    others committed civil disorder by committing each of the

8    elements of the offense charged as I have earlier explained;

9    second, Ms. St. Cyr knew that civil disorder was going to be

10   committed or was being committed by others; third, Ms. St. Cyr

11   performed an act or acts in furtherance of the offense; fourth,

12   Ms. St. Cyr knowingly performed that act or acts for the

13   purpose of aiding, assisting, soliciting, facilitating or

14   encouraging others in committing the offense of civil disorder;

15   and fifth, Ms. St. Cyr did that act or acts with the intent

16   that others commit the offense of civil disorder.

17        To show that Ms. St. Cyr performed an act or acts in

18   furtherance of the offense charged, the government needs to

19   show some affirmative participation by Ms. St. Cyr which at

20   least encouraged others to commit the offense; that is, you

21   must find that Ms. St. Cyr -- that her acts or acts did in some

22   way aid, assist, facilitate, or encourage other to commit the

23   offense.

24        It is enough if Ms. St. Cyr's act or acts aid, assist,

25   facilitate, or encourage only one or some parts or phases of

1    the offense.

2        In deciding whether Ms. St. Cyr had the required

3    knowledge and intent to satisfy the fourth requirement for

4    aiding and abetting, you may consider both direct and

12:48:17  5    circumstantial evidence, including Ms. St. Cyr's words and

6    actions and other facts and circumstances.

7        However, evidence that Ms. St. Cyr merely associated

8    with persons involved in a criminal venture or was merely

9    present or was merely a knowing spectator during the commission

12:48:35 10    of the offense is not enough for you to find Ms. St. Cyr guilty

11    as an aider and abetter.

12        If the evidence shows that she knew that the offense

13    was being committed or was about to be committed but does not

14    also prove beyond a reasonable doubt that it was Ms. St. Cyr's

12:48:50 15    intent and purpose to aid, assist, encourage, facilitate, or

16    otherwise associate herself with the offense, you may find --

17    you may not find Ms. St. Cyr guilty of civil disorder as an

18    aider and abetter.

19        The government must prove beyond a reasonable doubt

12:49:08 20    that Ms. St. Cyr in someway participated in the offense

21    committed by others as something she wished to bring about and

22    to make succeed.

23        The government is not required to prove that anyone

24    discussed or agreed upon a specific time or method of

12:49:24 25    committing the crime.  The government is not required to prove

that the crime was committed in the particular way planned or
agreed upon.  Nor need the government prove that the principal
offender and the alleged -- and the person alleged to be the
aider and abetter directly communicated with each other.

12:49:44      Count Three.  Count Three of the indictment charges
Ms. St. Cyr with entering and remaining in a restricted
building or grounds.

      In order to find Ms. St. Cyr guilty of this offense,
you must find that the government proved each of the following
12:49:58  two elements beyond a reasonable doubt:  First, Ms. St. Cyr
entered or remained in a restricted building or grounds without
lawful authority do so; second, Ms. St. Cyr did so knowingly,
meaning she knew that the building or grounds was restricted
and she knew she lacked lawful authority to enter or remain
12:50:22  there.

      The term "restricted building or grounds" means any
posted, cordoned off, or otherwise restricted area of a
building or grounds where a person protected by the Secret
Service is temporarily visiting.

12:50:36      The term "person protected by the Secret Service"
includes the vice president and the immediate family of the
vice president.

      The term "knowingly" has the same meaning as in the
instructions for Counts One and Two that I have already read.

12:50:53      Count Four of the indictment charges Ms. St. Cyr with

1    disorderly and disruptive conduct in a restricted building or

2    grounds.

3              In order to find Ms. St. Cyr guilty of this offense,

4    you must find that the government proved each of the following

12:51:11  5    elements beyond a reasonable doubt:  First, Ms. St. Cyr engaged

6    in disorderly or disruptive conduct in or in proximity to any

7    restricted building or grounds; second, Ms. St. Cyr did so

8    knowingly and with the intend to impede or disrupt the orderly

9    conduct of government business or official functions; and,

12:51:31 10    third, Ms. St. Cyr's conduct, in fact, impeded or disrupted the

11    orderly conduct of government business or official functions.

12              A few definitions.  Disorderly conduct occurs when a

13    person acts in a manner that causes another individual to be in

14    reasonable fear that some harm to their person or property is

12:51:53 15    likely, uses words or takes actions likely to produce violence

16    on the part of others, is unreasonably loud or disruptive under

17    the circumstances, or interferes with another person by

18    jostling against or unnecessarily crowding that person.

19              Disruptive conduct is a disturbance that interrupts an

12:52:17 20    event, activity, or the normal course of a process.

21              The term "restricted building or grounds" has the same

22    meaning as in the instructions for Count Three.

23              And the term "knowingly" has the same meaning as in

24    the instructions for Counts One and Two.

12:52:35 25              Count Five of the indictment charges Ms. St. Cyr with

1        disorderly conduct in a Capitol building.

2                In order to find Ms. St. Cyr guilty of this offense,

3        you must find that the government proved each of the following

4        elements beyond a reasonable doubt:  First, Ms. St. Cyr engaged

5        in disorderly or disruptive conduct in any United States

6        Capitol building; second, Ms. St. Cyr did so with the intent to

7        impede, disrupt, or disturb the orderly conduct of a session of

8        Congress or either house of Congress; third, Ms. St. Cyr acted

9        willfully and knowingly.

10               Some definitions.  The term "United States Capitol

11       building" includes the United States Capitol located at First

12       Street Southeast in Washington, D.C.

13               The term "disorderly or disruptive conduct" has the

14       same meaning as in the instructions for Count Four defining

15       disorderly conduct and disruptive conduct.

16               A person acts willfully if she acts with the intent to

17       do something that the law forbids; that is, to disobey or

18       disregard the law.  An act is not done willfully if it is done

19       as a result of mistake, carelessness, lack of an evil purpose

20       or motive, or some other innocent reason.  Willfully does not,

21       however, require proof that Ms. St. Cyr was aware of the

22       specific law or rule that her conduct may be violating.

23               The term "knowingly" has the same meaning as it does

24       in the instructions for Counts One and Two.

25               Finally, Count Six of the indictment charges

1    Ms. St. Cyr with parading, demonstrating, or picketing in a

2    Capitol building.

3           In order to find Ms. St. Cyr guilty of this offense,

4    you must find that the government proved each of the following

12:54:27  5    elements beyond a reasonable doubt:  First, Ms. St. Cyr

6    paraded, demonstrated, or picketed in any United States Capitol

7    building; and second, that Ms. St. Cyr acted willfully and

8    knowingly.

9           The terms "parade" and "picket" have their ordinary

12:54:45 10   meanings.

11          The term "demonstrate" has its ordinary meaning and

12   includes conduct that would disrupt the orderly business of

13   Congress.

14          The term "United States Capitol building" has the same

12:54:57 15   meaning as in the instructions for Count Five.

16          The term "knowingly" has the same meaning as the

17   instructions for Counts One and Two.

18          And the term "willfully" has the same meaning as in

19   the instructions for Count Five.

12:55:17 20          You are here, ladies and gentlemen, to decide whether

21   the government has proved beyond a reasonable doubt that the

22   defendant is guilty of the offenses charged.

23          The defendant is not on trial for any act, conduct, or

24   offense not charged in the indictment.  It is not up to you to

12:55:33 25   decide whether anyone other than the defendant should be

prosecuted for any of the offenses charged.  The fact that
another person also may be guilty is no defense to a criminal
charge.  The question of the possible guilt of others should
not enter your thinking as you decide whether this defendant
has been proved guilty of the offenses charged.

Each count of the indictment charges a separate
offense.  You should consider each offense and the evidence
which applies to it separately, and you should return separate
verdicts as to each count.

The fact that you may find Ms. St. Cyr guilty or not
guilty on any one count of the indictment should not influence
your verdict with respect to any other count of the indictment.

Someone's intent or knowledge ordinarily cannot be
proved directly because there is no way of knowing what a
person is actually thinking.  But you may infer someone's
intent or knowledge from the surrounding circumstances.  You
may consider any statement made or acts done or omitted by
Ms. St. Cyr and all other facts and circumstances received in
evidence which indicate her intent or knowledge.

You may infer but are not required to infer that a
person intends the natural and probable consequences of acts
they intentionally did or did not do.  It is entirely up to you
however, to decide what facts to find from the evidence
received during the trial.

You should consider all the circumstances and evidence

that you think are relevant in determining whether the

government has proved beyond a reasonable doubt that

Ms. St. Cyr acted with the necessary state of mind.

While a defendant must act with a requisite intent for

each charged crime, this need not be the defendant's sole

purpose.  A defendant's unlawful intent is not negated by the

simultaneous presence of another purpose for the defendant's

conduct.

Now for a few closing remarks.  When you return to the

jury room, you should first select a foreperson to preside over

your deliberations and to be your spokesperson here in court.

There are no specific rules regarding how you should

select a foreperson.  That is up to you.  However, as you go

about the task, be mindful of your mission to reach a fair and

just verdict based on the evidence.  Consider selecting a

foreperson who will be able to facilitate your discussions, who

can help you organize the evidence, who will encourage civility

and mutual respect among all of you, who will invite each juror

to speak up regarding his or her views about the evidence, and

who will promote a full and fair consideration of the evidence.

A verdict must represent the considered judgment of

each juror, and, in order to return a verdict, each juror must

agree on the verdict.  In other words your verdict must be

unanimous.

During the course of the trial, a number of exhibits

1    were admitted into evidence.  Sometimes only those parts of an

2    exhibit that are relevant to your deliberations were admitted.

3    Where this has occurred, I've required the irrelevant parts of

4    the statement or exhibit to be blacked out or deleted.  Thus,

12:58:55  5    as you examine the exhibits and you see or hear a statement

6    where there appear to be omissions, you should consider only

7    the portions that were admitted.  You should not guess as to

8    what has been taken out.

9         I will be sending into the jury room with you the

12:59:12  10   exhibits that have been admitted into evidence.  You may

11   examine any or all of them as you consider your verdicts.

12   Please keep in mind that exhibits that were only marked for

13   identification but were not admitted into evidence will not be

14   given to you to examine or consider in reaching your verdict.

12:59:30  15   And you will have access to all the video evidence as well.

16        The question of possible punishment of Ms. St. Cyr in

17   the event of conviction is not a concern of yours and should

18   not enter into or influence your deliberations in any way.  The

19   duty of imposing sentence in the event of conviction rests

12:59:52  20   exclusively with me.  Your verdict should be based solely on

21   the evidence in this case, and you should not consider the

22   matter of punishment at all.

23        If it becomes necessary during your deliberations to

24   communicate with me, you may send a note through the clerk or

13:00:11  25   the marshal, signed by your foreperson or by any one or more

1    members of the jury.  No member of the jury should try to

2    communicate with me except by such a signed note.  And I will

3    never communicate with any member of the jury on any matter

4    concerning the merits of this case except in writing or orally

13:00:31  5    here in open court.

6             Bear in mind, also, that you are never under any

7    circumstances to reveal to any person, not to the clerk, to the

8    marshal, or to me, how jurors are voting until after you have

9    reached a unanimous verdict.  This means that you should never

13:00:48  10   tell me in writing or in open court how the jury is divided on

11   any matter.  This means, for example, that you should never

12   tell me that the jury is divided six to six, for example, or

13   seven to five or 11 to one, whether the vote is for conviction

14   or for acquittal or in any other issue in the case.

13:01:09  15            I will provide you with a copy of my instructions, as

16   I said.  During your deliberations, you may, if you want, refer

17   to these instructions.  While you may refer to any particular

18   portion of the instructions, you are to consider the

19   instructions as a whole, and you may not follow some and ignore

13:01:25  20   others.  If you have any questions about the instructions, you

21   should feel free to send me a note.  Please return the

22   instructions to me when your verdict is rendered.

23            During the trial, I've permitted those jurors who

24   wanted to do so to take notes.  You may take your notes with

13:01:43  25   you to the jury room and use them during your deliberations if

1    you wish.  As I told you at the beginning of the trial, your

2    notes are only to be an aid to your memory.  They are not

3    evidence in this case, and they should not replace your own

4    memory of the evidence.  Those jurors who have not taken notes

13:02:00  5    should rely on their own memory of the evidence.  The notes are

6    intended to be for the notetaker's own personal use.

7         At the end of your deliberations, the clerk will

8    collect your notebooks and the pencils when you return to the

9    courtroom.  We will destroy your notes immediately after the

13:02:17 10    trial.  No one, including myself, will ever look at them.

11         You will be provided with a verdict form that's two

12    pages.  This is the verdict form for use when you have

13    concluded your deliberations.  The form is not evidence in this

14    case and nothing in it should be taken to suggest or convey any

13:02:37 15    opinion by me as to what the verdict should be.  Nothing in the

16    form replaces the instructions of law I have already given you,

17    and nothing in it replaces or modifies the instructions about

18    the essential elements which the government must prove beyond a

19    reasonable doubt.  The form is meant only to assist you in

13:02:54 20    recording your verdict.

21         The form has some space for entries of your verdict on

22    each count charged.  You should record your verdict on that

23    form only after you have received -- I'm sorry.  You have

24    reached a unanimous verdict.  It should then be signed and

13:03:11 25    dated by the foreperson.

1          The attitude and conduct of jurors at the beginning of

2     the deliberations are matters of considerable importance.  It

3     may not be useful for a juror upon entering the jury room to

4     voice a strong expression of an opinion on the case or to

13:03:28  5     announce a determination to stand for a certain verdict.  When

6     one does that at the outset, a sense of pride may cause that

7     juror to hesitate to back away from an announced position after

8     a discussion of the case.

9          Furthermore, many juries find it useful to avoid an

13:03:44 10     initial vote upon retiring to the jury room.  Calmly reviewing

11     and discussing the case at the beginning of deliberations is

12     often a more useful way to proceed.  Remember that you are not

13     partisans or advocates in this matter; you are the judges of

14     the facts.

13:04:03 15          We're almost done.

16          As I've instructed you previously, in some cases,

17     although not necessarily in this one, there may be reports in

18     the newspaper, radio, television, or internet concerning the

19     case while deliberations are going on.  If there should be such

13:04:18 20     a media -- such media coverage in this case, you may be tempted

21     to read, listen to, or watch it.  You must not listen to, read

22     such reports, and you must decide this case solely on the

23     evidence presented in the courtroom.  This includes any

24     electronic communications such as email or text or any blogging

13:04:38 25     about the case.

1        In addition, you may not conduct any independent --

2    investigation during deliberations.  This means you may not

3    conduct any research in person or electronically via the

4    internet or in any other way.

13:04:52   5        You must consider only evidence that meets certain

6    standards in reaching your verdict.  For example, witnesses

7    must be sworn to tell the truth and must be subject to

8    cross-examination.  News reports about the case are not subject

9    to these standards.  And if you read, listen to, or watch these

13:05:10  10   reports, you may be exposed to misleading or inaccurate

11   information that unduly favors one side of the case and to

12   which the other side is unable to respond.

13        Therefore, you must completely disregard any press,

14   television, radio, or internet reports that you may read, see,

13:05:27  15   or hear or be told about.  Such reports are not evidence and

16   you should not be influenced in any manner whatsoever by such

17   publicity.

18        If any publicity about this trial inadvertently comes

19   to your attention during your deliberations, please do not

13:05:44  20   discuss it with other jurors or anyone else.  Just let me or

21   the clerk or marshal know as soon after it happens as you can.

22   I will then briefly discuss it with you to make sure it does

23   not present any problems.  In fairness to both sides, it is

24   essential that you comply with this instruction.

13:06:04  25        Now, the last thing I must do before you begin your

deliberations is to excuse the alternate jurors.  And this is a
little bit of a sad thing to do, but it is a necessary thing.
As I told you before, the selection of alternates was an
entirely random process.  It's nothing personal.  We selected
two seats to be the alternate seats before any of you entered
the courtroom.  Since the rest of you have remained healthy and
attentive, I can now excuse those two jurors.  And they are the
jurors in seats six and ten.

Before you two leave, I'm going to ask you to tear out
a page from your notebook and to write down your name and
daytime phone number and hand it to Mr. Bradley, the clerk.  I
do this because it's possible, but not likely, that we will
need to summon you back to rejoin the jury in case something
happens to one of the regular jurors.

Since that possibility exists, I am also going to
instruct you not to discuss the case with anyone until we call
you.  My earlier instruction on the use of the internet still
applies.  Please don't research this case or communicate about
it on the internet.

In all likelihood, we will be calling you to tell you
there's been a verdict and you're now free to discuss the case
or do any research.  There is, however, the small chance that
we will need to bring you back on to the jury.

Thank you very, very much for your service, for your
attention, and for your diligence.  And please -- do they need

1      to report back to the jury lounge?

2                  COURTROOM DEPUTY:  No.  They're done.

3                  THE COURT:  You just need to turn in your badges --

4                  COURTROOM DEPUTY:  Yes.

13:07:44  5         THE COURT:  -- on your way out.

6              Mr. Bradley, if you could take the jurors in seats six

7      and ten.  And, again, it's with sadness that I dismiss you, but

8      it is a necessary part of this process.  And thank you again.

9          (Alternates excused.)

13:08:20 10         THE COURT:  Now for your favorite word:  Finally.  I

11     want to mention one or two matters before you begin your

12     deliberations.  These concern how your verdict will be

13     delivered.

14             When you have reached your verdict, just send me a

13:08:35 15    note, telling me you have reached a verdict and have your

16     foreperson sign the note.  Don't tell me what the verdict is,

17     do not send your verdict form out.  I will find out your

18     verdict by asking your foreperson to provide the verdict form,

19     and the verdict will then be stated in open court after you

13:08:51 20    have finished your deliberations and returned to court.

21             Don't be surprised when your verdict is returned if

22     one of the parties asks that the jury be polled.  The reason

23     for polling the jury is because each party has a right to be

24     sure that your verdict is unanimous.  Polling means that after

13:09:06 25    the foreperson states your verdict or I state it, I will ask

1  each of you individually whether your verdict agrees with that

2  announced by your foreperson.

3         Your job is easy.  If you agree with the verdict, you

4  should simply say yes when I call the number of your jury seat.

13:09:25  5  If you disagree in any way, you should simply say no.  Do not

6  say anything other than yes or no in response to a poll of the

7  jury and do not say anything during the poll unless and until

8  your seat number is called.

9         Ladies and gentlemen of the jury, at this time you may

13:09:40  10  retire to begin your deliberations.

11         Mr. Bradley assures me that the lunch is there in the

12  jury room for you.  You can begin your deliberations whenever

13  you wish, before you begin to eat lunch, after.  That's up to

14  you.  So I ask you to return now to the jury room to begin your

13:09:59  15  deliberations and enjoy the lunch that Mr. Bradley has worked

16  overnight to prepare for you.

17         COURTROOM DEPUTY:  It's good, yeah.

18         THE COURT:  If you believe that . . .

19  (Jury excused.)

13:10:20  20  (In open court.  Jury not present.)

21         THE COURT:  If he doesn't already, Jake, you need to

22  make sure that Mr. Bradley has a copy of the jury instructions

23  and the verdict form to give to the jury.  Not this second.

24         LAW CLERK:  Are you giving yours?  He said he's going

13:10:48  25  to grab yours.

1                    THE COURT:  We can give him mine.  We know this one is

2          complete because I just read it.  There is only one typo in it,

3          but I don't think it is a typo that matters so we will just go

4          with it as is.  And then when Mr. Bradley gets back in here,

13:11:15  5     make sure you get the exhibits all together and useful for the

6          jury to consider and use.

7                    So it's 1:12.  I'm not going to require you to stay in

8          the courthouse.  But I do require you to be available quickly

9          if we get a note or when the jury completes its deliberations.

13:11:44  10   So don't be more than ten or 15 minutes away.

11                   If we do get -- you know, at sometime as the after

12         progresses, I will ask you to come back.  But we don't need to

13         do that now.

14                   So is there anything that we do need to discuss at

13:12:01  15   this moment?

16                   Ms. Owens?

17                   MS. OWENS:  Your Honor, thank you.

18                   The parties have put what they believe are the

19         admitted exhibits onto a disk for the jury.  I had some

13:12:14  20   questions, though, so I wanted to check that with Your Honor's

21         list.

22                   THE COURT:  I'm going to give my list to Mr. Bradley

23         so he can check that with you.

24                   MS. OWENS:  And then he will check this.  Perfect.

13:12:27  25   Thank you.

1          THE COURT:  All right.  Anything else?

2          All right.  I'll put everything in Mr. Bradley's

3     hands, and he will be back here and can discuss the exhibits

4     with you to make sure that we have unanimity of what exhibits

13:12:49  5     have been -- thank you all and we will be in touch.

6          (Jury deliberating.)

7          (In open court.  Jury not present.)

8          THE COURT:  All right.  I tried to catch you in time

9     to do this by phone.  I don't think I need you here for it, but

15:06:24  10    we will do it in this manner.

11          Anyway, I received a note.  The note says:  We would

12    like to get a transcript of the defendant's testimony.  My

13    response in writing I propose would be the following:  The jury

14    has submitted a note, making the following request:  We would

15:06:43  15    like to get a transcript of the defendant's testimony.  The

16    answer to this request is:  Transcripts are not prepared

17    contemporaneously and are not available to the jury during

18    deliberations.  The jury should rely on its recollections of

19    all the testimony.

15:07:00  20          MS. SCHESNOL:  Your Honor, the government is fine with

21    that.  Perhaps adding jury should rely on their recollections

22    and any notes, if taken.

23          THE COURT:  No.  I'm not going to say rely on the

24    notes because the notes are an individualized -- then I would

15:07:18  25    have to remind them they are not to be for other jurors.

1           MS. SCHESNOL:  Fair enough.  Fair enough.

2           MS. OWENS:  Thank you, Your Honor.  We would agree

3    with just reminding them that they need to rely on their own

4    recollection.  Thank you.

15:07:29  5           THE COURT:  All right.  So I will sign this and have

6    Mr. Bradley provide it to the jury.  The date is --

7           COURTROOM DEPUTY:  The tenth.

8           THE COURT:  Yes.  And the time is three . . .

9           All right.  Make sure we get a copy in chambers of it.

15:08:05  10          COURTROOM DEPUTY:  If you guys want to see the note,

11   that's the note.  I'm going to take the response.

12          THE COURT:  We got less than two hours.  I don't know

13   if you want to hang around here or not.

14          COURTROOM DEPUTY:  They were right here on the floor.

15:08:19  15          THE COURT:  All right.  Okay.

16          COURTROOM DEPUTY:  All rise.

17       (Jury deliberating.)

18       (In open court.  Jury not present.)

19          THE COURT:  Good afternoon, everyone.

16:41:37  20          We have a note from the jury.  The note reads:  We

21   have reached verdicts on all six counts.

22          So we will bring the jury in and see what the verdicts

23   are.

24          COURTROOM DEPUTY:  Your Honor, the jury panel.

16:44:42  25       (Jury present.)

1          THE COURT:  All right.  Welcome, ladies and gentlemen.

2          We have your note.  Who will speak as your foreperson?

3      (Foreperson indicating.)

4          THE COURT:  And has the jury unanimously agreed on

16:44:53   5  each of the six verdicts?

6          FOREPERSON:  Yes, Your Honor, we have.

7          THE COURT:  If you could, hand that verdict sheet to

8      the marshal who will hand it to Mr. Bradley who will hand it to

9      me.

16:45:09  10         Thank you.  All right.  I find that the verdict form

11     is in good order.  And I will now publish your verdict; that

12     is, I will read the verdict aloud in open court.  I remind you

13     to pay close attention because it is possible that there will

14     be a request that you be polled.  So listen closely as I read

16:45:43  15  it in case I make a mistake.

16         The verdict form has six counts to it, and I will read

17     each of those counts.  Count Number One, with respect to the

18     offense of civil disorder in violation of 18 U.S.C. Sections

19     231A(3) and (2) related to the events on the west plaza of the

16:46:03  20  United States Capitol, we find the defendant, Yvonne St. Cyr,

21     guilty.

22         Number two, with respect to the offense of civil

23     disorder in violation of Title 18 of the U.S. Code, Sections

24     231A (3) and (2) related to events in the lower west terrace

16:46:22  25  tunnel, we find the defendant, Yvonne St. Cyr, guilty.

1           Count Three, with respect to the offense of entering

2   or remaining in a restricted building or grounds in violation

3   of Title 18 of the United States Code, Section 1752(a)(1), we

4   find the defendant, Yvonne St. Cyr, guilty.

16:46:43  5           Count Four, with respect to the offense of disorderly

6   or disruptive conduct in a restricted building or grounds in

7   violation of Title 18 of the U.S. Code, Section 1752(a)(2), we

8   find the defendant, Yvonne St. Cyr, guilty.

9           Count Five, with respect to the offense of disorderly

16:47:02 10  conduct in a Capitol building in violation of 40 U.S.C.,

11  Section 5104(e)(2)(D), we find the defendant, Yvonne St. Cyr,

12  guilty.

13          And Count Six, with respect to the offense of

14  parading, demonstrating, or picketing in a Capitol building in

16:47:22 15  violation of Title 40 of the U.S. Code, Section 5104(e)(2)(D),

16  we find the defendant, Yvonne St. Cyr, guilty.

17          And that is signed by the foreperson.

18          Is there a request for polling?

19          MS. OWENS:  Yes, Your Honor.

16:47:40 20          THE COURT:  All right.  I'm now going to poll the

21  jury.  I will do it by stating the question and then calling

22  out each seat, the jury seat that you're in.  And you only

23  have -- I will not repeat the question each time.  And you only

24  have to answer yes or no to the question.

16:47:55 25          And the question is whether the verdict, as just

```
 1    published, constitutes your individual verdict in all respects.

 2                 Juror in seat number one?

 3                 JUROR:  Yes.

 4                 THE COURT:  Juror in seat number two?

 5                 JUROR:  Yes.

 6                 THE COURT:  Juror in seat number three?

 7                 JUROR:  Yes.

 8                 THE COURT:  Juror in seat number four?

 9                 JUROR:  Yes.

10                 THE COURT:  Juror in seat number five?

11                 JUROR:  Yes.

12                 THE COURT:  Juror in seat number seven?

13                 JUROR:  Yes.

14                 THE COURT:  Juror in seat number eight?

15                 JUROR:  Yes.

16                 THE COURT:  Juror in seat number nine?

17                 JUROR:  Yes.

18                 THE COURT:  Juror in seat number 11?

19                 JUROR:  Yes.

20                 THE COURT:  Juror in seat number 12?

21                 JUROR:  Yes.

22                 THE COURT:  Juror in seat number 13?

23                 JUROR:  Yes.

24                 THE COURT:  And juror in seat number 14?

25                 JUROR:  Yes.
```

1        THE COURT:  The verdict, after polling, is accepted by

2    the Court and unanimity is verified, and the verdict form will

3    be filed and recorded in the record.

4        With that, we can discharge the jury.  There's nothing

16:48:59   5    further that the parties have at this time with respect to the

6    jury, is there?

7        MS. SCHESNOL:  No, Your Honor.

8        MS. OWENS:  No, Your Honor.

9        THE COURT:  All right.  Ladies and gentlemen, again,

16:49:07  10    thank you very, very much for your patience, diligence, and

11    good service to the community.  It's necessary and appreciated

12    very much by the Court and by the criminal justice system.

13        I wish you well.  Have a good weekend.  And thank you

14    again.

16:49:26  15        (Jury excused.)

16        (In open court.  Jury not present.)

17        THE COURT:  All right.  Two things we have are

18    sentencing date and any consideration of the change of status

19    pending a sentencing.

16:50:06  20        But, first, is there anything from the defense before

21    we do that?

22        MS. OWENS:  Your Honor, we would renew our motion

23    under Criminal Rule of Procedure 29 for a judgment of

24    acquittal.

16:50:18  25        THE COURT:  Do you have a desire to file a written

1  motion?  If you do, I will allow you to do that.

2            MS. OWENS:  No, Your Honor.

3            THE COURT:  All right.  Do you wish to argue?

4            MS. OWENS:  No, Your Honor.

16:50:32  5            THE COURT:  Anything from the government?

6            MS. SCHESNOL:  No, Your Honor.

7            THE COURT:  All right.  I had some questions in my

8  mind about the sixth count and whether standing on a ledge at

9  the very end of the tunnel without -- if one was not doing

16:51:01  10  anything other than standing there would constitute parading,

11  picketing, or demonstrating in a Capitol building.

12            I questioned both as to whether it's in a Capitol

13  building and whether it's one of those acts, one of those --

14  that type of conduct.  I don't think it's parading.  I don't

16:51:28  15  think it's picketing.  But there was more done than just

16  standing there.  There was encouragement.  There was yelling

17  by -- evidence of yelling by the defendant.  And there is

18  testimony that -- from the perspective of the Capitol Police

19  that the tunnel is considered part of the Capitol, and I think

16:51:57  20  that is a reasonable interpretation.

21            So that was close.  And I had to think it through.

22  But with respect to all of the other counts, as well as that

23  count, there was, in my judgment, sufficient evidence presented

24  in this case for a reasonable jury to reach a verdict of guilty

16:52:18  25  on each of those counts.

1                   And so I'm going to deny, after the completion of all

2       the evidence and now the jury's verdict -- I'm going to deny

3       the motion under Rule 29.

4                   With that, we need a sentencing date, Mr. Bradley.   In

16:52:34  5       about 90 days is what we're looking at these days.

6                   COURTROOM DEPUTY:   That brings us to Thursday,

7       June 8th.   I think that's a Thursday.   I know it's June 8th.

8                   THE COURT:   What do I have scheduled that week?

9                   COURTROOM DEPUTY:   Well, nothing actually.

16:52:48 10       THE COURT:   Nothing.

11                  COURTROOM DEPUTY:   You have no hearings that week, no.

12                  THE COURT:   What do I have scheduled the following

13       week?   June is good because all my January 6 trials I've got

14       scheduled before then.   Hopefully I'm going to get through them

16:53:03 15       all.   What do I have scheduled the following week?

16                  COURTROOM DEPUTY:   Trial.

17                  THE COURT:   In a January 6 case?

18                  COURTROOM DEPUTY:   Yeah.   I have it on the calendar as

19       such.

16:53:19 20       THE COURT:   How about the end of that week of June 8th

21       or is there someone who is going to be on a well-deserved

22       vacation?

23                  MS. SCHESNOL:   As they say, no rest for the weary.

24                  Your Honor, I will actually be in another January 6th

16:53:36 25       trial that week.   However, if the Court has availability

1    afternoon of the Ninth, I think that's realistic.

2              THE COURT:  What day of the week is the Ninth?

3              MS. SCHESNOL:  The Friday.  If that's available, I

4    think that's realistic that I would be available.

16:53:51  5              MS. OWENS:  Your Honor, the request we would have is

6    it be set in the afternoon just given our travel logistics.  I

7    think that makes the most sense.  We appreciate that.

8              THE COURT:  All right.  I think I can schedule it on

9    June 9th in the afternoon.  Is 2:00 o'clock all right?

16:54:06  10             MS. SCHESNOL:  The later the better.

11             THE COURT:  I like to plan it at 2:00 o'clock just in

12   case someone has weekend out-of-town plans.

13             MS. SCHESNOL:  Will you tell Judge Kelly where I am in

14   the event I'm not done in his court?

16:54:21  15             THE COURT:  Well, if you're not done in his court and

16   it's a trial, it will probably take precedence over the

17   sentencing.

18             MS. SCHESNOL:  That's why I'm thinking the later the

19   better.

16:54:33  20             THE COURT:  I understand.  I understand.

21             MS. SCHESNOL:  I'm just thinking he might allow us to

22   break early if we're not done that Friday.  That's all.

23             THE COURT:  It seems to me that it's more likely if

24   the trial is still going on -- it's more likely that he will be

16:54:41  25   comfortable with an earlier break in the day than ending the

1    proceedings at 4:00 o'clock because he can just schedule lunch

2    later.

3              MS. SCHESNOL:  Fair enough.

4              THE COURT:  I can do the 1:30 even.  That would be a

16:54:49  5    little more flexible in terms of if the trial is still going

6    on.  Maybe you will be able to convince him to have the lunch

7    break at that time.

8              MS. SCHESNOL:  That sounds great, Your Honor.  Thank

9    you.

16:54:59  10             THE COURT:  Why don't we do 1:30 on Friday, June 9th.

11   I will need sentencing memorandums by the previous Friday.  So

12   that's June 2nd.

13             Any request to change the current circumstances of Ms.

14   St. Cyr's release?

16:55:23  15             MS. SCHESNOL:  Not at this time, Your Honor.

16             THE COURT:  So, Ms. St. Cyr, you are on release

17   currently under certain conditions.  We're going to leave you

18   in that circumstance under those same conditions.  That means

19   you need to continue to report and comply with those

16:55:42  20   conditions.  A failure to do so could subject you to a serious

21   consequence.

22             THE DEFENDANT:  Yes, sir.

23             THE COURT:  I would advise you, as well, of two other

24   things.  Number one, you now have a sentencing date.  It's

16:55:54  25   June 9th at 1:30 here in this courtroom.  You will need to be

1    here at that time.  A failure to appear could subject you to

2    independent criminal consequences.

3            And, lastly, if while on release under these

4    conditions you were to commit a crime, you could be subject to

16:56:11  5    more serious penalties for that crime than you otherwise would

6    face.

7            With those admonitions that I give to everyone in this

8    circumstance, I think we're done for the day unless there's

9    anything else.

16:56:25  10           From the government?

11           MS. SCHESNOL:  No, Your Honor.  Nothing from the

12    government.  Thank you.

13           THE COURT:  From the defense?

14           MS. OWENS:  No, Your Honor.  Thank you.

16:56:29  15           THE COURT:  Thank you all.  It was a well-tried case.

16    I appreciate the efforts of all counsel.  I think the interest

17    of the United States and the interest of Ms. St. Cyr were well

18    represented and well presented, and that is a credit to those

19    involved and to the criminal justice system.  Thank you all.

16:56:45  20           COURTROOM DEPUTY:  All rise.  This honorable court

21    stands in recess until the return of court.  Have a good day,

22    everybody.

23        (The Proceedings were concluded at approximately 4:56 p.m.

24    on March 10, 2023.)

25

**CHERYL K. POWELL, CCR, RPR, FCRR**
Federal Official Court Reporter
155 St. Joseph Street
Mobile, AL 36602
251-690-3003/cheryl_powell@alsd.uscourts.gov

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4

5          I, the undersigned, hereby certify that the foregoing

6   pages contain a true and correct transcript of the

7   aforementioned proceedings as is hereinabove set out, as the

8   same was taken down by me in stenotype and later transcribed

9   utilizing computer-aided transcription.

10          This is the 10th day of May of 2023.

11

                      *Cheryl K Powell*

13   _____

14             Cheryl K. Powell, CCR, RPR, FCRR

15          Federal Certified Realtime Reporter

16

17

18

19

20

21

22

23

24

25