# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22-cr-185-JDB** |
| **YVONNE ST CYR,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Yvonne St Cyr to 33-months of imprisonment, which is the high end of the 27-33 month advisory Guidelines range, a term of supervised release of three years, restitution in the amount of $2,000, and a mandatory special assessment of $270.

## I.      INTRODUCTION

The defendant, Yvonne St Cyr, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

St Cyr, a former Marine Corps drill instructor, repeatedly engaged in riotous activity at the Capitol on January 6. When she arrived at the Capitol, she forced her way to the front of the crowd and pushed her body against the police line barricades on the Lower West Plaza. Despite entreaties from officers, she remained there for more than fifteen minutes, disobeying police commands to move and even ignoring their physical shoves to her back. When the crowd ultimately overwhelmed the police officers in that area, St Cyr was one of the first rioters to break through the fence line. She marched forward, eventually making her way into the notorious Lower West Terrace tunnel where she witnessed vicious acts of violence against police officers. She entered the tunnel not once but twice, the second time climbing onto a ledge overlooking the melee from which she filmed the violence and shouted at the crowd "we need fresh people" and "push, push, push." St Cyr finally left the tunnel when a police officer prodded her out with a flagpole. She then entered a senator's hideaway room adjacent to the tunnel, climbing through a broken window, where she helped another rioter enter the room and livestreamed video of herself while inside.

After a jury trial, St Cyr was convicted of two separate felony counts for violating 18 U.S.C. § 231(a)(3) and misdemeanors. The first § 231(a)(3) count was based on St Cyr's pushing against and breaking through the police barriers on the West Plaza, and the second § 231(a)(3) count was for yelling for "fresh people" and to "push" from her perch atop a ledge inside the tunnel. These are two separate and distinct crimes separated by both time and distance.

The government recommends that the Court sentence St Cyr to 33 months' incarceration, which is within the advisory Guidelines' range of 27-33 months, which the government submits is

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

the correct Guidelines calculation. A 33-month sentence reflects the gravity and seriousness of St Cyr's conduct.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the Court to the Affidavit in Support of the Criminal Complaint filed in this case, ECF 1-1, as well as the evidence introduced at trial, for a summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

#### *Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds*

Assaults against law enforcement on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible.  Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk. The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



***Image 1****: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds.   At approximately 12:45 p.m., a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway.   Seeing this, a half dozen USCP officers began to gather behind what is labeled in Government's Image 1 as "1st Police Barricade," circled in red and marked as Area A.   At 12:52 p.m., the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to

4

engage with USCP officers at the first manned barrier.  Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob.  By 12:58 p.m., the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Images 1.  They flooded the area labeled "Lower West Plaza" Area C on Government's Image 1, pushing against the barricade there.



***Images 2A-D***: *Four still images from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza.  For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and

5

reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



***Images 3A-D****: Four still images of the breach (top left) of the West Plaza barricades which was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left). In the photo of the nearly completed bicycle rack barrier line as of 1:39 p.m., a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 p.m., the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol.  At 2:03 p.m., Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd.  It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately.  This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left.  On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles.  Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves.  By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called.  With their defensive lines extinguished, several police officers were surrounded by the crowd.  The rioters had seized control of the West Plaza and the inauguration stage.  There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent.



***Images 4A-C****: Three still images of the breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed*

*by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

### Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the doors of the West Front of the U.S. Capitol Building

> The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line.

Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT"). The entrance usually consists of a flight of stairs leading to a doorway. On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long. That tunnel led to two sets of metal swinging doors inset with glass. On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building. The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building. This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day. Image 5; "Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.



***Image 5****: The entrance to the "tunnel" as it appeared on Inauguration Day.*

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby. Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department (MPD), were arrayed inside the doorway and guarding the entrance. Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

    At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and the

law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist. The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles and other items. Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray. At a later hearing on the events of January 6, Congressman Stephanie Murphy described her experience near this location in response to testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people. And most people don't know this -- and I don't think even you know this -- but your actions had a profound impact on me. So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in. That's about from the distance where I'm sitting here on the dais to that back wall. And from that office in close proximity to where you all held the line, I listened to you struggle. I listened to you yelling out to one another. I listened to you care for one another, directing people back to the makeshift eyewash station that was at the end of our hall. And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight."

Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers. The battle for the LWT entrance involved

11

intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction and tasering of MPD Officer Michael Fanone and the previously-mentioned assault of Officer Daniel Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters who took turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force.  Capitol Police Sgt. Aquilino Gonell, who was present in the tunnel that day, explained:

> What we were subjected to that day was like something from a medieval battle. We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process. My fellow officers and I were committed to not letting any rioters breach the Capitol. It was a prolonged and desperate struggle.

*Id.* (Statement of Sgt. Aquilino Gonell).  Despite the mob's efforts, the officers in the LWT held the line with commendable restraint, and through personal sacrifice and valor.  MPD Officer Michael Fanone remembers one of his colleagues' actions that day:

> In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle remained cool, calm, and collected as he gave commands to his officers. "Hold the line," he shouted over the roar. Of course, that day, the line was the seat of our American government. Despite the confusion and stress of the situation, observing Ramey's leadership, protecting a place I cared so much about, was the most inspirational moment of my life. The bravery he and others showed that day are the best examples of duty, honor, and service.

*Id.* (Statement of Officer Michael Fanone).

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional

12

munitions around 5 p.m.

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the tunnel area.  It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others and prevented potential harm to members of Congress.

### St Cyr's Role in the January 6, 2021 Attack on the Capitol

#### *St Cyr's Approach to the Capitol*

St Cyr participated in the January 6 attack on the Capitol. Her crimes are documented through a series of videos and images including footage from Metropolitan Police Department body worn cameras, open-source videos, and surveillance camera footage taken from inside the Capitol building.

St Cyr traveled to Washington, D.C. from her home in Mountain Home, Idaho, to attend former President Donald Trump's "Stop the Steal" rally at the Ellipse. After the rally, St Cyr marched with others toward the U.S. Capitol.

While already within the restricted perimeter of the Capitol grounds, St Cyr repeatedly shouted invective as she walked closer to the Capitol building, including: "Push it!"; "There are millions of us!"; "They can't stop us all!"; and "Tear it down!" (Tr. 3/9/2023, 870: 24-25, 871, 1-2, 871: 22-23, and 872: 8-9).

#### *On the West Plaza, St Cyr Disobeyed Police Commands and Pushed Against the Police Line*

After walking past established barriers including bike rack fencing, snow fencing, and "Area Closed" signs, St Cyr arrived at the Capitol's West Plaza just after 2:00 p.m.

To get to the front the line of rioters facing off with the police, St Cyr worked her way through thousands of people, because "where there's a will, there's a way." (Tr. 3/9/2023, 873: 4-16).  St Cyr remained amongst the chaos of Yelling, fighting, and chemical spray at the front of the police line.  (Tr. 3/9/2023, 873: 22-25; 874: 1-24).

Once face to face with police officers, St Cyr pushed her back against the bike rack fencing officers had placed to aid in their attempts at crowd control, and, for more than 15 minutes, refused to move. St Cyr stayed, lodged against the fence, even when police officers gave her repeated commands to "back up" and enlisted the help of others to "get her off the line."



***Image 6, Screenshot from Sentencing Exhibit 1 at 3:08****: St Cyr's backside wedged against the police line on the West Plaza. (Trial Ex. 708.5[marked but not admitted], derived from admitted Trial Exhibit 708)*

At trial, St Cyr admitted that she intentionally disobeyed officers.  (Tr. 3/9/2023, 878: 14-19,  during this time and that she "interfered with police." (Tr. 3/9/2023, 881: 7-15). St Cyr defying police orders, because she was going to "stand her ground."  (Tr. 3/9/2023, 886: 21-25).  St Cyr remained with her body pushed against the bike rack until 2:28 p.m., when the police line collapsed.

### St Cyr Led the Breach of the Police Line

St Cyr was one of the first people to breach the police line on the Lower West Terrace when it broke at 2:28 p.m. Amidst a chaotic scene of vitriolic shouting, thrown objects, and violent outbursts, St Cyr and her fellow rioters finally overpowered the few police officers who continued trying to hold their line on the Lower West Terrace. St Cyr, positioned at a seam in the bike rack fencing, pushed forward, flagstaff in hand, through the line of fencing and into the open area of the Lower West Terrace behind police.



***Image 7, Screenshot from Sentencing Exhibit 2 at 00:05***: *Taking advantage of a weak point in the fence line, St Cyr pushes her way forward. (Trial Ex. 609.1)*

As soon as St Cyr passed through the line, she continued her march forward to the Capitol building. Although she had ample opportunity to leave Capitol grounds, St Cyr instead made a beeline toward the Capitol's west side.



***Image 8, Screenshot from Sentencing Exhibit 3, at 0:49****: St Cyr marching forward after breaking through the police line. (Trial Ex. 605)*

### St Cyr Entered the Tunnel, Then Was Thrown Out

Minutes later, St Cyr made her first entry into the Tunnel—the site of some of the most heinous violence to take place on January 6. During her first incursion into the tunnel, St Cyr marched in just seconds after another rioter broke through the first set of glass doors.



***Image 9, Screenshot from Sentencing Exhibit 4, at 1:55****: Rioters breaking through the glass of the doors from the tunnel into the Capitol at 2:42:11 p.m. (Trial Ex. 702)*



***Image 10, Screenshot from Sentencing Exhibit 5, at 2:17****: St Cyr approaching the tunnel at 2:42:13 p.m. (Trial Ex. 404.2)*

St Cyr entered the Capitol through the tunnel and positioned herself between the two sets of glass double doors. Although chaos engulfed the area around her, St Cyr remained for approximately 13 minutes, refusing to leave the tunnel until a police officer grabbed her by the arm and forced her toward the exit at 2:55 p.m.



***Image 11****: Having been forced out by police officers, St Cyr leaves the Tunnel after her first incursion. She would return to climb onto a ledge just minutes after this. (Trial Ex. 707.2)*

***St Cyr Reentered the Tunnel and Provoked the Crowd from Her Perch on the Ledge***

Although police officers physically ejected St Cyr from the tunnel after her first incursion, she was not deterred. After less than three minutes outside the tunnel, St Cyr came back into the tunnel at 2:56 p.m., this time climbing onto the ledge on a side of the tunnel overlooking the mass of rioters. She stayed on that ledge for more than 20 minutes. While standing above the raucous crowd, St Cyr filmed the violence in front of her using her cellphone camera.



***Images 12A-C, Screenshots from Sentencing Exhibit 6, at 0:23, 2:50, and 4:45****: Screenshots of the violence St Cyr filmed with her cellphone inside the tunnel, including a rioter using a baton to strike police officers, another rioter launching a pole like a javelin, and another rioter spraying police officers with what appears to be pepper spray. (Trial Ex. 803)*

But St Cyr's participation in the riot was not limited to passive observation. On two separate occasions, St Cyr shouted down at the crowd, endorsing, encouraging, and provoking their attacks.

First, after another rioter who was also perched on the ledge shouted for "fresh people," St Cyr joined in the cries. At 3:03 p.m., she said, "Here, I got a loud mouth," then turned her head and body toward the larger crowd outside the tunnel on the Upper West Terrace and shouted, "We need fresh people! We need fresh people!"



***Images 13A-B, Screenshots from Sentencing Exhibit 7, at 6:19****: Composite image of simultaneous screenshots from Capitol CCTV and St from Cyr's own cellphone from her vantage point of leaning out of the tunnel and screaming for "fresh people." (Trial Ex. 906.1)*

Minutes later, at 3:04 p.m., St Cyr again goaded on the crowd. Watching rioters inside the tunnel engage in a heave-ho movement against police officers, St Cyr repeatedly shouted "Push!" at least fifteen times, further inciting the crowd's riotous behavior.



***Images 14A-B, Screenshots from Sentencing Exhibit 7, at 7:11****: Composite image of simultaneous screenshots from Capitol CCTV and St from Cyr's own cellphone from her vantage point of St Cyr yelling at rioters to "Push! Push! Push!" (Trial Ex. 906.1)*

Eventually, police officers in the tunnel began gaining an upper hand against the mob, forcing the crowd back and out of the tunnel's entrance. Still, St Cyr refused to leave her perch on the ledge. Only after police removed four other rioters from the same ledge, and after a police officer climbed onto the ledge and physically prodded St Cyr with a flagpole, did she finally jump down and leave the tunnel at 3:19 p.m.

But even after all she had seen and done in the tunnel, St Cyr still was not ready to leave Capitol grounds.



***Image 15, Screenshot from Sentencing Exhibit 8, at 1:03****: A screenshot from an officer's body worn camera shows the officer using a flagpole to finally dislodge St Cyr from the ledge. (Trial Ex. 905.2)*

MPD Commander Ramey Kyle described the events on the Lower West Terrace in a video victim impact statement, as seen in **Sentencing Exhibit** 9.

### St Cyr Entered a Senator's Hideaway Room Adjacent to the Tunnel

Having been ejected from the tunnel by police officers a second time, St Cyr found another way into the Capitol building. A few feet away from the tunnel's entrance, she found a broken window and crawled through it into a Senator's hideaway room, room ST-2M. Once inside the hideaway room, St Cyr leaned through a different broken window and filmed the crowd and herself on her cellphone. St Cyr also helped another rioter climb through that window and into room ST-2M.



***Image 16, Screenshot from Sentencing Exhibit 10, at 0:55****: St Cyr hoisting a fellow rioter into ST-2M. (Trial Ex. 617)*

St Cyr also filmed herself ranting while inside the room. She live-streamed her diatribes to Facebook and finished her last video with a corrosive statement: "Welcome to Communist America, aren't you so fucking proud?"



***Images 17A-B***: *Screenshots of the videos St Cyr filmed in ST-2M and posted on the internet. (Trial Exs. 806, 807)*

### ***St Cyr Finally Left Capitol Grounds, But Only After Police Deployed Chemical Agents***

Ultimately, after finally leaving room ST-2M, St Cyr made her way off Capitol grounds. With tear gas heavy in the air and the sounds of explosive devices detonating in the background, open-source video captured St Cyr walking away from the Capitol building. The fading dusk light and the fact that the lamps on the Capitol's light poles had become illuminated made it clear that St Cyr remained on Capitol grounds for hours after she first arrived at about 2:00 p.m. that day.



***Image 18, Screenshot from Sentencing Exhibit 11, at 0:21****: Open-source video captured the fog of tear gas on the Lower West Terrace as dusk sets in and St Cyr finally retreats.*
*(Trial Ex. 619)*

### St Cyr's Testimony at Trial

At trial, St Cyr testified falsely multiple times. St Cyr testified that she did not know that she was not allowed to be on the West Plaza, or inside the Lower West Terrace tunnel. (Tr. 3/9/2023, 850:8-9, 875:8-9; Tr. 3/10/2023, 957:15-958:24).  She said she believed she had a right to go inside the Capitol. (Tr. 3/9/2023, 835:1-25, 851:25-852:7). But on cross examination, she admitted seeing throngs of police, pepper spray, and violence all around her. (Tr. 3/9/2023, 869:10-870:17, 873:22-874:21).  In an attempt to support her absurd position, she asserted that she had never been to the U.S. Capitol before so she didn't know that she could not go in. (Tr. 3/9/2023, 833:17 – 835:9). She also testified that she had been to the State Capitol in Idaho, where there is no security, so she didn't know she had to go through security at the U.S. Capitol. *Id.* By its verdict, the jury rejected this testimony.

St Cyr also testified that she thought that she could go inside Senate room ST-2M immediately adjacent to the tunnel. (Tr. 3/9/2023, 851:12-852:7).  This testimony is belied by the fact that she entered ST-2M by crawling through a broken window after her forced removal from the tunnel two separate times. Sy Cyr testified that she only went into ST-2M to use a phone to

call her husband. (Tr. 3/9/2023, 851:12-852:7).  But once inside ST-2M, St Cyr remained for an extended period of time, during much of the time using her own phone (which was returned to her by a stranger) to film and livestream events, including destruction of property and the chaos on the West Front of the U.S. Capitol. St Cyr was also captured by open-source video hanging out of a window while assisting another rioter up through the broken window.  By its verdict, the jury rejected this testimony.

St Cyr also testified that she was not aware that she was not allowed on the West Plaza despite also acknowledging that she directly defied police orders while stationing herself along the line of officers and barricades. (Tr. 3/9/2023, 879:9-880:9, 880:21-23). In direct contravention of her claim, she stated under cross examination that she "wasn't going to move," despite being ordered to do so by police officers multiple times. (Tr. 3/9/2023, 879:9-881:15). When asked, "You interfered with the police, didn't you?" she answered, "Yes." *Id.* Her testimony that she did not know she was not allowed to be in the Capitol was rejected by the jury.

St Cyr testified that she tried for 12 minutes to leave the area between the two sets of double doors separating the tunnel and the interior of the U.S. Capitol (Tr. 3/9/2023, 846:14-25, 847:18-848:5, 896:24-899:8). This testimony is belied by the video evidence showing St Cyr standing between the doors and only leaving once physically removed by the police. It is also belied by the fact that as soon as she was removed from this location, she immediately went right back into the tunnel and climbed up on the ledge.  Her testimony was rejected by the jury.

St Cyr testified that, while in the tunnel, she screeched, "stop it" as an imperative to *everyone* present to stop fighting. (Tr. 3/9/2023, 849:15-850:2, 907:10-908:11). Several facts show the truth, that she was in fact yelling at police officers to stop hitting rioters: (1) she only yelled

when the police were using force to fend off the mob and made no such entreaties during mob violence against police; (2) she gave an interview on the "Diamond and Silk Chit Chat Hour" on or about February 27, 2023 (one week before trial), at which time she stated that she was upset that the police were "beating Americans"; and (3) after yelling "stop it" she called for "fresh people" and urged the mob to "push, push, push," against police. Her testimony was rejected by the jury.

St Cyr also stated under oath that she was trying to get down from the tunnel ledge and the only reason she did not get down was because she did not want to step on police officers. (Tr. 3/9/2023, 850:17-24, 913:1-917:15). This claim was belied by contemporaneous CCTV footage from inside the tunnel showing there were no police officers below St Cyr at the time officers began clearing rioters from the ledge. St Cyr made no effort whatsoever to get off the ledge. And St Cyr only got down when Detective Dowling used a flagpole to prod her out. She had ample opportunity to remove herself from the ledge. Her testimony was rejected by the jury.

## III.    THE CHARGES AND TRIAL

On May 25, 2022, a federal grand jury returned an indictment charging St Cyr with six counts, including: two counts of Interfering with Police Officers During a Civil Disorder in violation of 18 U.S.C. § 231(a)(3); Entering and Remaining in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2); Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D); and Parading, Demonstrating, or Picketing, in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G). On March 10, 2023, St Cyr was convicted of those offenses following a jury trial.

## IV.   STATUTORY PENALTIES

St Cyr now faces sentencing on all six counts. As noted by the Draft Presentence Report issued by the U.S. Probation Office (ECF 105), St Cyr faces the following maximum possible sentence on each count of conviction:

- Counts One and Two, Interfering with Police Officers During a Civil Disorder, 18 U.S.C. § 231(a)(3): five years of imprisonment, a term of supervised release of not more than three years, a term of probation of not more than five years, a fine up to $250,000, and a mandatory special assessment of $100,

- Count Three, Entering and Remaining in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(1): one year of imprisonment, a term of supervised release of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25,

- Count Four, Disorderly and Disruptive Conduct in a Restricted Building or Grounds, 18 U.S.C. § 1752(a)(2): one year of imprisonment, a term of supervised release of not more than one year, a fine up to $100,000, and a mandatory special assessment of $25,

- Count Five, Disorderly Conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D): six months of imprisonment, a fine up to $5,000, and a mandatory special assessment of $10,

- Count Six, Parading, Demonstrating, or Picketing, in a Capitol Building, 40 U.S.C. § 5104(e)(2)(G): six months of imprisonment, a fine up to $5,000, and a mandatory special assessment of $10.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The first § 231(a)(3) count was based on St Cyr pushing against and breaking through the police line on the West Plaza. The second § 231(a)(3) count was for yelling for "fresh people" and to "push, push, push" from her perch atop a ledge inside the Lower West Terrace Tunnel.  These

are two separate and distinct crimes separated by both time and distance.  The government agrees

with the Presentence Report ("PSR") calculations of the Sentencing Guidelines as follows:

*Count One, 18 U.S.C. § 231(a)(3)*

| | | |
|---|---|---|
| U.S.S.G. §2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1)(A) | Special Offense Characteristic | +3 |
| U.S.S.G. §3C1.1 | Obstruction of Justice | +2 |
| **Adjusted Total Offense Level** | | **15** |

*Count Two, 18 U.S.C. § 231(a)(3)*

| | | |
|---|---|---|
| U.S.S.G. §2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. §3C1.1 | Obstruction of Justice | +2 |
| **Adjusted Total Offense Level** | | **12** |

*Count Three, 18 U.S.C. § 1752(a)(1)*

| | | |
|---|---|---|
| U.S.S.G. §2B2.3(c)(1) | Base Offense Level | 13 |
| U.S.S.G. §3C1.1 | Obstruction of Justice | +2 |
| **Adjusted Total Offense Level** | | **15** |

*Count Four, 18 U.S.C. § 1752(a)(2)*

| | | |
|---|---|---|
| U.S.S.G. §2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. §2A2.4(b)(1)(A) | Specific Offense Characteristic | +3 |
| U.S.S.G. §3C1.1 | Obstruction of Justice | +2 |
| **Adjusted Total Offense Level** | | **15** |
| | | |
| U.S.S.G. §3D1.4 | Multiple Count Adjustment | +3 |
| **Final Offense Level** | | **18** |

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance,

the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, St Cyr's felonious conduct on January 6,

27

2021, was part of a massive riot that almost prevented the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and risking a Constitutional crisis. St Cyr interfered repeatedly and consistently with officers trying to secure Capitol grounds on the Lower West Plaza, then broke through their line. She witnessed and encouraged violent skirmishes in the tunnel, provoking the crowd from above. Undeterred by being thrown out of the tunnel twice, she entered the Capitol through a broken window and filmed an obscenity-laced tirade while inside. For her conduct, St Cyr was convicted of two separate counts of § 231(a)(3) and four misdemeanors.

Additionally, at trial St Cyr effectively admitted that she was at the Capitol to obstruct the official proceedings. She testified that she was unhappy with the outcome of the 2020 Presidential election.  St Cyr made clear that she believed the election was stolen, and she was there to have members of Congress send the electoral college votes back to the states.  (Tr. 3/9/2023, 822:13; 832: 11-24; 833: 2-16; 835: 22-25). The nature and circumstances of St Cyr's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 33 months' imprisonment.

### B.  The History and Characteristics of the Defendant

St Cyr is 56-years-old, a high school graduate; married; mother of five (ages 20-37); a former marine; capable of working, but currently unemployed (after quitting her job at PC Maintenance); and a resident of Idaho.  PSR ¶¶ 72, 80 - 83, 94 -96.

St Cyr has a history of disrespect for the law.  She was dishonorably discharged from the U.S. Marine Corps for a drug offense.  PSR ¶ 65.  St Cyr has also been convicted of trespassing at a government building in Idaho, for failing to comply with posted regulations and the directions

of a law enforcement officer, as specified in ECF 48 (quite similar to failing to comply with the restrictions at the Capitol on January 6 and the directions of MPD and USCP).   PSR ¶ 66. Furthermore, St Cyr refuses to pay income taxes.  PSR ¶ 107.

St Cyr reports no physical, mental, or emotional health problems. PSR ¶ 88 - 89.  St Cyr stated in a publicly available interview given April 26, 2023 on the program "Heartland Liberty" that despite having some difficulties in her childhood, "my life is no different than everyone else's." "We've all faced difficulties in our childhood."  "The majority of people are like me and come from broken families." *See **Sentencing Exhibit 12***, a video submitted to the Court for sentencing.

St Cyr's crimes on January 6 were not an isolated event in an otherwise law-abiding life. They came, instead, after other instances of disrespect for the law.  *See* PSR ¶¶ 65, 66, and 107. St Cyr's history and characteristics weigh in favor of the recommended sentence of 33-months' incarceration.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.  St Cyr is someone who does what she wants despite rules, regulations, and the law – this she has demonstrated before, during, and after January 6, 2021 and her felony jury trial before this Court.  St Cyr's criminal conduct on January 6 was the epitome of disrespect for the law.  As described, St Cyr not only failed to comply with law enforcement, but she also used her body weight to push against the bike-rack barricades for over 10 minutes, ultimately leading the charge through the barricades allowing thousands of people further onto the restricted grounds. Thereafter, she didn't leave. She was one of the first to the double doors of the tunnel.  After getting

in between the two sets of double doors, she was removed by police.  That didn't deter her; she came right back into the tunnel, this time getting to higher ground by climbing onto the ledge. There, she had a clear view of the violence being committed against police and called for more people to fight the police.  The police kicked everyone out of the tunnel, but once again, St Cyr refused to comply with orders and had to be physically prodded off the ledge by an officer with a long flagpole.  That didn't deter her either, and she then belly-crawled through a broken window to enter a Senate conference room.  She remained there until the chemical spray drove her out.  It's important to recall that while in that room, she helped at least one other rioter up into the building. St Cyr only left the grounds after hours of criminal conduct at that Capitol when it was clear that her objective was thwarted.

St Cyr's own words demonstrate her lack of respect for law.  She repeatedly called the legal system "corrupt," "unjust," "unfair."   St Cyr criticized the judge, prosecutor, and law enforcement witnesses.  In addition to her disrespect for the law, she disrespects authority. Time and time again she flagrantly disregarded police directives on January 6.  She also showed blatant disrespect for the Court proceedings, and this Court.  Immediately prior to and during the jury trial, St Cyr went on an internet talk show, and she also posted multiple Facebook Live videos to discuss her case, the proceedings, jury selection, her attorneys, witness testimony, and other aspects of trial (time and again calling the system "corrupt," "unjust," and a "shitshow.")  Once this Court became aware St Cyr's public comments, the Court advised St Cyr her conduct was ill-advised and cautioned against it, but that did not deter St Cyr.[2]  Thereafter, she continued to post several

---

[2] This exchange does not appear in the trial transcripts, but counsel for the United States has a vivid recollection of the Court's comments.

additional videos after the Court's admonition.  Post trial, St Cyr has continued to make statements via Facebook, Twitter, Heartland Liberty, and other public sources, calling the system "corrupt" and, most concerning, proclaiming she "had every right to be there."  *See **Sentencing Exhibit 13***, a video compilation of these statements submitted to the Court for sentencing.



***Images 19A-B:** In April 2023, within weeks of her conviction, St Cyr disparaged the trial process on social media, calling it corrupt, a clown court, and run by criminals – Image 19A. On September 2, 2023, less than two weeks before the sentencing hearing, St Cyr continues to refer to the legal process to be run by criminal – Image 19B.[3]*

After seeing all the evidence and listening to all the witnesses at trial (including Trial Exhibit 702, referenced above, depicting rioters breaking into the Capitol building), as recently as August 2023, by re-tweeting posts, St Cyr continued to allege January 6 was an "inside job" and downplayed the severity of the events at the Capitol.

---

[3]  On August 30, 3023, Judge Trevor McFadden held *pro se* defendant Brandon Fellows in contempt for referring to the proceedings as a "kangaroo court" in open court from the witness stand (but outside the presence of the jury) and imposed a five-month jail sentence as punishment. *See United States v. Fellows*, 21-cr-00083-TNM, ECF 139.



**Image 20**          **Image 21**

*In August 2023, St Cyr continued to refer to*
*January 6 as an "inside job."*

Additionally, on August 26, 2023, St Cyr posted on social media her intent to defy with compliance with 34 U.S. Code § 40702(a)(1)(B) and (d)(1) - Collection and use of DNA identification information from certain Federal offenders.



**Image 22**: *St Cyr posted on social media that she would not comply with sentencing requirements.*

32

St Cyr is certainly entitled to her opinion and First Amendment right to speak freely; however, her words show a lack of remorse, disrespect for the law, and disregard for the legal process.  This utter lack of respect for the law justifies a 33-month sentence.

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to St Cyr also weighs heavily in favor of a term of incarceration, and 33-months incarceration is warranted.  Despite being charged, arrested, tried, and convicted for her criminal conduct, St Cyr has repeatedly stated she had a right to be at the Capitol and the legal system was "corrupt."

Although St Cyr has a criminal history category of I, her history shows a clear pattern of disrespect for law and authority.  Moreover, St Cyr has not expressed any remorse or contrition. Her social media statements after January 6 were those of someone who doesn't believe she did anything wrong.  Further, St Cyr posted on social media after conviction by a jury that she had every right to be at the Capitol, demonstrating she has not been deterred. St Cyr was able to raise

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

money by starting a GiveSendGo account.  PSR ¶ 86.

Additionally, on August 18, 2023, St Cyr motioned the Court to direct the U.S. Marshal's Service fund her travel to Washington, D.C. for the sentencing hearing, avowing she had no money to travel.  ECF 103.  The Court granted the request.  On June 13, 2023, St Cyr posted a video on Twitter/TikTok depicting herself and her husband from inside an airport complaining about TSA officers following her from security to their gate.  It is unclear where St Cyr and her husband were traveling, who paid for plane tickets, or when payment was made.



*Image 23 from Sentencing Exhibit 14*: *St Cyr in an airport complaining about TSA following her to the gate within an airport on her date of travel, June 13, 2023.*

It is clear that St Cyr proceeds through life as she desires, with disregard for law and authority.  A 33-month sentence is warranted to deter her future crimes.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying

with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

## F.  Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing

disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[6]

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Hamner*, 21-cr-689-ABJ, the court imposed 30 months' incarceration for a single violation of 18 U.S.C. § 231(a)(3).[7] Hamner wrestled barricades away from police erected to keep a violent and hostile mob from entering the Capitol and participated in assaultive conduct. St Cyr, unlike Hamner, did not accept responsibility for her criminal conduct, and at trial she falsely testified. Hamner had a lengthy criminal history. As Hamner was only convicted of one count of § 231(a)(3) and faces trial for the remaining counts in the indictment, Judge Berman Jackson determined a 30-month sentence was appropriate. Unlike Hamner, St Cyr has been convicted by a jury for two separate and distinct counts of violating § 231(a)(3) at two separate times and locations at the U.S. Capitol.

In *United States v. Capsel*, 22-cr-107-TSC, the court imposed 18 months' incarceration for a single violation of 18 U.S.C. § 231(a)(3). On the Lower West Terrace, Capsel encouraged other rioters and recorded a TikTok video where he encouraged his followers to "hold the line;" was in a group that pushed against a police line; and encouraged other rioters to join the group by waiving his hand and shouting, "come on." Capsel's criminal history was a category II. St Cyr, unlike Capsel, did not accept responsibility for her criminal conduct, and at trial she falsely testified.

---

[7] Hamner's case is in a unique posture – he pled guilty and was sentenced for violating § 231(a)(3), yet charges of 18 U.S.C. §§ 111(a)(1) and (b), three misdemeanor charges, and a second charge of violating § 231(a)(3) remain pending.

Unlike Capsel, St Cyr has been convicted by a jury for two separate and distinct counts of violating § 231(a)(3) at two separate times and locations at the U.S. Capitol.

In *United States v. Baquero*, 21-cr-702-JEB, the court imposed 18 months' incarceration for a single violation of 18 U.S.C. § 231(a)(3). Baquero entered the Capitol; joined a confrontation against officers, grabbing the hand of an officer holding a police baton; called the police traitors; and only departed when the police forced rioters out. St Cyr, unlike Baquero, did not accept responsibility for her criminal conduct, and at trial she falsely testified. Unlike Baquero, St Cyr has been convicted by a jury for two separate and distinct counts of violating § 231(a)(3) at two separate times and locations at the U.S. Capitol.

## VII. RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has

suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But because St Cyr was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[8]

---

[8] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and her criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for her individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses");*see also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require St Cyr to pay $2,000 in restitution for her convictions on Counts 1 through 6. This amount fairly reflects Sr Cyr's role in the offense and the damages resulting from her conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 33-months of imprisonment, which is the high end of the 27-33 month advisory Guidelines range, a term of supervised release of three years, $2,000 restitution, and a mandatory special assessment of $270.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


By:      */s/ Jacqueline Schesnol*
JACQUELINE SCHESNOL
Assistant United States Attorney, Detailee
AZ Bar No. 016742
601 D Street, N.W.
Washington, D.C. 20530
(602) 514-7500
jacqueline.schesnol@usdoj.gov

*/s/ Eric Boylan*
ERIC W. BOYLAN
Assistant United States Attorney
Texas Bar No. 24105519
601 D Street N.W.
Washington, DC  20002
(202) 815-8608
eric.boylan@usdoj.gov

41