UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,      .
                               .
          Plaintiff,           .   CR No. 22-185 (JDB)
                               .
     v.                        .
                               .
YVONNE ST CYR,                 .   Washington, D.C.
                               .   Wednesday, September 13, 2023
          Defendant.           .   10:42 a.m.
. . . . . . . . . . . . . . . .


TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

For the Government:          JACQUELINE N. SCHESNOL, AUSA
                             United States Attorney's Office
                             40 North Central Avenue
                             Suite 1800
                             Phoenix, AZ 85004

                             ERIC BOYLAN, AUSA
                             US Attorney's Office
                             601 D Street NW
                             Washington DC, DC 20530

For Defendant:               NICOLE OWENS, ESQ.
                             Federal Defender Services
                             702 West Idaho Street
                             Suite 1000
                             Boise, ID 83702

Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001


Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

THE DEPUTY CLERK:  Good morning, Your Honor.  We're on the record in criminal case 22-185, United States of America versus Yvonne St Cyr.  Starting with government counsel, may you please approach the podium and state your appearance for the record.

MS. SCHESNOL:  Good morning, Your Honor.  Jacqueline Schesnol, Assistant United States Attorney representing the United States.  With me at counsel table is Eric Boylan, co-counsel, AUSA, and FBI agent Matt Gano.

THE COURT:  Good morning to all of you.

MS. OWENS:  Good morning, Your Honor.  Nicole Owens on behalf of Yvonne St Cyr, who is present in the courtroom.

THE COURT:  Good morning to each of you.

PROBATION OFFICER:  Robert Walters on behalf of probation.

THE COURT:  Mr. Walters, good morning to you.

We're here today for sentencing in this matter, and I have received the various materials filed by each side, both earlier and very recently.  So they've all been received and reviewed at least in part.  There's some video material that's been provided that I have not fully examined, but my law clerk has and we've discussed it.

So let me start with you, Ms. Owens, and ask you on behalf of yourself and Ms. St Cyr whether you've received and

1  reviewed the presentence report and whether there are

2  remaining issues in dispute.  I will note that there is an

3  issue with respect to restitution that's been raised, there

4  is an issue with respect to the application of 3C1.1 of the

5  guidelines, and there is a dispute with respect to the falsity

6  of Ms. St Cyr's testimony.  Beyond those issues, any other

7  issues?

8          MS. OWENS:  No, Your Honor.

9          THE COURT:  All right.  And the same set of questions,

10  Ms. Schesnol: received, reviewed and any remaining issues in

11  dispute?

12          MS. SCHESNOL:  Yes.  Received and reviewed.

13  No remaining issues.

14          THE COURT:  All right.  I will accept the presentence

15  report as findings of fact on issues that are not in dispute,

16  and that is pursuant to Federal Rule of Criminal Procedure

17  32(i)(3)(A).

18      So the case does fall within the Sentencing Reform Act

19  of 1984 by which the United States Congress created the

20  United States Sentencing Commission, and that commission

21  has issued detailed guidelines for judges to consider in

22  determining the sentence in a criminal case.  There are

23  sentencing ranges that have been set for specific offenses,

24  and those ranges are all contained in a guidelines manual.

25      But in light of Supreme Court and lower court decisions,

1    those guidelines are not mandatory.  Instead, they are

2    advisory.  That means, however, that they must be consulted by

3    the court in determining the appropriate sentence in a case,

4    and I will do that here.  I will assess and determine the

5    proper sentence in this case by referring to and considering

6    the sentencing guidelines in the first instance.

7        But the guidelines will be treated as advisory, not

8    mandatory, and there's no presumption that a guidelines

9    sentence is the correct sentence.  The guidelines will simply

10   be considered along with all other relevant factors pursuant

11   to § 3553(a) of Title 18 of the United States Code.

12       So we are here because the defendant was found guilty

13   following a jury trial on six counts.

14       Counts 1 and 2 are civil disorder and aiding and abetting,

15   in violation of Title 18 of the U.S. Code Section 231(a)(3),

16   and for the aiding and abetting, Section 2.

17       Count 3.  Entering and remaining in a restricted building

18   or grounds.  That's Title 18 of the U.S. Code § 1752(a)(1).

19       Count 4.  Disorderly and disruptive conduct in a restricted

20   building or grounds.  That's § 1752(a)(2) of Title 18.

21       Count 5.  Disorderly conduct in a Capitol building, which

22   is a violation of § 5104(e)(2)(D) of Title 40 of the

23   U.S. Code.

24       Count 6.  Parading, demonstrating, or picketing in a

25   Capitol building, in violation of § 5104(e)(2)(G), again of

1    Title 40.

2         The last two, Counts 5 and 6, are Class B misdemeanors,

3    and therefore the United States Sentencing Guidelines do not

4    even apply to those violations.

5         So my first obligation is to make what we call a guideline

6    calculation, and I will do so here.  I will be tracking, if

7    you will, the guideline calculation done by the probation

8    office.  There is the question of -- a couple of questions

9    that may impact that guideline calculation, particularly the

10   two issues that I -- well, I guess only one, but maybe one of

11   those issues also impacts guideline assessments, but the 3C1.1

12   adjustment is part of the guideline calculation.

13        And if there's anything else that you want to argue with

14   respect to the guideline calculation, let's do that now.  So

15   I'll hear first from Ms. Owens with respect to the guideline

16   calculation and then from Ms. Schesnol.  Ms. Owens.

17             MS. OWENS:  Thank you, Your Honor.

18        Your Honor, I would first address our objection to the

19   grouping as determined by the probation officer in the draft

20   PSR.  Your Honor, we believe that these counts should be

21   grouped together, that they should not be separated into three

22   separate groups for purposes of the calculations.

23        When making that determination, the Court really has to

24   look at two separate questions, first whether the offenses are

25   part of one criminal objective and course of conduct, and then

1  whether they involve the same victim.

2     Taking on that first question of whether they're the same

3  course of conduct, is the conduct the kind that involves the

4  same criminal --

5          THE COURT:  I guess I don't understand.  You're saying

6  they should or shouldn't be grouped?

7          MS. OWENS:  I'm saying they shouldn't be separated out

8  into three separate groups.

9          THE COURT:  They should all be one group?

10         MS. OWENS:  Correct, Your Honor.

11         THE COURT:  Okay.  Go ahead.

12         MS. OWENS:  Correct.  The probation office --

13         THE COURT:  So you're not objecting to grouping; you're

14  just objecting to the way the grouping was done.

15         MS. OWENS:  Correct, Your Honor.  Thank you.  And I'm

16  doing that because, again, these are -- this conduct is one

17  course of conduct.  I don't think that you can parse this out

18  even though they're separate charges.  It happened on the same

19  day and time, it was the same location, and it's really the

20  same objective here, was to go to the Capitol.

21     That there were, you know, different charges parsed out

22  I think is irrelevant here when you look at the totality of

23  the circumstances from the time Ms. St Cyr entered the Capitol

24  until she left.  This was one course of conduct, with one

25  objective, and I think that that is not disputed.

1      From my read of the probation officer's assessment, it

2   is -- the decision to group these charges into three separate

3   groups is based on the perception that there are different

4   victims for each of the counts.  And, Your Honor, in that case

5   we --

6           THE COURT:  Separate harms as well as separate victims.

7           MS. OWENS:  And that's, I guess, where we disagree.  We

8   believe that there is one harm, that the societal interest for

9   each of these counts is the same.

10          THE COURT:  Hypothetically, why is it the same harm

11  when you're looking at offenses, one of which would be to stop

12  the Electoral College certification and the harm would be the

13  interference with that certification, and -- this is a

14  hypothetical -- and another would be an assault on a police

15  officer that injured that police officer?  Why would those

16  harms be identical?

17          MS. OWENS:  Well, I guess those are not the harms that

18  we have in this case.

19          THE COURT:  But hypothetically -- but you're saying

20  that everything that happened on January 6 is basically all

21  one continuous event, all for one purpose, and therefore there

22  shouldn't be separate groups.  And I take it that you're

23  saying that not just for this case; you're saying that as a

24  general proposition.

25          MS. OWENS:  Well, Your Honor, I can speak to some of

1    the other cases where those facts have occurred, and in those

2    instances they have been grouped together, but primarily

3    because -- and if you'll pardon me -- primarily because the

4    assault, for example, becomes a guideline enhancement.  And so

5    for that --

6              THE COURT:  Right.

7              MS. OWENS:  -- purpose, then they are grouped together.

8    We don't have that here.

9              THE COURT:  Right.

10             MS. OWENS:  And so we have to look at grouping them a

11   different way and look at whether the societal harms are the

12   same.  So in the majority -- of course, I don't have access to

13   all the January 6 cases and fact patterns, but in the ones

14   that I could find, they were grouped together even under the

15   hypothetical that the Court just proposed.

16       And so if they are grouped in those instances where there

17   is an assault on an officer and then an attempt to obstruct

18   the certification of the Electoral College, how much more so

19   would you see that the kinds of harms that occurred in the

20   charges that we're dealing with in this case are the same and

21   similar.

22       We have two counts of civil disorder.  The civil disorder

23   is the same.  The timing is within moments of each other.  The

24   location is the same.  The purpose was the same for the civil

25   disorder.  When you look at the guidelines under 3A1.2, when

we're not sure whether there's a victim, the note to that
section is instructive, which is that when there's not
specified individuals, then the guideline does not apply when
the victim is an organization, agency, or the government,
which I think is exactly what we have here.  We have law
enforcement agencies that are giving instructions that she is
charged with and convicted of disobeying during this civil
disorder.

More importantly, it's not just a simple sort of failure
to obey law enforcement or resisting and obstructing; it's a
federal charge because a federal interest is at play.  They're
acting in their federal interest.  And so because of that,
that is the harm, and that interest was to keep people from
going into the Capitol, and that was her goal.  And so the
harm for society is the same in each of these counts.  And so
because of that they should be grouped together and not parsed
out into three separate groups as Probation has done in this
case, Your Honor.

THE COURT:  All right.

MS. OWENS:  Unless the Court has any other questions,
I would rest on that and the briefing for that.

THE COURT:  Nothing further you want to say with
respect to the 3C1.1 obstruction of justice?

MS. OWENS:  Your Honor, I would turn now to that
objection.  Your Honor, this case is one where I believe

1    almost the majority of Ms. St Cyr's conduct was captured on

2    video, and throughout the course of the trial, we watched her

3    conduct on that video through various exhibits and from

4    different vantage points and perspectives.

5        Her actions that day were not in dispute at this trial.

6    In fact, from the moment that she was charged in this case,

7    from her first interrogation with law enforcement back in

8    Boise with FBI agents, she admitted to everything that she

9    did, and that interview was virtually identical to the

10   testimony that she gave --

11            THE COURT:  Well, what did the jury have to decide?

12            MS. OWENS:  Your Honor, the question for the jury was

13   her intent.

14            THE COURT:  And that's a factual question.

15            MS. OWENS:  That is a factual question.

16            THE COURT:  So what's the difference between that as a

17   factual question -- for purposes of the obstruction of justice

18   adjustment, what's the difference between that as a factual

19   question and the other facts that you referred to?

20            MS. OWENS:  Your Honor, I think it's a little bit more

21   nuanced than the other facts.  So, for example, if we were

22   coming in and she was saying, you know, I wasn't at the

23   Capitol and she got up and she took the stand and said I

24   wasn't there that day, that's clearly something that can be

25   demonstrated on the video and shown, and that would clearly be

1  a material false statement.

2      But when we're talking about what someone's intent was,

3  what they believed in their head, even though the government

4  disagreed with it, and even though the jury may have disagreed

5  with it, there's no evidence to support that she got up and

6  said things that she believed were false.  I think it's a lot

7  more difficult to say she took the stand, she believed the

8  election had not been stolen, for example, and then got up and

9  said I believed the election was stolen.  That is a lot more

10  nuanced decision, and I think it's a lot more difficult --

11      THE COURT:  It may be nuanced, but it's still, in the

12  jury's view, and potentially in the Court's view for sentencing

13  purposes, is false.

14      MS. OWENS:  Well, I think -- I guess.  But whether she

15  believes it's false or not is the question, not whether it's

16  false.  We can all, I think, agree that we do not believe the

17  election was stolen, but what she's saying is she really did

18  believe the election was stolen.  Now, I think the Court has

19  to take a step further and make a determination --

20      THE COURT:  But again --

21      MS. OWENS:  -- that she thought that was false.

22      THE COURT:  Again, we have to be careful of how far

23  you're stretching this, because it sounds as if you're saying

24  every person who was at the Capitol on January 6 who believed

25  that the election was stolen can say whatever they want to say

1    in terms of the examination at trial and it isn't false.

2         MS. OWENS:  Well, I'm not saying that it's not false,

3    but it's whether she got up and actually said something that

4    she believed was false on the stand.  So it is a more nuanced

5    determination than something that is clearly demonstrably

6    provable.

7         THE COURT:  You think she's different from other

8    January 6 defendants because she actually believed that it

9    was stolen and they didn't?

10        MS. OWENS:  I mean, I think some maybe did.  I think

11   that's why they were there.  I don't know, Your Honor.  What

12   I know is that the Court has to make a determination about

13   whether, when she took the stand, if she was making a false

14   statement about her beliefs.

15     And her beliefs have been consistent.  Her testimony about

16   her participation in these events has been consistent.  She

17   admitted to the elements.  She admitted to her conduct.  The

18   question was, you know, whether, when she took the stand and

19   testified, when she said those words did she believe they were

20   false or did she believe they were true.

21        THE COURT:  So she testified that she didn't know that

22   she was not allowed to be on the West Plaza --

23        MS. OWENS:  Correct.

24        THE COURT:  -- or inside that tunnel, the Lower

25   West Terrace tunnel.  You're saying that wasn't false?

1          MS. OWENS:  I'm saying that was not false.  Her belief

2     was that she could be there.

3          THE COURT:  I think the jury concluded otherwise, and

4     I think my assessment is that it was false.  And she also

5     asserted that she believed that she could go into the Capitol:

6     She'd never been to the Capitol before, and she believed she

7     could just walk in; and my assessment of the evidence is that

8     that's not really true.  She didn't have that good-faith

9     belief.

10        She testified that she thought she could go crawl up inside

11    the Senate room, ST2M I think is the designation of it, that

12    was next to the tunnel, after she got pushed out of the tunnel

13    because she was unwilling to leave.  And that just doesn't

14    seem to be supported by the video evidence, particularly the

15    fact that she didn't just walk down a hall to that room; she

16    crawled through an outside window to get into that room.  All

17    of that seems to be false testimony.

18          MS. OWENS:  And, Your Honor, that's --

19          THE COURT:  And it's material to some of the charges.

20          MS. OWENS:  I think that's a determination the Court

21    has to make.  What I'm saying is that when she took the stand

22    and when she said those things, she believed they were true,

23    it is consistent with the statements that she has made

24    previously, and that the question the Court has to decide is

25    whether they're false.  And it's up to the Court to make that

1    finding.

2         THE COURT:  She testified that she was trying to get

3    down from the ledge in the tunnel, and the only reason she

4    didn't get down when told to get down is because she didn't

5    want to step on police officers.  The video evidence doesn't

6    support that.  I've looked at the video evidence during the

7    trial and afterwards.  She made no effort to get off that

8    ledge and she had to be pushed off the ledge with a flagpole.

9         MS. OWENS:  Your Honor, with all due respect, I

10   disagree as to what that shows.  I mean, she said she was

11   trying --

12        THE COURT:  I understand.  I understand you're

13   advocating on behalf of your client and you disagree, but to

14   me, that's not what the evidence showed.

15        MS. OWENS:  That video, she says she's trying.  There's

16   video of her on top of a law enforcement officer, in fact, as

17   she's trying to get down.  She loses her shoe.  I mean, it

18   is -- as we will hear and as we heard, it was a chaotic

19   environment, it was loud, and I think the Court again has to

20   make that determination.

21        THE COURT:  Okay.

22        MS. OWENS:  Unless the Court has any other questions,

23   I would rest on the argument we made in our briefing.

24        THE COURT:  Thank you, Ms. Owens.

25        MS. OWENS:  Thank you.

THE COURT:  All right.  What would the government like
to say with -- maybe I should ask for the probation office to
speak first, if you would like to say anything with respect to
not so much the adjustment for obstruction of justice but with
respect to the grouping issue.

PROBATION OFFICER:  Your Honor, Probation has no
comment, but happy to answer any questions you may have.

THE COURT:  So -- well, I'll make you comment by asking
the question:  What's the basis for the decision to group
separately, if you will, rather than group all as one, as
Ms. Owens is advocating?

PROBATION OFFICER:  As noted on page 28 in the
response, Probation sees it as there being three distinct acts
or victims, as you call them, harms: the West Plaza event, the
Lower West Tunnel event, and then Congress being its own harm.
Of course, at the West Plaza and the Lower West Tunnel,
there's law enforcement in each of those instances.

THE COURT:  All right.  Thank you.

Ms. Schesnol.

MS. SCHESNOL:  Thank you, Your Honor.

I'll address the grouping first.  The government vehemently
disagrees with the defense saying this is all one harm, one
course of conduct.  We do have three separate locations and
three separate points in time.  The West Plaza was from 2:15
to 2:28.  The defendant breaches that line.  Even if she

hadn't breached it, that is Count 1 of civil disorder.  She could have turned around and left, and that would have been one count of civil disorder.

But as Your Honor knows, she went into the tunnel, and after getting kicked out from between the two sets of double glass doors, she climbs up onto the ledge, calls for fresh people, and to push, push, push.  That's Count 2 of civil disorder.  She was on the ledge from 2:56 to 3:19.  That is a different place and a different harm.

And then, of course, as you noted, crawls in through a broken window.  So we have three separate -- and she stayed in that room, in the ST2M, from what -- best to assume from about 3:20 p.m. until five o'clock.

So we do have three separate locations, three separate places.  At any point she could have left and not been charged with these multiple counts.  And for the defense to say that in other January 6 cases it's all one group, that has not been my experience.  Other judges have found that there are separate groups, separate people impacted, and in this case we believe and agree with the probation officer that there are three separate groups in this case.

Moving on to the 3C1.1, it seems like Your Honor has a pretty good grasp on that.  We agree with your assessment that these are not just about defendant's beliefs, however erroneous they may be.  There were factual statements that

1  came from the witness stand that were not truthful.  As you

2  mentioned trying to get off the ledge, Detective Dowling, who

3  is here today, had to prod her off with a flagpole despite

4  every other rioter already being off that ledge.

5      The fact that she thought she had a right to be at the

6  Capitol, despite belly crawling through a broken window, she

7  said she tried to get out from between the two sets of glass

8  double doors.  That's not true.  We saw video of that at the

9  trial, of her being pushed out of there.

10     And generally saying that she thought she had a right to be

11 there when she was on the West Plaza with police officers on

12 one side of the bike rack and her on the other, that statement

13 is belied by the fact that, once that line broke with her at

14 the front of that line, she wasn't pushed through, or if she

15 was -- if she thought she had a right to be there, she would

16 have said, whoa, I thought I could only be on this side of the

17 police barricades; I know I can't go any further.  But she did.

18     So those are some actual factual statements the defendant

19 made from the stand that the government believes -- in

20 addition to everything we have in our sentencing memo in pages

21 23 through 25, and for those reasons we do believe that 3C1.1

22 applies.

23        THE COURT:  All right.  Thank you all.  And now I will

24 embark upon the task of conducting this guideline calculation

25 and draw the conclusions that I need to draw along the way.

1        There are six counts, as I said.  Only four of them are

2    subject to the guideline calculation, and I agree with the

3    probation office's assessment.  I've given some of the reasons

4    for that in my questions of Ms. Owens, but the guideline --

5    generally speaking, I think it is appropriate to group

6    separately where you have events and offense conduct that is

7    at clearly different times in clearly different places and

8    with, at least to some degree, different victims: the law

9    enforcement officers, the Congress.

10        The guideline applicable to Counts 1 and 2, which are the

11   West Plaza grouped counts, is 2A2.4.  That same guideline

12   applies to Count 3 and to Count 4.  Counts 1 and 2 are

13   distinct civil disorders at different places and different

14   times, and they are considered, I think appropriately,

15   separate harms.

16        Counts 3 and 4 are grouped because they do involve the same

17   victim, which is the broader congressional victim, and there

18   were acts that were connected to some degree, at least by a

19   common objective, a criminal objective, and part of a common

20   scheme.  And that's under §3D1.2(b) with respect to grouping.

21        So, ultimately, the prevailing guideline is 2A2.4 because

22   that guideline produces the highest offense level.  But the

23   way this is done is for the West Plaza group of counts, the

24   guideline for the 231(a)(3) offense is found at 2A2.4(a), and

25   that is a base offense level of 10.

1    We then have a three-level increase to that, what's called

2    a special-offense characteristic, because the offense involved

3    physical contact: Ms. St Cyr using her body weight to push

4    against and on the police line on the West Plaza as the police

5    were trying to reposition and steady the bike racks that were

6    there as a barrier.  Under §2A2.4(b)(1)(A), therefore, there's

7    a three-level increase in the offense level.

8         And then the further adjustment is for the obstruction

9    of justice under 3C1.1.  That's for willful obstruction or

10   impeding or attempting to obstruct or impede the

11   administration of justice.  Here that can be applied because

12   of the untruthful testimony, and I've indicated some ways in

13   which I think that Ms. St Cyr testified untruthfully on the

14   stand during the trial.  I will review those in a little more

15   detail in a few moments.

16        But those two adjustments, a three-level adjustment and

17   two-level adjustment, to the base offense level of 10 result

18   in an adjusted offense level of 15 for that first group.

19        The second group, what took place in the Lower West Terrace

20   tunnel, again, the guideline for the 231(a)(3) offense at

21   Count 2 is 2A2.4, and that leads to a base offense level of

22   10.  The adjustment for obstruction of justice is applied

23   there as well under 3C1.1, a two-level increase, and that

24   results in an adjusted offense level on that group of 12.

25        And on the third group, which involves the 1752(a)

1    offenses, again, it's 2A2.4 of the guidelines and a base

2    offense level of 10, and because of the physical contact,

3    there's a three-level increase under 2A2.4(b)(1)(A).  That

4    means that there is -- and then also the two-level increase

5    for obstruction of justice.  And that means the adjusted

6    offense level here is 15.

7        What you do then with these groups is that one unit is

8    assigned to the group with the highest offense level, and one

9    additional unit is assigned to any group that is the same in

10   seriousness or within one to four levels of that highest group

11   in terms of seriousness.

12       Here you have an adjusted offense level of 15 for the first

13   group, 12 for the second, and 15 for the third.  So each gets

14   assigned one unit.  That's a total of three units.  That's

15   added to the highest offense level, which is 15, and results

16   in a combined adjusted offense level of 18 under §3D1.4.

17       And this is why -- this additional three levels by the

18   grouping is what the defense has objected to, but I find that

19   that is appropriate in this grouping analysis because of the

20   reasons that the offenses are separate, as I've delineated.

21       There's no acceptance of responsibility here.  I will

22   discuss that in a little more detail in a few moments.  But

23   the defendant, first of all, by going to trial and contesting

24   factual issues relating to *mens rea*, the intent question,

25   which is often the most important factual question at one of

1    these trials, doing so makes it so that the acceptance of

2    responsibility adjustment is rarely available, and I find that

3    it's not available here.  That means that the total offense

4    level is 18.

5        With respect to criminal history, there's one of

6    Ms. St Cyr's prior contacts with law enforcement that is

7    relevant for the criminal history calculation.  It's set out

8    at paragraph 66 of the presentence report.  It leads to one

9    criminal history point, but that leaves her still in the

10   lowest criminal history category, a category I.

11       The guideline range for imprisonment based on a total

12   offense level of 18 and a criminal history category of I is

13   27 to 33 months.

14       So I'll ask counsel whether there's any objection to those

15   conclusions, other than the objections that have been raised

16   and discussed already, as to appropriate offense level,

17   criminal history category, and advisory guideline range.

18   Ms. Schesnol.

19           MS. SCHESNOL:  No objection from the government.

20           THE COURT:  Ms. Owens.

21           MS. OWENS:  Just the objections we've previously

22   raised.

23           THE COURT:  All right.  As I've said, the sentencing

24   guidelines are advisory, they are not binding on the Court,

25   although they will be, as I am obliged to do, fully considered

1     along with all other relevant factors under § 3553(a) of

2     Title 18.

3          So, with that, I think I will again hear from counsel,

4     first from the government and then from Ms. Owens for the

5     defense, and then if Ms. St Cyr wishes to address the Court,

6     I would be pleased to hear from her as well.

7          We will start with you, Ms. Schesnol.

8               MS. SCHESNOL:  Thank you, Your Honor.

9          Before I begin, just as a bit of a housekeeping matter.

10    I'd like to move to admit the 15 video exhibits that were

11    submitted to the Court.

12              THE COURT:  They will be admitted.

13              MS. SCHESNOL:  Thank you, Your Honor.

14    Yvonne St Cyr is a person who does what she wants without

15    care to rules, authority, or the law.  Here are some examples:

16         When she was in the Marines, she used drugs and was charged

17    with not only possession of a controlled substance, but almost

18    more pertinent here, failure to obey a lawful order, which

19    resulted in a bad-conduct discharge.

20         On December 8th of 2020, less than a month before the

21    events that bring us here today, the defendant went to a

22    health department meeting in her home state of Idaho, refusing

23    to comply with posted regulations to wear a mask, and was told

24    several times, you can put on a mask or you can leave.  She

25    refused to put on a mask.  Police were called.  The police

1    told her several times, you can leave voluntarily or be

2    arrested; and she opted for being arrested, and she was

3    charged with trespassing and convicted of that.

4        According to the presentence report, she refuses to pay

5    her taxes.  She quit her job and doesn't pay rent or bills.

6    Before trial, during the week of trial, and after trial, up

7    into including last night, which is what accounts for the very

8    late video submission last night, the defendant was posting on

9    social media that the government is corrupt, this was a setup,

10   and she had every right to be at the Capitol.

11       And I'll remind Your Honor -- and I'm sorry I did not find

12   the exact spot of the transcript to include in the government's

13   sentencing memo, but Your Honor actually advised Ms. St Cyr

14   during trial how ill-advised it was for her to continue to

15   post on social media about the events.

16       THE COURT:  Was that during trial or prior to trial?

17       MS. SCHESNOL:  It was during trial.  And I eventually

18   found it in the transcript.  It was actually on March 9

19   during -- right around a lunch or an afternoon break and --

20   in the March 9th transcript.  I could cite to the page and the

21   line number if you would like, but, as Your Honor may

22   remember, you said there's not a gag order, I can't tell you

23   not to, but it is quite ill-advised.  And the defendant

24   continued that evening and the next day, both before trial, on

25   the lunch break, and after court, to post.

1        So, again, this goes back to someone who does what she

2    wants.  And I will tie that in to deterrence when we talk

3    about the 3553(a) factors.

4        And then, of course, the reason why we're all here:

5    January 6, 2021.  The defendant was at the Capitol for at

6    least three hours.  So, less than a month after being arrested

7    for trespassing in Idaho for failing to comply with

8    regulations, she comes to the Capitol to do the exact same

9    thing, to not follow lawful orders, to do what she wants,

10   police be darned.

11       When she is first -- when St Cyr is first walking, already

12   on restricted grounds but walking on what -- it was testified

13   as the Pennsylvania walkway -- she's saying "Push.  They can't

14   stop us all.  There's a million of us."  She pushed her way

15   past tens of thousands of people to get right to the front of

16   the police line, where she had no right to be, and despite the

17   shouting and the tear gas and the utter chaos, the defendant

18   remained there.

19       Your Honor, I'm sure, watched the video.  We played it at

20   trial.  It's Sentencing Exhibit 1.  It was Trial Exhibit 708.

21   The police told her repeatedly, back up, please, we don't want

22   to hurt you, and even tried to get other members of the crowd

23   to say please pull her off the line; we don't want her to get

24   hurt.  We played that video.

25       Unfortunately, MPD Officer Cory, who spoke those words,

1    could not be with us today.  He is still working, protecting

2    our city.  But she did not obey those lawful commands.  She

3    remained on that police line for 14 to 15 minutes and was

4    first through where that set of bike racks separated.  And we

5    have that in Sentencing Exhibit 2, Trial Exhibit 609.1.

6        Now, to hear Ms. St Cyr tell her story, she wasn't trying

7    to breach the police line; she got pushed through.  Here's why

8    we know that's not what really happened:  Number one, we have

9    video.  Number two, because if she really thought she could be

10   on this side of the police line when the barricades broke, if

11   she wasn't trying to get through, she would have said, whoa, I

12   know I don't have a right to be any further than I already am,

13   and either stayed where she was or turned to leave, to say I

14   don't want to be part of this chaos.  But she moved closer to

15   the Capitol.

16       THE COURT:  And, of course, this assessment has already

17   been made by the jury.

18       MS. SCHESNOL:  Yes.  It has been.  Just -- and

19   obviously, I know Your Honor has watched these videos and

20   sat through the trial, but it was back in March, so just to

21   refresh your recollection a little bit, and I will connect

22   these to the 3553(a) factors.

23       The defendant moved not only from the West Plaza closer and

24   closer, she went right into the tunnel just after the doors

25   were breached.  And Sergeant Riley, who is here today, he

1    testified at trial he was at those double glass doors.  He

2    heard the call of Commander Kyle saying "We are not losing the

3    Capitol today."  And Sergeant Riley -- and we had the video

4    in trial, and it's video Exhibit 4 of sentencing and it was

5    Trial Exhibit 702.  Sergeant Riley goes to those glass doors,

6    he looks at the crowd, shakes his head, gears up his troops

7    because he knows what they're in for, and the crowd bashes

8    through the glass doors.  And the defendant is right up in

9    that tunnel within seconds.

10       And as we've already talked about, she gets herself between

11   the two sets of the double glass doors for about 12 to 13

12   minutes, refuses to leave, said she was trying to get out.

13   That is not true.  Image 11 and Trial Exhibit 707.2 show that

14   the police had to forcibly remove her.

15       That did not deter her.  She went right back into the

16   tunnel and climbed the ledge, where she had an eagle's eye

17   vantage point to the fighting, the yelling, the chaos, and

18   the brutality in which she participated.

19       Trial Exhibit 906.1, Sentencing Exhibit 7, accounts for

20   what the defendant was doing and thinking and saying in those

21   moments.  Despite what she said on the witness stand, despite

22   what she might tell you here today, the first thing she says

23   on the video at three o'clock is "This is America, are you

24   f'ing kidding me?"  But she actually said the full word.

25   Then, within seconds, "They are hitting Americans.  We are

1    just trying to get into our house.  This is our house."

2        When the police were hitting rioters and using chemical

3    spray on rioters, only then did the defendant yell "stop it

4    and knock it off."  The defendant would have you believe that

5    she was yelling at everyone to stop fighting because she wants

6    peace.  But that cannot be believed because that does not make

7    sense in line with "are you f'ing kidding me?  They're hitting

8    Americans.  This is our house."  And thereafter she yells,

9    "I have a loud mouth" and yelled out to the crowd of 10,000

10   people on the West Front, or more, "We need fresh people."

11       Fresh people to do what, if she doesn't want any fighting?

12   Fresh people to come fight the police.  Fresh people to come

13   break into the Capitol.  Fresh people to assault officers,

14   like Sergeant Gonell, who is here today, who was assaulted

15   by other rioters within minutes of the defendant yelling for

16   fresh people and to "push, push, push" over 15 times.

17   Sergeant Gonell had to retire from the Capitol Police due to

18   his injuries.

19       The defendant also, from that vantage point -- Sergeant

20   Gonell was assaulted between 3:07 and 3:11 p.m.  Those facts

21   were established in the trial of Patrick McCaughey, case

22   No. 21-CR-40 before Judge McFadden.

23       Also established at that trial, MPD Officer Danny Hodges,

24   who still works for MPD and is out protecting our city

25   streets, was crushed in those glass double doors between 3:12

and 3:13 p.m. when the defendant was on the ledge, with an
eagle's eye view.

I will also point out that Officer Michael Fanone of MPD
was dragged out from the crowd from the tunnel at 3:18 when
the defendant was still in the tunnel.

And as we've already established, the defendant refused to
leave.  How do we know that?  Again, the video.  How else do
we know it?  When the defendant was testifying about getting
through the tens of thousands of people in the crowd of the
West Plaza, she said, "Where there's a will, there's a way."

So if she wanted to get off the ledge, she would have
gotten off the ledge.  She did not want to get off the ledge;
and it took Detective Dowling, who I've already pointed out
testified at trial and is here today, prodding her with a
flagpole, and she was the last one to leave.  Every other
member of the riot managed to get down.  And that is
Sentencing Exhibit 8 and Trial Exhibit 905.2.

As Your Honor noted, the defendant went right back in.
She belly crawled through a broken window.  The defendant
would have you believe she went into that room to either
charge her phone or to call her husband.  Well, that is belied
by the fact that she stayed until about five o'clock, so about
an hour and a half.

We also had evidence at trial of the defendant taking
videos in that room of all the damage, hanging out of the

window, taking videos of the mob on the West Front, and
there's even a video of her helping another rioter, or
attempting to help another rioter, into the building.  Those
were also trial exhibits as well as submitted for sentencing.

Your Honor noted the guidelines are only advisory.
They absolutely are.  The 3553(a) factors support the
recommendation that the government is making.  In fact, dare
I say the government is being restrained in its recommendation
of 33 months, because the government does believe that the
guidelines should be followed whenever appropriate.

The guidelines here don't fully capture the defendant's
conduct on the day of January 6.  Between the defendant's
testimony, her Facebook live-streaming videos, and things that
she said during her evaluation in preparation for trial, the
Obstruction of an Official Proceeding, had we had all that
information at the time of charging, the government believes
easily could have been met.  But we believe in the guidelines
and are asking for a guidelines sentence.

And here's why the 3553(a) factors support the 33 months.
The nature and circumstances of the offense.  We all know that
the events of January 6 are unprecedented, barely imaginable,
the likes of which we would expect to see in a Third World
country.  And as we watched on our televisions in dismay as
tens of thousands of people descended on the Capitol and we
learned of the brutality against police officers that day, like

the officers in this courtroom, instead of the defendant being horrified and turning away from it, she moved closer to it. She wanted to be in the thick of it, and she encouraged others to engage in fighting the police.

As described in the sentencing memo by Sergeant Gonell, who as I mentioned is here today, the fight in the tunnel was a medieval battle, fighting hand to hand, inch by inch, to prevent an invasion of the Capitol.

As Your Honor said when sentencing Nicholas Languerand in January of 2022, what happened on January 6 is an offense that "strikes at the very heart of our democratic process, and the rule of law."

"[t]he effort undertaken by those who stormed the Capitol on January 6 and those who entered the Capitol or who, like the defendant, sought to, but didn't ultimately enter the Capitol, that effort was to stop the peaceful transfer of power following a legitimate outcome of our presidential election ... a process that's been the hallmark of American democracy for 200 years."

The government couldn't agree more.  And Mr. Languerand actually took a plea, accepted responsibility, and accepted -- and expressed great remorse at his sentencing, from a review of that transcript.

The defendant considers herself a patriot.  There are exhibits where she said "Patriots in our house."  She said that she was at the Capitol, she testified at trial she was there for

patriotism and love, and the first line of her sentencing memo says she was there for patriotism.  And what the government submits is, what the defendant engaged in was not patriotism.  That was tribalism.

As Your Honor noted when sentencing Languerand, "the patriots were not those invading the Capitol and attacking the police.  The patriots were the police officers defending the Capitol building and our democratic values."

And the government couldn't agree more.  And I've already pointed out that MPD Sergeant Riley is here, Detective Dowling from MPD is here, as is retired Officer Sergeant Gonell, as well as Capitol Police Officer Harry Dunn, who not only still works at the Capitol -- that is a crime scene.  That is the crime scene where Officer Dunn was victimized -- but he took time out of his day, all four officers did, to come to court because that's how important this is to them.

Who else are the patriots?  The people who work in the Capitol building.  Not just elected members of Congress.  Them too.  But their staff, their young interns and pages.  What about people who work in the parliamentarian's office whose offices were trashed by rioters?  The janitorial staff who had to clean up the mess from inside the Capitol, from inside the room where Defendant St Cyr took videos?

The defendant, we acknowledge, did not directly engage in hands-on violence or planning, and that is why she is not

1    charged with assault or conspiracy.  And if she had been, her

2    guidelines would be much higher.  So the fact that she did not

3    personally engage in hands-on violence or preplanning has

4    already been accounted for in the guidelines, making a

5    guidelines sentence appropriate.

6        What about the history of the defendant?  She is a criminal

7    history category I.  That, too, has already been accounted for.

8    She should not be given additional credit for that.  She's

9    already at that end of the guidelines of a criminal history I.

10       The defendant has laid out her difficult childhood, her

11   attorneys have, and the government takes no issue with that.

12   It is very unfortunate that she was subjected to the things she

13   was in her childhood.

14       But, in her own words, from video Exhibit 12 that we

15   submitted, and I hope Your Honor had an opportunity to watch,

16   she said that her childhood was difficult, but it was no

17   different than anybody else's; most people she knows had

18   difficult childhoods.  And there has been no direct link drawn

19   between her difficult childhood and the choices that she made at

20   the Capitol on January 6.

21       The defendant's sister, who wrote a letter in support,

22   and another sister who I don't believe wrote a letter but is

23   referenced in the materials that came from the presentence

24   report and the evaluation that were done, they didn't go to the

25   Capitol and call for fresh people to push against the police,

1    and they had difficult childhoods.

2        Usually, when we consider a difficult childhood in sentencing,

3    there is a direct link.  For example, a defendant whose parents

4    maybe were drug users or dealers, and then that defendant goes

5    on to emulate what their parents did.  So we have that

6    connection.  Here we don't have that.

7        And then I will also point out, in video Exhibit 15 -- and I

8    apologize that it was submitted so late last night, but it was

9    literally a live stream that the defendant did last night.  It

10   could not have been submitted any sooner.  In video Exhibit 15,

11   the defendant says that her life experience is not mitigation,

12   it's not her downfall, it's not her damage, it didn't give her

13   PTSD or delusional disorder, and that she is not a victim to her

14   life.

15       It would be very easy to feel sorry for the defendant because

16   of her childhood and use that as a reason to not impose a

17   guideline sentence.  I feel sorry for the police officers.  I

18   feel sorry for the people who work inside the Capitol building.

19   Those are the people who I feel sorry for, the people like the

20   officers here today: for Harry Dunn, who has to work at his own

21   crime scene on a daily basis, and for Sergeant Gonell, who was

22   injured so badly he had to retire from a job that he loves.

23   Those are the patriots.

24       I expect, based on the pleadings, that Ms. St Cyr's attorneys

25   will point out that her views are misguided.  Millions of people

have misguided views.  Millions of people think that Joe Biden did not win the election.  But they did not all come and storm the Capitol and call for fresh people and crawl through broken windows and push against the police.

Judge Kollar-Kotelly, when sentencing defendant Nicholas Brockhoff in case 21-CR-524, pointed out that in the year 2000 there were lots of people who did not agree with the outcome of that election, and yet people abided by the Supreme Court's ruling and accepted the outcome of that election without violence.

And because the defendant doesn't think she did anything wrong, because she thinks she had every right to be at the Capitol, that's what should concern us, that she would engage in the same conduct again.  She engaged in that conduct at the health department in Idaho.  She engaged in that conduct at the Capitol, blocks from here.  And still today she does not reflect on what she did and say, wow, when I look at those videos, I don't recognize myself.  That's not the person who I purport to be.

And if she gets up here and tells you that today, it's only in response to what I'm just telling you because, as of her video last night, she was not saying, wow, that isn't who I am; wow, when I watch those videos, I didn't remember doing that, but I'm horrified by my conduct.

That's not what she's saying.  Up until last night, she's

saying I had a right to be there, that this was a setup, that Nancy Pelosi set this whole thing up.  And we know what she's telling people in her orbit because when they were interviewed for her evaluation and people who wrote letters in support say things like she didn't do anything but charge her cell phone, that's what she's still telling people.

It might be easy to feel sorry for the defendant because she has little money.  It was pointed out that she had no money to get to court and petitioned Your Honor for the Marshals Service to pay for her to be here and that she lives in a trailer.  I will point out what is in the presentence report.

She does not pay taxes.  She doesn't have a job because she quit her job where she made over $50,000 a year.  She refuses to pay her bills or rent.  That's why she chooses to live in a trailer.  I don't know how the defendant ultimately got here today, if she actually had the Marshals Service pay for her transport, but what I will tell Your Honor is that her husband traveled with her, and he is in the courtroom today.

So it appears -- although I don't know for certain, it appears as that Ms. St Cyr had the Marshals Service pay for her transport, and somehow family or friends came up with the money for her husband to be here with her.

It might also be easy to look at her military service as a mitigating factor.  It is not.  After serving in the military, the defendant should know better about chain of command and

1    authority.  And again, one of the reasons she was discharged

2    for bad conduct was failing to obey lawful orders, even back

3    then in 2003, 20 years ago.  She could have used that military

4    service to lead rioters away from the violence.  If she believed

5    she really had a right to be there to make her voice heard,

6    she could have led her troops of fellow like-minded people, with

7    a voice of reason, to be peaceful.  But, instead, she used her

8    experience as a drill sergeant to summon more warriors into the

9    fight.

10       We've talked about the defendant's total disrespect and

11   defiance for authority, and that history is not just on January

12   6.  It is before and it is since.  How do we promote respect for

13   the law, which is a 3553(a) factor?  She has repeatedly said,

14   if you look at videos 13 and 15:  The system is corrupt, a clown

15   court run by criminals.  This was a setup.  D.C. is biased.

16   The laws are unconstitutional.

17       On one of her Facebook live videos the night of trial, she

18   even referred to 25-year veteran, former Marine Paul Riley --

19   and excuse my language -- as a "douche."  That is not respect

20   for authority.  She has said repeatedly she will not give her

21   DNA, which by statute is required for people who are taken into

22   BOP.

23       In all of her interviews and posts, she has expressed concern

24   for herself, for other January 6 rioters, and for her perceived

25   cause.  She has never expressed concern for police or the people

1    who work in the Capitol.  And, again, if she expresses that

2    today, it is only in response to me bringing it up right now

3    because, as of last night, she wasn't saying that.

4        Her attorneys point out that, because of her childhood, she

5    is more susceptible to conspiracy theories.  I don't care if she

6    believes Trump won the election, if the moon landing was fake,

7    or the earth is flat.  Because of her actions on the 6th and

8    since, she needs to be deterred, or she will engage in similar

9    conduct again.

10       Based on the sentencing memo by the defense, I expect her

11   attorneys might say she's a bit out of touch with reality,

12   but she is not being prosecuted for her views.  She is being

13   prosecuted and sentenced for her conduct and her ongoing views,

14   which make her an ongoing danger to commit similar crimes in the

15   future because she still says I had a right to be there, and it

16   was a setup and it was an inside job.

17       With regard to sentencing disparities, hundreds of thousands

18   of people came to Washington on January 6 and they didn't all go

19   to the Capitol, and those who did go to the Capitol didn't all

20   engage in violence.  As a matter of fact, Ms. St Cyr's husband

21   went to the Capitol and did not engage in violence.  She

22   voluntarily chose to impede the police time and time and time

23   again.

24       Now, there's no other case exactly like this.  The defendant

25   is convicted for her own distinct criminal acts.  But her acts

1    and the 3553(a) factors do warrant the 33 months that the

2    government is asking for.

3        I am aware that just last week Your Honor sentenced Alexander

4    Sheppard.  The difference between Alexander Sheppard and

5    Ms. St Cyr is Sheppard showed remorse.  And, again, the

6    defendant has not done that in this case.  And if she shows

7    any remorse right now, it's really just in response to what

8    I am saying because, as of last night, she had none.

9        I will also point out the defendant McCaughey, who I

10   referenced earlier, who was considered a tunnel commander.

11   He was a male on the outside of the tunnel.  He was tried in

12   the case I mentioned before Judge McFadden, and he received

13   90 months.  His guidelines were much higher.  He was held

14   accountable for injury to officers and physical restraint of

15   officers, but Defendant St Cyr isn't altogether different.

16   She was inside the tunnel shouting commands.

17       So let's get to the elephant in the room, and then I will

18   wrap up.  Perhaps mental health issues.  Getting treatment is

19   a 3553(a) factor, (a)(2)(D), vocational skills, other kinds of

20   treatment that's necessary.

21       I believe her attorneys will reiterate what's in the

22   sentencing memorandum, that because of her childhood she's

23   susceptible to believing Trump.  They use words in their

24   sentencing memo like "mob mentality" and "group think," but then

25   in their memo they also go on to point out the defendant is a

1   strong-willed individual.

2      And as Capitol Police Officer Dunn has said publicly,

3   these are grown men and women who made their own choices,

4   who are responsible for their own actions.  The defendant here

5   has made it very clear that she does exactly what she wants.

6   She made the decision to come to D.C. from Idaho on January 6

7   and all her actions on that day, which I will not reiterate.

8   Lots of people believe in conspiracy theories.  They don't all

9   storm the Capitol.

10     The defendant probably could benefit from treatment, but it

11  doesn't matter what her attorneys think, what I think, or what

12  you think.  It only matters if the defendant thinks she can

13  benefit from treatment and if she is amenable to it.  And we

14  know from the evaluation submitted as Exhibit A to the defense

15  sentencing memorandum, the defendant doesn't think she needs

16  treatment.  She's happy, not depressed, knows how to deal with

17  anxiety.  She even recognizes that other people sometimes think

18  she's crazy, but she is not.  That is on page 24 of Exhibit A

19  attached to the defense sentencing memo.

20     They also say on page 25, because Ms. St Cyr does not believe

21  in doctors or counseling, treatment might be limited.  And

22  again, just last night she said, "My life experience isn't

23  mitigating.  I don't have PTSD or delusional thoughts."

24     The evaluation on page 46 said, the likely scenario for

25  recidivism would be if Ms. St Cyr resumed involvement in

political protests.  She's been doing ongoing political protest
with all her posting and video streaming and interviews she has
given, all of which have been submitted to the Court.  I have no
intention of playing them here.  Your Honor already said you've
watched them in whole or in part.

I cannot envision a scenario where the defendant would go
into treatment and pay for it.  After all, she won't pay taxes,
rent, or her own way to D.C. for sentencing.  So if you think
that she needs treatment, probably the best way to do that is
in the Bureau of Prisons.

They cannot force her to do it, but at least there she
wouldn't be in her own circular rabbit trail of like-minded
people and conspiracy theories.  She might get a chance to get
away from that and maybe think clearly and maybe reflect on
everything that has happened at trial, all the videos, all the
evidence that is right in front of her face.  Maybe she could
finally have the chance if she got away from her nonstop circle
of like-minded conspiracy theories that she is supposedly
susceptible to, and in the Bureau of Prisons, if she chooses
to get treatment, it is available for her there.

I don't know what she will say to you.  I would be shocked
if she expressed remorse, contrition, regret, or acceptance of
responsibility.  And if she does, it would be disingenuous based
on what we already know.  The reason she's a risk to reoffend is
because, even after everything, she is still saying she had a

1   right to be at the Capitol and she didn't do anything wrong

2   and these laws are unconstitutional.  So why would we think she

3   would do anything different if given the opportunity again in

4   the future?

5       All of these things are what make a guidelines sentence

6   appropriate, and the government stands by its belief that the

7   high end is appropriate, in large part due to her ongoing

8   tweeting, Facebook, that we have presented with the Court just a

9   fraction of.  And because of that, we are asking for the $2,000

10  restitution, which every January 6 defendant pays, if not more.

11  That's the minimum everyone pays.

12          THE COURT:  Many pay $500 if they aren't convicted of

13  felonies.

14          MS. SCHESNOL:  You are correct, Your Honor.  And I

15  apologize.  Yes, misdemeanor-only defendants pay $500.  Felony

16  defendants all pay $2,000 restitution.  You are correct,

17  Your Honor.  There is a mandatory special assessment.  We are

18  asking for three years of supervised release and for that to

19  follow the 33 months of incarceration.

20      Thank you, Your Honor, for allowing me this much time.

21          THE COURT:  A lot of time.

22      Ms. Owens.

23          MS. OWENS:  Thank you, Your Honor.  We have submitted

24  our sentencing materials, and I don't want to actually take

25  too much time.  I'd like to give that to my client for her

1    statement.  We would rely on those sentencing materials.  The

2    Court is aware of the facts in this case, and so I would like

3    to point out a couple of things.

4       We stand by the statement in our sentencing memo that

5    Ms. St Cyr was there based on a misguided sense of patriotism,

6    and we think it's important for the Court to consider where

7    that misguided sense came from in making the decision today,

8    which is why we focused our argument on her background, her

9    personal history and characteristics, the things she's gone

10   through in her life, as well as the mental health evaluation,

11   because that gives context to her behavior.  It explains where

12   she came from and how she ended up in front of Your Honor.

13      We're not submitting that so that the Court feels sorry for

14   her.  Not at all.  In fact, Ms. St Cyr would not want anyone

15   to feel sorry for her.  I think that is part of what motivates

16   her statements that she is not a victim.  Those experiences

17   have made her who she is today, and she -- she's not ashamed

18   of those experiences.  She does not feel personally victimized

19   by those experiences.  That is not the purpose of explaining

20   her background.

21      But as even the government noted, as you look at those

22   experiences, they have an impact.  Just as having loving,

23   supportive family members has an impact on someone's growth

24   and development.  Having the opposite, having family members

25   who are absent, who are abusive, who are neglectful, family

members who are alcoholics and who are likely going through

their own mental health issues has an impact.

That impact for Ms. St Cyr was that she did not have a

loving, supportive environment to grow up in.  That impact

was that, by the time she was just a young teenager, she

didn't even have a home.  She was in five different foster-

care placements.  She was jumping from couch to couch when she

wasn't in foster care, and she was placed in a group home

where she was exposed to things that were even worse than what

she had been exposed to in her family-of-origin home.

Her sister describes their upbringing and childhood in her

letter of support.  And I think her sister is probably one of

the people who knows her best in the world, and it's with care

and kindness she describes Yvonne.  And she does ask the Court

to consider that environment, though, in how it shaped

Ms. St Cyr and her thought and development.

I think it's important to consider her military service

in this case.  She served in our military for 16 years.  She

credits that experience with saving her from her abusive

childhood, and I think she's exactly right.  I think she's

accurate in that.

And I think it's important.  Just personally, anecdotally,

I struggle when I have clients who are veterans.  I think they

deserve more for their service.  And so I think it's important

that we consider that in fashioning this sentence, that --

1          THE COURT:  But it does cut both ways in these cases.

2     Military service does warrant some respect and consideration

3     and credit.  On the other hand, military service should also

4     be recognized as putting one in a position of taking an oath

5     to the Constitution and having a responsibility to respect the

6     law and to act accordingly.  So it cuts both ways.

7          MS. OWENS:  You know, I agree, Your Honor, and I think,

8     though -- and again, I don't know, I'm not a psychologist or

9     psychiatrist, but I do think it's anecdotally remarkable how

10    many January 6 defendants served in our military.  I think

11    that there are people there who believed that they had a duty

12    to the country and to their Constitution based on the propaganda

13    that had been told to them.

14      You know, certainly I can't speak for all of them, but, you

15    know, I think we have to look at this in the greater context

16    as well, that there are a vast majority of people who believe

17    that propaganda that the election was stolen.  This is not a

18    conspiracy theory like, you know, some that are outlandish.

19         THE COURT:  It's not a vast majority of people.  The

20    outcome of the election determined that.

21         MS. OWENS:  Well, there's a lot of people in our

22    country who believe that.  There's a lot of news organizations

23    that are perpetuating that.  There's a lot of rhetoric that is

24    being, you know, presented online and in other forums that

25    validates those beliefs and lends credibility to those

beliefs.  Whether those people believe it or not is a
different question, but it's certainly not some fringe belief.
It is something that I think, as a country, we have to wrestle
with, and --

THE COURT:  It is important to recognize, and I will
say this with conviction:  Ms. St Cyr is not here today,
prosecuted and now being sentenced, because of her beliefs
and because of her speech.  It's her conduct on January 6.
And relevant to that is things she has said in advance of or
subsequent to that conduct.  But it's the conduct on January 6
and the choices she made that bring her before the Court and
result in her conviction and now her sentencing.

MS. OWENS:  And, Your Honor, I appreciate that.
I think that is an important distinction to make, that what
one may say online or otherwise is protected by the First
Amendment, but it can give context as well, I think.

But, you know, certainly Ms. St Cyr is someone who spends
a great deal of time online, both consuming this kind of media
and, you know, going live on Facebook or other things that I
don't very much understand, to be honest.  But there's a lot
of media consumption, and I think that that does contribute to
how we got here.  I understand that that's not why she's being
punished or why she's being sentenced today, but again it
gives context.

I don't believe that for mitigation a direct link is

1    required.  Certainly, as a defense attorney, I love a direct

2    link.  I think it's easier to understand.  But I do think that

3    the Court has to consider the background, the personal history

4    and characteristics of every person who comes before the Court

5    to be sentenced, whether there's a direct link or not.  That

6    is not required for something to be mitigating or for this

7    court to consider it when fashioning a sentence.  So I did

8    want to note that.

9        But we have, through the mental health evaluation, tried to

10   establish how her background and history, how that neglectful

11   experience as a child, how her experience in the military, how

12   her diagnosis of PTSD and delusional disorder set her up to be

13   susceptible to coming to the Capitol, to listening to this

14   kind of rhetoric that's being perpetrated, and how she was

15   more susceptible to that speech because of her background and

16   history.

17       I don't think a correlation is necessary, but I believe

18   there is one here.  I don't think that that excuses her

19   behavior.  That's not what we're asserting.  Again, we're

20   explaining how she got here and why she's here.

21       She does not see herself as a victim.  She does not see

22   herself as somebody who is negatively impacted by mental

23   health.  She has in fact spent the past couple of years

24   focusing on her own spiritual development, on her own journey

25   and experiences and on growing as a person, and she will tell

1    the Court about that much better than I can.

2         THE COURT:  And she does not even agree with the mental

3    health assessment that has been submitted on her behalf.

4         MS. OWENS:  That is correct, Your Honor.  I think

5    sometimes people don't agree with those assessments.

6         THE COURT:  It does happen.  It's not rare.

7         MS. OWENS:  I think sometimes it's difficult to

8    have insight into our own mental health issues sometimes,

9    Your Honor.

10        One thing I want to note, the Court has adequately,

11   I think, grasped the First Amendment issues.  She has been

12   active online and otherwise, as I think other January 6

13   defendants have, including Mr. Sheppard who the Court

14   sentenced last week.  But for over two years, while she's been

15   on pretrial release, she has not attended a political event.

16   She has not violated that pretrial release through

17   demonstrating or through defying police orders or going to

18   protests or things of that nature.  I think that's important

19   to note.

20        And it's not for lack of opportunity.  Believe it or not,

21   there's a lot of political protests in Idaho.  There's a very

22   active fringe group of protesters in the Boise community.  In

23   fact, they were protesting a judge's home in my neighborhood

24   just a couple of weeks ago.  She was not there with this

25   group.  She does not associate with this group.  It is a group

1    that local FBI agents asked her about in her initial

2    interrogation, asked her if she was connected to.  She is not.

3    She's not doing this because of being associated with

4    political groups.

5        As she told the jury at her trial and as she has said,

6    she has believed this in her heart for her own self, and so

7    she's motivated by personal desires rather than by political

8    associations or group association.  And so I think it's

9    important to note that, that the concern that this might

10   happen again, those opportunities have been there for her,

11   and she has not engaged in that behavior.

12       She has spent time at her home, on her land, with her

13   family.  She has spent time focusing on herself, and she has

14   engaged in online discussions.  But those discussions have

15   not led to action that this court should be concerned about.

16       She has come to Washington, D.C., when ordered.  She has

17   participated in the interviews as asked.  Even the mental

18   health evaluation that she disagrees with she willingly

19   participated in.  You know, actions speak louder than words

20   in some instances, and I think we're here for her actions --

21       THE COURT:  I guess that's the point in terms of

22   January 6.

23       MS. OWENS:  It is.  And it's also the point, I think,

24   in looking at how to evaluate what she's said online and in

25   other contexts as well, Your Honor.  And so I think there's

1    not a concern that this will replicate itself, because it

2    hasn't since then.

3        I'm going to let her speak.  I think that this court is

4    well prepared and has the facts before it, has the materials

5    that are necessary to make the decision.  I think that the

6    3553(a) factors warrant consideration in a way that is less

7    than what the guidelines are calculated out to be, and we

8    would ask the Court to consider those factors in making its

9    determination.  And unless there are other questions, I would

10   rest on those things.

11           THE COURT:  I guess I'll ask you the hard question.

12           MS. OWENS:  Okay.

13           THE COURT:  And that is, as you've just spoken on her

14   behalf, and as your sentencing memo reflects, you don't make a

15   specific recommendation with respect to a sentence.  You just

16   say, please take all of these things into account.  Are you

17   making a recommendation to the Court?

18           MS. OWENS:  Your Honor, I think she would want a

19   recommendation of probation.  I don't think that that's

20   inappropriate given her conduct on pretrial release.  You

21   know, the Court could fashion that either as probation or

22   supervised release.

23       If the Court is inclined to give her a sentence of

24   incarceration, I don't believe a lengthy sentence is

25   necessary.  I would suggest, you know, perhaps 12 months and

1    a day; but ultimately that is up to the Court to decide, and

2    so those are recommendations from counsel and from Ms. St Cyr.

3              THE COURT:  Fair enough.  Thank you, Ms. Owens.

4              MS. OWENS:  Thank you, Your Honor.

5              THE COURT:  Now, Ms. St Cyr.  If you would like to say

6    something, I would be happy to hear from you.

7              MS. OWENS:  Your Honor, where would you like her to

8    make her statement?

9              THE COURT:  I'd like her to be up here if that's

10   comfortable for her.  If there's some reason not to, then...

11   Okay.  And by "up here," I'm pointing.  I mean at the lectern.

12             THE DEFENDANT:  Good morning, Your Honor.

13             THE COURT:  It's now afternoon.  Good afternoon.

14             THE DEFENDANT:  Yeah.  I have a written statement that

15   I will read, and I assume that you watched the video that I

16   submitted; and I had another video that I wanted to be

17   submitted that wasn't able to, and I will read from that one

18   because there's context to it.  But I did want to talk about

19   some of the things that happened.

20       I've been on a spiritual journey.  In 2020 I started to

21   wake up.  And I may repeat some of this that I've written, so

22   I apologize if I do, but this just came up from today so I

23   want to address this and then I'll go into my written.

24       In 2020 I started to wake up.  It wasn't just -- it started

25   with Covid but it actually started -- I've lost over a hundred

pounds, and through my weight loss and documentaries there,
I started to realize that things were not as we were told; not
everything was as it seemed.

I learned about sugar and how they don't put the amount of
sugar that we intake on our daily suggested values because we
consume way more sugar than we should.  And if you do studies
and research on sugar, they've given sugar water to rats and
cocaine to rats, and rats will go to the sugar water before
they will the cocaine.  There's something to what we put into
our bodies and how we live our lives.

So 2020 started this journey that I had no idea.  It
started with the weight loss, and my husband -- my son got
off his ADHD medicine, the whole house was with us, and we all
felt better.  And then Covid happened.  And that kind of took
me back, and a little voice inside of me -- and I believe that
I am being led by God.

I believe we all have a higher power, an oversoul.  I
believe we are not our physical bodies, that we are spirit
bodies, that we are here for the human experience.  And in
2020 that oversoul started to become apparent to me.  I've
always been led by that, but I didn't realize that that's
what was happening, as most of us don't.

I went to -- we had a mom that was arrested for a park --
she took her kids to the park on the playground in Idaho, and
she was arrested.  And that kind of started my -- never been

to a protest prior to that.  I had never even really been

political.  My husband had listened to talk radio --

THE COURT:  Slow down a little bit for the court

reporter.

THE DEFENDANT:  Sorry.

So my husband -- I started listening and became a little

more political, but still not really my forte and not my

interest.  I'm not a history person.  I don't love that kind

of stuff.  That would be my husband.  But in 2020, things came

into my face.  And when you tell me that I have to wear a mask

when I'm not sick and I -- it doesn't make any sense to me,

and there's plenty of research to show that masks do not work.

And it has, since Covid has come out and that's been out, I

started to question things.

When Sara was arrested for going to the park, it was my

very, very first protest I'd ever been to, and I left my

chiropractor's office; and I went over to the thing, and I had

my Tree City Church -- I was still actively involved in our

church.  We were still helping with the teens, even though

church was online at that point.

But I started to see things.  I started to see things

differently, and I started to question things.  When I went to

that protest, I saw myself on TV, and believe it or not -- and

my husband can attest to this -- I did not like what I saw.  I

did not like how angry I was and that energy that that brought

1     out.  I didn't understand what was happening.

2          And at that point I stepped back from the protest, and

3     I didn't do anything the rest of 2020.  I started just

4     researching.  I started learning about spirituality.  I

5     started learning about meditation.  I started learning about

6     our energy centers in our body and how we are much more than

7     we've been told and that we are very powerful.  I started to

8     learn all those things.

9          And I started to watch.  I started to watch everything.

10    I started to watch the news and what people would say and

11    their actions.  I started to watch this bickering between --

12    may I get my water, sir?  All right.

13         (Pause.)

14         I watched and I observed.  And I went to one other protest

15    that was very peaceful.  It wasn't about anyone getting

16    arrested; it was just at our capitol out front, and it was

17    about mask mandates.  And I think that was in maybe March or

18    April of 2020.  And then I didn't attend anything else until

19    they started -- because at first the masks, it was -- in Idaho

20    we were very lenient with the masks.  They didn't force it

21    like they did in other states, and so I was okay with that.

22    But then when they started to force it and to make me wear it,

23    that was when I went to my next protest, was in that December

24    of 2020.

25         And at that point -- because I realized how important our

1    breath is.  See, most humans think that this is just air and
2    that this is nothingness.  I don't believe that.  I believe
3    this is our life force, that this is God in -- with us in
4    spirit, is surrounded by us.  Just because we can't see it
5    doesn't mean it's not true.  And I will cover that.  That's
6    one of the videos I will.

7        But the one thing I also did in 2020 was I watched.  I
8    watched cities burn.  I live in Idaho, which is very close to
9    Portland and Seattle, which were huge hot spots during 2020.
10   I managed -- until I quit my job in 2020, I managed big-box
11   corporations, their landscaping in Washington, Oregon, and
12   California.  I didn't have California in 2020, but I had
13   Washington and Oregon and a few other states, but those were
14   the big ones.  Part of my job when I took over, because I had
15   to deal with such homeless -- and I will cover that in my
16   thing -- was I had to watch a video about Seattle is dying and
17   homelessness.

18       So I started to pay attention of a lot of things that I had
19   never paid attention to before and started asking questions.
20   And -- and then I watched people, because if you have an
21   election, you have to have physical -- you have to have bodies
22   to vote for you.  And I still with all my being, all my heart.
23   I know the election was stolen.  But I don't believe it's the
24   first election that was stolen.  That's what I found out since
25   then.  I believe that this system was created, and it has been

controlled since its creation.  And I will get into that in my letter.

As far as protesting, one thing I've learned since January 6 and since December is energy does matter and our actions do matter.  I know that I went there with the right intention. I -- everyone has a perspective of truth.  The thing is, is we think that you can say the truth is this, that this is the truth.

But the thing is, is every single one of us is experiencing this moment right now in this courtroom with different thoughts, with different backgrounds, with different -- not one of us, not one of us, I guarantee you, have the same exact thought right now.  Not one of us is taking the same experience away from this moment.  Not one of us.

So who's the liar?  And that's the thing, is it takes -- it's a perspective of truth.  And I believe that we're here to realize that.  I believe that earth is a school, that we come to this planet in the lowest dimension of consciousness.

So basically we are unaware of anything but our reality that we believe is a reality, and until you realize that there's more and that we're connected and that we are all connected to the creator, that we are all the sons and daughters of God -- so I won't reoffend.  I can tell you that right now because my energy matters.  But I don't need to do that consciousness.  I can bring more power to this and affect

the planet more by closing my eyes, turning off my mind, and letting God work through me and meditate. And that is how I affect the collective.

I didn't know that in 2020. I was learning my spiritual -- who I was spiritually, so I had no idea my impact or my power and my energy. And I do now. So now I do sit at home. I ground in. I am sitting outside. I am surrounded by nature, because we are from nature. We are nature. That is who we are, and that's where we come from. And just like nature, it's a constant shift. It's a constant change. The one thing in our world that is constant is change.

So I just wanted to touch that, because everyone seems to think -- I do have a strong will, and I am controlled, but I can tell you right now, I don't want to be a part of this anymore. This is all -- this whole thing has taught me so much. It's all about perspective. And the thing is, is perspective is never truth; it's just perspective. Just like January 6, everybody walked away from there with a different perspective.

I took an oath to support and defend the Constitution, and that is why I went. I had no idea what was going to happen that day. I had no intention of getting caught up. But when you're in a moment, you respond in the moment, and that is the only thing. I don't -- there -- the one -- and it's not regret, because I don't want her to think that it is. When I

came here and I was able to see the Capitol Police and what
they went through and I saw their perspective, I did leave
with a different viewpoint.  But I felt sorry for them because
I believe they were just as much set up as we were set up,
that they didn't -- and there's plenty of Capitol Police and
Metropolitan Police that are on social media that are speaking
out against what happened at January 6.

That chief's son did a Tucker -- did an interview with
Tucker Carlson and talked about January 6.  He was fired.
There was another gentleman, Terrence, I don't know his last
name, he was also fired, and he talks about January 6.  So
there are many perspectives from the police also of what
happened.  They are my brothers, and I didn't mean to be
involved in anything that harmed them.  But I still believe in
why I went.  I still believe in why I was there.

And with that, I will read this.

So this first one is from the video of Dr. Joe.  And again,
since I couldn't submit the video, you get to listen to it.
I'm sorry for that.  Dr. Joe Dispenza was a chiropractor, and
in his 20s he was in a bike race, and he was paralyzed.  He
was hit by a truck in the race, and he was paralyzed and he
was told he would never walk again.  And because he was a
chiropractor, he understood the surgery he needed, and he
refused the surgery.  And he started to meditate, and he made
a deal with God, and he said, God, if I can heal myself, then

1   I will spend the rest of my life teaching others to heal

2   themselves.  And that is what he does.

3       So he does a workshop -- he literally, after 10 weeks --

4   and you can hear the story if you want to -- he healed himself

5   and he walks again, and now he does workshops all around the

6   world where they go in for week-long workshops and they have

7   spontaneous healing, cancer, blind, deaf.  And then they go

8   into children's hospitals and they heal, and they do it

9   without touching.  They do it through energy, because we are

10  connected.  We are energetic beings here in a physical

11  reality.  So this is from Dr. Joe:

12      "What I've learned" --

13          THE COURT:  How long are you reading from --

14          THE DEFENDANT:  I'm just going to read a little bit,

15  and then I'll read my letter to you.  I just want to read this

16  part because it's important for people to understand about

17  frequencies and -- people believe -- their reality is based on

18  what they see and what they know.  But the truth is, is there

19  is a lot of unknown things that people don't research and

20  we're not taught.  And I have been researching that.  Yes, I

21  do spend a lot of time on media, but it's not on propaganda;

22  it's learning about who I am.  It's learning about --

23          THE COURT:  Go ahead and read, then.

24          THE DEFENDANT:  "What I've learned over the years" --

25  and this is from Dr. Joe, not from me -- "that no new

information can enter the nervous system that is not equal to the person's emotional state.  You can give them the answer, the right answer to the problem, and they won't hear it because it's not relevant, equal to the emotion that they are experiencing.  People will analyze themselves or analyze their life within disturbing emotion -- when we looked at the realtime brain scans" --

-- "or analyze their life within some disturbing emotion, when we looked at the realtime brain scans" -- oh, he became a neuroscientist.  I left that part out.  So after he healed himself, he became a neuroscientist, and now he studies brain waves and meditation and what we do when we meditate.

"When we looked at the realtime brain scans, we saw that they were actually making their brain worse.  They were driving their brain further out of balance, overthinking, overanalyzing.  When you analyze something within an emotion, an emotion is a record of the past, so you're thinking in the past.  The solution could never be there.  Free the person from the emotion, and of course they see it from a greater level of consciousness.

"We have been talking a lot about light and information or energy and consciousness.  Everything in our known universe is made up or emits either light and information and energy and consciousness, which are other ways of describing electromagnetic energy.

1    "In fact, these elements are so intimately combined that

2    it's impossible to separate them.  Look around you.  Even if

3    you don't see anything other than matter, objects, things,

4    people or places, there's also a sea of infinite invisible

5    frequencies that are carrying encoded information.  That means

6    not only that your body is made up of light and information,

7    of energy and consciousness, but also you as a conscious being

8    with a body are made up of gravitational, organized light

9    packed with information that is continuously sending and

10   receiving various frequencies, all carrying different signals,

11   just like a radio or cell phone.  All frequency, of course,

12   carries information.

13   "Think about radio waves for a moment.  There are radio

14   waves moving through the room we're sitting in right now.

15   If you turned on a radio, you could turn it on to a specific

16   wavelength or signal, and then a little tranducer in the radio

17   would pick up that signal and would turn it into sound that you

18   could hear and understand as your favorite song, the news, or

19   even a commercial.  Just because you don't see the radio waves

20   in the air doesn't mean they are not there carrying distinct

21   information on a specific frequency at all timeS.  If you change

22   the frequency a small degree and tune in to another station, a

23   different message will be carried on that wavelength.

24   "The visible light spectrum where we perceive various array

25   of colors in the present world we live in makes up less than 1

percent of all the frequencies of light that exist."  So we can

only see less than 1 percent of all the frequencies that exist.

"For example, even though we don't see x-rays, they still

exist.  We know this because, as human beings having the ability

to create x-rays, we can measure them.  In fact, an infinite

number of frequencies exist within the spectrum of x-ray light.

X-rays are a faster frequency than visible light we see, and

therefore have more energy because, again, the faster a

frequency is, the higher its energy.

"Matter by itself is the densest frequency because it is

the slowest and most condensed form of light and information.

Here's an example:  The color red has a slower frequency" --

THE COURT:  I have to interrupt.  How much longer are

you going to go on reading from --

THE DEFENDANT:  Well, I don't have to read that.  I

just wanted --

THE COURT:  -- this person's --

THE DEFENDANT:  I wanted, because people say that --

think that their reality is only by the seen, and that's not

true.  So I will go on.  I just wanted to put that on the

record to make sure that just because people believe

differently doesn't mean they know everything and it doesn't

mean they have all the answers.  They are only limited to the

knowledge they are willing to receive and look into.

So now I will go on to my letter.

I do not consent, nor do I or will I comply.  I am a free, divine, sovereign being who was born on this earth with inalienable rights to life, liberty, and the pursuit of happiness.

During the year 2020, I started to awaken from a slumber and connect to a higher purpose and reason for being on this earth other than the "eat, sleep, work, play" lie humanity has bought into.  I am not this physical body that my soul and spirit reside in.

Nor am I Yvonne St Cyr.  That is a label my earth mother gave me.  She had no idea she was giving my sovereignty away when she allowed a death certificate to be issued at my birth. Yes, I know all about the money these elite families are making off us, trading us like we are commodities, as do millions of others.

I am much more than this physical body.  I am a conscious being whose spirit is eternal.  I know who I am and my connection to creator.  I know that this human body contains and stores the history of the universe in my DNA, and that is why I will never voluntarily give or concede to give anyone my DNA.

I also know I was born for such a time as this.  No thing is happening or going to happen to me or this body that was not divinely appointed.  That includes going to prison if I do.  Spirit has assured me that isn't going to happen.  But I

am also more than willing to make that sacrifice and allow my
physical body to be locked up if it is what is needed to help
wake up my brothers and sisters.

You see, you may have that power over the physical body,
but the physical body is limited.  Astral travel, lucid
dreaming, and remote viewing are very real and things our
spirit bodies can do no matter the physical location of the
body I inhabit.

You see, those of us that many of you look down upon and
judge as lesser-than because we weren't born with some of the
same privilege as many, or we didn't go to college so people
somehow believe that education equals intelligence, that is a
lie.  Truth be told, most of the people with higher education
actually just have more indoctrination and less ability to see
the truth because of it.  Education has been used to
indoctrinate, not educate.  They seem to think less of or seem
to look down upon those of us that have suffered at the hands
of mitigating circumstances, better known as trauma.

I'm here to set the record straight.  I don't believe in
mitigating circumstances.  I believe in life lessons that help
mold and shape us.  I know that the circumstances of my life
were not my downfall.  They did not in some way damage me or
leave me with PTSD or some type of delusional disorder.  They
left me with the ability to see the entire picture, to look at
all sides of what is happening, and to be a free thinker.

1   I am a survivor, I am a fighter, and I have never been a

2   victim in life.  I am here to learn lessons, to grow and

3   become stronger in my love with my brothers and sisters and in

4   my connection to the source.  Just like the video stated, once

5   you have -- if you watch that video about the spirit body,

6   once you have this connection, once you know who you are,

7   nothing can stop you.  If I go to prison, it's not because you

8   sent me there or the prosecution won.  It's because my energy,

9   my spirit, needs to be there.

10   Consciousness is unstoppable.  My consciousness grows

11   moment by moment.  The more they try and label and understand

12   who I am, the clearer it becomes to me who I truly am and how

13   powerful I am.  The more I let go of the labels and the lies

14   and the manipulation, the more I connect to the power inside

15   me.

16   I did not come to overthrow or overturn our government

17   or this corrupt injustice system of enslavement.  I came to

18   expose it and then destroy it without any violence or hate.

19   We will win, and it will be through consciousness and love.

20   The game that is being played isn't helping hide the darkness.

21   It's exposing it for all to see.  If anyone thinks locking

22   this body up in a prison with women who have suffered

23   unimaginable trauma and want nothing more than their freedom

24   is a punishment to me, they obviously haven't been stalking me

25   close enough.

1    I long for the challenge.  For three years I've been

2    waiting for a response from God and what is next and why I am

3    here.  We are finally here, and now I will know what God has

4    in store.

5        As I was walking to the courthouse, I was reminded it's not

6    Yvonne here today; it's her oversoul and her essence.  I'm not

7    alone and I have surrendered my will to the greater good.  Man

8    has never had, nor will any man ever have, control of my being.

9        In 2020 I became aware of who I was.  I started

10   remembering, and this is my story which will be told from my

11   lips, and an entire picture will be given of who I am.  No

12   more lies.  No more word salad.  It's called spelling for a

13   reason, and I will no longer allow anyone to cast spells over

14   me, and I am no longer under the controllers of this world and

15   their spells of thought.  I know what my own thoughts are and

16   what are not.  I know who I am, and I am going to share with

17   you.

18       I was born in a small town in Idaho.  My mom was from

19   Spain, and my father was an American.  My dad was in the Air

20   Force and met my mom while stationed in Spain.  My mom was a

21   very poor, uneducated, but extremely smart -- and, yes, you

22   can be uneducated and still smart.  She was also a very

23   passionate woman and maybe didn't understand how to parent,

24   but she knew how to love.  Both her parents died when she was

25   young.  She was orphaned, raised by family, but split up from

her brothers and sisters.  She was never afforded the opportunity to go to school, but she still taught herself how to read, speak, and write English.

My father also lost his father very young and suffered from much trauma, which I assume is why he was a raging alcoholic. I only say this because generational curses and trauma are real, and it's something that the very corrupt CIA has used for their benefit.  I highly recommend you all go study and learn about Project Monarch and MK Ultra.  I know it sounds delusional, but it's only delusional for people who refuse to do any research and pool all the information that is available to us via the internet and unclassified documents.

The elite and powerful never thought we'd be smart enough to use the information available to find truth out.  It's called his-story, history, for a reason, and it's written by the victors.  Most of humanity suffers from Stockholm Syndrome.  I, however, am no longer under their spell.

I was born to two parents that suffered severely from trauma and, unfortunately, unknowingly passed that on to me. I do not have many childhood memories, and whether that's from trauma or I just can't remember, one thing I've learned about the past is it's not even real.  The past is just a bunch of memories our minds construct and most the time aren't even accurate to what happened in that moment of time.

I'm not my past choices or my past mistakes.  I had no idea

as a child what was happening, just as none of you did.  But we all buy in to the storyline humanity has created.  None of us know any different, so why would we question things?  Unfortunately, the corrupt individuals and elite families, there are many of us that -- unfortunately for the corrupt individuals and the elite families, there are many of us that are no longer living in the ignorant state of complete unconsciousness — or conspiracy theories, as you like to call them.

THE COURT:  Let me interrupt.  How much longer is this document --

THE DEFENDANT:  My --

THE COURT:  -- that you're reading going to be?

THE DEFENDANT:  It's my letter to you, and it's seven pages total.

THE COURT:  How many pages have you read so far?

THE DEFENDANT:  Two.  This is my trial, and I want to make sure this is on the record because I --

THE COURT:  This isn't your trial.  This is your sentencing.  This has been --

THE DEFENDANT:  Well, this is my sentencing.

THE COURT:  And it's been going on for two hours now.  And I'm going to listen to you, because I think I have to.

THE DEFENDANT:  Okay.  Thank you.

THE COURT:  So go ahead.

1          THE DEFENDANT:  Thank you.

2       I've always been aware that kindness --

3          THE COURT:  And don't speed up, because that's not

4       fair to the court reporter.

5          THE DEFENDANT:  Okay.

6       I have always been aware that kindness matters.  I have

7       always lived by the golden rule of treating others as I would

8       want to be treated.  I was the child that would stand up to

9       the bullies when other kids were being bullied.  I have

10      invited homeless people into our home, campsite, and meals

11      many times.  I am the person that notices people that most of

12      you look down upon or are just invisible to you.

13      I'm not a criminal, nor am I a felon.  Those are lies and

14      a narrative created to hide the truth.  You all can try and

15      paint a minimal picture with a very limited perspective and

16      call it a justice system, but I experienced firsthand what it

17      was and am a victim of the lies of this criminal system.

18      My trial showed and exposed many things to me, my husband,

19      and my family.  I will use whatever platform I am given to

20      expose those lies.  Prison will help give me plenty of time

21      to write a book, research and expose all the lies and the

22      corruption of this system you all believe in.

23      The fact in this city alone you have real criminals

24      that are committing violent offenses and being let go while

25      you lock people up who never even dream of bringing harm to

1    another human being, this just proves how corrupt and how

2    broken the system is.

3        You don't even allow for the entire story to be told.  You

4    only allow enough of your perspective to be given to create a

5    crime.  If we were following the Constitution *for* the United

6    States instead of the Constitution *of* the United States, which

7    corporate America created to enslave us in 1871 under the Act

8    of 1871, this sentencing wouldn't even be happening.  I have

9    the right to life, liberty, and pursuit of happiness.  Those

10   rights are given to me by my creator, and no man has the

11   authority or power over me to take those rights away.

12       If there is no victim, there is no crime.  You all have

13   changed the rules and think you got away with it, but you

14   haven't.  It's only a matter of time that this charade will

15   continue.  It's only a matter of time until all those that

16   knowingly participate in this lie and this charade will be

17   held accountable.

18       For those of you that are ignorant and really believe you

19   are on the right side of justice, you are not.  I am walking

20   proof of that.  There is absolutely no justice in locking up a

21   human like me.  I know my thoughts and actions matter.  I love

22   fully and unconditionally, even to the ones supporting this

23   lie and are a part of it.

24       Whether you have knowingly or unknowingly been a part of

25   it, I have already forgiven you and pray for your mercy and

grace.  I know the truth of why we are here, and I know each
of us is doing just what we believe is right.

I know that there is only truly a handful of actual
psychopaths in this world; and I don't truly believe that
anyone in this room falls in that category, but you are
unknowingly helping them.  Or, who knows, maybe you know more
than I realize about how dirty this all is.  But I will assume
the best and believe you all truly think you are doing the
right thing.

Which brings me to my journey to D.C. on January 6.  My
husband and I sat back all of 2020 and watched cities burn.
We live close to Portland and Seattle and how they created the
murderous city of CHAZ.  I watched both those gorgeous cities
literally turn into homeless shitholes.  Funny thing is, my
job from 2018 and 2020 included California, Washington State,
and Oregon, and part of that job was managing -- I'll skip
this part since I already did it.

I have seen what these liberal policies and laws do to
cities.  I have been a part of it, and the truth cannot be
denied.  I also live in areas where there is so much land and
very limited population.  I can see with my own eyes how the
1 percent have controlled the wealth and use our government
and their corporations to control and maintain all the wealth.

There is more than enough abundance in this world for all
humans to live decently, but that was never allowed to happen

if the ruling elite were in power.  If we are all abundant,
who would be their slaves?  I know we are not free.  We have
been paid slaves for a long time.  The truth is everywhere;
it's just going to take a bit more time for the last few of
you to see.

Thank you for helping with that, though.  You see, by going
after people like me, you've opened many eyes.  People that I
have done life with know the truth, and my story and all
others will continue to be told.

When Covid happened, God told me to wake up and pay --

THE COURT:  Slow down.

THE DEFENDANT:  When Covid happened, God told me to
wake up and pay attention.  I had no idea what that meant at
the time or how deep the corruption went.  I had no idea what
I was going to be given 20/20 vision to see the world as it
really is and not what people believe.  Again, you're only
seeing what you're capable of seeing.

I started watching and observing.  I realized then how
corrupt the churches and religions were.  I saw how the
medical system we all trusted was created by the ruling and
elite and was never a health system; it's a debt system that
was created to keep us sick and spending our money on Big
Pharma.

I saw how the schools are being used to indoctrinate our
children's mind and destroy the family unit.  I saw the

1    election process and how they have created a two-party system

2    to give the illusion of choice, all while owning every

3    candidate that ever ran for president.  President Trump is the

4    exception, and that is why you all hate him so, because he's

5    not controlled by the system.

6        I started to see how everything was connected and how these

7    systems are used.  God showed me early in 2020 how you create

8    these unconstitutional laws and how they used Covid and the

9    Patriot Act to commit these treasonous crimes.

10       Let's use traffic citations, for example.  I'm quite

11   capable of knowing what a safe speed to drive my car is.  Why

12   do we need speed limits?  I'll tell you why.  It's just one

13   more corrupt system that was created to take more money from

14   we the people and turn it back through the money-laundering

15   system of our government.  It's why the resident Biden, the

16   president of bankrupt corporate America, only authorized $700

17   to each household in Maui but billions to Ukraine.

18       We aren't ignorant.  We can see what is happening, just

19   like we can see what is happening with January 6.  The only

20   coup that was committed was committed on November 3, 2020, and

21   January 6 is being used to hide their tracks and project onto

22   me and the other defendants exactly what they are doing and

23   what is happening in our government.

24       My only question is who in this courtroom is in on it, on

25   this coup, or who is ignorantly helping.  Either way, it

doesn't matter.  The truth will come out, and the truth always wins.  Those responsible will be held responsible.  We are talking treason here.  I know this, and I know the truth. It's what keeps me going and gives me the strength to face each day.

I know that I did nothing to overthrow or break any laws. I never had, nor will I ever have, an intent to commit a crime.  *Mens rea* must be proven, and it has not been in my case.  And you telling me what I believe doesn't make it so, I, know what I believe; and someday you'll have a life review, and you will all know what I believe and that I believed that I was doing the right thing.

Plus, that fact that there had to be a crime, the government must have clean hands, and because this was a fed-surrection, they do not have clean hands.  Nothing can stop the truth.  The media that is controlled is no longer trusted, so people are searching and finding truth, and it can't be censored fast enough to stop it.

I understand the importance of free will and love.  I understand that I am responsible for my thoughts and actions. I understand what the true criminal activity is, and I know beyond a shadow of a doubt that it doesn't exist in me.  I know who I am.  I know how I love.  I know I am a light in this world and I came to help expose the darkness, not partake in it.  I understand I came here to learn, to have a pure

1     heart, and to see truth and help this earth transition to a

2     new earth of love and light.

3         Truth for all.  No more lies.  No more deceptions about who

4     we are.  This world is coming, and I know because I'm helping

5     create it.  We are all creators.  We are all children of the

6     creator, and this paradigm is shifting to bring the truth to

7     this planet.  We will finally have heaven on earth as we were

8     promised.  I hope for your sake, if you're a willing participant

9     and you know how corrupt our government is and still participate

10    in it, you see what is happening and you end this now.

11        We the people are all guilty of being complacent and

12    allowing this to happen.  We the people need to unite and take

13    our world and our earth back.  We need to end these lies now,

14    and it's never too late.  When full consciousness does come

15    to this planet, we'll realize everyone played a part and there

16    truly isn't darkness.

17        We are all God's children.  We are all created in their

18    image.  It is only here on earth, in this 3D world of duality,

19    it has been used to teach and show us.  Without knowing what

20    darkness is and how it destroys us, we would never appreciate

21    God's love and truth.

22        We are here to learn and grow, I know that, and that is my

23    story.  I am the light of God's love.  I am here to help raise

24    the consciousness on the planet and bring truth, and I will be

25    redeemed.  If the truth doesn't come first from God and

1    complete consciousness, it will come through a pardon of

2    innocence, and then you will all have to answer for what

3    your part is on that.  You can stop this now.

4        The American people will be forgiving for those of you

5    that were caught up in this lie and this wrongdoing.  They

6    will see, as I do, all this happened for a reason and it's all

7    part of the truth of who we are.  I will pray for you all that

8    you search for truth and you help undo what is being done.

9            THE COURT:  What page are you on?

10           THE DEFENDANT:  Five.

11           THE COURT:  You need to wrap it up.

12           THE DEFENDANT:  Okay.

13       I know this has been a little all over the place and a

14   little messy, kind of like life.  I've tried to put into words

15   who I am in this lifetime, but that is a hard thing to do

16   because --

17           THE COURT:  If wrapping it up means you're just going

18   to read the rest of it, then I'm going to cut you off.  You

19   need to summarize and wrap it up.  You're just repeating

20   things.  You're just saying the same thing --

21           THE DEFENDANT:  I'm not repeating it, sir.

22           THE COURT:  -- over and over.

23           THE DEFENDANT:  This is my statement --

24           THE COURT:  Ms. St Cyr.

25           THE DEFENDANT:  Okay.

1        Judge Bates, you are also my brother, and I know that my

2    letter or speaking probably did very little to move the energy

3    to my side --

4        THE COURT:  Don't go faster just because I'm making you

5    end it.  Be considerate of the court reporter.

6        THE DEFENDANT:  You are also my brother; and I know

7    that my letter or speaking probably did very little to move

8    the energy to my side, but I forgive you.  I know you truly

9    believe you are doing the right thing.  You, I am sure, have

10   no intention of doing anything but what you believe is right.

11   Just like when I drove cross-country to support and defend the

12   Constitution for the people, I knew and still know I did the

13   right thing.  You can choose to see my heart and see the truth

14   and end this now, or you can continue.

15       But the tides have already shifted, and everyone is watching

16   everything.  Nothing you or any of you do is going to be

17   hidden any longer.  All the darkness will be exposed by the

18   light.  So the sooner you realize and welcome the truth, we

19   can forgive -- let me skip that part.  I will go down.

20       I trust whatever happens is exactly what meant to happen.

21   Again, I'm not a victim to my circumstances.  I'm here to help

22   change the world.  I can only do that by changing me, and I

23   assure you that happens daily.  Every day I become a much

24   better, stronger, more powerful and loving human than I was

25   yesterday.  That is the only power I have in this world and

1    the only power I need.

2        Unlike the unconscious souls walking on this earth who

3    believe positions of power somehow make them powerful, that's

4    a lie.  We are all created equal, and we are all children of

5    God.  I finally have the eyes to see there is no enemy.  I

6    guess the only thing I regret is that I didn't see it sooner.

7        Had I known sooner, I probably would never have driven to

8    this dark place.  I would have stayed put, knowing that my

9    light and energy are more powerful when used in love and

10   consciously than coming here and try to help others see what

11   they just aren't ready to see yet.  I can't change that moment

12   in time when I came to this city.  There's nothing I can do to

13   change it.  But I won't live in regret, and I will never submit

14   to being a victim.

15       I follow my heart, as I've done most of my life.  Now

16   Now I'm consciously aware of my thoughts and actions.  Now

17   I understand I'm tapped into source, and every moment is an

18   opportunity to see this world from the eyes of the creator,

19   to live in love, peace, and harmony, as was intended for this

20   earth.  I will do that no matter the circumstances of my outer

21   world.  I will be the best version of who I came here to be,

22   not because of any other reason than I was created to be loved

23   and I am an expression of God.  I hope you can see me through --

24           THE COURT:  Ms. St Cyr, I've been listening for over 40

25   minutes.

1          THE DEFENDANT:  I know.  It's almost done, sir.

2          THE COURT:  You have one minute to wrap up.

3          THE DEFENDANT:  Okay.

4      I hope you are willing to open your heart and the

5   possibility and consider the possibilities.  Either way, I

6   have never thought my freedom and truth would come through

7   this unconsciousness and lies.  As forefathers mentioned,

8   without liberty, there's no reason to go on living in this

9   physical realm.

10      I totally understand what Patrick Henry meant when he said

11   give me life -- give me liberty or give me death.  Just as the

12   prosecution said, I came here to do what I want; I have a very

13   strong will, and that is my magic.  And the only thing I want

14   is to love my brothers and sisters no matter their beliefs and

15   bring truth to this planet.

16      If that gets me locked up, then so be it.  I will be in

17   company of many heroes who have fought and died for truth and

18   freedom for a long time.  I know my redemption will come; I

19   just don't know when.  But thank you for your time, and again,

20   I love you and I forgive you.  I see you as my brother and the

21   child of God that you are, playing this role as the Honorable

22   Judge Bates.  It's only a matter of time before we realize if

23   you are truly honorable.  Nothing remains hidden.  All will be

24   revealed.

25          THE COURT:  All right.  Thank you, Ms. St Cyr.

1        Now we're going to move into the actual sentencing.

2    I will say that your last words directed to me -- I think much

3    of what you just said was directed to me, but the last words

4    were specifically directed to me, and they are somewhat

5    inconsistent with words that you have posted recently saying

6    that the criminals make all the rules, referring to the court as

7    a clown court, and I think generally calling January 6 and what

8    has been done with respect to you by the criminal justice system

9    a setup -- and you referred to that in your comments here,

10   saying it was a setup -- and that you and others are being

11   sentenced for crimes that someone inappropriately created in

12   order to stop you.

13       It just -- I've listened to what is basically your political

14   beliefs.  And you're not here because of your political beliefs,

15   political or other kinds of beliefs.  You're here because of

16   your conduct on January 6 and what you have exhibited with

17   respect to that conduct and the criminal justice system and the

18   law that is being applied here.

19       And I think it's fair to say that anyone who's listened to

20   you, as I have, has to understand that you have little or no

21   respect for the law, little or no respect for our democratic

22   systems and the criminal justice system that is part of our

23   democratic systems.  And I just have to repeat what I said many

24   minutes ago now, and that is that you're not being held

25   responsible for your beliefs.  You're not being held responsible

1    for what you have said.  You're being held responsible for the

2    choices you made on January 6 and the conduct that you engaged

3    in on January 6.  And that is what we're now going to move to.

4        I have considered the presentence report, the memoranda

5    supplied by each side, several memoranda from each side, along

6    with exhibits, including the mental health assessment that was

7    provided by the defense, and I've taken all of that and what has

8    been said here today into account.

9        First, there is an issue of restitution.  There is authority

10   for restitution in this case.  It comes from sections 3663 and

11   3663A of Title 18.  The mob on January 6 caused almost $3 million

12   in damages and losses to a victim, the Architect of the Capitol

13   in this instance, and you were part of that mob.  And as other

14   judges and I in other cases have done, I am going to award

15   restitution of $2,000 payable to the Architect of the Capitol.

16       In light of that, I am not inclined to impose a substantial

17   fine here.  But I cannot ignore the fact that you've raised some

18   money through GiveSendGo in support of yourself and your views.

19   You don't pay federal income taxes.  Apparently, you don't pay

20   other obligations and responsibilities.

21       In assessing your situation, I do believe you're able to pay

22   a modest fine, and I am going to impose a modest fine here, a

23   fine of $1,000, because I think that is consistent with the

24   sentencing structure and consistent with the facts with respect

25   to you, Ms. St Cyr.

1    So now I'm going to go to the rest of the sentence that

2    will be imposed.  I'll give counsel one final opportunity

3    to make any legal objections before the sentence is actually

4    imposed.  But I will ask you, Ms. St Cyr, and Ms. Owens, to

5    come up to the lectern while I do this, please.

6    (Defendant and counsel comply.)

7    There's no question in my mind, or in the minds of other

8    judges, and lawyers who appear in this courtroom on January 6

9    cases, there's no question that the conduct on January 6 was

10   extremely serious, that it was an assault on our democratic

11   principles and values and institutions, and it represented an

12   attempt to thwart the peaceful transition of power from one

13   presidential administration to another that has been an

14   important part of this country's identity and has been admired

15   throughout the world.

16   The events of January 6 resulted in scores of injuries,

17   several deaths, extensive property damage, in addition to

18   the damage it has done to the values and principles that are

19   important to this country.  So it must be taken seriously by

20   the criminal justice system, and that's why we're here today.

21   Ms. St Cyr, you were a very active participant in those

22   events.  I'm going to review a few aspects of your conduct.

23   Early on, within the restricted perimeter, you encouraged others

24   to be actively and aggressively involved against the police.

25   "Push it, there are millions of us.  They can't stop us all.

1  Tear it down."  These are your words.

2  You brought yourself purposefully to the front of the

3  confrontation with the barricades, and you pushed against them

4  with your back for lengthy periods of time, more than 15

5  minutes, I think.  And you would not move.  Asked and told to

6  move, you refused.

7  You've admitted during the trial that you intentionally

8  disobeyed police officers, that that was what you were doing and

9  you were purposefully doing so.  You were going to stand your

10  ground no matter what the police said.  An absolute lack of

11  respect for lawful authority.

12  And you were one of the first people to break through the

13  line on the Lower West Terrace.  And as soon as you did so, you

14  went forward to the Capitol.  That was your purpose.  That was

15  your goal.  And then you went to one of the most -- what turned

16  out to be one of the most violent places, what's called the

17  tunnel.

18  First time you went there, you went inside the tunnel, past

19  the broken set of glass doors, and remained there and refused

20  to leave.  You were there, again, close to 15 minutes -- I don't

21  think quite 15 minutes -- and ultimately only left because the

22  police had to physically remove you, grabbed you by the arm and

23  forced you to exit, notwithstanding that you were repeatedly

24  told to leave.

25  So what did you do?  You came back into the tunnel.  This

1    time, climbed up onto the ledge along the tunnel, and you stayed

2    there for more than 20 minutes, filming what was taking place,

3    much of it violent conduct directed at the police and the police

4    reacting thereto.

5        You shouted down to the crowd, encouraging the crowd,

6    prompting more activity, at one point saying, when someone else

7    was not apparently loud enough, you said "Here, I got a loud

8    mouth."  And then yelled, "We need fresh people.  We need fresh

9    people," urging more to come into the tunnel to fight with the

10   police.  And you repeatedly, I think a dozen or more times,

11   shouted "push" to the crowd, urging them to more aggressively

12   come in contact with the police.

13       And then it took the police quite a while to get you to leave

14   that perch on the ledge.  They got other people to leave, but

15   you would not.  And it was only when an officer got up there and

16   physically pushed you with a flagpole to get you to leave that

17   you finally were willing to jump down and leave the tunnel.

18       So did you leave then?  No.  Second time that you were taken

19   out of the tunnel, what did you do?  You turned around and

20   crawled through a broken window nearby, into a room that's used

21   by the Senate, and helped another rioter in there and stayed

22   there for quite a while, until you finally left.

23       So my observations about your testimony at trial I need to

24   repeat a little here.  I think you falsely testified on several

25   occasions, notwithstanding your counsel's very adept argument to

1     the contrary.

2         You testified that you didn't know that you weren't allowed

3     to be on the West Plaza or inside the Lower West Terrace tunnel,

4     and I think the evidence just firmly contradicts that.  It shows

5     that you were at a barricade and fighting to get through the

6     barricade and ultimately breaching the barricade.  That's a

7     clear indication that you weren't allowed to be where you went.

8     And the same thing with the tunnel.  It was clear that you were

9     not allowed to be in there; and they attempted to remove you on

10    two different occasions, and it took several minutes to do so.

11        So your testimony that you didn't know that you weren't

12    allowed in those locations is just not credible.  Indeed, I find

13    that it was false.  You testified that you thought you could go

14    crawl back inside that room of the Senate.  That flies in the

15    face of video evidence showing you having to crawl through a

16    broken window to get in there.

17        You defied the police on several occasions, police orders not

18    to go or be at a location, and you interfered with the police.

19    And, indeed, you admitted that at trial.  You testified that you

20    tried to leave in the tunnel between the double doors during

21    that time, but the video evidence does not confirm that at all.

22    It does not confirm that you were attempting to leave, and it

23    was only after you were physically brought out of that location

24    that you left.  And then you went right back in.

25        And while you were on the ledge, the evidence -- Ms. Owens

1   may disagree with this, but I think the evidence speaks for

2   itself -- and my view of the evidence is that your testimony

3   under oath that you were trying to get down from the tunnel

4   ledge and you could not do so only because police were in the

5   way and you didn't want to step on them, that's just not borne

6   out by the video evidence.

7   There were numerous occasions that you could have gotten

8   down; and you were told to get down, and you didn't make any

9   effort to do so.  And it was only when you were pushed and

10  prodded by a flagpole.  That was what the police had to resort

11  to in order to get you out of the tunnel.  So you testified

12  falsely at trial about your participation in the riot.  And

13  the jury, obviously, rejected your testimony, and I do as well.

14  And now you've said on social media, as recently as this

15  month, the kinds of things that I indicated a few moments ago,

16  and in your remarks to the Court you've confirmed that you have

17  no regret for what you did, that you believe that you and others

18  were set up by some corrupt law enforcement and are now being

19  prosecuted and sentenced by a corrupt criminal justice system

20  and a corrupt court.  You've shown no remorse, no acceptance of

21  responsibility — and perhaps, most importantly, no respect for

22  the law.

23  On the other hand, you are a veteran, and I do take that into

24  account and give an individual credit for that, although -- and

25  I also give credit for their family situation and their family

1   support.  And I take into account the difficult upbringing that

2   you had experienced.

3       I don't completely accept the mental health assessment that

4   has been provided to the Court.  There's been no history of

5   mental health treatment or problems, and this has been done

6   only in the context of presentation to the Court for sentencing.

7   And the assessment of delusional beliefs brought on by the

8   dishonorable discharge from the military for cocaine-related

9   offenses and for PTSD, you reject it, and I don't think that it

10  is a sufficient basis to decide not to give you a sentence that

11  involves incarceration.

12      The sentencing guidelines, 27 to 33 months.  The government

13  is asking for the top of the guidelines, 33 months.  The

14  probation office is asking for 33 months.  Your counsel, when

15  pressed on your behalf, is asking me to take into account your

16  personal history and your mental health -- and I will take those

17  into account -- but has only reluctantly put forth a specific

18  recommendation, and I think that recommendation ultimately does

19  not take sufficient account of your conduct on January 6 and

20  your attitude towards the criminal justice system and the law

21  and your lack of respect for the law and your total absence of

22  remorse or acceptance of responsibility for your very, very

23  serious conduct on January 6, and your repeated false testimony

24  on the witness stand under oath.

25      So I think that incarceration is not just warranted but is

required here.  Normally, given what I have just said, I would sentence you to the top of the guidelines, 33 months.  I think that is a sentence that is sufficient but not greater than necessary to comply with all the purposes and factors set forth in 3553(a) and the criminal justice system.

But I do take account of what I view as not a serious mental health problem that warrants a variance to probation, but your mental health circumstances and conditions as well as the difficult upbringing that you experienced; and for that reason I am going to impose a sentence not of 33 months, the top of the guidelines, but of 30 months, the middle of the guidelines, and I believe that is sufficient but not greater than necessary.

And looking at the factors in 3553(a), I believe that it does take full account of the nature and circumstances of your offense and your history, characteristics, and what you have exhibited here today as well as on January 6.  It will reflect the fact that this is a very, very serious offense, and it will promote respect for the law, which I think is markedly absent in your comments to date, and to provide a just punishment.

In addition, I think it will make available treatment, whether it be educational or vocational, or, more importantly perhaps, medical and mental health treatment, and does avoid any unwarranted sentencing disparity with respect to others convicted of similar conduct having similar criminal records.  And you don't have a criminal record of note here.

1          I believe that there is a risk of your re-offending,

2    notwithstanding your counsel's observations, and so I think

3    there is a deterrence factor not just for you individually, but

4    that's important here, that special deterrence, but generally

5    for those who might contemplate this kind of activity and

6    complete disregard of the law.

7          I've already addressed how I assessed your military

8    experience, and I will end by saying what I've said before:

9    You're being held responsible for your choices on January 6,

10   your conduct on January 6, and the total lack of any remorse

11   or acceptance of responsibility for that criminal conduct that

12   a jury has found you guilty of.  You are not being held

13   responsible for your abstract beliefs or your speech, except to

14   the extent that what you have said in social media posting and

15   the like demonstrates a lack of remorse and a lack of acceptance

16   of responsibility.

17         So, with that, I'm going to read the sentence that the Court

18   is imposing:  Pursuant to the Sentencing Reform Act of 1984, and

19   in consideration of the provisions of 18 U.S.C. § 3553, as well

20   as the advisory sentencing guidelines, it is the judgment of

21   the Court that you, Yvonne St Cyr, are hereby committed to the

22   custody of the Bureau of Prisons for a term of 30 months -- that

23   is two years and six months -- as to each of Counts 1 and 2; 12

24   months -- that is one year -- as to each of Counts 3 and 4; and

25   6 months as to each of Counts 5 and 6, with all counts to be

1   served concurrently, and therefore for a total of 30 months,

2   two years and six months.

3       You are further sentenced to serve a 36-month, that is a

4   three-year term of supervised release as to Counts 1 and 2; and

5   a 12-month -- that is one year -- term of supervised release as

6   to Counts 3 and 4, with all counts to be served concurrently,

7   for a total of 36 months.

8       In addition, you are ordered to pay a special assessment of

9   $270 -- those are the special assessments that add up for the

10  six counts that you were convicted of -- in accordance with

11  Title 18 of the U.S. Code § 3013.

12      While on supervision, you shall abide by the following

13  mandatory conditions as well as all discretionary conditions

14  recommended by the probation office in Part D, Sentencing

15  Options, of the presentence report, which are imposed to

16  establish the basic expectations for your conduct while on

17  supervision.

18      The mandatory conditions include that you must not commit

19  another federal, state, or local crime; you must not unlawfully

20  possess a controlled substance; you must refrain from any

21  unlawful use of a controlled substance and submit to one drug

22  test within 15 days of placement on supervision and at least

23  two periodic drug tests thereafter as determined by the Court.

24  You must cooperate in the collection of DNA as directed by the

25  probation officer, and you must make restitution in accordance

1   with sections 3663 and 3663A of Title 18 or any other statute

2   authorizing a sentence of restitution.

3        You shall comply with the following special conditions:

4   You must provide the probation officer access to any requested

5   financial information, and authorize the release of any

6   financial information.  The probation office may share

7   financial information with the United States Attorney's Office.

8        You must not incur new credit charges or open additional

9   lines of credit without the approval of the probation officer.

10  You must submit to substance-abuse testing to determine if you

11  have used a prohibited substance.  You must not attempt to

12  obstruct or tamper with the testing methods.

13       Within 45 days of release from incarceration, you will

14  appear before the Court for a reentry progress hearing.

15  The United States Probation Office in the district where you are

16  supervised will submit a progress report to the Court within 30

17  days of the commencement of supervision.  Upon receipt of that

18  progress report, the Court will determine if you are required to

19  appear.

20       You are ordered to pay a fine in the amount of $1,000.

21  The Court determined that you do not have the ability to pay

22  interest and therefore waives any interest or penalties that may

23  accrue on the balance.  You are ordered to make restitution to

24  the Architect of the Capitol in the amount of $2,000.  The Court

25  determined that you do not have the ability to pay interest and

1  therefore waives any interest or penalties that may accrue on

2  the balance.

3      Restitution payments shall be made to the Clerk of the Court

4  for the United States District Court, District of Columbia, for

5  disbursement to the Architect of the Capitol at the address in

6  Washington, D.C., for the Architect of the Capitol, and that

7  amount is $2,000.

8      You must pay the financial penalty in accordance with the

9  scheduled payments sheet of the judgment.  You must also notify

10  the Court of any changes in economic circumstances that might

11  affect your ability to pay this financial penalty.  Having

12  assessed the defendant's ability to pay, payment of the total

13  criminal monetary penalties is due as follows:  Payment in equal

14  monthly installments of $100 a month over a period of 30 months,

15  to commence after the date of this judgment.

16      The financial obligations are immediately payable to the

17  Clerk of the Court for the U.S. District Court at the address

18  here in Washington, D.C.  Within 30 days of any change of

19  address, you shall notify the Clerk of the Court of the change

20  until such time as the financial obligation is paid in full.

21      The probation office shall release the presentence

22  investigation report to all appropriate agencies, which includes

23  the United States Probation Office in the approved district of

24  residence, in order to execute the sentence of the Court.

25      Now, Ms. St Cyr, you have the right to appeal.  You were

1    convicted after a trial by jury.  You have the right to appeal

2    your conviction, and you also have the right to appeal the

3    sentence that I have just imposed.

4        You have the right to apply for leave to appeal in forma

5    pauperis.  That basically means free of court costs.  And if you

6    were to so request and qualify, the Clerk of the Court would

7    prepare and file a notice of appeal on your behalf, although I

8    note that you are represented by very able counsel here today

9    who presumably would assist you in that process if you wished to

10   follow it.  With few exceptions, any notice of appeal must be

11   filed within 14 days of the entry of judgment.  I expect that

12   judgment will probably not be entered today but will be entered

13   tomorrow or Friday.

14       With that, let me ask counsel whether they know of any

15   reason, other than the reasons that have already been stated

16   and argued here today, why the sentence should not be imposed

17   as I have just indicated it.  Ms. Owens?

18           MS. OWENS:  No, Your Honor.

19           THE COURT:  Ms. Schesnol.

20           MS. SCHESNOL:  No, Your Honor.

21           THE COURT:  Is there anything else that we need to

22   cover before I formally impose the sentence, Ms. Owens, in

23   terms of place, programs, or anything else?

24           MS. OWENS:  Your Honor, we would ask that the Court

25   recommend FCI Dublin as the place of confinement.

1          THE COURT:  And I will do so.

2          MS. OWENS:  And then any program --

3          THE COURT:  It is, of course, as Ms. St Cyr must know,

4    not my decision to make in terms of a place of confinement.

5    That is for the Bureau of Prisons.  But I will make that

6    recommendation.

7          THE DEFENDANT:  May I ask a question?

8          THE COURT:  Ask of your counsel first.

9       (Defendant and counsel conferring.)

10         MS. OWENS:  Thank you, Your Honor.  And that any

11   programs or treatment that are available through that

12   institution, we would ask that the Court recommend she be

13   allowed to take those.

14         THE COURT:  So any specific program, or just whatever

15   is available?

16         MS. OWENS:  Whatever's available.

17         THE COURT:  Okay.  And the Bureau of Prisons will do

18   that.

19       All right.  With that, I will order that the sentence --

20   there are no counts to be dismissed because the jury resolved

21   all counts.  And was there any -- is this an original

22   indictment or superseding indictment?  And do we have to deal

23   with any dismissal of any preceding indictments?

24         MS. SCHESNOL:  No, Your Honor.  It's an original

25   indictment, Document 37 on the docket.

1    THE COURT:  Okay.  I order that the sentence is

2   imposed as I have indicated.  That is the sentence of the

3   Court.  And with that, I now have one remaining issue to deal

4   with, and that is the question of release pending service of

5   the sentence.  And, Ms. St Cyr, you can have a seat along with

6   Ms. Owens.  Is there a request from the government?

7    MS. SCHESNOL:  Your Honor, it's certainly within your

8   jurisdiction to take Ms. St Cyr into custody and she begin

9   serving her sentence immediately.  The government does

10   acknowledge that she has been compliant with her terms of

11   release while pending trial, and that is certainly something

12   the Court can also take into consideration when determining

13   whether or not Ms. St Cyr should be taken into custody today.

14    If she is allowed to self-report, the government would ask

15   that Ms. St Cyr find her own way back home, number one,

16   because 18 U.S.C. 4285 --

17    THE COURT:  You don't have to repeat that.  I know

18   that -- I'm not going to authorize payment for return home.

19   The statute doesn't authorize it.

20    MS. SCHESNOL:  Thank you.

21    THE COURT:  Anything you want to say, Ms. Owens?

22    MS. OWENS:  Yes.  We would ask that she be allowed to

23   self-report, and we agree with the probation officer's

24   recommendation to that point, that she be allowed to

25   self-report.  Additionally, we believe her compliance while

1    on pretrial release, including traveling from the District of

2    Idaho to both her trial and the sentencing hearing, willingly

3    and without issue, demonstrate that she's willing to also turn

4    herself in to serve her sentence.  Thank you, Your Honor.

5         THE COURT:  All right.  Thank you, Ms. Owens.

6    I am going to order that you be released on the conditions

7    that you've been under and that you self-report at the time

8    and place that you're directed to report for service of your

9    sentence.  I do so -- as I have in, I think, all of the

10   January 6 cases where the defendant was not held prior to

11   trial, I do so on the belief that you will comply as you have

12   complied to date with your conditions of release.

13   And I will repeat, as to those conditions, that you are

14   still under those same conditions and you need to continue to

15   comply with them.  Failure to do so could subject you to

16   serious consequences.

17   You will have a report date given to you by the responsible

18   authorities from the Bureau of Prisons, Marshals Service,

19   etc., Probation, and that date and time and place, you need to

20   comply with and report.  A failure to report could subject you

21   to independent, very serious consequences.

22   And lastly, if you were to commit a crime while on release

23   under these conditions, as you've been told before, you could

24   be subject to more serious penalties for that crime than you

25   otherwise would face.

1    With that, anything further from the government today?

2         MS. SCHESNOL:  No, Your Honor.  Thank you.

3         THE COURT:  From the defense?

4         MS. OWENS:  No, Your Honor.  Thank you.

5         THE COURT:  All right.  That completes these

6    proceedings.  Anyone who is here on behalf of Ms. St Cyr,

7    I welcome you and your support.  Your continuing support for

8    her will obviously be necessary.

9       Those who are here because they were present on January 6

10   and experienced the trauma of that day and fulfilled their

11   responsibilities, I welcome you and thank you for your

12   continuing service, and especially for your service to the

13   country on that day.

14      With that, these proceedings are completed.  Thank you.

15        (Proceedings adjourned at 1:18 p.m.)

16

17

18

19

20

21

22

23

24

25

\*   \*   \*   \*   \*   \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne